UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| JOHN AND JANE DOE NO. 1, et al., | CASE NO. 3:22-cv-00337 |
| Plaintiffs, | JUDGE MICHAEL J. NEWMAN |
| vs. | |
| BETHEL LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, et al., | REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| Defendants. | |

## INTRODUCTION

In the instant motion (the "PI Motion"), Plaintiffs explained that preliminary injunctive relief is proper based on the straightforward application of the Ohio Open Meetings Act (the "OMA"). In response, Defendants avoid the crux of the matter and try to play evidentiary games rather than deal with the text of the statute.

Bethel schools had a long-standing rule that intimate facilities were separated by biological sex. On December 31, 2021 that was still the rule. Then, effective January 1, 2022 the rule was changed. Intimate facilities are now separated by gender identity. That change is cognizable under the plain terms of the OMA, which require Defendants to have adopted the change in an open meeting. But the change was not adopted in an open meeting. And by the time that Lydda Mansfield admitted the district had "adopted" the change at the Board meeting on January 10, 2022, it had already been implemented.

1

The OMA is a neutral statute. It protects both liberals and conservatives, religious and non-religious, and the rich and poor by requiring elected bodies to conduct public business in public. The present issue is not about what Defendants did; the issue is how they did it, in secret. Defendants violated the OMA by changing the rule outside of public view and Plaintiffs' requested relief is therefore proper.

## ARGUMENT

In the PI Motion, Plaintiffs specifically explained that the Board adopted a new rule permitting biological males to use female intimate facilities and vice versa. Mem. in Supp. of Pls.' Mot. for Prelim. Inj., Doc. 5-1 at 56, 59–60.[1] Prior to this new rule, Bethel's rule was that biological males used intimate facilities designated for men (or boys), and biological females used intimate facilities designated for women (or girls). Plaintiffs further explained that this rule had existed for more than a century. *Id.* Defendants concede as much when they try to characterize the new rule as an "accommodation," in the process admitting that the baseline rule in Bethel schools has long been sex separated bathroom facilities. If this were not the case, Anne Roe would not have felt the need to seek accommodations, and the school would not have felt the need to grant them.

In Opposition, Defendants ignore the text of the OMA (discussed below). Plaintiffs' brief was simple and straightforward. Defendants try to re-frame it as "factually devoid and legally skeletal." *See* Defs.' Mem. in Opp'n to Pls.' Mot. for Prelim. Inj., Doc. 20 at 662 (confusing simplicity with paucity). But Defendants still

---

[1] All page citations to ECF documents herein denote the "PageID" page number.

2

spend six pages trying to soften the admissions of Jacob King and Lydda Mansfield, belying that the PI Motion is not factually devoid. And, on the legal side, Defendants avoid the central, unanimous, Ohio Supreme Court authority that ultimately governs the analysis in this matter: *State ex rel. More Bratenahl v. Vill. of Bratenahl*, 136 N.E.3d 447 (Ohio 2019). If Defendants really believed that Plaintiffs' brief was "legally skeletal," then their failure to address the central law cited in Plaintiffs' brief only underscores the fact that they cannot do so.

In their attempt to avoid *More Bratenahl*, Defendants misapply *State ex rel. Hicks v. Clermont Cty. Bd. of Commrs.*, 2022-Ohio-4237, ---N.E.3d--- (Ohio 2022) to try to play evidentiary "gotcha." *See* Doc. 20 at 663–64.[2] But *Hicks* and *More Bratenahl* are apples and oranges. *Hicks* is an evidentiary case regarding burden of persuasion while *More Bratenahl* is the substantive case for proper interpretation of the terms of the statute (and the PI Motion turns on interpretation of the statute). Put simply, *More Bratenahl* is directly applicable to the statutory interpretation question that determines the merits of Plaintiffs' claim, and Defendants' avoidance of the same underscores Plaintiff's substantial likelihood of success on those merits.

