UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| JOHN AND JANE DOE NO. 1, et al., | CASE NO. 3:22-cv-00337 |
| Plaintiffs, | JUDGE MICHAEL J. NEWMAN |
| vs. | |
| BETHEL LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, et al., | REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| Defendants. | |

## INTRODUCTION

In Opposition to Plaintiffs' request for a preliminary injunction, Intervenor-Defendant Anne Roe ("Roe") does not contest the first two factors in the analysis (likelihood of success and irreparable harm), only factors three (balancing the equities) and four (public interest).

Given the particular cause of action at issue in the instant motion (the "PI Motion"), the first factor is largely dispositive because the cause of action explicitly decides the second and the third factors and implicitly decides the fourth. Nevertheless, Roe's claims for potential harm and public interest still overlook important aspects of this dispute. Roe is requesting that the Bethel Local School District Board of Education's (the "Board") lawless adoption of a new intimate facility rule be upheld by this Court because it benefits Roe, instead of requiring the Board to properly adopt a new intimate facility rule as required by law. There is no potential

1

harm that the Board cannot mitigate by doing its job properly. But in adopting this controversial new rule in secret, the Board disregarded the voices of its other constituents, including vulnerable constituents who have historically been subject to discrimination and political powerlessness.

In the end, Plaintiffs are substantially likely to succeed on the merits of their claim under the Ohio Open Meetings Act (the "OMA"); their requested relief is therefore proper. If the Board subsequently tries to properly adopt a new rule to replace the invalid one, Plaintiffs sincerely hope that the Board looks at the issue more closely and considers the needs of the entire community. Beyond Plaintiffs' OMA harms that give rise to the instant injunction, the Board's official action has broader consequences. Unfortunately, this includes a recent incident with multiple eyewitness where young girls were exposed to male sexuality in the school's communal girls restroom. This causes real pain and true powerlessness for constituents who cannot live according to their values in their own local community. It also underscores why these issues have to be deliberated in the light of day so that the Board will understand the needs of all its students and their families.

## ARGUMENT

**I.  Anne Roe does not Contest the First Two Preliminary Injunction Elements.**

Intervenor-Defendant does not contest either of the first two elements in the preliminary injunction analysis: likelihood of success on the merits and irreparable harm. Intervenor-Defendant Anne Roe's Mem. in Opp'n to Pls.' Mot. for Prelim. Inj.,

2

Doc. 31 at 717-18.[1] Roe's position therefore is essentially that, although the Board may have violated the law and caused irreparable harm to Plaintiffs, the Court should nonetheless refrain from issuing the injunction because of potential harm to Roe and the public interest related to that harm. *Id.*

As the Sixth Circuit has routinely held, however, the nature of a claim can make success on the merits the dispositive or determinative factor in the analysis. *Wilson v. Williams*, 961 F.3d 829, 837, 839 (6th Cir. 2020) (citing *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689 (6th Cir. 2014) and *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). Plaintiffs' claim is no different.

Plaintiffs are suing under the private right of action in O.R.C. § 121.22(I)(1). In subsection (I)(3), the cause of action specifically provides that factors two and three of the preliminary injunction analysis are "conclusively presumed" to remedy a violation of the statute. O.R.C. § 121.22(I)(3) ("Irreparable harm and prejudice to the party that sought the injunction shall be conclusively and irrebuttably presumed upon proof of a violation or threatened violation of this section."). The fourth factor, public interest, is not specifically addressed in the OMA; however, as explained in Plaintiffs' PI Motion, the factor weighs heavily in favor of granting an injunction because the state legislature has already determined public interest by enacting the OMA and conclusively, and irrebuttably, presuming irreparable harm and prejudice to Plaintiffs. Mem. in Supp. of Pls.' Mot. for Prelim. Inj., Doc. 5-1 at 62. Therefore,

---

[1] All page citations to ECF documents herein denote the "PageID" page number.

under the particular claim at issue here, likelihood of success on the merits is the dominant and decisive factor. And Roe does not contest that factor.

## II. Balancing The Equities Favors Plaintiffs Because of the Board's Violation of Ohio Law and Harm to Third Parties.

### A. Ohio's OMA Creates a Presumption of Harm to Plaintiffs.

Roe acknowledges the presumption of irreparable harm contained in the OMA. Doc. 31 at 722 (citing O.R.C. § 121.22(I)(3)). But Roe ignores the provision for balancing the equities for Plaintiffs in the same subsection. *See generally id.* Subsection (I)(3) specifically provides that, where there is a violation of the statute, "prejudice to the party that sought the injunction shall be conclusively and irrebuttably presumed." *Id.* In other words, the cause of action establishes the third factor as well.

