## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **JOHN AND JANE DOE NO. 1, et al.,** | : | **CASE NO.  3:22-cv-00337** |
| | : | |
| **Plaintiffs,** | : | **JUDGE MICHAEL J. NEWMAN** |
| | : | |
| **vs.** | : | |
| | : | **PLAINTIFF'S REPLY BRIEF ON** |
| **BETHEL LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, et al.,** | : | **STANDING FOR FEDERAL CLAIMS** |
| | : | |
| | : | |
| **Defendants.** | : | |

## INTRODUCTION

Plaintiffs allege six causes of action in the Complaint. Five of those causes of action arise under federal law. Prior to exercising its supplemental jurisdiction over an issue of state law, the Court ordered the parties to brief Plaintiffs' standing to assert their federal law claims as the threshold requirement for the Court's supplemental jurisdiction. The Court specifically ordered the parties to brief standing and the Sixth Circuit has emphasized multiple times that jurisdictional analysis—like standing—is distinct from merits analysis.

Accordingly, Plaintiffs walked through the various elements of Article III standing for each federal claim. Intervenor-Defendant Anne Roe ("Roe") only contests one of the five claims: Title IX; Roe contests the parents' standing to assert their equal protection and free exercise claims but acknowledges, at least at this stage, the students can assert those claims and the parent Plaintiffs can assert their parental rights claims. Therefore, under Roe's analysis, all Plaintiffs are properly before the Court and four of the five federal questions are properly before the Court as well (although Plaintiffs disagree with Roe on Title IX and the parents' standing to assert their free

1

exercise and equal protection claims).[1] Board Defendants ("<u>Defendants</u>") essentially adopt Roe's standing analysis, but then proceed outside the scope of that analysis to argue the merits. In the end, Plaintiffs have standing to assert their federal claims, and the Court has supplemental jurisdiction to properly determine the pending issue of state law.

## I.    Plaintiffs Have Standing To Bring Their Federal Claims.

In their initial brief, Plaintiffs analyzed the various factors for Article III standing which requires "an actual or imminent injury that is traceable to the defendant and redressable by the court." *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 515 (6th Cir. 2019) (citation omitted). *See generally* Pls.' Br. on Standing for Fed. Claims, Doc. 59 at 1297–1310[2] (analyzing *Lujan* factors for injury in fact, traceability, and redressability).

### A.    Count II: Title IX

It is "emphatically the province and duty of the [Court] to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Plaintiffs have standing to assert their Title IX claim because they are being injured by Defendants' enforcement of Title IX. Parties generally have standing for declaratory judgment with respect to the enforcement of laws including the threatened enforcement of laws. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (discussing Supreme Court precedent for threatened enforcement). In this case, there is actual, ongoing enforcement of a law causing Plaintiffs' injury and Plaintiffs have standing for declaratory judgment regarding that law. *See Saginaw Cty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 959 (6th Cir. 2020) ("central defect" was absence of actual enforcement).

---

[1] Roe does not address Count VI under the PPRA because it falls outside the scope of Roe's intervention and reserves the right to make merits challenges to Defendants' other claims at a later time, recognizing that the Court's order was limited to standing. Roe's Br. in Resp. to Pls.' Br. on Standing to Bring Fed. Claims, Doc. 62 at 1418–19.

[2] All page citations to ECF documents ("<u>Doc.</u>") herein denote the "PageID" page number. For ease of review, Plaintiffs submit one brief in reply to both Roe and Defendants.

Roe relies on *Saginaw County*, Doc. 62 at 1423, to argue that Plaintiffs lack standing under Title IX. But the court in *Saginaw County* explained the "central defect" in that case as the absence of actual enforcement. 946 F.3d at 959. This case is different. Here, Defendants acknowledge that they are enforcing Title IX and Plaintiffs allege the same. Pls.' Compl., Doc. 1 at 3-4, 15, 19, ¶¶3, 6, 8, 87, 108; s*ee* Defs.' Mem. in Opp'n to Pls.' Mot. for Prelim. Inj., Doc. 20 at 659–60 (arguing that Defendants are acting under Board Policy 5517 and framing the dispute as balancing Plaintiffs' rights with Defendants' responsibility to "enforce" federal law); BOE 196-246 - Student Policies, Doc. 16-6 at 400 (stating "[t]he Board will vigorously enforce its prohibition against discriminatory harassment" on bases "protected by Federal civil rights laws"); Doc. 16-6 at 410, 418 (same); *see also* Doc. 20 at 669 (explaining the District's new rule and accommodations policy as being adopted pursuant to Title IX and applying to students generally, beyond Roe). Therefore, this case has actual enforcement.

