# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **JOHN AND JANE DOE NO. 1, et al.,** | : | **CASE NO.  3:22-cv-00337** |
| | : | |
| | : | |
| **Plaintiffs,** | : | **JUDGE MICHAEL J. NEWMAN** |
| | : | |
| **vs.** | : | |
| | : | |
| **BETHEL LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, et al.,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

_____

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT-INTERVENOR ANNE ROE'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND MOTION FOR JUDGMENT ON THE PLEADINGS [ORAL ARGUMENT REQUESTED]**

_____

# TABLE OF CONTENTS

**INTRODUCTION** .......................................................................... 1

**ARGUMENT** ................................................................................ 4

**I.** The Pleadings Provide a Short and Plain Statement of Plaintiffs' Claims Showing that Plaintiffs are Entitled to Relief. ............................. 4

    A. Legal Standard ...................................................................... 4

The Federal Rules of Civil Procedure require a short plain statement of a claim. All allegations must be accepted as true and all reasonable inferences drawn in the Plaintiffs' favor. *Jelovsek v. Bredesen*, 545 F.3d 431, 434 (6th Cir. 2008).

    B. The Pleadings ...................................................................... 4

For over 100 years Bethel has had sex separated intimate facilities. At the beginning of 2022, the Defendants changed this rule in secret. Defendants' new rule permits males into female spaces and females into male spaces. Communal restrooms are a long-standing educational benefit. The Defendants have a policy guaranteeing nondiscrimination and equal educational opportunities for Bethel students. The Defendants are discriminating against the Plaintiffs and are not providing an equal educational opportunity to the Plaintiffs.

**II.** Title IX. ............................................................................... 8

    A. The Plaintiffs have Standing for their Title IX Claim. .................. 8

The Plaintiffs reassert their prior standing arguments. Pls.' Br. on Standing for Fed. Claims, Doc. 59 at 1297–1300; Pls.' Reply Br. on Standing for Fed. Claims, Doc. 67 at 1459–63. As to Roe's new argument that the Plaintiffs also lack standing because the Plaintiffs do not have a private right of action under Title IX, the Plaintiffs do not need a private right under a particular law to challenge the government's enforcement of that law against them, and the Plaintiffs alleged that the Defendants are discriminating against them under the Defendants' application of the law. The Defendants cannot deny the Plaintiffs the same benefits it provides Roe on the basis of sex, and that is what they are doing.

    B. The Only Settled Law that Governs the Parties is the Text of Title IX. .... 12

       i. Dodds is not Binding Authority Upon the Court. .................. 12

The decision in *Dodds* is from a motions panel, not a merits panel, and it is not binding on this Court. *See D.H. v. Williamson Cnty. Bd. of Educ.*, No. 3:22-CV-00570, 2022 WL 16639994, at *7 (M.D. Tenn. Nov. 2, 2022). Similarly, the decision in *Dodds* was not even the law of the case for *Dodds*, much less can it be the law of the circuit. *See Wilcox, D.O., P.C. Emps.' Defined Benefit Pension Tr. v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989). There is no binding authority on this issue in the Sixth Circuit.

ii.    Title IX Expressly Permits Separate Intimate Facilities Based on Biological Sex.    14

Title IX differs from Title VII in important respects; significantly, schools must consider sex in certain instances, such as allocating athletic scholarships. *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). Title IX also expressly permits Bethel to maintain sex-separated intimate facilities and the largest judicial panel to have ever considered the issue agreed with that conclusion. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812-15 (11th Cir. 2022) (en banc). The ordinary public meaning of "sex" in Title IX means biological sex based on timely dictionary definitions, Supreme Court opinion, and Title IX's own implementing regulations. The Defendants' decision to treat the Plaintiffs differently based on their sex is impermissible discrimination under Title IX.

**III.** Parental Rights.    19

A. The Defendants are Infringing on the Plaintiffs' Fundamental Parental Rights by Materially Interfering with their Ability to Properly Choose the Right School or Educational Option for their Child.    20

The parties agree that Plaintiffs have a fundamental right to choose the right school for their children and that the government infringes on fundamental parental rights when it burdens those rights. Roe's argument that the Defendants are not "actually burdening" the Plaintiffs' rights ignores the foundational basis of the right that parents are to deploy their considered judgment in exercising the right. *Troxel v. Granville*, 530 U.S. 57 at 66 (2000). The Plaintiffs are not asserting an unmoored Constitutional right to information from schools. The Defendants are interfering with the parents' ability to deploy their considered judgment on behalf of their children with respect to issues that fall within a parent's essential domain. And Roe's argument that the Plaintiffs can just take their children out of public school ignores the State's mandatory attendance requirements and the complexities of real life. See *Tatel v. Mt. Lebanon Sch. Dist.*, No. CV 22-837, — F. Supp. 3d —, 2022 WL 15523185, at *21 (W.D. Pa. Oct. 27, 2022).

B. The Defendants are Violating the Plaintiffs' Parental Rights by Forcing their Children to Share Communal Intimate Facilities with Members of the Opposite Biological Sex and Improperly Promoting LGBTQ+ Beliefs to Them.    26

The Plaintiffs' allegations concern issues that go to the core of fundamental parental rights, and can only be properly dismissed if parental rights are truly barred at the schoolhouse door, as Roe seems to argue. But the Sixth Circuit has explained that the fundamental parental right "plainly extends to the public school setting." *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005). And that is consistent with the Supreme Court's many pronouncements of the right going back to *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923).

i.    Plaintiffs' Right to Guard Their Children in Intimate Spaces and Raise Them in the Faith go to the Core of Fundamental Parental Rights.    29

The Plaintiffs' right to guard their children in intimate spaces goes to the very core of the fundamental right. There is nothing more central to the "care" and "custody" of a child than guarding their safety and privacy in intimate spaces. And forcing the Plaintiffs' children to share communal restrooms with members of the opposite biological sex is "incompatible with [the] religious beliefs that they [] hold." *Blau*, 401 F.3d at 386. Fundamental parental rights are also particularly acute when they intersect with religious freedom. *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972).

ii. The Defendants are Interfering with the Plaintiff Parents' Fundamental Parental Right by Improperly Promoting LGBTQ+ Beliefs and Values to their Children.                                                                                        31

There is a difference between providing information as part of a transparent curriculum and reaching outside of proper curriculum to promote a particular belief or ideology on a sensitive topic that a school withholds from parents. The Plaintiffs allege the latter. This interferes with a parent's right to direct the upbringing of their children and abuses the social contract between parents and public schools discussed by the Supreme Court in *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987).

**IV.** Equal Protection.                                                                                        33

"To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Andrews v. City of Mentor*, 11 F.4th 462, 473 (6th Cir. 2021). Defendants are treating the Plaintiffs worse than the families of transgender students and that disparate treatment is burdening their fundamental rights.

A. The Defendants are Discriminating Against the Plaintiffs and Denying them Equal Treatment.                                                                                        34

The Plaintiffs bring an equal protection claim because the school has chosen to selectively administer its nondiscrimination policy against the religious community in favor of a different protected group. Irregular, discriminatory application of 'neutral' laws violates equal protection. *Meriwether v. Hartop*, 992 F.3d 492, 514 n.9 (6th Cir. 2021). The Defendants are treating the Plaintiffs and transgender students and parents differently based on which group they are in and are preferring the transgender group. The Defendants are denying the Plaintiffs protection of a written policy that explicitly protects them.

B. Plaintiffs and the Families of Transgender Students are Similarly Situated for the Purposes of the Defendants' Actions.                                                                                        37

The Plaintiff students and transgender students are all students at Bethel schools, eligible for the use of communal restroom facilities, and the Defendants have

guaranteed both equal educational opportunities as protected classes under their Nondiscrimination and EEO Policy. Likewise, the parents of the two groups are all parents of students receiving these benefits and have a desire to properly raise and support the health and well-being of their child. The only dissimilarity is that the Defendants prefer Roe over Plaintiffs. The discriminatory act itself cannot create dissimilarity otherwise equal protection could never be applied.

C. Defendants' Actions Must Satisfy Strict Scrutiny Because Their Discrimination Impinges on Plaintiffs' Fundamental Rights.     38

Unequal treatment is subject to strict scrutiny where the government's disparate treatment impinges on a fundamental right. *Andrews v. City of Mentor*, 11 F.4th 462, 473 (6th Cir. 2021); *Maye v. Klee*, 915 F.3d 1076, 1086 (6th Cir. 2019). The Plaintiffs have alleged two fundamental rights: The Plaintiff parents' and students' free exercise and the Plaintiff parents' parental rights. Unequal treatment on either right requires the application of strict scrutiny, however, the Defendants are treating the Plaintiffs unequally on both rights.

V.   Free Exercise.     39
     A. The Defendants' Actions Burden the Plaintiffs' Free Exercise.     40

The Defendants' actions have burdened the Free Exercise rights of the Plaintiffs under the Ohio Constitution and the United States Constitution. "Laws that burden religious exercise are presumptively unconstitutional unless they are both neutral and generally applicable." *Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021). The Defendants have put the Plaintiffs to an impossible choice: share communal intimate facilities with members of the opposite biological sex in violation of their religious beliefs, or be excluded from the benefit of communal restrooms. This choice burdens their free exercise and triggers strict scrutiny. *See Sherbert v. Verner*, 374 U.S. 398, 406 (1963); *McDaniel v. Paty*, 435 U.S. 618, 626 (1978).

B. The Defendants' Actions are Not Neutral.     44
     i.   The Defendants are Discriminating Against Religion.     44

The Free Exercise Clause protects religious observers against unequal treatment and prohibits the disfavoring of religion for non-religion. *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 479 (6th Cir. 2020); *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020). The Defendants are treating the Plaintiffs worse than the families of transgender students and favoring Roe's secular gender identity over the Plaintiffs' identity arising from their religious beliefs. The Defendants are also penalizing religion by making the Plaintiffs' use of communal restrooms dependent on their willingness to violate their faith. *See, e.g., Espinoza v. Mont. Dep't of Revenue*, 140 S.Ct. 2246, 2261 (2020).

ii.  The Defendants' Actions and Irregularities Bear the Marks of Religious Hostility.     46

District courts in the Sixth Circuit should scrutinize irregularities in government action and potential religious hostility closely. *Meriwether v. Hartop*, 992 F.3d 492, 512-15 (6th Cir. 2021). The Defendants' actions bear lots of these marks, which belie Defendants' departure from neutrality. The Court should meticulously scrutinize the Plaintiffs' claims on a full record.

**VI.** The Defendants' Discrimination Against the Plaintiffs Cannot Survive Strict Scrutiny.                                                                                                    49

Strict scrutiny is a high bar that is rarely satisfied. *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020). To survive, the Defendants' actions must be motivated by a compelling government interest, and be narrowly tailored to achieve that interest. The Plaintiffs alleged, and the Defendants told the community, that their interest was enforcing Title IX (which gave them no choice). The Defendants did not brief that interest in support of the instant motions. Instead, the Defendants defer to Roe to define the government's interest which the Court and the Plaintiffs cannot properly assess at this point in the litigation. Roe's arguments are nonetheless unavailing.

A. Roe Does Not Offer a Compelling Interest.                                                                52

Roe argues that the policy promotes student safety and helps eliminate discrimination on the basis of sex and transgender status. Roe never explains how the policy promotes student safety. Ending discrimination also cannot be the true goal of the policy, as transgender students were never being discriminated against, the school had an evenly applied policy that ignored transgender status entirely, a policy Title IX permits. Further, because the policy itself creates discrimination, it cannot be viewed as one that eliminates discrimination. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546–47 (1993).

B. Roe's Proffered Compelling Interests are not Narrowly Tailored and the Least Restrictive Means to Accomplish those Interests.                                              54

There are less restrictive means to accomplish the Defendants' alleged compelling interests. Transgender students can use single-occupancy restrooms if they do not want to use the restroom associated with their biological sex. The Defendants can engage in meaningful education related to respecting other students and that bullying will not be tolerated. And the Defendants can enforce the same with meaningful investigation and discipline. The Defendants can further meet the specific needs of transgender students through a variety of approaches. *See, e.g., Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty*, 57 F.4th 791, 797-98 (11th Cir. 2022) (en banc).