I. **Plaintiffs Are Likely to Succeed on the Merits.**

    A. **Defendants' Fact-Based Arguments Fail.**

Without the law on their side, Defendants advance two fact-based arguments: (1) that Plaintiffs offered no evidence supporting the rule change; and (2) that the decision to allow biological males to use female intimate facilities and vice versa (in

---

[2] Defendants also build their brief and declarations around the oft-repeated strawman of a "secret meeting"—a phrase that does not appear in Plaintiffs' brief or the Complaint.

3

contravention of a century old rule) was not their decision. It was the administration's decision. *See, e.g.*, Doc. 20 at 665, 670–71. But both arguments fail. As mentioned above, the first argument ignores the admissions of Jacob King and Lydda Mansfield. And the fact that Defendants spend six pages trying to contextualize the admissions of multiple Board Presidents belies the straightforward evidentiary nature of those admissions. Likewise, the second argument is simply false. It was never the administration's decision to make.

Notably absent from Defendants' brief and declarations is evidence from the time that the decision was actually made. Post hoc, the Board now claims that the administration was simply applying Board Policy 5517. *Id.* at 672. But Board Policy 5517 is an anti-harassment and anti-bullying policy. The District's rules for "accommodation" of its long-established sex-separated intimate facility rule are nowhere in that policy, and the Board does not even try to explain where it appears or how Policy 5517 applies to the instant case. *Id.* Indeed, when the administration was actually addressing Anne Roe, middle school principal Matt Triplett specifically emailed superintendent Justin Firks to say: "[a]fter looking through board policy I see nothing about student rights and bathroom use. Please let me know how you would like me to respond. I know in the past they have had these students use the staff and clinic restrooms." Declaration of Julie E. Byrne (hereinafter "Byrne Decl.") ¶9, & Exh. A to Byrne Decl. Plaintiffs agree with Principal Triplett that it simply is not addressed by the written Board policies.

4

Nor was it the administration's decision. On February 2, 2022, then-superintendent Justin Firks specifically emailed an upset parent to let them know that it was the Board's decision, not his. Mr. Firks explained that he just enforces the Board's decisions and, if the community wanted something different, the Board needed to make the change because "these decisions are made by [the Board]". Declaration of Bronwyn Croley (hereinafter "Croley Decl.") ¶5, & Exh. A to Croley Decl. Further, simply because Mr. Firks implemented the new policy does not make it an "administration" decision. The law makes clear that the superintendent is "the executive officer *for the board*." O.R.C. § 3319.01 (emphasis added). When the superintendent acts, he or she acts on behalf of the Board, not on his or her own behalf. In short, this was the Board's decision, and it was implemented on the Board's behalf by the Board's agent.

Consistent with the same, Jessica Franz, a former member of the Board (although not a member at the time of the decision) attended the Board's executive session on December 7, 2021 as a guest. Declaration of Jessica Franz (hereinafter "Franz Decl.") ¶¶3, 5–6. The purpose of the executive session was to discuss the potential change. *Id*. ¶9. All of the Board members were present (Jacob King, Lydda Mansfield, Lori Sebastian, Danny Elam, and Julie Reese). *Id*. ¶7.

Justin Firks, the superintendent at the time, attended the meeting but was largely quiet. *Id*. ¶14. Instead, the meeting was controlled by Jacob King (the Board President). *Id*. Mr. King argued that federal law required Bethel to let students use the bathroom of their chosen gender. *Id*. ¶15. Board Members Lydda Mansfield and

Lori Sebastian also argued for the same outcome. *Id.* ¶16. They based their arguments on the opinion of the Board's attorney; however, he was not present at this executive session or available by phone. *Id.* ¶17. With a majority of the Board arguing that the only choice was bathrooms based on gender identity (and no attorney to question), all five members of the Board expressed agreement with the same. *Id.* ¶¶18–19. The decision was made at that point, and had already been implemented by the time of the board meeting on January 10, 2022. *Id.* ¶¶20–22.

This was the Board's decision; the superintendent merely gave effect to the decision of the Board, his employer. Anything the administration did (or continues to do) on this issue was based on the Board's decision to change a century old rule. In addition, the Board's argument that it did not change a "Policy" or that it was merely granting "accommodations" are inapposite to the analysis because those are not the terms that appear in the statute.[3] Ultimately, Defendants are trying to play semantics with a statute that forecloses the effort.