Nonetheless, Roe's arguments of harm do not fit or determine the instant dispute. Plaintiffs moved for a preliminary injunction because the Board failed to deliberate and adopt a major rule change in public. Plaintiffs were unable to voice their opinion, participate in their local government, and have suffered harms from that official action. Doc. 1 at 11-17, ¶¶66-100. Plaintiffs' PI Motion is based on ***how*** the Board acted when adopting this new intimate facility policy. However, Roe's alleged injuries are unrelated to the ***how.*** Instead, they relate to ***what*** the new rule provides for Roe. It gives Roe, a biological male, access to ***female*** restrooms. If that rule is removed, Roe may lose this special privilege. But the PI Motion is not ultimately focused on the wisdom of the new rule but rather how that rule was adopted—in secret. Under this particular cause of action, the analytically proper

4

harm analysis arises from the way the policy was adopted, not the substance of the policy.

Additionally, in this dispute, the Board is the ultimate cause of any claimed risk to Roe—not an injunction that would keep the Board from enforcing a controversial rule that it illegally adopted in secret. At this point, there is nothing to stop the Board from going through the correct process to adopt a gender-identity rule for intimate facilities. Indeed, the Board was already willing to do it once in contravention of the OMA. And because the Board has already tried to do this once, Roe's claim of certain harm is analytically speculative.

Roe's claim of certain harm is also undermined by the fact that Roe still uses the single-use restrooms in addition to the communal girls' restrooms "depending on which is more convenient or accessible." Decl. of Joanne Roe, Doc. 13-2 at 136, ¶35. Of course, this demonstrates that the "immediate and irreparable injury" to Roe is not so immediate and irreparable. If Roe is already using other facilities besides the girls restroom without issue, Roe can continue to do so even if a preliminary injunction is granted.

   **B. Anne Roe's Own Actions Have Caused Harm to Others.**

On January 12, 2023, after the PI Motion and all Responses had been filed, and after Roe intervened in this case, there was an incident in one of the girls' restrooms at Bethel High School.

5

Around lunchtime, Student Witness No. 2 ("Student No. 2"),² a 15-year-old, tenth grade female student at Bethel was using the communal girls' restroom near the cafeteria. Declaration of Student No. 2 (hereinafter "Student No. 2 Decl.") ¶¶1-3, 5-6. She was in the restroom with several other girls and observed Anne Roe enter a restroom stall that was already occupied by a female student. *Id.* ¶¶7-8. Anne Roe was standing facing the toilet and the female in the stall was sitting with her feet facing the door. *Id.* ¶10. Student No. 2 heard "sucking noises[,] as if someone was sucking on a lollipop." *Id.* ¶11. They were in the stall together for a few minutes. *Id.* ¶9. It was her clear impression that Anne Roe and the female student, both minors, were engaged in oral sex. *Id.* ¶12. This was a violation of Student Witness No. 2's privacy; she no longer feels safe in this private space and now avoids using the restroom by the cafeteria at lunchtime. *Id.* ¶¶13-15.

Another eyewitness tells a similar story. Student Witness No. 3 is a 14-year-old ninth grade female at Bethel. Declaration of Student Witness No. 3 ¶¶1-4. She is a practicing Muslim who wears a hijab to protect her modesty. *Id.* ¶¶5-6. On January 12, 2023, she was also using the communal girls' restroom outside the cafeteria around lunchtime with some of her Muslim friends and other girls. *Id.* ¶¶ 9-10. She also witnessed Anne Roe enter a bathroom stall that was already occupied by a female student. *Id.* ¶11. Student Witness No. 3 could tell from the shoes under the stall that Anne Roe was standing up facing the other student, and the other student was seated facing Anne Roe. *Id.* ¶12. They remained in the stall like that for a few minutes. *Id.*

---

² All witnesses are presented pseudonymously pursuant to the Stipulated Protective Order. *See* Stipulated Protective Order, Doc. 11 at 83-84.

¶13. It was her clear understanding that Anne Roe was receiving oral sex. *Id.* ¶14. This deeply disturbed her, and she could not bring herself to tell her family after school. *Id.* ¶15.

Student Witness No. 1, is a 15-year-old, tenth grade female student at Bethel. Declaration of Student Witness No. 1 ¶¶1-4. She is also a practicing Muslim who wears her hijab to protect her modesty. *Id.* ¶¶5-6. On January 12, 2023, around lunchtime, she went to the same girls' communal restroom by the cafeteria. *Id.* ¶8. She also saw two pairs of feet in one of the bathroom stalls facing each other. *Id.* ¶9. Student Witness No. 1 then saw Anne Roe leave the bathroom stall. *Id.* ¶10. There were several upset girls present, including several of the school's many Muslim girls. *Id.* ¶11. They told her that a transgender student had been in the stall with a female student engaging in sexual activity. *Id.* ¶12. She was "very upset." *Id.* ¶13. After the incident, she spoke to Principal Swope. *Id.* ¶17. She told him that she was not comfortable sharing a restroom with a biological boy, and that her Muslim friends were not okay with it either. *Id.* ¶¶14, 16-17. Principal Swope only said "OK" and did not appear as if he would do anything to help her. *Id.* ¶18. He also did not tell her about her ability to use any another restroom, nor has anyone at the school ever advised her that she could do so. *Id.* ¶19.