In addition to actual enforcement, Defendants claim that Roe threatened imminent legal action regarding the matter, which precipitated the change in school policy. Doc. 1 at 3, ¶3; Doc. 20 at 669; Decl. of Justin Firks, Doc. 48-1 at 1052, ¶¶4-6. In contrast to this case, the threat of litigation in *Saginaw County* was ***six years old***. 946 F.3d at 955. Here, the threat of legal action claimed by Defendants was ***less than a year old*** at the filing of the Complaint and directly precipitated the enforcement of Title IX causing Plaintiffs' injuries.

Indeed, Roe intervened in this case to protect that very result. In requesting intervention, Roe even argued *Jansen v. City of Cincinnati*, 904 F.2d 336 (6th Cir. 1990) for the proposition that an intervenor has a substantial interest in protecting a previous result that they fought to obtain. *See* Roe's Mot. to Intervene as Def., Doc. 13 at 113-14. And among the specific reasons given by Roe for intervention in this case was the fact that Roe and Plaintiffs have common claims but

3

adverse interests in "**adjudicating . . . Title IX**". *Id.* at 115 (emphasis added); *see also id.* at 105, 112.

Roe glosses over Defendants' enforcement of Title IX, offering a short argument that Plaintiffs' Constitutional injuries cannot serve as a qualifying injury related to Defendants' enforcement of the statute. *See* Doc. 62 at 1424. But Roe offers no law for that proposition. *Id.* And Constitutional injuries arise all the time from the government's enforcement of a law. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 67, 73 (2000) (plurality op. of O'Connor, J.) (finding a parent's fundamental parental rights were violated by the enforcement of a statute granting rights to others). Plaintiffs' injuries are injuries in fact arising from Defendants' enforcement of the statute.

Roe also tries to frame Plaintiffs as attempting to secure an advisory opinion, Doc. 62 at 1425-27, but this ignores Plaintiffs' injuries and the applicable legal standard which is not a bright line test.[3] There has never been a bright line test for declaratory judgment:

> The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Md. Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). To be sure, declaratory judgment always involves a matter of degree. But here, Defendants are enforcing Title IX against Plaintiffs' interests, to Plaintiffs' injury, because Roe threatened to file a Title IX complaint, and Roe specifically intervened in this case to protect that result.

---

[3] Plaintiffs are also not trying to "transform the law" through improper advisory guidance as Roe claims. Doc. 62 at 1418, 1426. Plaintiffs who are injured and cannot live their values in their own local community because Federal law is being (incorrectly) enforced against them, have a right to determine the actual substance of that law. And the present dispute satisfies the requirements of *MedImmune, Inc.* and *Lujan*.

In sum, Defendants' enforcement of Title IX is real and immediate (and still ongoing), and is causing Plaintiffs' injuries. The reality of this "substantial controversy" was immediate enough for Roe to intervene. And Plaintiffs, Defendants, and Roe all have adverse legal interests before, during, and after resolution of this dispute (which is the point of Roe's intervention). Now that Roe is a defendant in this suit, declaratory judgment will bind **all** parties with respect to the Title IX issue—including Roe. And as Roe argued in seeking intervention: "the benefits to judicial economy of warding off additional suits and addressing the relevant issues with finality weigh strongly in favor of permitting Anne Roe to intervene under Rule 24(b)." Doc. 13 at 116 (cleaned up). There is nothing improper or premature about deciding the Title IX issue in an action that Roe joined for the purpose of "addressing the relevant issues with finality." *Id.* (citation omitted).

Because *MedImmune, Inc.* and all three elements of the *Lujan* test are met as discussed in Plaintiffs' initial brief, Doc. 59 at 1297–1300, the Court should find that Plaintiffs have standing to pursue their Title IX declaratory judgment claim.

## B.     Count III: Parental Rights – Fourteenth Amendment

Roe does not contest the parent Plaintiffs' standing to assert their parental rights claims. Doc. 62 at 1418. Defendants' claim that "Count Three of the Complaint should be dismissed for lack of standing." Doc. 63 at 1444. But Defendants do not raise any actual standing arguments. Instead, Defendants argue the legal merits of Plaintiffs' claim. *See id.* at 1439–44. Consistent with this, none of Defendants' parental rights cases are standing cases. *See generally id.*

Merits and standing are distinct concepts. *Benalcazar v. Genoa Twp.*, 1 F.4th 421, 424–26 (6th Cir. 2021) (finding standing and explaining that "[s]ubject-matter jurisdiction over a dispute is one thing; the merits of the underlying dispute are another. Rarely do the twain meet."); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("Jurisdiction is not defeated by the

possibility that the averments might fail to state a cause of action on which petitioners could actually recover.") (cleaned up); *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1058–60 (6th Cir. 2022) (reversing lower court where "the district court's conflation of jurisdiction and the merits cut[] against the basic principle that those distinct analyses must be conducted separately"). For purposes of standing, what matters is whether "the federal questions raised by this complaint legitimately create federal court jurisdiction because they are not so frivolous as to be a contrived effort to create such jurisdiction." *Benalcazar*, 1 F.4th at 424–25. Plaintiffs' claims are simple and straightforward to redress a real controversy under federal law; there is nothing frivolous or contrived about them and, as a result, Plaintiffs have standing.