*CONCLUSION*                                                                                                        55

# TABLE OF AUTHORITIES

## CASES

*Am. Civil Liberty Union v. Mukasey,*
    534 F.3d 181 (3d Cir. 2008) ............................................................................... 13

*Andrews v. City of Mentor,*
    11 F.4th 462 (6th Cir. 2021) ................................................................... 34, 37, 38

*Arnold v. Board of Education of Escambia County Alabama,*
    880 F.2d 305 (11th Cir. 1989) ........................................................................... 23

*Bangura v. City of Philadelphia,*
    2008 WL 934438 (E.D. Pa. Apr. 1, 2008) ......................................................... 23

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
    457 U.S. 853 (1982) ........................................................................................... 28

*Benalcazar v. Genoa Twp.,*
    1 F.4th 421 (6th Cir. 2021) ............................................................................... 34

*Blau v. Fort Thomas Pub. Sch. Dist.,*
    401 F.3d 381 (6th Cir. 2005) ........................................................... 20, 26, 27, 30

*Board of Education of the Highland Local School District v. United States*
    *Department of Education,*
    208 F. Supp. 3d 850 (S.D. Ohio 2016) ............................................................. 13

*Bostock v. Clayton Cnty.,*
    140 S. Ct. 1731 (2020) ......................................................................... 11, 15, 15

*Byrd v. Haas,*
    17 F.4th 692 (6th Cir. 2021) ............................................................................. 49

*Charlton-Perkins v. Univ. of Cincinnati,*
    35 F.4th 1053 (6th Cir. 2022) ........................................................................... 14

*Cherry v. LeDeoni,*
    2002 WL 519717 (E.D.N.Y. Mar. 31, 2002) .................................................... 23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ....................................................................... 39, 44, 49, 53

*Crowley v. McKinney,*
    400 F.3d 965 (7th Cir. 2005) ............................................................................. 23

*D.H.v. Williamson Cnty. Bd. of Educ.,*
    2022 WL 16639994 (M.D. Tenn. Nov. 2, 2022) ......................................... 12, 14

*Dahl v. Bd. of Trustees of W. Mich. Univ.,*
    15 F.4th 728 (6th Cir. 2021) ............................................................................. 42

*Dodds v. United States Department of Education,*
    845 F.3d 217 (6th Cir. 2016) ............................................................................. 12

*Edwards v. Aguillard,*
    482 U.S. 578 (1987) ..................................................................................... 32, 43

*Employment Division, Department of Human Resources of Oregon v. Smith,*
    494 U.S. 872 (1990) ..................................................................................... 20, 39

*Espinoza v. Mont. Dep't of Revenue,*
  140 S.Ct. 2246 (2020) .............................................................................20, 45, 49
*Fields v. Palmdale Sch. Dist,*
  447 F.3d 1187 (9th Cir. 2006)........................................................................ 27
*Frontiero v. Richardson,*
  411 U.S. 677 (1973) ....................................................................................... 16
*Gavitt v. Born,*
  835 F.3d 623 (6th Cir. 2016)............................................................................ 4
*Humphrey v. Lane,*
  728 N.E.2d 1039 (Ohio 2000) ....................................................................... 43
*J.E.B. v. Alabama ex rel. T.B.,*
  511 U.S. 127 (1994) ....................................................................................... 53
*Jelovsek v. Bredesen,*
  545 F.3d 431 (6th Cir. 2008)....................................................................... 4, 4
*John & Jane Parents 1 v. Montgomery County. Board of Education,*
  2022 WL 3544256 (D. Md. Aug. 18, 2022) ...................................................... 23
*Kasper v. Sch. Bd. of St. Johns Cnty.,*
  57 F.4th 791 (11th Cir. 2022) .................................................................. 15, 55
*Kennedy v. Bremerton Sch. Dist.,*
  142 S. Ct. 2407 (2022) ............................................................................ 49, 53
*Koger v. Mohr,*
  964 F.3d 532 (6th Cir. 2020)......................................................................... 39
*Living Water Church of God v. Charter Twp. of Meridian,*
  258 F. App'x 729 (6th Cir. 2007) .................................................................. 42
*Ricard v. USD 475 Geary Cnty., KS Sch. Bd.,*
  2022 WL 1471372 (D. Kan. May 9, 2022) ...................................................... 23
*Lyng v. Nw. Indian Cemetery Protective Ass'n.,*
  485 U.S. 439 (1988) ....................................................................................... 45
*Maye v. Klee,*
  915 F.3d 1076 (6th Cir. 2019)................................................................. 34, 38
*McDaniel v. Paty,*
  435 U.S. 618 (1978) ....................................................................................... 40
*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021)...................................................................*passim*
*Meyer v. Nebraska,*
  262 U.S. 390 (1923) ...............................................................................19, 28, 52
*Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't,*
  984 F.3d 477 (6th Cir. 2020)................................................................... 44, 44
*N. Haven Bd. of Educ. v. Bell,*
  456 U.S. 512 (1982) ................................................................................. 18, 18
*Pierce v. Society of Sisters,*
  268 U.S. 510 (1925) ....................................................................................... 19
*Ricard v. USD 475 Geary Cnty., KS Sch. Bd.,*
  522-cv-0401 ..................................................................................................... 23

*Roberts v. Neace*,
   958 F.3d 409 (6th Cir. 2020)............................................................39, 44, 49, 49

*Rogers v. Pike Road Board of Education*
   2022 WL 4563014 (M.D. Ala. Sept. 29, 2022) ................................................. 23

*Schmidt v. Des Moines Public School*,
   2010 WL 11493827 (S.D. Iowa Sept. 23, 2010)............................................... 23

*Sherbert v. Verner*,
   374 U.S. 398 (1963) ................................................................................... 40, 42

*State ex rel. Maras v. LaRose*
   2022 WL 15654420 (Ohio 2022) ....................................................................... 34

*State v. Cook*,
   2020 WL 615076 (Ohio Ct. App. Feb. 10. 2020)............................................... 43

*State v. Whisner*,
   351 N.E.2d 750 (Ohio 1976) ............................................................................ 44

*Steffel v. Thompson*,
   415 U.S. 452 (1974) ........................................................................................... 9

*Tatel v. Mt. Leba*,
   2022 WL 15523185 (W.D. Pa. Oct. 27, 2022) ....................................24, 31, 31

*Tennessee v. U. S. Dep't of Educ.*,
   615 F. Supp. 3d 807 (E.D. Tenn. 2022) ............................................................ 14

*Tollbrook, LLC v. City of Troy*,
   2018 WL 339900 (E.D. Mich. Jan. 9, 2018)...................................................... 46

*Tollbrook, LLC v. City of Troy*
   774 F. App'x 929 (6th Cir. 2019) ..................................................................... 46

*Troxel v. Granville*,
   530 U.S. 57 (2000) ..................................................................................... 20, 21

*United States v. Batchelder*,
   442 U.S. 114 (1979) ......................................................................................... 35

*Util. Air Reg. Grp. v. E.P.A.*,
   573 U.S. 302 (2014) ......................................................................................... 17

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ...................................................................19, 20, 21, 25

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
   979 F.3d 426 (6th Cir. 2020)............................................................................ 13

*Wilcox, D.O., P.C. Emps.' Defined Benefit Pension Tr. v. United States*,
   888 F.2d 1111 (6th Cir. 1989)........................................................................... 12

*Williamson Cnty. Bd. of Educ.*,
   3:22-CV-00570 ................................................................................................. 12

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ...................................................................19, 21, 33

*Yaacov v. Mohr*,
   2018 WL 6333604 (6th Cir. June 5, 2018) ...................................................... 42

*Zobel v. Williams*,
   457 U.S. 55 (1982) ........................................................................................... 34

## US CONSTITUTIONAL PROVISIONS

Amendment XIV
    § 1............................................................................................................ 33

## STATE CONSTITUTIONAL PROVISIONS

Ohio Art. I
    § 2............................................................................................................ 33

## FEDERAL STATUTES

20 U.S.C.
    § 1681................................................................................................10, 11, 18
    § 1686.........................................................................................11, 15, 17, 18

42 U.S.C.
    § 2000e–2 .............................................................................................. 10

## FEDERAL RULES

Federal Rules of Civil Procedure
    F.R.C.P. 1.............................................................................................. 4
    F.R.C.P. 8.............................................................................................. 4

## FEDERAL REGULATIONS

34 C.F.R. § 106.33 ........................................................................................ 17
45 Fed. Reg. 30960 ...................................................................................... 17

## OTHER AUTHORITIES

Nondiscrimination and EEO Policy ........................................................... 7

Board of Education, *Regular BOE Meeting*, (Jan. 10, 2022) ...................................... 46

## <u>INTRODUCTION</u>

The Intervenor-Defendant's ("<u>Roe's</u>") Motion to Dismiss should be denied. Roe argues for a backwards world where Roe has standing to bring a Title IX claim but the Plaintiffs do not; where Roe's parents get to direct Roe's education and upbringing but the Plaintiffs' parents do not; where Roe determines the government's interest (and the government comes in after the fact and adopts Roe's argument in full); where schools are permitted to discriminate against those who disagree with Roe; and where schools must allow biological males to use the female restroom, even though Congress explicitly provided for the opposite.

In this regressive world, the school must shelter Roe from "social stigma," "invasion of privacy," "risk of emotional or physical harm," and "limitations on school participation" but it must subject the Plaintiffs to those very harms. And the Plaintiffs do not get to enforce their civil rights, even where those rights are violated under a straightforward application of the law. It is a world where separating intimate facilities based on biological sex— which has been done for centuries in America, millennia around the world, and was expressly protected by the People's elected representatives in Congress— has been twisted into impermissible discrimination under Title IX and the Equal Protection Clause. Roe argues that the Plaintiffs are using "rhetorical sleight of hand and distortion of constitutional principles" to turn fundamental

1

Constitutional protections "on their heads." However, it is the Defendants[1] who are using rhetorical tricks to discriminate against the Plaintiffs. And it is the Defendants (and Roe) who seek to undermine democracy by changing the law outside of the proper processes for doing so.

This case is about the rule of law. Roe argues that the Plaintiffs want to discriminate against Roe because of Roe's transgender status. But nothing could be further from the truth.

In the context of school intimate facilities, the law requires analysis on the basis of biological sex, *not* gender identity. Once this one correction is made, things become clear. The Plaintiffs are advocating for the equal treatment of *all students*, as Title IX requires; and the sole exception to that under the law is based on biological sex, not gender identity. Roe advocates for an atextual requirement that some students receive special privileges based on their self-asserted gender identity while the Plaintiffs argue the law requires equal treatment for all based on biological sex, an immutable characteristic.

Roe should not be excluded from female areas *because* Roe is transgender, but rather because Roe is a biological male. The Plaintiffs agree that the Constitution is not a vehicle to compel discrimination; neither is Title IX. That is why the Plaintiffs are advocating for equal treatment of the Plaintiffs and all other students. However, the framework under which this Court must analyze that treatment is not on the basis of gender identity (a

---

[1] Bethel Local School District Board of Education, Lydda Mansfield, Lori Sebastian, Natalie Donahue, Danny Elam, Jacob King, and Superintendent Matthew Chrispin.

concept wholly unknown to most people until very recently), but rather on the basis of biological sex. And improperly enforcing the law to discriminate against the Plaintiffs is regress, not progress; it is backward, not forward.