### B. Defendants Violated the OMA.

There is no material difference between this case and *More Bratenahl*. If anything, this case is easier because of the underlying issue. In *More Bratenhal*, the public body was selecting a backup mayor in the event of an emergency. 136 N.E.3d

---

[3] The legal meaning of an "accommodation" specifically involves a "change" anyway. Black's Law Dictionary 749 (6th Pocket Ed.2021) (defining accommodation as "the act or an instance of making a change or provision for someone or something"). And even under Defendants' argument, "change" is the proper way to conceive of any accommodations because the school is not building a handicap ramp by the front door or giving someone an extra thirty minutes for a test; Defendants flipped the settled expectations of every other student in relation to a rule that impacts their most intimate private spaces, undermines student safety, and burdens the fundamental religious convictions of many students.

at 449. If public bodies cannot choose backup officers in secret, then they cannot decide extremely contentious issues of public debate in secret either.

It is not surprising then that this is the result when applying the terms of the statute. In *More Bratenahl,* Justice DeWine explained that, when terms are not defined in the OMA, courts should apply the ordinary meaning of those terms. And where a term has "a variety of usages," courts should apply the meaning of the term that furthers the purpose of the statute. *Id.* at 450–51.

Ohio Revised Code Section 121.22(H) states: "[a] resolution, rule, or formal action of any kind is invalid unless adopted in an open meeting of the public body." The term "rule" is not defined in the statute. Therefore, we apply its ordinary meaning. And the ordinary meaning of the word "rule" expressly includes a "custom." Webster's Seventh New Collegiate Dictionary 752 (1971) (defining rule as "an accepted procedure, custom, or habit").

Defendants do not dispute that Bethel had a long-established custom of separating intimate facilities based on biological sex. Defendants simply (and incorrectly) argue that this well-established custom is not relevant. Doc. 20 at 665 ("What Bethel students have done in the past century is not relevant to proving a strong success on the merits [of] the OMA claim."). But it is the statute, not Defendants' opinion, that makes it relevant. Defendants changed the "rule"—where students used the intimate facilities of their biological sex—to a new "rule" (or custom or procedure)—where students use the intimate facilities of their self-identified gender identity. In doing so, Defendants replaced an existing "rule" with a new "rule"

7

that fell on the opposite side of an admittedly contentious issue. *Id.* at 669 (explaining the stance they "adopted" was the rule that "transgender students may use the restroom that aligns with their gender status"); s*ee also id.* at 659 (agreeing the issue is contentious).

Defendants' change was also a "formal action" under the statute. This is true as a matter of common sense because when Lydda Mansfield said they "adopted" the "stance" that students will use the intimate facilities of their gender identity she was saying that this is now the official position of the school. *See id.* at 669. But it also fits within the ordinary meaning of the terms. An "action" is "a thing done" or "the bringing about of an alteration by force or through a natural agency." Webster's Seventh New Collegiate Dictionary 9 (1971). And the word "formal" includes the idea of a decision being made "according with established form, custom, or rule." *Id.* at 328.

In Ohio, superintendents do not make major decisions without the consent of the Board because the law tasks the Board—not the administration—with "the management and control of all of the public schools" and making the "rules [] necessary for . . . its employees, pupils of its schools, and all other persons entering upon its school grounds or premises." O.R.C. §§ 3313.47 & 3313.20(A). As such, it was quite conventional that the Board gave its consent before Mr. Firks carried out its wishes. Franz Decl. ¶¶14–21; s*ee also* Croley Decl. ¶5, & Exh. A to Croley Decl. (Mr. Firks explaining "these decisions are made by [the Board]"). In this case, the "thing done" and the "alteration" brought about were made according to the established

8

norm in Ohio that the school Board ultimately decides. Therefore, it was a "formal action" under the terms of the OMA. And it does not matter that the Board's collective decision came through consent and agreement rather than a roll-call vote. *Mansfield City Council v. Richland Cnty. Council AFL-CIO*, No. 03 CA 55, 2003 WL 23652878, at *5 (Ohio Ct. App. Dec. 24, 2003) (affirming the trial court that "[i]t is not necessary that there be a formal vote for there to be a formal action. Any mechanism by which council members make their view known in order to make a decision pending before them suffices"); *Keystone Comm. v. Switzerland of Ohio Sch. Dist. Bd. of Educ.*, 67 N.E.3d 1, 8 (Ohio Ct. App. 2016) (formal action includes "reaching any collective decision[] during an executive session"). It was still improper under the OMA.