Since the incident on January 12, 2023, Student No. 2 has been exposed to the same sexual activity in the girls' communal restroom at least on a weekly basis. Student No. 2 Decl. ¶16. When she witnessed this occurring, she reported it to a

7

teacher. *Id.* ¶17. To her knowledge, the school has taken no action against either student. *Id.* ¶18.

Father of Student No. 2 learned from his daughter about this issue and incident that happened on January 12, 2023 as is recounted in his daughter's declaration. Declaration of Father of Student No. 2 ¶¶1, 4-6. He is upset that the school put his daughter in a situation that put her safety and privacy in jeopardy. *Id.* ¶¶8-9. "I cannot put into words, as a father, how much anger and pain this has caused me." *Id.* ¶10. He believes the school bathroom should be a safe place for his daughters but now he is worried for their safety and privacy. *Id.* ¶11. He believes the school is failing to protect his daughter. *Id.*

Finally, an incident report was created by the Miami County Sheriff's Office regarding this incident. A true and correct copy is attached to the Declaration of John Doe No. 2 (hereafter "John Doe No. 2 Decl.") as Exhibit A to his declaration.[3] The narrative provided by Deputy McGuire aligns with the facts told by the Student Witnesses. On January 12, 2023, Principal Swope asked for Deputy McGuire to enter the girls' restroom because of a loud commotion. Ex. A to the John Doe No. 2 Decl., p.4. Deputy McGuire noted there was an unusual number of girls inside the bathroom and they became quiet when they saw the Deputy. *Id.* One student was visibly upset, and so the Deputy spoke with her. *Id.* The student is Muslim and indicated that she was upset because transgender students were using their bathroom. *Id.* The Deputy then asked everyone who was not actively using the restroom to leave. *Id.* After

---

[3] Students' names and personal identifiable information have been redacted from the incident report in accordance with Section 5 of the Stipulated Protective Order. *See* Doc. 11 at 83-84.

leaving the restroom, the Deputy asked the upset female student to speak with Principal Swope. *Id.* Deputy McGuire went back into the hallway to allow the upset student and the principal to speak and while there another student came up and notified the Deputy that two students went into a stall together. *Id.* This student advised the Deputy that one student was "sitting down, while another one of them was standing up." *Id.* Deputy McGuire notified Principal Swope of these new facts but Deputy McGuire did not witness this firsthand. *Id.* Deputy McGuire recommended to Principal Swope that in the future a staff member should be present in the girls' and boys' restrooms during class changes and during lunch to prevent further issues in the future. *Id.*

None of these witnesses are Plaintiffs in this case, yet all have been harmed by the actions of the Defendants. The Board's failure to follow the OMA has already caused real harm to these witnesses, and likely other students and parents at Bethel.

The Board failed to follow Ohio law and allow local constituencies to participate in their local government. They could still provide this opportunity but refuse to do so. This has caused additional harms because of the invalidly adopted intimate facility policy, including Anne Roe's actions that harmed the above Student Witnesses. Further, the school was put on notice of the incident and has apparently taken no action to either offer these girls alternative restrooms, or to protect them in the girls restrooms.

Roe ignores the Plaintiffs' injuries, and other students' injuries. Like Anne Roe claims, Plaintiffs now hold their urine throughout the day because of their discomfort

9

in using the restrooms at school. However, unlike Anne Roe, the Plaintiffs and the Muslim, Christian, and objecting children at the school make up several hundred students.[4] There is no way an accommodation of single-use restrooms could be made for such a large portion of the student body.

Therefore—even though the underlying cause of action establishes the third factor—the general balance of the equities favors Plaintiffs as well.

### III. The Public Interest Favors Plaintiffs Because Following Ohio Law and the Public Policy of the State Benefits Everyone.

As the Sixth Circuit has frequently held, it is always in the public interest to prevent the violation of constitutional rights. *Liberty Coins, LLC*, 748 F.3d at 690 (citing *Obama for Am.*, 697 F.3d at 436); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (citing *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)). While the instant issue concerns a statutory right pursuant to O.R.C. § 121.22, the analysis is no different. The Ohio Legislature, through enactment of the statute, identified that the public policy of the state is to favor (and indeed require) sunlight on governmental decisions. The determinative consideration of the public interest here is not, as Roe has framed it—"preventing discrimination against a vulnerable class of persons, such as transgender students"— but the Board's refusal to comply with the OMA. Doc. 31 at 728. If Plaintiffs have shown a violation, then the public interest ***must*** favor requiring compliance with the law, even if other downstream harms occur.