Notably, Defendants acknowledge that Plaintiffs have a "fundamental right to make decisions regarding the care, custody, and control of their children." Doc. 63 at 1440. Defendants also acknowledge that Plaintiffs "have a fundamental right to decide whether to send their child to a public school" (here Bethel). *Id.* at 1441. In addition, Defendants do not dispute that burdening Plaintiffs' fundamental right constitutes an infringement of that right. *Compare* Doc. 59 at 1301–02 (providing Supreme Court precedent), *with* Doc. 63 at 1439–44. To be sure, there may be a time in this case to argue whether rational basis review or strict scrutiny applies to Defendants' actions. *See* Doc. 63 at 1440 (explaining analytical framework for rational basis review versus strict scrutiny). But standing is not it.

Plaintiffs have a fundamental right to direct the upbringing and education of their children, especially "the religious upbringing of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972) ("[T]he Court's holding in *Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children."). Absent a compelling interest that is narrowly tailored,

Defendants cannot usurp Plaintiffs' fundamental parental role and especially their fundamental parental role to direct the religious upbringing of their children.

In this case, the parent Plaintiffs have alleged two bases for infringement of their fundamental parental rights: (1) denying Plaintiffs the material, common sense, information they need to properly exercise their right to decide where to send their children to school[4]; and (2) forcing their children to share communal intimate facilities with members of the opposite biological sex and improperly promoting LGBTQ+ beliefs and values to them. As discussed above, Defendants do not dispute the Supreme Court precedent cutting across various areas of the law that burdening Plaintiffs' exercise of their fundamental right amounts to an infringement of that right. Doc. 59 at 1301–02. Therefore, Defendants failed to demonstrate that this claim is "so frivolous as to be a contrived effort to create such jurisdiction." *Benalcazar*, 1 F.4th at 424. Accordingly Plaintiffs have standing under the first basis.

The same is also true with respect to the second basis. While Defendants bluster about the general rule that parents do not have a right to control the school, Doc. 63 at 1440–43, Defendants fail to address Plaintiffs' actual claims.[5] Contrary to Defendants' framing, Plaintiffs are not seeking "a unilateral line-item veto on any thing within [sic] School District's walls they do not like." *Id.* at 1443. Plaintiffs are also not trying to control any of the domains that Defendants claim are generally theirs, or that the court listed in *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381,

---

[4] These include the school's gender rules for: locker rooms; adult use of restrooms of their preferred gender identity; adult and student use of restrooms at sporting events; high school student use of elementary restrooms; Bethel's safety plan to monitor restrooms; how faculty and staff are supposed to know who is allowed to be in which intimate facilities; how students are supposed to know who is allowed to be in which intimate facilities with them; overnight trips and camps and whether biological sexes will be mixed in hotel rooms and cabins; and how Defendants are addressing the promotion of LGBTQ+ beliefs to students. Doc. 1 at 16-17, ¶97.

[5] Defendants overframe Judge Sutton's opinion in *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381 (6th Cir. 2005). *See* Doc. 63 at 1440–41. The court specifically recognized that the infringement of one's fundamental parental rights are Constitutionally protected and subject to strict scrutiny. *Blau*, 401 F.3d at 393–94. The court just did not find, with good reason, that the right to wear blue jeans fit within that fundamental core. *Id.* In contrast, the issues here go directly to the gravamen of the right itself and the Supreme Court's pronouncements regarding the right. *See infra* n.6.

395-96 (6th Cir. 2005). Doc. 63 at 1441. Nor is this a case where the claimed right is the right to wear blue jeans. *Blau*, 401 F.3d at 393–96. Instead, the claims are fundamental.

The claims here go to the very heart of the parental relationship and decision making in the "care" and "custody" of one's children (i.e., the child's safety and privacy), as well as their educational and religious upbringing and the forming of a child's core identity and religious and moral beliefs and practices. Those matters are central to the core fundamental liberty interest of parents in raising their children. *See Tatel v. Mt. Lebanon Sch. Dist.*, No. CV 22-837, — F. Supp. 3d —, 2022 WL 15523185, at *17–18 (W.D. Pa. Oct. 27, 2022) (parental rights within a school are fundamental for matters of great importance that go to the heart of parenting including the child's personal identity and religious and moral beliefs). And as the Supreme Court has explained, the right to raise one's children is an "essential, basic civil right[] of man, and [is] far more precious than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (cleaned up). Accordingly, while parents may not have the general right to control public schools, the rights at issue here are squarely within their essential domain.