To be sure, separating bathrooms on the basis of biological sex is not discriminatory on the plain reading of Title IX (or under the Constitution). However, it is also not discrimination on the basis of gender identity. Proving the point, a school that separates intimate facilities on the basis of biological sex would exclude Roe from the communal intimate facilities for biological females, even without ever knowing Roe is transgender. Roe's gender identity is simply irrelevant to the question. The school would exclude Roe from the female communal intimate facilities because Roe is a biological male and males are not permitted in that female space. Thus, the "discrimination" against Roe *cannot be* because of Roe's transgender status because the school would not know of such a status and would still require Roe to use the male communal intimate facilities. This is how the law, including Title IX and Constitutional principles, are meant to operate. The law treats all people equally and makes distinctions only on grounds explicitly permitted (such as Title IX's exception). Here, that ground is biological sex.

Roe's conception of Title IX means every school district has violated Title IX every day since 1972; and strangely, nobody has ever raised that issue until the last few years. And Roe's regressive conception of civil rights undoes hundreds of years of progress. The Defendants are discriminating against the

Plaintiffs under the straightforward application of the law. Roe's motion should be denied.

## ARGUMENT

I. **The Pleadings Provide a Short and Plain Statement of the Plaintiffs' Claims Showing that the Plaintiffs are Entitled to Relief.**

### A. Legal Standard

With the goal of securing the "just, speedy, and inexpensive determination of every action[,]" the Federal Rules of Civil procedure instruct plaintiffs to file "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 1 and 8(a). The standard of review for a motion under Rule 12(c) is the same as the Court's review for a motion under Rule 12(b)(6). *Jelovsek v. Bredesen*, 545 F.3d 431, 434 (6th Cir. 2008). The Court views the Complaint in the light most favorable to the Plaintiffs, accepts all allegations as true, and draws all reasonable inferences in the Plaintiffs' favor. *Id.* In addition, the Court "may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to the Defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein[.]" *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### B. The Pleadings

Accepting the Plaintiffs' allegations and drawing all reasonable inferences in the Plaintiffs' favor, the following is established: For more than a hundred years, Bethel schools required separate intimate facilities for

biological boys and biological girls. Compl., Doc. 1 at 3, 7, ¶¶1, 41.[2] At the turn of 2022, the Defendants changed that rule in secret to avoid the expected community opposition; Bethel is a very conservative area with large Muslim and Christian communities. *See id.* at 3, 9, 11, ¶¶2, 50, 64. The Defendants now require that biological boys and biological girls share communal restrooms with members of the opposite biological sex corresponding with students' "asserted" gender identity where "the gender identity is sincerely held as part of the student's core identity." Bethel Loc. Sch. Dist., FAQ About Transgender Students, Doc. 39-6 at 959, 963; Doc. 1 at 15-16, 21, ¶¶87, 91, 123.

The Plaintiffs are comprised of Muslim families, Christian families, and the father of a Bethel student who is not particularly religious. Doc. 1 at 11, 13, 16, ¶¶66, 79, 93. The Muslim parents and students have sincerely held religious beliefs that are incompatible with sharing intimate facilities with members of the opposite biological sex. *Id.* at 11-12, ¶¶67–70. These arise from beliefs that Allah has created men and women, that men and women are distinct and separate sex, and that they must maintain that distinction and obey commands of modesty and separateness between the sexes. *Id.* at 11, ¶67. The Muslim parents also have a religious duty to raise their children in the faith and teach the next generation to adhere to the morals and values of Islam. *Id.* at 11-12, ¶68. In the context of their Muslim beliefs, making the children of these families share intimate facilities with members of the opposite biological

---

[2] All page citations to ECF documents ("Doc.") herein denote the "PageID" page number.

sex is like making them eat pork. *Id.* at 12, ¶70. After the Defendants announced the change, members of the Muslim community, (including John and Jane Doe No. 2) donated their own resources to build a sex-neutral, single-occupancy, restroom that transgender students could use close to the communal restrooms as part of the community. *Id.* at 10, ¶61. The Defendants disrespected the donors by using their resources, but ignoring the families' needs and wishes and not telling them that the district was disregarding those needs and wishes and using their resources for other purposes. *Id.*, ¶¶61–62.

The Christian parents and students have sincerely held religious beliefs similar to those of the Muslim families. *Id.* at 14-15, ¶¶80, 85. Christianity teaches that our fundamental identity as people comes from God who made human beings in his image—male and female. *Id.* at 14, ¶80. And their distinct separateness of being created male or female is a fundamental part of their dignity as human beings, which is to be deeply respected and not oversexualized. *Id.*

The Defendants have provided a limited number of single-occupancy private restrooms; but the school is already overcrowded, and this limited option is not practical for Bethel's large religious communities. *Id.* at 11, ¶64; Defs.' Answer to Pls.' Compl., Doc. 39 at 842, ¶¶63–64 (admitting that the school is overcrowded and that access is limited for single-occupancy restroom facilities which are limited in number). For example, there are approximately 400 students from the Ahiska Muslim Turkish community alone. Decl. of John

6

Doe. No. 2, Doc. 49-1 at 1114, ¶12. The children of these families are holding their urine and avoiding the restroom at school if at all possible. Doc. 1 at 12, 14, ¶¶72, 81–84.

Communal restrooms are a long-standing educational benefit. *Id.* at 16, 21, ¶¶91, 121. The Defendants have a written nondiscrimination policy that guarantees nondiscrimination and equal educational opportunities for Bethel students. *Id.* at 15, ¶88; Bethel Local School District, Policy Manual po2260, *Nondiscrimination and Access to Equal Educational Opportunity*, http://go.boarddocs.com/oh/bethlsd/Board.nsf/goto?open&id=CCHG9L42B912 [hereinafter "Nondiscrimination and EEO Policy"]. The policy creates protected classes and makes "Religion" one of those classes. Doc. 1 at 15, ¶89. The Defendants have also made gender identity and transgender status a protected class under the same policy. *Id.* at 15, ¶90. The Defendants are providing transgender students with communal intimate facilities in accordance with those students' asserted identity but not providing the religious Plaintiffs with intimate facilities based on biological sex in accordance with their core identity. *Id.* at 21, ¶123. The Defendants are providing this benefit for transgender students at the behest of the parents of transgender students. *Id.* The Defendants are denying the Plaintiff parents an equal benefit: communal restrooms separated by biological sex for their children. *Id.*, ¶124.

To make decisions for their children and evaluate their various safety, privacy, moral, and didactic concerns, the Plaintiff parents and other parents at the school have asked the Defendants to provide the rules for a number of issues including *inter alia* adult transgender use of communal restrooms, overnight trips and mixing sexes in hotel rooms, and addressing the promotion of LGBTQ+ beliefs among students. *Id.* at 16-17, ¶97. The Defendants have refused to answer these questions. *Id.*, ¶98.

The Defendants are administering attitudinal surveys to students regarding their views on sexual and transgender issues, without providing notice to parents or obtaining the consent of parents, including the Plaintiffs. *Id.* at 24, ¶139. The Defendants are also requiring students to complete assignments promoting LGBTQ+ beliefs. *Id.* at 13, ¶75. This includes a fifth-grade reading assignment testing the students' comprehension of a story lauding gender transition. *Id.*

The Defendants claimed they had no choice but to make the bathroom change to enforce Title IX. *Id.* at 3, ¶3.

II.    **Title IX.**

A. **The Plaintiffs have Standing for their Title IX Claim.**

In addition to moving for judgment on the pleadings, Roe moves to dismiss the Plaintiffs' Title IX claim for lack of subject matter jurisdiction. The Plaintiffs incorporate their previous Title IX standing briefing herein. Pls.' Br. on Standing for Fed. Claims, Doc. 59 at 1297–1300; Pls.' Reply Br. on Standing for Fed. Claims, Doc. 67 at 1459–63. In short, the Defendants are enforcing

Title IX against the Plaintiffs to the Plaintiffs' injury. Roe and Roe's family advocated for the same—including the Defendants' claim that Roe's threat of imminent legal action precipitated their change in school policy. And Roe specifically intervened to protect that result. Mot. to Intervene as Def., Doc. 13 at 107. The Court's resolution of the issue will bind all of the parties and "the benefits to judicial economy of warding off additional suits and addressing the relevant issues with finality" is the reason Declaratory Judgment exists in the first place. *Id.* at 116 (cleaned up). As discussed in Section VI, *infra*, the proper application of Title IX is also a fundamental part of this dispute because it was the interest asserted by the government in discriminating against the Plaintiffs; evaluating that asserted interest is part of the Court's review of the government's actions.

The only new argument Roe raises in the instant briefing is an argument that the Plaintiffs do not have standing for declaratory judgment because they do not have a private right of action under Title IX for discrimination on the basis of sex. Roe's Mot. to Dismiss, Doc. 75 at 1603–05. But Roe's argument is unavailing for two reasons.

First, there is no requirement that a plaintiff challenging the government's enforcement of a law against them must have a private right of action under that law in order to have standing. That is not the law. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 454 n.1 (1974). And the proposition would

be so devastating to the preservation of liberty, were it accepted, that it defeats itself.

Second, Roe ignores the true nature of this suit, pretending that "[t]he substance of the Plaintiffs' claim is not an objection that they (or even any students) have received different or worse treatment than others 'on the basis of sex,' but an objection to their receiving *equal* treatment that they argue is not required by Title IX." Doc. 75 at 1605 (emphasis in original). Roe is not the only person with civil rights. And the gravamen of the Plaintiffs' suit is that the Defendants are discriminating against the Plaintiffs and violating their civil rights to favor Roe. Doc. 1 at 3-4, ¶6. "Under the Board's own view of what constitutes discrimination in the context of intimate facilities, this is unavoidable." Doc. 1 at 16, ¶92.

The Defendants are violating Title IX, even operating under their own conception of the law. To be sure, the Defendants' atextual enforcement of Title IX is improper to begin with, but the Defendants are discriminating against the Plaintiffs under the Defendants' own view of what constitutes discrimination for intimate facilities.

This is an area where the text of Title IX and Title VII are different. Title IX guarantees that no person "shall, on the basis of sex . . . be subjected to discrimination[.]" 20 U.S.C. § 1681(a). Whereas Title VII specifically says that employers cannot discriminate against any individual "because of such individual's . . . sex[.]" 42 U.S.C. § 2000e–2(a)(1). Title IX expressly lacks the

requirement that the discrimination arise because of that person's sex. Instead, the plain text of Title IX simply says that no person shall be subject to discrimination "on the basis of sex."

Referring to the Defendants' Nondiscrimination and EEO Policy, the Defendants' FAQs state: "The [District] has a policy prohibiting discrimination on the basis of sex (including sexual orientation and gender identity)." Doc. 39-6 at 960. The Defendants even claim a desire to "respect[] the . . . dignity of each and every student." Doc. 39-6 at 959, 962. Yet the Defendants have decided that the Plaintiffs' dignity and core identity are less important than Roe's. To be sure, the Constitution prevents that value judgment (*see* Section IV.A., *infra*). But so does Title IX in this case. Under the plain reading of Title IX—without the safe harbor in 20 U.S.C. § 1686—the Defendants cannot selectively maintain communal restrooms promoting some people's beliefs about "sex" while denying the same to others. To do so is to discriminate "on the basis of sex[.]" 20 U.S.C. § 1681(a).

In addition, the Defendants are discriminating against the Plaintiffs and treating them worse than Roe "on the basis of sex" by choosing Roe's gender identity over their biological sex. For purposes of the Defendants' consideration of "sex," the Defendants added the concepts of sexual orientation and gender identity to biological sex and then began discriminating against the Plaintiffs' biological sex in favor of Roe's gender identity. And by treating the Plaintiffs worse than the families of transgender students, the Board is

11

currently discriminating against the Plaintiffs "on the basis of sex." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1740 (2020) ("To 'discriminate against' a person, then, would seem to mean treating that individual worse than others who are similarly situated.").

All students need a safe intimate space. This includes the Plaintiffs' children. Under Title IX, the Board cannot deny the Plaintiffs the same benefit of safe and private intimate facilities that others enjoy, on the basis of sex. The Board is currently doing so, and violating Title IX.