In addition to the instant case falling within the ordinary meaning of both "rule" and "formal action," the OMA further provides that it invalidates an improper "resolution, rule, or formal action ***of any kind***." O.R.C. § 121.22(H) (emphasis added). Here, the phrase "of any kind" is properly interpreted to modify both "rule" and "formal action" because "[u]nder conventional rules of grammar, when there is a straightforward, parallel construction that involves all nouns or verbs in a series, a modifier at the end of the list normally applies to the entire series." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012) (Scalia & Garner)) (internal quotations omitted). Therefore, the General Assembly determined that this provision is particularly broad and covers any species of official action that is not made accessible to the public or decided in an open meeting.

9

As Jessica Franz observed, the decision was made by consensus at the executive session on December 7, 2021 and implemented prior to the public Board meeting on January 10, 2022. Franz Decl. ¶¶18–22. Therefore, it was not adopted by the Board in an open meeting and is therefore invalid. There is no room for semantics. That is just the application of the law.

In addition, the December 7, 2021 executive session itself was improper. The Board only provided notice for three safe harbors: Ohio Revised Code Section 121.22(G)(1) (discipline or charges against individual employees), (G)(3) (conferencing with an attorney regarding pending or imminent court action), and (G)(6) (security arrangements and emergency response protocols for the public body). Byrne Decl. ¶10 & Exh. B to Byrne Decl., p.2; Board Education, *Board Work Session*, YOUTUBE (Dec. 7, 2021), https://www.youtube.com/watch?v=DGFWcZRhEhI, at 53:13–54:50 (noticing O.R.C. § 121.22(G)(1), (3), and (6) for executive session). And none of these exceptions apply to the Board's discussion about the bathroom issue.

Subsection (G)(1) is not available to the Board because it did not discuss any "public employee, official, licensee, or other individual and/or a charge or complaint against them" related to the bathroom issue. Franz Decl. ¶24. The Board also did not conference with any attorney or discuss any security arrangements or emergency response protocols related to the bathroom issue. *Id.* ¶¶13, 24. In fact, the Board's lawyer was not present at the executive session and was not on the phone during the executive session. *Id.* ¶13. Therefore, subsection (G)(3) cannot cover the Board's discussion of the bathroom issue. *Ames v. Rootstown Twp. Bd. of Trustees*, 151 N.E.3d

10

37, 43 (Ohio Ct. App. 2019) ("[T]he Board admitted that no attorney was present during the August 11, 2015 meeting, and thus it is clear this session does not fall under the R.C. 121.22(G)(3) exception."). Because none of the safe harbors noticed by the Board for the December 7, 2021 executive session apply to the Board's discussion of the rule change the executive session violated the OMA, the Board violated the OMA, and any subsequent public adoption would have been invalid under the statute anyway. O.R.C. § 121.22(G)&(H).

Finally, Defendants suggest that the statute is not "triggered" to invalidate an improper rule unless there is first a "meeting." *See* Doc. 20 at 662, 665. But while the text of the OMA does obviously involve meetings, it is not ultimately a bureaucratic meeting statute. It is a decision and deliberation statute, which is why decision and deliberation are the dominant parts of Section 121.22(A)—not the meetings. As such, while Defendants did actually adopt the change at a "meeting," the text of the OMA does not require that they have done so before there can be a violation. The first sentence of subsection (H) certainly does not include that limitation: "[a] resolution, rule, or formal action of any kind is invalid unless adopted in an open meeting of the public body." O.R.C. § 121.22(H). And Subsection (I)(1) creates a private right of action to enforce the whole statute, including Subsection (H): "[a]ny person may bring an action to enforce this section." O.R.C. § 121.22(H)&(I)(1). In short, the text and structure of the statute provide a private right of action to enjoin secret decisions and deliberations that affect people's lives. It fundamentally contradicts the General

11

Assembly's plain language in Subsections (A),[4] (H), and (I)(3) to impose an artificial "trigger" that does not appear in the text.