---

[4] John Doe No. 2 Decl. ¶12 states that approximately 400 Turkish Muslim children attend Bethel schools and that does not include other Muslim families, Christians, or other families who object to the new rule.

10

In addition, Roe's public interest argument for "preventing discrimination against a vulnerable class" only underscores the importance of enforcing the OMA. *Id*. If you want to truly stop bigotry in all of its forms, then you have to make public officials act in the light. Ohio has made that determination.

Roe's argument also does not fit the reality of this dispute. Eight of the fifteen Plaintiffs are Ahiska Turkish Muslims. Their community has long been subject to deportation, discrimination, and violence to their persons and the faithful practice of their Muslim religion. John Doe No. 2 Decl. ¶¶9-10, 17. The public interest is not served by denying them a voice in their government and denying them the right to live their lives according to their faith and their values. If anything, the Board discriminated against one vulnerable group in favor of another.

Nor is Roe powerless. In this particular instance, the Board violated Ohio law to try to achieve the policy result that Roe desires. And the ACLU[5] is litigating for Roe's interest at the direct expense of one of its canonical constituencies—vulnerable Muslim communities. Indeed, the ACLU has long touted its commitment to defending Muslims and their right to be who they are. E.g., Protecting the Religious Freedom of Muslims, ACLU, https://www.aclu.org/issues/national-security/discriminatory-profiling/protecting-religious-freedom-muslims (last visited Feb. 3, 2023). It is rare that truly powerless interests can acquire the backing of a group as wealthy and esteemed as the ACLU. The fact that the ACLU is actively litigating against Muslims

---

[5] According to the ACLU's most recent financial reports, they have an annual budget of over 350 million dollars, and an endowment that is nearing the one-billion-dollar mark. *See ACLU 2022* Annual Report, ACLU, https://www.aclu.org/report/aclu-2022-annual-report (last visited Feb. 3, 2023).

on these core, common sense, issues of the Muslim faith only underscores how much power has been brought to bear to achieve the results that Roe desires.[6] Roe is anything but powerless here.

In the end, the Board violated Plaintiffs' freedom by denying their voice to live their lives according to their core values and faith. Even in the recent *St. Johns* decision—where the court upheld the plain language of Title IX in a decision contrary to Roe's position—at least the school board considered the needs of the people on the other side of the issue. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, No. 18-13592, 57 F.4th 791, 797-98 (11th Cir. 2022) (en banc) (detailing the school board's extensive efforts to understand the issues and balance the needs of its students). Here, the Board did none of that, denied Plaintiffs their voice, and imposed a controversial new rule on them in secret.

In short, the public interest favors the deliberation and open decision making that the OMA requires. The board violated the OMA. And Plaintiffs requested relief is therefore proper.

---

[6] Lawyer shaming is a huge problem in America today. *See* Eugene Scalia, *John Adams, Legal Representation, and the "Cancel Culture"*, 44 HARV. J. OF L. & PUB. POL'Y 333 (2019) (available at https://bit.ly/3JB8Xx5). This point is not raised to besmirch the ACLU or attack the professionalism of its attorneys in any way. Plaintiffs respect the right of all parties to be represented and did not oppose Roe's intervention in the suit. But the fact that the ACLU is actively litigating against the Ahiska Muslim community on this issue absolutely underscores the point that, of all the words that could be used to describe the promotion of LGBTQ+ interests and beliefs in America today, "powerless" is not one of them.

## **CONCLUSION**

For all the foregoing reasons preliminary injunctive relief is proper in this case, including enjoining Defendants from enforcing the Board's invalid rule during the pendency of this dispute.

Dated:	February 3, 2022

                                    Respectfully submitted,

                                    <u>s/ Joseph P. Ashbrook</u>
                                    Joseph P. Ashbrook (0091279)
                                    Julie E. Byrne (0085174)
                                    Ashbrook Byrne Kresge, LLC
                                    PO Box 8248
                                    Cincinnati, Ohio 45249
                                    Tel: (513) 582-7424
                                    Fax: (513) 216-9882
                                    jpashbrook@ashbrookbk.com
                                    jebyrne@ashbrookbk.com

                                    Nicholas Barry
                                    (*pro hac vice*)
                                    America First Legal Foundation
                                    611 Pennsylvania Ave, SE #231
                                    Washington, DC 20003
                                    Telephone: (615) 431-9303
                                    Facsimile: (513) 216-9882
                                    nicholas.barry@aflegal.org

                                    *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

 I hereby certify that on the 3rd day of February, 2023, I served a copy of the foregoing via the Court's ECF system, which notifies all counsel of record.

s/ Joseph P. Ashbrook  
Joseph P. Ashbrook