The parent Plaintiffs' fundamental rights in raising their children—while precious—are not absolute and schools can still act on those fundamental rights where there is a compelling interest that is also narrowly tailored. *Blau*, 401 F.3d at 393 ("Governmental actions that infringe a fundamental right receive strict scrutiny."); *compare Tatel*, 2022 WL 15523185, at *18 (applying strict scrutiny), *with John & Jane Parents 1 v. Montgomery Cty. Bd. of Educ.*, No. 8:20-3552-PWG, — F. Supp. 3d —, —, 2022 WL 3544256, at *8 (D. Md. Aug. 18, 2022) (applying rational basis review where claims "do not include a religious element"); s*ee also Yoder*, 406 U.S. at 233 ("*Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their

children."). Ultimately, however, the parent Plaintiffs have standing to assert this fundamental right under either basis proffered.[6]

Because all three elements of the *Lujan* test are met, Doc. 59 at 1300–03, the Court should find that Plaintiffs have standing to pursue this claim.

## C.    Count IV: Equal Protection

While reserving rights, Roe does not dispute that the student Plaintiffs have standing to assert their equal protection claims. Doc. 62 at 1418, 1427–29. Roe only contests the parents' standing, arguing that their standing improperly rests on vicarious injury. Doc. 62 at 1427–29. But the parent Plaintiffs have their own independent equal protection injury, thus supporting parent Plaintiffs' standing.

Both parent Plaintiffs and the parents of transgender children, including Roe's parents, have a fundamental parental right concerning the care and custody of their children, as well as to direct their education and upbringing. Defendants' communal restroom facilities directly implicate that right (*see supra* I.B. above). Plaintiffs specifically allege that Defendants are allowing the parents of transgender students to exercise that right to obtain an educational benefit that they believe is important for their child while denying the same to the parent Plaintiffs. Doc. 1 at 15, 19-21, ¶¶87, 112–15, 123 ("[T]he Board is providing this educational benefit at the behest of the

---

[6] With respect to the second basis, neither the Supreme Court nor the Sixth Circuit have ever held that parental rights are barred at the schoolhouse door. And the instant issues fall squarely within the fundamental right identified by the Supreme Court. *E.g., Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("to direct the education and upbringing of one's children"); *Yoder*, 406 U.S. at 233 ("to direct the religious upbringing of [one's] children"); *Troxel*, 530 U.S. at 66 ("to make decisions concerning the care, custody, and control of their children"); *Stanley*, 405 U.S. at 651 ("to raise one's children"). As the *Tatel* court recognized, it is not proper to disregard the Supreme Court's repeated pronouncements of this fundamental right: "These repeated pronouncements from the Supreme Court are not simply platitudes or mere surplusage, which may be given lip service and brushed aside." *Tatel*, 2022 WL 15523185, at *11–13 (discussing pronouncements). Plaintiffs respectfully submit that, until there is controlling precedent from the Supreme Court or the applicable circuit court to deny parental rights within a school setting, the court should uphold parental rights as a fundamental right as expressed by the Supreme Court. To refuse to do so—when even **students** do not "shed their constitutional rights . . . at the schoolhouse gate"—risks judicial usurpation of a fundamental right under the auspices of judicial modesty. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

parents of transgender students but rejecting the same desire from the parents of religious students.").

Defendants are therefore treating the parent Plaintiffs worse than the parents of other students with respect to a fundamental right—which is the quintessential denial of equal protection. And the unequal treatment gives plaintiff Parents standing. *See Benalcazar*, 1 F.4th at 426 (standing exists where plaintiffs seek to "ensure equal treatment"). Accordingly, parent Plaintiffs have standing to assert their equal protection claims.

Beyond Roe, the Board Defendants challenge the student Plaintiffs' standing to bring equal protection claims. Doc. 63 at 1444. But Defendants' briefing ignores the Board's guarantee of equal educational opportunities regardless of status in a protected class (with religion as a protected class). Doc. 1 at 15-16, 20-21, ¶¶88–92, 117–22; Doc. 59 at 1304–05. The student Plaintiffs have standing to "ensure equal treatment," *Benalcazar*, 1 F.4th at 426, and to challenge this unequal benefit and the corollary unequal burden that Defendants are imposing on them. Doc. 59 at 1304.

And because all three elements of the *Lujan* test are met, *Id.* at 1300–03, the Court should find that all Plaintiffs have standing to pursue their equal protection claims.

**Count V: Free Exercise**

Roe and Defendants' free exercise arguments are similar to their equal protection arguments. Roe does not dispute that the student Plaintiffs have standing to assert their free exercise claims. Doc. 62 at 1418, 1429–31. At the same time, Roe challenges the parent Plaintiffs' standing based on the same idea of vicarious injury that Roe argues for equal protection. *Id.* at 1429–31. But, again, the parent Plaintiffs have their own independent free exercise injury as well.