### B. The Only Settled Law that Governs the Parties is the Text of Title IX.

#### i. *Dodds* is not a Binding Authority Upon the Court or the Parties.

Under basic principles of jurisprudence, there is no binding Sixth Circuit authority on Title IX for this case. *Dodds v. United States Department of Education* was a motions panel decision regarding the stay of a preliminary injunction. 845 F.3d 217 (6th Cir. 2016).

The *Dodds* motions panel decision was not a decision on the merits. *See D.H. v. Williamson Cnty. Bd. of Educ.*, No. 3:22-CV-00570, 2022 WL 16639994, at *7 (M.D. Tenn. Nov. 2, 2022). And, as a matter of law, it was not even the law of the case. *See Wilcox, D.O., P.C. Emps.' Defined Benefit Pension Tr. v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989) ("Refusal to stay a preliminary injunction pending appeal does not establish the law of the case since it rests on nothing more than a tentative appraisal of the probable result

on the merits.") (citation omitted). *Dodds* cannot be the law of the circuit when it is not even the law of the case.

In addition, the *Dodds* opinion involved interrelated considerations of factors beyond the likelihood of success just as the district court's decision did. Therefore, *Dodds* involves multiple levels of non-dispositive predictions and interrelated factors outside of the merits. Underscoring that point, *Dodds* contains **_no_** analysis of the statute. The only legal point even raised by the motions panel was the idea that discriminating against someone because of that person's non-conforming gender behavior is improper under Title VII (and civil rights statutes generally). *Dodds*, 845 F.3d at 221. But no one here wants Roe to be discriminated against for gender non-conforming behavior; that is not what this case is about. The Plaintiffs simply want the protections and considerations for biological sex that their elected representatives provided in the text of Title IX.

As a preliminary injunction, the underlying decision in *Board of Education of the Highland Local School District v. United States Department of Education* was also **_not_** a merits decision. 208 F. Supp. 3d 850 (S.D. Ohio 2016). As a matter of law, "[a] court's determination of substantive issues at the preliminary injunction stage is **_not_** dispositive of those substantive issues on the merits[.]" *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 438 n.2 (6th Cir. 2020) (emphasis added) (cleaned up); *see also Am. Civil Liberty Union v. Mukasey*, 534 F.3d 181, 188 (3d Cir. 2008) (appellate panels

not bound by prior panel's analysis regarding likelihood of success). In addition, the Department of Education ("<u>DOE</u>") was a party in *Highland* and the court specifically deferred to DOE's transitory interpretative guidance regarding sex which included gender identity. *Bd. of Edu. of the Highland Local Sch. Dist.*, 208 F. Supp. 3d at 869–70. But DOE is not a party to this case and the current DOE's guidance regarding the same has been enjoined. *Tennessee v. U. S. Dep't of Educ.*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022).

Accordingly, there is no binding authority in the Sixth Circuit controlling the issues at hand and the Court must conduct its own independent analysis of the statute. The Middle District of Tennessee recently considered *Dodds* and *Highland* and came to the same conclusion. *See D.H.*, 2022 WL 16639994, at *6-7 (applying the text of Title IX to conclude that the plaintiff was unlikely to succeed on the merits of Roe's position).

### ii. Title IX Expressly Permits Separate Intimate Facilities Based on Biological Sex.

As the Sixth Circuit recently explained, "Title VII differs from Title IX in important respects"; for instance, "under Title IX," schools "must consider sex in allocating athletic scholarships, and may take it into account in maintaining separate living facilities for the different sexes." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (cleaned up). Accordingly, "it does

not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Id.*[3]

Accordingly, Title IX must be analyzed under its own text. And when you apply the text of Title IX, you get a different result than *Bostock* because, as the Sixth Circuit pointed out, 20 U.S.C. § 1686 expressly allows schools to "maintain[] separate living facilities for the different sexes." *Id.* at 510 n.4. Courts cannot read this text out of the statute and even the *Bostock* court emphasized that "the same judicial humility that requires [courts] to refrain from adding to statutes requires [courts] to refrain from diminishing them." 140 S. Ct. at 1753. Essentially, Roe asks the Court to diminish Title IX when even the *Bostock* court itself explained that doing so would be improper. Here, Congress has expressly addressed Bethel's situation in the plain terms of the statute. And that "should be the end of the analysis." *Id.* at 1743 (citation omitted).

Reinforcing that this is correct, the largest judicial panel to have ever considered the issue found that Title IX means what it says—Bethel is allowed to  maintain intimate facilities based on biological sex. *Adams by & through*

---

[3] The Defendants cite Judge Bush's opinion in *Charlton-Perkins v. University of Cincinnati* for the proposition that courts should use Title VII cases for the legal standards resolving Title IX cases. Doc. 75 at 1606 n.1. But Title VII is fundamentally an employment law statute. And Roe ignores Judge Bush's specific explanation that courts often look to Title VII for Title IX claims "when those causes of action are used to assert employment-discrimination claims, ... given the highly developed body of caselaw in that area." *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1058 n.2 (6th Cir. 2022). The instant dispute is not an employment dispute and therefore any employment case law has significantly less persuasive force.

*Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812-15 (11th Cir. 2022) (en banc). The *Adams* court's judgment is fundamentally correct.

When Congress passed Title IX in 1972, the ordinary public meaning of "sex" was the traditional understanding of sex as a binary classification based on the biological distinctions between male and female. And this is reflected in numerous dictionary definitions of "sex" from the time. *See, e.g.*, *The American College Dictionary* 1109 (1970) ("the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished ..."); *Webster's Third New International Dictionary* 2081 (1971) ("the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change ..."); *American Heritage Dictionary* 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions"); *Webster's New Collegiate Dictionary* 1054 (1979) ("the sum of the structural, functional, and behavioral characteristics of living beings that subserve reproduction by two interacting parents and that distinguish males and females").

In addition, at the time Congress passed Title IX, the same traditional understanding of "sex" was also reflected by the Supreme Court, which explained that "sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth[.]" *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion). Therefore—according

16

to both the dictionary and the highest American legal authority available at the time—when Title IX was enacted, the ordinary public meaning of "sex" in the statute is the traditional concept of biological sex as determined at birth. Accordingly, the Court must apply the ordinary public meaning of "sex" under the statute which is biological sex.

The statute's long-standing implementing regulations further underscore the correctness of biological sex as the ordinary public meaning of "sex" in 1972. Pursuant to 20 U.S.C. § 1686, Title IX's implementing regulations have long specified that schools "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. This provision was adopted in 1980. 45 Fed. Reg. 30960 (May 9, 1980). It specifically demonstrated the traditional binary understanding of male and female as the biological sexes because it referred to "one sex" and "the other sex." Therefore, not only does Congress' plain language directly address Bethel's situation, but contemporaneous agency regulations confirm the same.

These long-standing agency regulations are particularly powerful evidence of the original public meaning of Title IX. Because they have no Constitutional role and are not elected by the People, agencies do not have the power to prohibit what Congress expressly permits nor permit what Congress expressly prohibits. *Util. Air Reg. Grp. v. E.P.A.*, 573 U.S. 302, 327 (2014) ("The

17

power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration. But it does not include a power to revise clear statutory terms that turn out not to work in practice."). If "sex" in Title IX did not mean immutable biological sex at birth, then agency regulations expressly permitted a form of discrimination that Title IX directly prohibits. Yet, the regulations only became effective after extensive review by Congress, including more than a week of Congressional hearings to confirm that the regulations were "consistent with the law and with the intent of the Congress in enacting the law." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 532 (1982) (citation omitted). Those regulations have stood for nearly 50 years without substantive change. Indeed, "[w]here an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." *Id.* at 535 (cleaned up). Accordingly, the long-standing historical implementing regulations are ***powerful*** evidence corroborating the ordinary public meaning of Title IX.[4]

---

[4] Even if a federal agency were to try to change the long-standing historical regulations to prevent communal restrooms separated by biological sex, the agency would run into the corollary problem. In that case the agency would be trying to prohibit something that Congress' statute expressly permits in 20 U.S.C. § 1686. The American Constitutional order does not work that way. It undermines democracy when unelected administrative agencies attempt to change the law and control behavior through improper guidance or formal action to rewrite a statute and prohibit what Congress has chosen to expressly permit. The Plaintiffs have a right to rely on the ordinary public meaning of the text that their elected representatives enacted at

In short, the word "sex" not only applies in 20 U.S.C. § 1681 regarding discrimination but also in 20 U.S.C. § 1686 in expressly authorizing schools to "maintain[] separate living facilities for the different sexes." Therefore, the ordinary public meaning of Title IX—as confirmed by the dictionary, the Supreme Court, and the contemporaneous and closely vetted implementing regulations—is that schools may maintain separate intimate facilities based on biological sex.

The Defendants are discriminating against the Plaintiffs based on their biological sex and denying them an educational benefit, the use of sex separated intimate facilities, by allowing biological males to use a female only intimate facility (or biological females to use male only intimate facilities). Thus, the Plaintiffs (male or female) are denied an educational benefit based on their sex, which is impermissible discrimination under Title IX.

III. **Parental Rights.**

The Plaintiffs discussed their fundamental parental rights in some detail in their standing briefing. Doc. 59 at 1300–03; Doc. 67 at 1463–67. The Plaintiffs incorporate all of that reasoning and analysis herein. Instead of rehashing issues already briefed, the Plaintiffs focus on providing additional context and information to help the Court resolve the instant motion.

The Plaintiff parents (and all parents broadly) have a fundamental right to "direct the upbringing and education of children under their control."

---

the time it was enacted. And the only way to change that text is through the People's representatives in Congress

*Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972); *see also Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (Due Process Clause provides "heightened protection against government interference" with a parent's right "to direct the education and upbringing of one's children") (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)). That right is particularly acute where the infringement involves "the rights of parents to direct the religious upbringing of their children." *Yoder*, 406 U.S. at 233; *Emp't Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 881 (1990) (distinguishing strict scrutiny of government action where free exercise involves parental rights). This right specifically secures the parent's ability to make educational decisions without government interference. *See Troxel v. Granville*, 530 U.S. 57 at 66 (2000) (plurality opinion) (citing *Glucksberg*, 521 U.S. at 720). And while schools generally retain the power to control their operations, the fundamental parental right "plainly extends to the public school setting[.]" *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005).

### A. The Defendants are Infringing on the Plaintiffs' Fundamental Parental Rights by Materially Interfering with their Ability to Properly Choose the Right School or Educational Option for their Child.

The Supreme Court has specifically explained that the Constitution provides "heightened protection against government interference" with the Plaintiffs' fundamental parental rights. *Glucksberg*, 521 U.S. at 720. The Supreme Court has also demonstrated in multiple contexts that the burdening

20

of a right constitutes an infringement of the right. *See, e.g.,* Doc. 59 at 1301–02. In addition, the Supreme Court has specifically recognized that this principle applies to parental rights. *See Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) (recognizing impermissible burden on a parent's potential choice of school).

Importantly, there is no disagreement on this point of law. Roe agrees that "rights may be infringed where they are burdened" and that the *Espinoza* court found that "the parenting right was impermissibly burdened[.]" Doc. 75 at 1612. To be sure, Roe contends that *Espinoza* is a Free Exercise case. *Id.* But this is a Free Exercise case as well. And fundamental parental rights are particularly acute where they involve the religious upbringing of one's children. *See Yoder*, 406 U.S. at 233.

Without any real disagreement on the point of law that the Defendants cannot interfere with the Plaintiffs' fundamental rights, Roe's briefing comes down to the assertion that the Plaintiffs' parental rights are not "actually burdened" or that the Defendants are not "interfering" with that right as provided by the Supreme Court in *Glucksburg*. Doc. 75 at 1612; *Glucksburg*, 521 U.S. at 720. Put differently, when Roe contends that the Defendants are not burdening the Plaintiffs' right to choose the right school or educational option for their children, Roe is arguing that the Defendants are not interfering with the Plaintiffs' ability to make that choice. But Roe's argument disregards the very nature of the right.