In sum, there is no creative way around the OMA; there was never supposed to be. Based on a straightforward application of the legal analysis, Plaintiffs are substantially likely to succeed on the merits. To that end, the parties agree that an evidentiary hearing is not necessary at this point. *See* Doc. 20 at 676.[5] The instant motion is properly resolved on the text of the statute, which is a legal question.

## II. The Other Factors Favor Relief.

As discussed in the PI Motion, where there is a violation or threatened violation of the OMA, the General Assembly has determined that the second and third factors (irreparable harm and balancing the equities) are conclusively presumed. O.R.C. § 121.22(I)(3); Doc. 5-1 at 61–62. And the General Assembly has already effectively determined the fourth factor, public interest, by determining that the public's interest in having public business done in public is so important that it created subsections (H) and (I)(1) for enforcement of the OMA and also created the conclusive presumptions in subsection (I)(3). Factors 2 through 4 are also supported by the other reasons set forth in the PI Motion without needing to be repeated. Doc. 5-1 at 61–62. In short, while Plaintiffs are likely to succeed on the merits, factors 2, 3, and 4 favor a preliminary injunction as well.

---

[4] "This section shall be liberally construed to require public officials to take official action and to conduct all deliberations upon official business only in open meetings . . . ." O.R.C. § 121.22(A).
[5] Plaintiffs maintain their request for oral argument. Plaintiffs believe the instant dispute is primarily a legal dispute that can be properly decided on the submissions and oral argument; however, Plaintiffs will comply with the Court's discretion regarding any evidentiary hearing for the same.

12

Because Plaintiffs are likely to succeed on the merits, the school has no interest in maintaining a legally invalid policy. The proper consideration for harm is related to the improper adoption of policies; the actual harm is to the constituents of the school board, who were unable to have their voices heard on this contentious issue. These harms are not compensable, which makes them irreparable. And the public interest, by definition, favors following the public policy of the State of Ohio as defined by the legislature of the state. There is no valid public interest in maintaining an invalid rule.

Defendants and Intervenor Anne Roe ask the Court to deny the preliminary injunction because of the potential harm to Anne Roe. *See* Doc. 20 at 674–75; Intervenor-Defendant Anne Roe's Mem. in Opp'n to Pls.' Mot. for Prelim. Inj., Doc. 31 at 716. But this is a false problem that focuses on the wrong harms. Even assuming, *arguendo*, that Anne Roe's (and any other transgender students') harms are more important than the Plaintiffs' harms, including the young Muslim girls, then their proper remedy is for the Board to follow the OMA and properly deliberate and adopt the change Roe seeks in an open meeting. The proper remedy is not to have the Court maintain an invalid decision in violation of the OMA; doing so would effectively make the Court into a legislative body through enactment of an intimate facilities policy the Intervenor desires but which the Board has failed to properly adopt. It is the Board's responsibility to make such a momentous change through public deliberation and decision, which it has failed to do.

13

The OMA is a neutral law of procedure. It favors neither Plaintiffs nor Anne Roe. But it still matters. There is an election next November that will determine control of the Board. If the current Board were to subsequently make the change correctly under the OMA but then lose all their seats, would Anne Roe want a new Board to reverse those changes in secret? Of course not. But if the new board did so, Anne Roe would be justified in obtaining the same relief that Plaintiffs seek here, through the same methods.