Roe's argument disregards the nature of Plaintiffs' religion and faith, and that it is a fundamental aspect and duty of the parents' own faith to raise their children in the faith. Doc. 1 at

11-12, 15, ¶¶68, 85. And Roe's argument that there is no coercive effect on the parents is neither a federal free exercise requirement nor an Article III standing requirement. Doc. 62 at 1429. Indeed, Roe's cited case on this point, *New Doe Child #1 v. Cong. of U.S.*, specifically rejected the idea that Article III standing requires "government coercion." 891 F.3d 578, 586 (6th Cir. 2018). Even still, while not required, Roe's argument also ignores that (1) compulsory education requirements clearly impact the parents, s*ee generally Yoder*, 406 U.S. 205 (parent plaintiffs only), (2) that the parent Plaintiffs are being pressured to compromise their beliefs on a fundamental level for their children to simply have access to communal bathrooms because the Defendants have adopted a new rule and/or policy forcing communal restrooms based on self identified gender identity rather than biological sex, Doc. 1 at 11-12, 15, 22, ¶¶68, 85, 129; Bethel Loc. Sch. Dist., FAQ About Transgender Students, Doc. 39-6 at 959–61 (stating that the District's "rules with regard to restroom use" are that "a transgender student [has] access to the facilities that he or she prefers"), and that (3) Plaintiffs' allege Defendants are promoting LGBTQ+ beliefs and values to their children outside of proper school curriculum and thus working against the parents exercise of their own faith, Doc. 1 at 11-12, 15, ¶¶68–71, 85. In short, the parent Plaintiffs have their own injury and standing to assert their free exercise claims.

Beyond Roe, Defendants incorporate a number of their merits arguments and argue that even the student Plaintiffs lack an injury in fact. But Defendants ignore that the infringement on one's free exercise is an intangible injury in fact. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (providing infringement of free exercise as an example of concrete intangible harm). Defendants also argue that the boy Plaintiffs have not asserted harm (not true) and that the girls' harm is legally insufficient because "[b]eing in the same communal room with Anne Roe, albeit a restroom, is legally insufficient." Doc. 63 at 1444. But Defendants cite no law for this proposition.

And Defendants pretend that Plaintiffs object to being in the same room with Roe rather than the actual problems of sharing intimate space with members of the opposite biological sex. *See, e.g.*, Doc. 59 at 1306-07. Ultimately, Defendants' arguments amount to mere speculation about Plaintiffs' religious beliefs (and the harms relating to the infringement of the same), while ignoring the applicable threshold for standing. *Benalcazar*, 1 F.4th at 424–25 (requiring that "the federal questions" cannot be "so frivolous as to be a contrived effort to create such jurisdiction").

Because all three elements of the *Lujan* test are met, Doc. 59 at 1306–09, the Court should find that Plaintiffs have standing to pursue this claim.

### D.      Count VI: Section 1983 (20 U.S.C. § 1232h)

Defendants argue that Plaintiffs fail to satisfy the "mandatory standing requirements of Article III because the [Protection of Pupil Rights Amendment ("PPRA")] contains no private right of action."[7] Doc. 63 at 1444–45. Defendants, here, are making a failure to state a claim argument, and not a standing argument. For clarity, Plaintiffs first address standing related to their PPRA claim and then the substantive PPRA cause of action issue Defendants' raised.

#### 1.      Plaintiffs satisfy standings minimal requirements.

The appropriate standing analysis is related to injury, traceability, and redressability of Plaintiffs' PPRA claim. As identified in Plaintiffs' initial brief, Plaintiffs' injury is the loss of their rights under the PPRA; namely, the Defendants are required to provide notice to Plaintiffs and Plaintiffs are entitled to the right to consent. Plaintiffs have alleged that Bethel is administering attitudinal surveys with students regarding their views on sexual and transgender issues (deeply private issues), without providing notice or obtaining consent from parents, including Plaintiffs.

---

[7] *See supra I.B.*, for purposes of standing, what matters is whether "the federal questions raised by this complaint legitimately create federal court jurisdiction because they are not so frivolous as to be a contrived effort to create such jurisdiction." *Benalcazar*, 1 F.4th at 424–25.

Doc. 1. at 24, ¶139. This is a violation of the PPRA and is sufficient to establish an injury. As for standing's traceability and redressability requirements, Plaintiffs' injury is a direct result of Defendants failure to provide notice to Plaintiffs and to obtain their consent. This is redressable by an order of this Court finding in favor of Plaintiffs that their statutory rights were violated and requiring Defendants to comply with the statute. Thus, standings minimal requirements are satisfied.

### 2. Plaintiffs have alleged a proper cause of action.

The *Lexmark* Court analyzed whether the Lanham Act created a cause of action for the plaintiff based on two considerations: (1) zone of interest and (2) proximate cause. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–34 (2014). *Lexmark* reinforces that Plaintiffs have stated a cause of action here because 20 U.S.C. § 1232h, the PPRA, was created to protect parental rights, grants parents and students explicit rights, and the Plaintiffs, as parents and students, clearly fall into the zone of interest of the PPRA. Additionally, the injury alleged is proximately related to the Defendants' actions. Thus, *Lexmark* supports Plaintiffs' claim.