Fundamental parental rights rest on the long-standing legal presumption "that fit parents act in the best interests of their children." *Troxel*, 530 U.S. at 68. And the right of a parent to decide what is in the best interests of their child is inextricably connected to the parents' right to deploy their judgment on behalf of the child:

> Our constitutional system long ago rejected any notion that a child is the mere creature of the State and, on the contrary, asserted that parents generally have the right, coupled with the high duty, to recognize and prepare their children for additional obligations. The law's concept of the family rests on a presumption that ***parents possess*** what a child lacks in ***maturity, experience, and capacity for judgment*** required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

*Id.* (emphasis added) (cleaned up).

By denying the parent Plaintiffs the common sense information they need to fully assess the school to make decisions in the best interests of their child—including the religious upbringing of the child—the Defendants are specifically interfering with the parents' ability to deploy their considered judgment on behalf of the child. At the risk of stating the obvious, "maturity," "experience," and "capacity" are no good if not informed by the facts. As such, the Defendants are interfering with and creating an undue burden on the Plaintiffs' fundamental parental right to choose the right school in the best interests of their child. And the Defendants are doing so at the right's very foundation by robbing these parents of their ability to deploy their considered judgment on behalf of the child.

The Plaintiffs are not asserting some unmoored Constitutional right to information from schools. The mixing of biological males and females in intimate spaces—including the mixing of youth of different ages and adults with children—and the school's rules for the same, go to the core of the child's being as well as the child's safety, privacy, and upbringing (especially their religious upbringing). Indeed, "[i]t is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children, information fundamental to a child's identity, personhood, and mental and emotional well-being[.]" *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, No. 522-cv-04015-HLT-GEB, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022). In the instant case, the Defendants' withholding of this common sense information ***regarding the Defendants' own rules*** is absolutely interfering with the parents' fundamental right to choose the school that is in the best interests of their child. Roe's argument that parents have no right to information from the school impacting their own children is incorrect, and it is not supported by the very case law they cite for the proposition.[5]

---

[5] *Crowley v. McKinney* for example, deals with the rights of a noncustodial parent, a situation wholly different from the one here. 400 F.3d 965, 971 (7th Cir. 2005). *Bangura v. City of Philadelphia* also deals with the rights of a noncustodial parent. No. 07-127, 2008 WL 934438, at *4 (E.D. Pa. Apr. 1, 2008). *Schmidt v. Des Moines Public School* deals with a noncustodial parent's attempts to violate a court ordered custody arrangement, and the ensuing lawsuit against the school for failing to assist that violation. 4:08-CV-477, 2010 WL 11493827, at *1, 6 (S.D. Iowa Sept. 23, 2010). *Cherry v. LeDeoni*, deals with a noncustodial parent who was incarcerated after multiple violent crimes. No. 99 CV 6860(SJ), 2002 WL 519717, at *1 (E.D.N.Y. Mar. 31, 2002). His child's mother testified against him, and he sued to obtain an unredacted report card (which would include an address), which the government believed he

In addition, public schools are supposed to reflect the values of their local communities. And local communities can differ. Therefore, both Roe and the Plaintiffs could move to different communities with different values for other public schools if they wanted. The Plaintiffs chose to live in Bethel partly because the community shares their values. And the Defendants chose to adopt these changes in secret for the same reason, because the community shares the Plaintiffs' values. *See* Doc. 1 at 9, ¶50.

Finally, Roe's argument that the Plaintiffs can just pull their children out of public school, Doc. 75 at 1612, ignores the complex nature of real life, including the State's mandatory school attendance requirements. Not everyone can afford to send their child to private schools. Nor can everyone homeschool their children. "For many, particularly those of limited means or education, public school is effectively mandatory." *Tatel v. Mt. Lebanon Sch. Dist.*, No. CV 22-837, — F. Supp. 3d —, 2022 WL 15523185, at *21 (W.D. Pa. Oct. 27, 2022).

---

would use to harm his child's mother, as she had testified against him at trial. *Id.* at *2, 7. In *John & Jane Parents 1 v. Montgomery County. Board of Education*, there was no Free Exercise claim and the court's analysis belied the difference for claims arising in the religious context. No. 8:20-3552-PWG, — F. Supp. 3d —, 2022 WL 3544256, at *8 (D. Md. Aug. 18, 2022). *Rogers v. Pike Road Board of Education*, is a qualified immunity case concerning comprehensive notification about an incident, which places school officials in a perpetually impossible position of individual liability and second guessing, whereas this case is about parents knowing the school's own rules for matters impacting the core right so they can use their judgment in exercising the right. No. 2:21cv455-MHT, 2022 WL 4563014 (M.D. Ala. Sept. 29, 2022). Finally, the court in *Arnold v. Board of Education of Escambia County Alabama* was "balancing" the rights of parents and schools to the particular facts of that case, not creating a global rule regarding the scope of the right. 880 F.2d 305, 314 (11th Cir. 1989). That is the same task for the Court here on the particular facts of this case, where the issues go to the fundamental core of the right itself. The Plaintiffs are not trying to micromanage the Defendants. And it is difficult to see how the school's interest in hiding its own rules from the parents overcomes the parents' ability to exercise their Constitutional right at its core.

In addition, all options come with their own costs, and parents need information from the schools to weigh those costs and judge what is best for their child.

For instance, private school (if it is even an option) may require a parent to take an additional job, reducing the amount of time they can spend with the child. Home schooling could cause one parent to leave the workforce, reducing the family's standard of living. Or maybe the child has great friends at school or in the neighborhood and changing schools, switching to homeschooling, or moving to a different neighborhood would be a significant burden on the child. The Plaintiff parents cannot successfully use their considered judgment in navigating these various dynamics without knowing the school's own rules regarding these common-sense questions. Based on the school's actual rules regarding the fundamental issues of safety, privacy, and identity (including religious identity), different parents may make different decisions, including some who may choose to leave their children in the school; however, *that* is the parent's decision to make and the government cannot interfere with it. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

In the instant dispute, everyone agrees that the Plaintiff parents have a fundamental right to choose where their children go to school. Doc. 75 at 1609; Defs. Mot. to Dismiss, Doc. 79 at 1652. In addition, Roe agrees that the Defendants are not permitted to substantially burden the right or interfere with the exercise of the right. Doc. 75 at 1610-11. The Board Defendants agree

as well. Doc. 79 at 1652 ("Defendants . . . incorporate by reference Defendant-Intervenor Anne Roe's Motion to Dismiss . . . in its entirety."). And the Plaintiffs have alleged that the Defendants are actually burdening their exercise of that right by denying them the common sense information they need about the school's own rules to make that decision in the best interests of their child. This interference contravenes the foundational basis of the right (for parents to use their considered judgment for their own child) with respect to foundational issues at the core of the right (safety, privacy, and the upbringing of the child, including their religious upbringing). In short, the Plaintiff parents have stated a claim.

> **B. The Defendants are Violating the Plaintiffs' Parental Rights by Forcing their Children to Share Communal Intimate Facilities with Members of the Opposite Biological Sex and Improperly Promoting LGBTQ+ Beliefs and Values to Them.**

The Plaintiff parents have also properly alleged that the Defendants are violating their fundamental parental rights by forcing their children to share intimate facilities with members of the opposite biological sex and improperly promoting LGBTQ+ beliefs and values to them. Doc. 1 at 11-13, ¶¶68, 74-75.

The only way the Court could find that the Plaintiffs have failed to state a plausible claim for relief under these allegations is by ruling that parental rights truly end at the schoolhouse door, as Roe seems to argue. Doc. 75 at 1613. But as explained in the Plaintiffs' standing reply, neither the Supreme Court nor the Sixth Circuit has ever said that. Doc. 67 at 1467 n.6. The Sixth Circuit has actually said the opposite (discussed below). *Blau v. Fort Thomas*

*Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005) (stating that the fundamental parental right "plainly extends to the public school setting"). And it would be improper to apply Roe's proposition given the Supreme Court's various pronouncements regarding the right. Doc. 67 at 14667 n.6. Finally, even the Ninth Circuit panel that stated parental rights do not extend beyond the schoolhouse door took that proposition out of its own opinion, after a resolution of the United States House of Representatives condemned the opinion as an infringement on the Plaintiffs' Constitutional rights. *Fields v. Palmdale Sch. Dist.* (PSD), 447 F.3d 1187, 1190–91 (9th Cir. 2006) (removing "we affirm that the *Meyer–Pierce* right does not extend beyond the threshold of the school door"); H.R. Res. 547, 109th Cong. (2005) (enacted) ("Expressing the sense of the House of Representatives that the United States Court of Appeals for the Ninth Circuit deplorably infringed on parental rights in *Fields v. Palmdale School District*.").

Roe and the Ninth Circuit overframe and misapply Chief Judge Sutton's opinion in *Blau*. The Plaintiffs are not claiming that they have a right to control the school generally. Roe proffers a block quote from *Blau* but ignores that twice in that quote Chief Judge Sutton uses the qualifier "generally." Doc. 75 at 1613. And immediately preceding the quote, Chief Judge Sutton explained that the fundamental parental right "***plainly extends to the public school setting***[.]" *Blau*, 401 F.3d at 395 (emphasis added).

Read properly, *Blau* stands for the proposition that parents do not have the right to control schools generally; however, the Defendants' decisions are subject to parental rights in the rare circumstance when the core of that parental right is actually implicated. Confirming that this is the correct reading of *Blau*, Chief Judge Sutton specifically observed that "[t]he Blaus did not claim that the dress code was incompatible with any religious beliefs that they may hold." *Id.* at 386. Put differently, the proper reading of Sixth Circuit caselaw is precisely as the Plaintiffs claim.

In short, while the Defendants have a right to control the school generally, they do not have an absolute fiefdom. When Justice McReynolds drafted *Meyer*, he used an example that forecloses that result when explaining the rationale of fundamental parental rights in the American Constitutional order:

> In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. Although such measures have been deliberately approved by men of great genius their ideas touching the relation between individual and state were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any Legislature could impose such restrictions upon the people of a state without doing violence to both letter and spirit of the Constitution.

*Meyer v. Nebraska*, 262 U.S. 390, 402 (1923).[6] The Defendants are not the "official guardians" of the Plaintiffs' children in control of a barracks in

---

[6] In *Blau*, Judge Sutton also correctly noted that the statute at issue in *Meyer* applied to both private and public schools. 401 F.3d at 395 (parenthetical for *Meyer*); *see also Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 861 (1982) (plurality opinion)

furtherance of some ideology. Therefore, no matter how important the Defendants believe it is for the Plaintiffs' children to embrace LGBTQ+ beliefs and values in total disregard of their families' religious and traditional values, and to share intimate facilities with members of the opposite biological sex, the schoolhouse walls and the Plaintiffs' tax dollars do not give the Defendants an absolute fiefdom in which to do that. And it would be anathema to the "ideas touching the relation between individual and state" which underlie our Constitution to hold otherwise. *Id.*

### i. The Plaintiffs' Right to Guard Their Children in Intimate Spaces and Raise Them in the Faith go to the Core of Fundamental Parental Rights.

Unlike *Blau*, this is not a case about the right to wear blue jeans to school. This case directly involves concerns that go to the core of the fundamental right.

There is nothing more central to the "care" and "custody" of one's children than to guard their safety and privacy in intimate spaces. Nor is there a more important deployment of a parent's "natural bonds of affection," "maturity," "experience," or "capacity for judgment" than to protect the dignity of their child's core identity and shaping of that core identity in line with their religious and moral beliefs and practices. Forcing the Plaintiffs' children to

---

(using *Meyer* as an example and noting "[o]ur precedents have long recognized certain constitutional limits upon the power of the State to control even the curriculum and classroom").

share intimate facilities with members of the opposite biological sex, directly and substantially, interferes with the Plaintiff parents' right to guard their child and direct their education and upbringing. Doc. 1 at 11-12, 15, 19-20, ¶¶68, 85, 110-13; Doc. 59 at 1300-03. To be sure, this is particularly acute for the religious parents given *Yoder*. But it also applies for John Doe No. 9 who is not particularly religious, yet still retains the fundamental right to guard the safety and privacy of his children and instill in them the traditional understanding of gender and biological distinctions between male and female. Doc. 1 at 16, ¶¶93–96.