### III. The Board is Not a Victim Here.

What the Defendants did undermines democracy. It is essentially the same thing that was recently enjoined by the United States District Court for the Eastern District of Tennessee when the Department of Education improperly attempted to change its rules, and the law, without going through the proper process. *Tennessee v. United States Dep't of Educ.*, No. 3:21-CV-308, ---F.Supp.3d---, 2022 WL 2791450, at *1 (E.D. Tenn. July 15, 2022). Attempting to change the law and control people's behavior outside the proper process fundamentally undermines democracy and principles of self-governance. Just as the Administrative Procedure Act prevents the Department of Education from acting outside of the proper process, the Ohio Open Meetings Act prevents Defendants from acting in secret to achieve their desired ends.

Defendants also argue that Plaintiffs have had "at a minimum, one year to investigate their claims". Doc. 20, at 659–60, 662. But counsel has only been involved in this case since the turn of the Fall and most of the Plaintiffs are ethnic minority Muslims from immigrant families. They are not professional activists. And they tried

14

to address the situation without the need for litigation—including by providing their own resources to build a new single-occupant restroom for any student (including transgender students). Doc. 1 at 10, ¶61. Those are precisely the kinds of efforts that our legal system needs. Plaintiffs should not be penalized for their hesitancy to rush into court and file a lawsuit before attempting to resolve the situation amicably. Further, Plaintiffs agreed to allow Defendants additional time to file their response brief and to have every opportunity to put their best case forward, which they have now done. But their best case still fails.

The Board is not a victim here. They made a major change in secret on an issue they admit "provokes contentious debate," and a large portion of the community feels like the Board betrayed their trust. Doc. 20 at 659. The Board also portrayed the decision as if it had no choice but to make the change because "the attorney said so," without making the attorney or that justification available to the community (or even to the Board itself) for discussion and vetting.

Based on elementary principles of jurisprudence, there is no binding authority that requires the Board to do what it did. Their attorney's argument is a prediction of where the case law will land in the coming years on school bathrooms. *See* Doc. 20 at 669. And at the time of the "prediction," the Sixth Circuit Court of Appeals had already explained that "Title VII differs from Title IX in important respects" and expressly permits schools to "maintain[] separate living facilities for the different sexes." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("[I]t does not

15

follow that principles announced in the Title VII context automatically apply in the Title IX context.").

In addition, the largest number of federal judges to have ever considered the issue recently ruled that Title IX allows schools to maintain separate intimate facilities based on biological sex. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, No. 18-13592, ---F.4th---, 2022 WL 18003879 (11th Cir. Dec. 30, 2022) (en banc). In short, the Board made a major change in secret without any binding requirement to do so. But even if there were a binding requirement, the Board would still need to comply with the OMA and make any required changes in public.

Finally, believing that invalidation and injunction results from the straightforward application of the OMA to the facts of this case, but also understanding that the issue is important to Anne Roe (and other transgender students), Plaintiffs are willing to accelerate consideration of the Title IX issue. Specifically, Plaintiffs are willing to accelerate the Title IX declaratory judgment claim with an early summary judgment motion—since it is a pure question of law— and consent to immediate appealability of the Court's decision (regardless of the outcome), subject to the Court's discretion. Ultimately, true binding clarity best serves the interests of all parties and the public.

## CONCLUSION

For all the foregoing reasons preliminary injunctive relief is proper in this case, including enjoining Defendants from enforcing the Board's invalid rule during the pendency of this dispute.

Dated: January 23, 2022

        Respectfully submitted,

        <u>s/ Joseph P. Ashbrook</u>
        Joseph P. Ashbrook (0091279)
        Julie E. Byrne (0085174)
        Ashbrook Byrne Kresge, LLC
        PO Box 8248
        Cincinnati, Ohio 45249
        Tel: (513) 582-7424
        Fax: (513) 216-9882
        jpashbrook@ashbrookbk.com
        jebyrne@ashbrookbk.com

        Nicholas Barry
        (*pro hac vice*)
        America First Legal Foundation
        611 Pennsylvania Ave, SE #231
        Washington, DC 20003
        Telephone: (615) 431-9303
        Facsimile: (513) 216-9882
        nicholas.barry@aflegal.org

        *Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of January, 2023, I served a copy of the foregoing via the Court's ECF system, which notifies all counsel of record.

s/ Joseph P. Ashbrook<br>
Joseph P. Ashbrook