Further, Defendants cite *Ashby v. Isle of Wight Cty. Sch. Bd.*, 354 F. Supp. 2d 616 (E.D. Va. 2004) as support, parenthetically quoting "These statutes [FERPA and PPRA] do not create private causes of action" and end the parenthetical. Doc. 63 at 1445 (alteration in original). However, the sentence in full reads: "These statutes do not create private causes of action, but might serve as the basis for an action pursuant to 42 U.S.C. § 1983." *Ashby*, 354 F. Supp. 2d at 623 n.9. Likewise, Defendants cite *C.N. v. Ridgewood Bd. of Educ.*, 146 F. Supp. 2d 528 (D. N.J.), *aff'd in part, rev'd in part*, 281 F.3d 219 (3d Cir. 2001) parenthetically quoting "it must be noted that indeed neither the PPRA nor the FERPA provide a private right of action." Doc. 63 at 1445. However, the sentence before this states: "Plaintiffs concede that the question of whether the PPRA

or the FERPA provide a private right of action is irrelevant because 42 U.S.C. § 1983 may be used to enforce such rights." *C.N.*, 146 F. Supp. 2d  at 535 n.7.[8]

Here, Plaintiffs allege a § 1983 claim for violations of their statutory rights secured by the PPRA. Doc. 1 at 23-24, ¶¶26, 133–41. Without going through a full analysis, as it is unrelated to standing, Plaintiffs have properly pled a § 1983 claim for violation of their statutory rights under the PPRA. Section 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities" secured by the federal Constitution and laws. 42 U.S.C. § 1983. This section safeguards, *inter alia*, rights conferred by federal statutes. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *Maine v. Thiboutot,* 448 U.S. 1, 4–5 (1980).

Under § 1983, "a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law." Blessing*, 520 U.S. at 340. A three-factor test applies. First, Congress must have intended that the provision in question benefit the plaintiff. *Id.* Second, "the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement [strains] judicial competence." *Id.* at 340-41 (citation omitted). Third, "the statute must unambiguously impose a binding obligation on" a State or local government. *Id.* at 341. "In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Id.* at 341. If plaintiffs demonstrate that a statute confers an individual right, then the right is presumptively enforceable via § 1983. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002).

The PPRA was enacted to benefit individual parents and students, codifying their rights to obtain information and opt out of specified public school activities. *See, e.g.,* 20 U.S.C. §§ 1232h(a), (b), (c)(1)(A)(i), (c)(2), (c)(5)(B), (d), & (f); 34 C.F.R. § 98.4; Student Privacy Policy

---

[8] It appears in *John & Jane Parents 1*, the final case cited by Defendants, that the plaintiffs there did not allege a § 1983 claim for the PPRA but instead alleged a claim pursuant to Article 2 of the Maryland declaration of rights. 2022 WL 3544256, at *19-20. Thus, the question related to § 1983 was not addressed.

Office, U.S. Dep't of Edu., *Protection of Pupil Rights Amendment (PPRA)* SPPO-21-01 (Nov. 24, 2020). PPRA enforcement will not strain judicial competence as the rights it recognizes are plain and clear. *See Wilder v. Va. Hosp. Ass'n.*, 496 U.S. 498, 509 (1990); *Wright v. City of Roanoke Redev. and Hous. Auth.*, 479 U.S. 418, 432 (1987). The PPRA does more than express a mere congressional preference for a certain kind of conduct. Instead, it explicitly commands the Defendants provide individual students and parents with specified information and an opt out opportunity. *See* 20 U.S.C. §§ 1232h(a), (b), (c)(1)(A)(i), (c)(2), (c)(5)(B), (d), & (f); 34 C.F.R. § 98.4. Thus, Plaintiffs' PPRA claim is enforceable through § 1983.[9]

Finally, Defendants argue that the limiting language "as part of any applicable program" means Plaintiffs have failed to properly plead a PPRA claim. Doc. 63 at 1445–46. But Plaintiffs pled that Bethel receives federal funds. Doc. 1 at 23, ¶135. The PPRA's relating to "any applicable program" language means any school receiving federal funds, as the school is then part of an "applicable program." 20 U.S.C. § 1221(c)(1) ("The term 'applicable program' means any program for which the Secretary or the Department has administrative responsibility as provided by law or by delegation of authority pursuant to law. The term includes each program that the Secretary or the Department has administrative responsibility under the Department of Education Organization Act or under Federal law effective after the effective date of that Act."). The Secretary has administrative responsibility for the federal funds that Bethel receives. For example, Bethel received $10,000 to offset a school resource officer's (SRO) costs under Title IV, which is administered by the Secretary. Tina K. Hageman, *Bethel Local Schools Federal Program Update, May 2022*, https://tinyurl.com/10k4sro (last visited Mar. 6, 2023). Thus, Bethel is subject to the PPRA because it participates in and is part of an "applicable program."