The Defendants are forcing the Plaintiffs' children to share restrooms with members of the opposite biological sex. As pled, the school's single-occupancy restrooms are not sufficient to serve the large religious communities in Bethel. *Id.* at 11, ¶64. As explained by John Doe No. 2 in the preliminary injunction proceedings, there are approximately 400 Ahiska Muslim Turkish students in the school alone (without including the other Muslim students or any of the Christian families). Doc. 49-1 at 1114, ¶12. The parents have the same desire for their children to share in communal facilities that Roe's family does. Doc. 1 at 22, ¶129; Decl. of Joanne Roe, Doc. 13-2 at 135, ¶29. And the families are subject to the same pressure of alienation and stigmatization that Roe claims in using the single-occupancy restroom. *See* Doc. 13-2 at 134, ¶26.

Ultimately, the Defendants' gender identity restroom policy is forcing the Plaintiffs' children to share intimate facilities with members of the opposite

biological sex which is incompatible with the safety, privacy, and identity shaping judgment of all the Plaintiff parents. And for the religious Plaintiffs, the policy is "incompatible with [the] religious beliefs that they [] hold." *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 386 (6th Cir. 2005). These objections all fall within the parents' essential domain. The school must respect the parental right and accommodate the families from having to share communal intimate facilities with members of the opposite biological sex, absent a compelling interest achieved through narrowly tailored means. *Id.* at 393 ("Governmental actions that infringe a fundamental right receive strict scrutiny."); *see also Tatel v. Mt. Lebanon Sch. Dist.*, No. CV 22-837, — F. Supp. 3d —, 2022 WL 15523185, at *17–18 (W.D. Pa. Oct. 27, 2022) (parental rights within a school are fundamental for matters of great importance that go to the heart of parenting including the child's personal identity and religious and moral beliefs).

### ii. The Defendants are Interfering with the Plaintiff Parents' Fundamental Parental Right by Improperly Promoting LGBTQ+ Beliefs and Values to their Children.

There is a difference between providing information as part of a transparent curriculum and reaching outside of proper curriculum to promote a particular belief or ideology on a sensitive topic that a school withholds from parents. The latter, on a developed record, can arise to government interference with fundamental parental rights. *See, e.g.*, *Tatel*, 2022 WL 15523185, at *23 ("[A]bsent a compelling need, a school district should have

31

tolerance for differing parental views on sensitive topics and may at least need to provide notice and opt out opportunities for those who take a different stand with respect to their offspring.") (cleaned up).

The Plaintiffs allege that the Defendants are improperly promoting LGBTQ+ beliefs and values to their children without notifying the parents or giving them any meaningful ability to opt out. Doc. 1 at 13, 24, ¶¶75-77, 140-41. This includes required reading and surveys that promote the same and are designed to affect the children's behavioral, emotional, and attitudinal characteristics regarding the same. *Id.* 13, 23-24, ¶¶74–78, 138, 140.

This directly undermines the parental role and abuses the advantage and respect that are properly due educators in our system. "The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure." *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987). In addition:

> Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary.

*Id.*

There is no material difference between forcing the children of the Ahiska Turkish Muslim community to listen to lectures about the divinity of Jesus Christ and making them subject to the promotion of LGBTQ+ beliefs and

values or required assignments lauding gender transitions. Either way, the school is advancing views on sensitive topics that have an undeniable tie to religious questions that may conflict with the private beliefs of the family. In that regard, the school is interfering in the religious sphere in the same way that discriminating against religion for non-religion is just as problematic under Free Exercise as discriminating against one religion for another. The fundamental parental right protects against that. *See Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972) ("*Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children.").

In addition to improperly administering attitudinal surveys and requiring "Bethel students [to] complete assignments promoting LGBTQ+ beliefs[,]" The Plaintiffs' allege that Defendants have been violating federal law by failing to provide notice to the parents about these efforts or giving the parents the ability to opt out. Doc. 1 at 13, 23-24, ¶¶75-78, 136-141. Similarly, the Defendants refuse to provide the Plaintiffs with the Defendants' rules for "the promotion of LGBTQ+ beliefs among students." *Id.* at 16-17, ¶97. All this reinforces the plausibility of the Plaintiffs' claims because people tend to want to hide improper behavior. To be sure, the Plaintiffs' must ultimately prove this claim; however, it is properly pled and subject to discovery.

## IV. Equal Protection.

The Plaintiffs have also properly pled a straightforward Equal Protection claim to remedy the Defendants' discrimination. The United States Constitution prevents the Defendants from denying the Plaintiffs "the equal

protection of the laws." U.S. Const., amend. XIV, § 1. And the Ohio Constitution gives the Plaintiffs a similar guarantee. Ohio Const., Art. I, § 2 (providing that the peoples' government is instituted "for their equal protection and benefit").

"To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Andrews v. City of Mentor*, 11 F.4th 462, 473 (6th Cir. 2021) (citation omitted). The Plaintiffs have stated an equal protection claim because the Defendants are discriminating against the Plaintiffs and that discrimination is burdening their fundamental rights.

Here, the Defendants are engaged in disparate treatment by providing an important educational benefit to Roe and other transgender students that the Defendants are denying to the Plaintiffs. Doc. 1 at 16, ¶91. "When a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment." *Zobel v. Williams*, 457 U.S. 55, 60 (1982). And as is implicit in the statement of the law from the *Andrews* court, differential treatment is subject to strict scrutiny where the discrimination "invades a fundamental right, such as speech or religious freedom." *Maye v. Klee*, 915 F.3d 1076, 1086 (6th Cir. 2019) (cleaned up). The same is true under the Ohio Constitution. *State ex rel. Maras v.*

*LaRose*, 2022-Ohio-3852, 2022 WL 15654420, *3 (Ohio 2022) (strict scrutiny under Ohio law where equal protection involves a suspect class or fundamental rights).

### A. The Defendants are Discriminating Against the Plaintiffs and Denying them Equal Treatment.

Plaintiffs have long brought Equal Protection claims to "ensure equal treatment" under the law. *Benalcazar v. Genoa Twp.*, 1 F.4th 421, 426 (6th Cir. 2021) (ensuring equal treatment provides standing for Equal Protection claim). And the Equal Protection Clause has long barred religious discrimination. *See United States v. Batchelder*, 442 U.S. 114, 125 n.9 (1979) ("The Equal Protection Clause prohibits selective enforcement based upon an unjustifiable standard such as race, ***religion***, or other arbitrary classification.") (emphasis added) (cleaned up). The Plaintiffs properly bring such a claim under the Equal Protection Clause because the school has chosen to selectively administer its nondiscrimination policy against the religious community, in favor of a different protected group. This violates the Equal Protection Clause. *See Meriwether v. Hartop*, 992 F.3d 492, 514 n.9 (6th Cir. 2021) ("The Equal Protection Clause does not tolerate irregular, discriminatory application of 'neutral' laws. Nor does the Free Exercise Clause.").

In the Complaint, the Plaintiffs explained that communal restrooms are a long-standing educational benefit. Doc. 1 at 16, ¶91. The Defendants are providing that benefit to transgender students in accordance with their perceived identity while denying the same to the religious students. *Id.* at 16,

21, ¶¶91, 121–24. And the Defendants are doing so even though they have enacted a written nondiscrimination policy that specifically guarantees equal educational opportunities to all students, but also explicitly to religious students as a protected class. *Id.* at 15–16, 20-21, ¶¶87–91, 117–124. The Plaintiffs also allege that the Defendants are treating transgender students as a protected class under the same policy and providing the communal restroom benefit to transgender students in a manner that reinforces their identity but refused to provide the religious students with the same. *Id.* at 21, ¶¶119, 122–124. The Plaintiffs further allege that the Defendants are doing so at the insistence of the parents of transgender students for the perceived well-being of their children while denying the same to the religious parents for the perceived well-being of their children. *See id.* at 21, ¶123.

Therefore, the Defendants have chosen to treat parental rights unequally, depending on the protected group to which the parent in question belongs. The Defendants are also providing educational benefits unequally and denying the Plaintiffs the protection of the Defendants' written policy that explicitly protects them from this sort of treatment—all for the benefit of a more favored class of students. *Id.* at 3-4, ¶6. Put differently, the Defendants have enacted a specific law/policy that expressly protects the Plaintiffs and guarantees them equal educational opportunities. The Defendants have chosen to deny them the protection of that law/policy and the equal benefits guaranteed by the same while providing both to Roe and other transgender

students.[7] These are straightforward claims of unequal treatment and the quintessential denial of "equal protection of the law."

### B. The Plaintiffs and the Families of Transgender Students are Similarly Situated for the Purposes of the Defendants' Actions.

The religious Plaintiffs and the families of transgender students are similarly situated in all material respects for purposes of the Defendants' actions. Although, "[w]hen evaluating whether parties are similarly situated, courts should not demand exact correlation, but should instead seek relevant similarity." *Andrews v. City of Mentor*, 11 F.4th 462, 474 (6th Cir. 2021) (cleaned up). In addition, at the pleading stage all that is required are plausible allegations that the parties are similarly situated. *See id.* at 475 ("[A]t the pleading stage, all that we require of the Trust are plausible allegations that its property is similarly situated to the Woodlands of Mentor."). Here, the Plaintiffs easily satisfy this requirement.

---

[7] In the Defendants' FAQs put out after adopting the rule change, the Defendants even explained that they were simply acting consistent with their aforementioned nondiscrimination policy to provide equal educational opportunities to their students. *See* Doc. 39-6 at 959, 960, 962, 963 (discussing the decision to "allow[] a transgender student access to the facilities that he or she prefers" as rooted in the school's nondiscrimination policy and providing equal educational opportunities). But the fact that they are discriminating against the religious Plaintiffs despite guaranteeing them equal educational opportunities is probably why the Defendants advanced the argument in response to their Ohio Open Meetings Act ("OMA") violation that they were acting pursuant to an anti-harassment policy. Doc. 20 at 660, 672-73. This anti-harassment policy is not an accommodations policy and says nothing about accommodations. Decl. of Julie E. Byrne, Doc. 37-1 at 805 (Middle school principal Matt Triplett emailing superintendent Justin Firks to say: "[a]fter looking through board policy I see nothing about student rights and bathroom use"). Perhaps the Defendants thought it better to try the ether of unenumerated governmental discretion, although still failing under the OMA, than advance the nondiscrimination provision that demonstrates their violation of the Plaintiffs' civil rights

The Plaintiff students and transgender students are all students at Bethel schools, eligible for the use of communal restroom facilities provided by the Defendants. Doc. 1 at 8, ¶48. The Defendants have also guaranteed both equal educational opportunities as protected classes under its Nondiscrimination and EEO Policy. *Id.* at 15, ¶88. Likewise, the parent Plaintiffs and parents of transgender students are all the parents of students receiving these benefits and have a desire to properly raise and support the health and well-being of their child.

In short, the Plaintiff parents and religious students are all similarly situated for purposes of the decision that the Defendants' made and continue to make. The only real dissimilarity between the Plaintiffs and Roe in this case is that the Defendants and Roe want the law to apply differently to them. But the law does not apply differently; it applies equally. And the relevant parties are all similarly situated.

## C. The Defendants' Actions Must Satisfy Strict Scrutiny Because Their Discrimination Impinges on the Plaintiffs' Fundamental Rights.