---

[9] Plaintiffs give this limited analysis even though it is unrelated to standing because Plaintiffs did not want to leave the argument unaddressed. Should Defendants raise this in future briefing, Plaintiffs will provide a fuller analysis.

**E.  Defendants Lydda Mansfield, Lori Sebastian, Jacob King, Danny Elam, Natalie Donahue, and Matthew Chrispin are all Proper Defendants of Plaintiffs' Federal Claims.**

Defendants argue that the individual Defendants sued in their official capacity are not proper defendants and should be dismissed. Doc. 63 at 1446–47. But Defendants are wrong.

The Supreme Court has explained that individuals sued in their official capacity are proper defendants under Section 1983 for purposes of prospective relief. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (citing *Ex parte Young* and explaining that officials sued in official capacity for injunctive relief are appropriate "persons" under Section 1983). The Sixth Circuit recognizes this as well. *See Cox v. Shelby St. Cmty. Coll.*, 48 F. App'x 500, 504 (6th Cir. 2002) (citing *Will* and reversing district court where suit against individual in official capacity not barred "insofar as it is for injunctive relief"); *McCormick v. Miami Univ.*, 693 F.3d 654, 662 (6th Cir. 2012) (suit against individuals in official capacity not precluded "for prospective injunctive relief"). Although the issue often arises in the context of sovereign immunity, the *Will* court explained that the analysis tracks the historical distinction for sovereign immunity and so the analysis is the same. 491 U.S. at 71 n.10. *See also Lawson v. Shelby Cnty., TN*, 211 F.3d 331, 333, 335 (6th Cir. 2000) ("claims for prospective injunctive and declaratory relief" proper against individuals sued in official capacity). Accordingly, the individual defendants in their official capacities are proper defendants on the federal claims.

Here too, neither of Defendants' cases were analyzed as standing cases. In addition, neither implicated declaratory or injunctive relief. For example, in *Alkire v. Irving*, the plaintiff's claims for declaratory and injunctive relief had already been resolved prior to the court's decision and were no longer pending. 330 F.3d 802, 821 (6th Cir. 2003). And in *Wilson v. Trumbull Cty. Dep't of Job & Fam. Servs*, the plaintiffs were seeking "general, compensatory, and punitive damages."

No. 4:12 CV 02163, 2013 WL 5820276, at *1 (N.D. Ohio Oct. 29, 2013). In contrast, Plaintiffs seek declaratory and prospective injunctive relief to stop the violation of Plaintiffs' civil rights. Doc. 1 at 24–25. This is proper to prevent the individuals who make up the Board, including its executive officer, from violating Plaintiffs' civil rights.

## II.        Defendants' Merits Arguments Should be Disregarded.

Even though the Court ordered the parties to brief standing, Defendants argued extensively on legal and factual merits issues. *See generally* Doc. 63. Defendants failed to show that Plaintiffs' claims are "so frivolous as to be a contrived effort to create [federal] jurisdiction" and thus their merits arguments should be disregarded. *Benalcazar*, 1 F.4th at 424.

From a factual standpoint, Plaintiffs' federal claims should be properly determined on full factual development and discovery. Even Defendants' current arguments are contradicted in this extremely limited record dominated by Defendants' self-selected declaration testimony.

For instance, Defendants argue that Anne Roe is the only transgender student using the opposite restroom (i.e., the girls' restroom), and that no transgender student is using the boys' restroom. Doc. 63 at 1437. But Defendant Lydda Mansfield—when announcing the larger rule change that transgender students would use the restroom that aligns with their gender identity— specifically advised that, in making the change, "[o]ur students are using bathrooms aligned with their identity at this time." Doc. 20 at 669 (plural). In addition, Ms. Mansfield's declaration also refers multiple times to the school's response to transgender students—again, plural. Decl. of Lydda Mansfield, Doc. 18-3 at 635-38, ¶¶12-13, 20-21, 24. This is also Plaintiffs' current understanding as the Complaint alleges that the boys are avoiding the restroom and holding their urine as well and that the issue extends to multiple students (plural). Doc. 1 at 12, 14-15, ¶¶72, 81,

82, 84, 87, 123.[10] These issues remain proper to proceed at this point given the allegations in the Complaint and the extremely limited, conflicting, record.