As discussed above, unequal treatment is subject to strict scrutiny where the government's disparate treatment impinges on a fundamental right. *Andrews v. City of Mentor*, 11 F.4th 462, 473 (6th Cir. 2021); *Maye v. Klee*, 915 F.3d 1076, 1086 (6th Cir. 2019). This case involves two fundamental rights: religious freedom and parental rights. As discussed in the Complaint and below, the Defendants' discrimination against the Plaintiffs invades both the parents' and students' rights to Free Exercise. In addition, the Defendants are

interfering with the Plaintiff parents' fundamental parental rights while allowing the parents of transgender students to exercise their parental right to direct the education and upbringing of their child as those parents believe is in the best interests of their child. On both counts, the Defendants' unequal treatment invades a fundamental right and is subject to strict scrutiny. And the Sixth Circuit has repeatedly held that Equal Protection claims are proper—and government actions subject to strict scrutiny—where religious distinctions burden a plaintiff's right to Free Exercise. *See Koger v. Mohr*, 964 F.3d 532, 545 (6th Cir. 2020); *Maye*, 915 F.3d at 1086.

## V. Free Exercise.

In addition to Equal Protection, the Plaintiffs also alleged Free Exercise claims under both the United States Constitution and the Ohio Constitution. Ohio Free Exercise analysis is slightly different than the Federal analysis because, as discussed below, Ohio did not adopt the Supreme Court's framework in *Employment Division, Department of Human Resources of Oregon v. Smith*. 494 U.S. 872 (1990). But the result is the same in this case, and the Defendants must satisfy strict scrutiny.

Under the Free Exercise Clause of the United States Constitution, "laws that burden religious exercise are presumptively unconstitutional unless they are both neutral and generally applicable." *Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021). In addition, "the Free Exercise Clause guards against even subtle departures from neutrality on matters of religion." *Id.* (cleaned up). And "[a] law is not neutral and generally applicable unless there is neutrality

between religion and non-religion." *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020) (cleaned up)*; see also Church of the Lukumi Babalu Aye v. City of Hiahleah*, 508 U.S. 520, 537 (1993) (prohibiting government action that "devalues religious reasons for [an action] by judging them to be of lesser import than nonreligiousreasons [sic]").

The Defendants are providing a long-standing educational benefit—communal restroom facilities—to transgender students in accordance with their identity arising from secular reasons while denying the Plaintiffs the same benefit in accordance with their identity arising from religious reasons. The Defendants are also permitting the parents of transgender students to shape ***their*** children's educational experience in conformity with their child's believed core identity on secular grounds while denying the same to the parent Plaintiffs on religious grounds. In this case, neither the United States Constitution nor the Ohio Constitution allow the Defendants to make that value judgment.

## A. The Defendants' Actions Burden the Plaintiffs' Free Exercise.

This dispute involves significant issues that go to the heart of the Plaintiffs' faith. And the Defendants' actions place a substantial burden on their free exercise. "[T]o condition the availability of benefits upon [individuals'] willingness to violate a cardinal principle of [their] religious faith effectively penalizes the free exercise of [their] constitutional liberties." *Sherbert v. Verner*, 374 U.S. 398, 406 (1963); *see also McDaniel v. Paty*, 435

U.S. 618, 626 (1978). The Complaint alleges sincere religious beliefs that a human being's essential identity reflects a Creator who forms them at birth as distinct and separate genders, either as male or female. Doc. 1 at 11, 14, ¶¶67, 80. And it is incompatible with the Plaintiffs' sincerely held religious beliefs for the students to share intimate facilities with members of the opposite biological sex for reasons of modesty, privacy, and maintaining separateness between the biological sexes. *Id.* at 11-12, 14, 19-20, 22, ¶¶67-68, 72-73, 82, 112-113, 128; *see also* Doc. 59 at 1307. This problem extends to the parents as well because raising their children in the faith is a fundamental part of the exercise of their own faith. *Id.* at 11-12, 15, ¶¶68, 85.

The Plaintiffs specifically alleged that the school's private single-occupancy restrooms are limited and not practical for the large religious communities in Bethel. *Id.* at 11, ¶64. Nor are any private facilities available for school events such as football games. *Id.* Corroborating the absence of any viable alternative, these religious students are holding their urine to avoid using the restroom if at all possible. *Id.* at 12, 14, ¶¶72, 80. For their part, the Defendants admit that the school "is overcrowded" including "the restrooms" and that "single user restroom facilities are limited in number" and "access is [] limited[.]" Doc. 39 at 842, ¶¶63–64. Without any viable alternative, the Plaintiffs are being forced to share communal intimate facilities with members of the opposite biological sex. Doc. 1 at 12, 19, ¶¶70, 112.

But even if reasonable alternatives were available, the Plaintiffs' free exercise would still be substantially burdened so long as their access to communal restrooms required their willingness to share the communal restrooms with members of the opposite biological sex. That is precisely the sort of "Hobson's Choice" that substantially burdens free exercise. *Meriwether v. Hartop*, 992 F.3d 492, 517 (6th Cir. 2021). The Plaintiffs are faced with the choice of violating cardinal tenets of their faith or receiving government benefits, which penalizes their religious beliefs. *Sherbert*, 374 U.S. at 406; *see also Dahl v. Bd. of Trustees of W. Mich. Univ.*, 15 F.4th 728, 731 (6th Cir. 2021) ("[A] policy that forces a person to choose between observing her religious beliefs and receiving a generally available government benefit for which she is otherwise qualified burdens her free exercise rights."); *Yaacov v. Mohr*, No. 16-4361, 2018 WL 6333604, at *2 (6th Cir. June 5, 2018) ("[A] burden is substantial where it forces an individual to choose between following the tenets of his religion and retaining governmental benefits[.]") (citing *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007)).

The plaintiffs are human too. They do not want to be stigmatized as "bigots" for using private restrooms. And they want to participate in communal restrooms. These are the same issues complained of by Roe. Doc. 13-2 at 134, ¶26; Doc. 75 at 1632. Yet the Defendants are treating them worse than Roe.

The coercive effect of the Defendants actions is that the Plaintiffs must adhere to LGBTQ+ orthodoxy or forego a long-standing educational benefit. Doc. 1 at 22, ¶129 (pleading coercive effect of mandatory attendance and pressure to violate core beliefs to use communal intimate facilities); *see also Meriwether*, 992 F.3d at 517. And that is well recognized as a substantial burden under the law. Therefore, the Defendants' actions place a substantial burden on the Plaintiffs' free exercise both because they are placing the Plaintiffs' children in a position that is incompatible with their religious beliefs and because their actions have a coercive effect on the Plaintiffs' free exercise.

Finally, the Plaintiffs allege that the Defendants are improperly promoting LGBTQ+ beliefs and values to their children without consent (and while trying to hide it from parents). Doc 1. at 11–13, 23-24, ¶¶68, 75-78, 138-41. It substantially burdens the parents' right to raise their children in the faith to have to compete with the school's active promotion of opposing messages—especially when the school keeps notice of the same from the parents. *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) (schools have unique power over students given mandatory attendance requirements, inherent respect for school leaders, and the vulnerable nature of children as impressionable and subject to peer pressure); *see also* Section III.B.i., *supra*.

In sum, the Plaintiffs have alleged multiple substantial burdens on the free exercise rights of both the students and the parents. Accordingly, the Defendants must satisfy strict scrutiny because their actions are not neutral

towards religion or the Plaintiffs' beliefs. Under the Ohio Constitution, the Defendants actions must also satisfy strict scrutiny because the Defendants are placing substantial burdens on the Plaintiffs and Ohio applies strict scrutiny even if a law is neutral and generally applicable. *State v. Cook*, No. 5-19-26, 2020 WL 615076, at *4 (Ohio Ct. App. Feb. 10. 2020) (holding that the government must satisfy strict scrutiny where government action has a coercive effect on the plaintiffs' religious practice); *Humphrey v. Lane*, 728 N.E.2d 1039, 1045 (Ohio 2000) (same); *State v. Whisner*, 351 N.E.2d 750, 764 (Ohio 1976) (applying *Yoder* and *Sherbert* burden inquiry for coercive affect requirement).

### B. The Defendants' Actions are Not Neutral.

#### i. The Defendants are Discriminating Against Religion.

The Equal Protection Clause is not the only Constitutional requirement where equal treatment matters. In addition to the Equal Protection Clause, "[t]he Free Exercise Clause protects religious observers against unequal treatment[.]" *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 479 (6th Cir. 2020) (second alteration in original) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993)). The Plaintiffs allege a straight-forward case of unequal treatment. Here, the Defendants are providing some parents and students with important benefits in conformance with their proffered core identity while denying the same to the religious Plaintiffs. On a fundamental level, the Plaintiffs allege that the

Defendants are treating the Plaintiffs' religious identity as less than Roe's gender identity—which is a value judgment that the Constitution prohibits. *See Monclova Christian Acad.*, 984 F.3d at 480 ("[The Free Exercise] Clause prohibits government officials from treating religious exercises worse than comparable secular activities.") (cleaned up); *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020) ("A law is not neutral and generally applicable unless there is neutrality between religion and non-religion.") (cleaned up); *Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021) ("[T]he Free Exercise Clause guards against even subtle departures from neutrality on matters of religion.") (cleaned up).

As a corollary to the Defendants' unequal treatment of religion and these religious Plaintiffs, the Free Exercise Clause prohibits government actions that "penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens[.]" *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n.*, 485 U.S. 439, 449 (1988)). The Plaintiffs' specifically pled that, due to the Defendants' actions, "Plaintiffs are being pressured to violate their core beliefs for the use of communal intimate facilities." Doc. 1 at 22, ¶129. And as discussed Section V.A., *supra*, the government penalizes religion when the availability of benefits depends on the willingness to violate one's faith.

45

As a result, the Defendants' actions are not neutral and must satisfy strict scrutiny under both the United States Constitution and the Ohio Constitution.

### ii. The Defendants' Actions and Irregularities Bear the Marks of Religious Hostility.

The Sixth Circuit has instructed courts that they must be careful to fully scrutinize potential religious hostility. *Meriwether v. Hartop*, 992 F.3d 492, 514 (6th Cir. 2021) ("[C]ourts have an obligation to meticulously scrutinize irregularities to determine whether a law is being used to suppress religious beliefs."). Irregularities in government action reveal signs of non-neutrality and religious hostility violates Free Exercise as inherently non-neutral government conduct. *Id.* at 512–15.

This case bears the hallmarks of irregularity and indicia of religious hostility properly considered on a full record. For instance, the government "must give neutral and respectful consideration to a person's sincerely held religious beliefs." *Id.* at 512 (cleaned up). But when members of the Ahiska Muslim Turkish community gave their own resources to try to find a solution for everyone, the Defendants treated them with patent disrespect by taking their resources and putting them to use contrary to their wishes without even telling them. Doc. 1 at 10, ¶61.