In addition, Defendants lash out at Plaintiffs regarding the testimony of three young girls, continuing a theme from oral argument that the testimony is just a contrived and salacious rumor. *See* Doc. 63 at 1437; *see also* Oral Arg., Feb. 7, 2023, Tr. of Proc., Doc. 56 at 1198, 1212-13, 30:2-30:19, 44:22-45:6. But this ignores the facts. Anne Roe admits to being in that restroom on January 12, 2023. Suppl. Decl. of Roe, Doc. 57-1 at 1263, ¶4. And Anne Roe admits to being accompanied by a "close friend and fellow student." *Id.* at 1264, ¶5. But Anne Roe denies being in the same stall with the student. *Id.* ¶6. In contrast, there are at least four eyewitnesses who saw two people in the stall and Roe either entering or exiting the stall with the other student. Decl. of Student Witness No. 1, Doc. 49-2 at 1124, ¶¶10, 15; Decl. of Student Witness No. 2, Doc. 49-3 at 1127, ¶8; Decl. of Student Witness No. 3, Doc. 49-5 at 1136, ¶11; *see also* Decl. of John Doe No. 2*,* Doc. 49-1 at 1120 (noting additional student informing the officer she "was sure" Anne Roe was in the stall with another student); Doc. 56 at 1214, 46:5-7 (Roe's counsel pointing out the fourth eyewitness from the police report). To be sure, someone is not telling the truth. But the threshold credibility battle is **_not_** the alleged sexual activity; the threshold credibility battle is the students being in the same stall together. And there are at least four eyewitnesses who put Roe in that stall. Defendants' continued disregard of this suggests the truly spurious nature of any "investigation" conducted by the school and underscores the unequal treatment that Plaintiffs seek to redress in this case. *Id.* at 1201, 33:7-11; Doc. 63 at 1437.

Finally, Defendants repeatedly argue that Plaintiffs could just forgo the communal restroom and use a single user, sex-neutral restroom. *See* Doc. 63 at 1436, 38. But that is not a

---

[10] Defendants' argument that "modesty only applies to girl student Plaintiffs," Doc. 63 at 1438, is also a sexist stereotype, insensitive to the religious beliefs and mores of many young men. Doc. 1 at 13-14, ¶¶79, 82, 84.

practical solution. The parties agree that the school is overcrowded, and Plaintiffs allege that the single user, sex-neutral facilities are inadequate for large religious communities like the communities in Bethel. *See* Decl. of Matthew Chrispin, Doc. 18-5 at 642*,* ¶¶15; Doc. 1 at 11, ¶64. There are around 400 Ahiska Turkish Muslim students in the school alone. Doc. 49-1 at 1114, ¶12. To put that in perspective, the Ohio Building Code minimum requirement for educational facilities is one toilet or urinal per 25 men or women. *See* Ohio Building Code §§ 2902.1, 2902.1.1, & 2902.2 (referencing the "occupant load" for each sex).  The limited single use restroom access at the school is not a reasonable accommodation for student Plaintiffs or these large religious communities.

Plaintiffs have a valid desire to use communal restrooms consistent with their sincerely held religious beliefs. And parent Plaintiffs have a valid desire for their children to be part of the community without compromising their faith. Plaintiffs are also subject to the related pressure of being stigmatized as bigots for using single use restrooms rather than the communal restrooms with members of the opposite biological sex. But Defendants are requiring them to forgo their beliefs without the public support of the Defendants that Roe enjoys. This is a real pressure that Plaintiffs face. Doc. 1 at 22, ¶129. Nor are the Defendants making a concerted effort to meet the needs of these families.  *See, e.g.*, Doc. 49-2 at 1124-25, ¶¶17–19 (principal and Defendants not informing distraught Muslim student of any potential accommodation). Accordingly, even these issues are contested on the presently limited record and need to be developed through discovery.

This is true with respect to Plaintiffs' other concrete harms discussed in Plaintiffs' brief. Neither Roe nor Defendants argue that Plaintiffs' dignitary harms are not cognizable injuries for standing. *See generally* Doc. 62; Doc. 63; s*ee also Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020) (emotional and dignitary harm cognizable). Nor do they contest that

Plaintiffs are holding their urine. *See generally* Doc. 62; Doc. 63. And while holding urine is itself a physical injury, it also corroborates the severity of the emotional injury because the students would rather endure physical injury than use the restroom. Accordingly, Plaintiffs' claims and injuries are properly alleged and should be developed and determined on a full factual record pursuant to discovery.

## **CONCLUSION**

For all the foregoing reasons Plaintiffs have standing for each claim they have brought.

Dated: March 6, 2023

Respectfully submitted,

s/ Joseph P. Ashbrook
Joseph P. Ashbrook (0091279)
Julie E. Byrne (0085174)
Ashbrook Byrne Kresge, LLC
PO Box 8248
Cincinnati, Ohio 45249
Tel: (513) 582-7424
Fax: (513) 216-9882
jpashbrook@ashbrookbk.com
jebyrne@ashbrookbk.com

Nicholas Barry
(*pro hac vice*)
America First Legal Foundation
611 Pennsylvania Ave, SE #231
Washington, DC 20003
Telephone: (615) 431-9303
Facsimile: (513) 216-9882
nicholas.barry@aflegal.org

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 6th day of March, 2023, I served a copy of the foregoing via the Court's ECF system, which notifies all counsel of record.


<u>s/ Joseph P. Ashbrook</u>
Joseph P. Ashbrook