The Defendants conduct has also been irregular. *First*, the Defendants alleged basis for making the change has been "a moving target." *Meriwether*, 992 F.3d at 514. When announcing the new rule, Board President Lydda

Mansfield specifically claimed that the District made the change because Title IX required it upon the advice of the board's attorney. Board of Education, *Regular BOE Meeting*, YOUTUBE (Jan. 10, 2022), https://www.youtube.com/watch?v=36ndGc1Ge-8&list=PPSV, at 1:16:00–1:17:50; 1:29:17.[8] In response to a question from the audience, Ms. Mansfield later advised that the decision was made consistent with the Defendants' nondiscrimination policy. *Id.* at 1:29:05-1:30:15. And the FAQs also emphasize the nondiscrimination policy as the basis for the Defendants' decision. Doc. 39-6 at 960, 963 ("[The District] has a policy prohibiting discrimination on the basis of sex[.]"). But in opposition to the Plaintiffs' motion for a preliminary injunction, the Defendants claimed that basis was the school's anti-harassment policy. Doc 20 at 660, 672-73. *Second*, the Defendants' new rule or accommodations policy itself is a "Moving Target" that lacks consistency. *Meriwether*, 992 F.3d at 515. For instance, the Defendants' FAQs claim that the school values the "dignity" of every student and they provide "accommodations" to "ensur[e] the student has equal access to, and an equal opportunity to participate in, the District's education programs[.]" Doc. 39-6 at 959, 962. This led the school to provide communal restrooms in conformity with the transgender students' core identity. Yet biological sex is fundamentally tied to the religious Plaintiffs' "dignity" and the school has a written Policy

---

[8] The Board's meetings are public record and proper for judicial notice. *Tollbrook, LLC v. City of Troy*, No. 17-CV-11417, 2018 WL 339900, at *5 (E.D. Mich. Jan. 9, 2018), *aff'd,* 774 F. App'x 929 (6th Cir. 2019) (taking judicial notice of video evidence of a city council meeting accessible by YouTube).

specifically guaranteeing them equal educational opportunities. Yet, the Defendants are not providing them with communal restroom accommodations in support of their dignity or compatible with their core identity. *Third*, the Defendants' supposed investigation into the events of January 12, 2023, where several witnesses identified Roe in a restroom stall with a female student, "raises several red flags." *Meriwether*, 992 F.3d at 515. For instance, the Defendants emphasize in their briefing that Roe denies the allegations. Defs.' Br. in Resp. to Pls.' Br. on Standing to Bring Fed. Claims, Doc. 63 at 1437. Yet, the Defendants' "investigation" did not extend to any of the multiple eyewitnesses. In addition, the Defendants disregard that the threshold credibility battle between Roe and the multiple eyewitnesses is not the sexual conduct but whether Roe was in the same stall with the other student. There are four eyewitnesses that put Roe in the same stall. The Defendants appear to deny that Roe went to the restroom with another student, while Roe admits using the restroom with a female friend. Doc. 63 at 1437 ("[Female students] made scandalous allegations against Anne Roe, none of which investigation, including review of security video, were able to verify and all which Anne Roe uncategorically and emphatically denies."); Suppl. Decl. of Roe, Doc 57-1 at 1263-64, ¶¶4-5 ("[O]n January 12, 2023, I believe I did enter and use the girls' communal restroom located near the cafeteria of Bethel High School" with "my close friend and fellow student[.]"). The Defendants' investigation reaches "conclusions" without fully vetting the witnesses and pressing key issues which

48

suggests that any investigation was either conclusory or illusory. Such a poorly conducted investigation and inconsistent findings present circumstantial evidence of "subtle departures from neutrality." *Meriwether*, 992 F.3d at 516. And, *fourth*, all of the foregoing is in addition to the significant procedural irregularity that the Defendants violated the letter and the spirit of the Ohio Open Meetings Act to make a major rule change in secret.

In sum, the Defendants are treating the Plaintiffs' religion worse than Roe's secular gender identity and the Defendants' actions are therefore not neutral. But the Defendants' actions also bear hallmarks and indicia of irregularities and religious hostility. Therefore, it is proper to resolve the Plaintiffs' Free Exercise claim on a full record. And this is especially true in a case like this involving a contentious cultural issue where the religious claimants are up against a powerful movement of the day. *See Byrd v. Haas*, 17 F.4th 692, 700 (6th Cir. 2021) ("[I]f anything, we must be especially solicitous of religious claimants who run against fashionable trends.").

## VI. The Defendants' Discrimination Against the Plaintiffs Cannot Survive Strict Scrutiny.

It is "rare" to satisfy strict scrutiny. *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020). To do so, the Defendants must have a compelling interest that is narrowly tailored and the least restrictive means to accomplish its objective. *See, e.g.*, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) (striking down government action that denied benefits to religious persons while expressly rejecting more "roomy or flexible approaches to discrimination

against religious organizations and observers") (cleaned up). This is the government's burden to prove. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). It is "a difficult hill to climb, and [] was never meant to be anything less." *Roberts*, 958 F.3d at 415.

As an initial matter, strict scrutiny is the ***government's*** burden to prove not Roe's, and the compelling interest advanced has to be the actual genuine interest behind the government's actions. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2432 n.8 (2022) ("Government justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation.") (cleaned up). As pled in the Complaint, argued by the Defendants in their briefs, announced by the Defendants to the community, and included in the Defendants' FAQ, the government's justification for its actions was enforcing Title IX. Doc. 1 at 3, 4, 15, ¶¶3, 8, 87; Doc. 20 at 669 ("Title IX of the Educational Amendments of 1972 requires that transgender students be granted access to the restrooms and locker rooms of their sexual identification."); Doc. 39-6 at 960, 962 (stating that the District must provide these bathroom accommodations because "discrimination on the basis of gender identity is unlawful discrimination under Title IX[.]").

Roe contends that the government's interest was actually "protecting student health and safety and eliminating discrimination on the basis of sex and transgender status." Doc. 75 at 1630. To be sure, Roe's arguments are not

persuasive as discussed below. But that is also not what the government said.[9] Roe is essentially saying that the Defendants lied to the community. The Defendants seem to admit the same by incorporating all of Roe's briefing into theirs. Doc. 79 at 1652. But the moving target of the government's proffered justification underscores why it would be improper to determine the parties' arguments on the pleadings anyway because the Court needs to fully evaluate the claims against vetted truth rather than shifting *post hoc* positions that are not briefed by the government.[10]

The Defendants' Title IX justification is not really proper to brief for strict scrutiny at this stage since the Defendants' did not argue it. *See Meriwether v. Hartop*, 992 F.3d 492, 517 (6th Cir. 2021). But part of the reason that the enforcement of Title IX is not a compelling interest is because Title IX specifically permits the school to maintain restrooms separated by biological sex. Section II.B.ii., *supra*. This reinforces the propriety of the Plaintiffs' Title IX claim since the statute is a necessary part of the strict scrutiny analysis. Nonetheless, the new position adopted by the Defendants in this briefing is also unavailing.

---

[9] Nor did the Plaintiffs say this. Roe pretends that the Plaintiffs alleged this in paragraphs 3, 49, and 52 in the Complaint. Doc. 75 at 1630. But student health and safety and remedying transgender discrimination are nowhere in those paragraphs. This is the first time these interests have been advanced by the Defendants, Roe, or the Plaintiffs.

[10] Unfortunately for the local community, this is also consistent with a fundamental problem at the core of this dispute. While their representatives may act dishonestly and inconsistently, they can ultimately trust that the government's interest will be whatever Roe says it should be.

### A. Roe Does Not Offer a Compelling Interest.

Roe argues two compelling interests: (1) protecting student health and safety and (2) eliminating discrimination on the basis of sex and transgender status. Doc. 75 at 1630. Neither are compelling in this instance.

Roe does not explain the "student health and safety" interest that the school was supposedly promoting. *See generally id.* at 1630-31. Roe just passes over it in getting to what appears to be Roe's real argument: eliminating discrimination based on gender identity. In good faith, the Plaintiffs looked at the cases Roe cited regarding safety but still cannot figure out what Roe is arguing here.[11] And this underscores the improper vice of the Defendants trying to shoehorn this in through Roe at this phase of the litigation because the Court and the Plaintiffs need the government to explain the health and safety interests they were furthering to properly assess and analyze against the requirements of the law.

The Plaintiffs understand Roe's argument about eliminating discrimination. But that cannot serve as a compelling interest in this case. *First*, transgender students were not being discriminated against with biologically sex-separated bathrooms because Title IX expressly permits it. Further, Roe was not prohibited from using the female bathrooms because Roe is transgender; but rather because Roe is a biological male. Thus, there was

---

[11] Roe has argued (and cites cases) that seem to indicate health and safety is a proper consideration of the government but has not described the health and safety issue being addressed by allowing a male into a female intimate facility.

never any "gender identity" discrimination to begin with. *Second*, even assuming the Defendants had a good-faith belief that they were previously discriminating against transgender students (which they were not), two wrongs do not make a right. *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923) ("[A] desirable end cannot be promoted by prohibited means [which conflict with the Constitution]."). The Defendants do not have a compelling interest in discriminating against the Plaintiffs. *Third*, the inherent structure of the law forecloses that result since religious discrimination is subject to strict scrutiny whereas sex discrimination is subject to intermediate scrutiny. *Compare Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421–22 (2022) (strict scrutiny for religious discrimination), *with J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 152 (1994) (Kennedy, J., concurring) (intermediate scrutiny for sex discrimination). And, *fourth*, "[i]t is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546–47 (1993) (cleaned up).[12] Not only are the Defendants' actions leaving, indeed causing, appreciable discriminatory

---

[12] This applies to health and safety as well because the Defendants have created safety risks that the Plaintiffs are trying to address. Safety risks that Roe has allegedly already exacerbated through sexual misconduct in the restrooms. *See, e.g.*, Doc. 1 at 8, 16, 20, ¶¶47, 95, 113; Decl. of Student Witness No. 1, Doc. 49-2, Decl. of Student Witness No. 2, Doc. 49-3, Decl. of Father of Student Witness No. 2, Doc. 49-4, Decl. of Student Witness No. 3, Doc. 49-5. In no sense at this point of the litigation have the Defendants established that they are promoting student health and safety. Instead, the record at this stage permits the conclusion that the Defendants are creating health and safety risks, a core complaint of the Plaintiffs.

damage to the Plaintiffs and a large portion of the school, but half of the Plaintiffs and a large portion of the school are Ahiska Muslim Turks. Doc. 49-1 at 1114, ¶12. Prior to coming to the United States, they were long subject to stigmatizing and dehumanizing discrimination that prevented them from living their faith and traditions. John Doe No. 2 personally experienced that for much of his life. *Id.* at 1113, ¶9. And those Plaintiffs, like the Christians and other Muslims, are being "pressured to violate their core beliefs" to avoid the same type of stigmatizing injury that Roe claims the Defendants were trying to eliminate. Doc. 1 at 22, ¶129. In short, Roe's proffered argument cannot be an interest of the highest order in this case because *inter alia* it leaves (indeed creates) significant discriminatory damage.

### B. Roe's Proffered Compelling Interests are not Narrowly Tailored and the Least Restrictive Means to Accomplish those Interests.

Nor are the Defendants actions narrowly tailored to Roe's proffered compelling interests nor the least restrictive means to accomplish the same. There are plenty of less restrictive ways to pursue Roe's proffered interests than discriminating against the Plaintiffs. Here again, it is impossible to effectively assess and analyze Roe's health and safety argument without the government's explanation (or any explanation) as to what is meant by that in this context and how the government's actions were specifically taken to further that interest. But there are plenty of less restrictive ways to combat discrimination. For example, Roe and transgender students can use single-occupancy restrooms if they are uncomfortable with using the restroom that

corresponds to their biological sex. In addition, the Defendants could address discrimination through civic education, teaching students that they must respect all students even if they disagree with them and that no discrimination or bullying will be tolerated. The Defendants could also enforce that prohibition with meaningful investigation and discipline. But instead of pursuing more narrowly tailored options, the Defendants' chose broad discrimination against the religious Plaintiffs.

In addition to the foregoing approaches to promoting safety and preventing discrimination, schools can meet the specific needs of transgender students through a variety of approaches subject to the judgment of each local community. *See, e.g., Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 797-98 (11th Cir. 2022) (en banc) (explaining efforts of the school district to value LGBTQ students). The Defendants previous rule separating intimate facilities on the basis of biological sex did not discriminate against Roe. Roe has never explained why it is necessary to infringe on the Plaintiffs' constitutional rights and force them to choose between the faithful practice of their religion and using the communal restroom.

## **CONCLUSION**

For all the foregoing reasons Roe's motion should be denied

Dated:        April 17, 2022

                                    Respectfully submitted,

s/ Joseph P. Ashbrook
Joseph P. Ashbrook (0091279)
Julie E. Byrne (0085174)
Ashbrook Byrne Kresge, LLC
PO Box 8248
Cincinnati, Ohio 45249
Tel: (513) 582-7424
Fax: (513) 216-9882
jpashbrook@ashbrookbk.com
jebyrne@ashbrookbk.com

Nicholas Barry
(*pro hac vice*)
America First Legal Foundation
611 Pennsylvania Ave, SE #231
Washington, DC 20003
Telephone: (615) 431-9303
Facsimile: (513) 216-9882
nicholas.barry@aflegal.org

*Attorneys for the Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of April, 2023, I served a copy of

the foregoing via the Court's ECF system, which notifies all counsel of record.


s/ Joseph P. Ashbrook   
Joseph P. Ashbrook
