```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF OHIO
 2                          AT DAYTON
    _____
 3  JOHN DOE NO. 1, JANE DOE NO. 1,      )
    JOHN AND JANE DOE NO. 1,             )
 4  JOHN DOE NO. 2, JANE DOE NO. 2,      )
    JOHN DOE NO. 3, JOHN DOE NO. 3,      )
 5  JANE DOE NO. 4, JANE DOE NO. 4,      )
    JANE DOE NO. 5, JANE DOE NO. 5,      )
 6  JANE DOE NO. 6, JANE DOE NO. 7,      )
    JANE DOE NO. 7, JOHN DOE NO. 8,      )
 7  JANE DOE NO. 8, JOHN DOE NO. 9,      )
                       Plaintiffs,       ) CASE NO. 3:22-CV-00337
 8                                       )
                       -vs-              )
 9                                       )
    BETHEL LOCAL SCHOOL DISTRICT BOARD   )
10  OF EDUCATION, LYDDA MANSFIELD, LORI  )
    SEBASTIAN, NATALIE DONAHUE, DANNY    )
11  ELAM, JACOB KING, MATTHEW CHRISPIN,  ) ORAL ARGUMENT
                       Defendants,       )
12                                       )
                       -vs-              )
13                                       )
    ANNE ROE,                            )
14           Intervenor Defendant.       ) COURTROOM 4
    _____)
15
                  TRANSCRIPT OF PROCEEDINGS
16         BEFORE THE HONORABLE MICHAEL J. NEWMAN,
           UNITED STATES DISTRICT JUDGE, PRESIDING
17                 TUESDAY, MAY 9, 2023
                        DAYTON, OH
18
    APPEARANCES:
19  For the Plaintiffs, John Does and Jane Does:

20                        JOSEPH PATRICK ASHBROOK, ESQ.
                          JULIE ELIZABETH BYRNE, ESQ.
21                        Ashbrook Byrne Kresge LLC
                          P.O. Box 8248
22                        Cincinnati, Ohio 45249

23                            AND

24                        NICHOLAS BARRY, ESQ.
                          American First Legal Foundation
25                        836 Rachel Drive
                          Goodlettsville, Tennessee 37072
```

1    **For the Defendants Bethel Local School District Board of**
     **Education, Lydda Mansfield, Lori Sebastian, Natalie Donahue,**
2    **Danny Elam, Jacob King, and Matthew Chrispin:**

3                              **LYNNETTE DINKLER, ESQ.**
                              Dinkler Law Office, LLC
4                              174 Lookout Drive
                              Dayton, Ohio 45419
5

6

7    **For the Intervenor Defendant, Anne Roe:**

8                              **DAVID J. CAREY, ESQ.**
                              ACLU of Ohio Foundation
9                              1108 City Park Avenue
                              Suite 203
10                             Columbus, Ohio 43206

11

12

13
     **Courtroom Deputy:        Ms. Claire McDowell**
14   **Term Law Clerk:          Mr. Brendan Sullivan**

15

16

17      Proceedings reported by mechanical stenography,
     transcript produced by computer.
18
                     **Julie Hohenstein, RPR, CRR, RMR**
19                   Federal Official Court Reporter
                       200 West Second Street
20                     Dayton, OH  45402
                       *** *** *** ***
21

22

23

24

25

```
 1    P-R-O-C-E-E-D-I-N-G-S                    9:56 A.M.

 2           COURTROOM DEPUTY MS. McDOWELL:  All rise.  This

 3    United States District Court for the Southern District of

 4    Ohio is now in session.  The Honorable Michael J. Newman,

 5    United States District Judge, presiding.  Please be seated.

 6           THE COURT:  Good morning, everyone.  So I'll begin

 7    by apologizing.  I understand we've had some technological

 8    issues this morning.  The Court's been ready to start at

 9    9:30.  It's now almost ten.  We're almost a half an hour

10    late.  I was waiting in our chambers ready to start at 9:30.

11           We went through the system yesterday, had no

12    glitches whatsoever; but apparently today we're having some

13    glitches, so I apologize.  I've now actually called our

14    Clerk of Courts, because I'm so upset, because we shouldn't

15    be having issues like this.

16           So with all that in mind, Mr. Ashbrook, can we talk

17    to you?  Are there folks that you wish to have on-line this

18    morning?  I want to be sure that everyone, you and Lynnette

19    and the other parties, wish to have here are able to be

20    here, so I just want to talk to you about that before we get

21    started.

22           MR. ASHBROOK:  Yes, Your Honor.  Thank you.  I

23    believe that we've discussed between the parties, and

24    everybody is comfortable proceeding without the on-line

25    access, and that we have been able to let anybody know who
```

```
 1    is expecting to be on.  So there's no issue from our end

 2    proceeding.

 3              THE COURT:  All right.  And, Ms. Dinkler?

 4              MS. DINKLER:  No issue, Your Honor.

 5              THE COURT:  Okay.  Any other party wishes to --

 6              MR. CAREY:  No objections from us.

 7              THE COURT:  Do you want to state who you are just

 8    so Julie --

 9              MR. CAREY:  David Carey.  We represent the

10    Defendant Intervenors, Your Honor.

11              THE COURT:  All right.  And Counsel?

12              MR. BARRY:  Nicholas Barry.  No.

13              THE COURT:  All right.  So I do apologize.  We ran

14    through it yesterday.  There were no glitches.  Apparently,

15    for whatever reason, there's a glitch this morning.  It

16    happens.  I appreciate your sensitivity in understanding,

17    and my apologies also for running late.  We try very hard to

18    be on time.

19              So with that, who would like to begin first this

20    morning?  And we're under no time constraints, and I'm happy

21    to hear from everyone.

22              MR. CAREY:  Your Honor, the Defendant Intervenors

23    will be beginning in a moment, but I'd like to inform the

24    Court of the parties' agreement about the run of show, so to

25    speak.
```

```
 1            THE COURT:  Please, please.
 2            MR. CAREY:  The parties have agreed -- and I'm sure
 3    Mr. Ashbrook will step in if I'm misstating anything -- the
 4    Defendant Intervenors and the Defendants will be going
 5    first, followed by an agreed ten-minute break, followed by
 6    the Plaintiffs, followed by an agreed ten-minute break,
 7    followed by rebuttal by the Defendants and Defendant
 8    Intervenors.
 9            THE COURT:  Works totally fine for me, and thank
10    you.  I appreciate your ability to work together, which
11    doesn't happen in all the cases in front of me, and your
12    kindness and your civility.  It's all good.  Thank you.
13            MR. CAREY:  And we've also agreed that the
14    cumulative total for each side is not to exceed half of the
15    total available time.  We do not agree in advance to any
16    surrebuttals, to be taken as it comes.
17            THE COURT:  I understand.  Okay.
18            MR. CAREY:  Thank you.
19            THE COURT:  And the podium does go up and down, if
20    you'd like it to.  We can show you how to do that.  There's
21    just a little switch on the right-hand side.
22            MR. CAREY:  Thank you, Your Honor.
23            THE COURT:  And thank you for your patience this
24    morning.
25            MR. CAREY:  Once, again, good morning, Your
```

1    Honor --

2              THE COURT:  Good morning.

3              MR. CAREY:  -- David Carey of the ACLU of Ohio.

4              THE COURT:  Nice to see you, Counsel, and thank you

5    for being with us this morning.

6              MR. CAREY:  Thank you, Your Honor.  Representing

7    Defendant Intervenor Anne Roe.  I'll be primarily addressing

8    the claims that are the subject of Anne Roe's Rule 12

9    Motion, which is Counts 2, 3, 4, and 5 of the Complaint.

10             But as an initial matter, I'd like to speak to the

11   Court's question regarding whether the pending Rule 12

12   Motion should be resolved before the Preliminary Injunction,

13   and we believe the answer to that is yes.

14             So just to clarify Anne Roe's position here as

15   Intervenor, she has no position on the ultimate legal merits

16   of the Plaintiffs' Open Meetings Act Claim, but she does

17   oppose the grant of a Preliminary Injunction on the basis of

18   the harm that would befall her, and she would be prejudiced

19   if the Court were to enter an injunction before ruling on

20   the Motions to Dismiss because even setting aside the

21   Defendant's rule -- that the Defendants have filed a Rule 12

22   Motion on the OMA Claim itself, all of the Plaintiffs'

23   Federal Claims are now subject to pending Motions to

24   Dismiss; and should the Court grant those motions as to the

25   Federal Claims, then the OMA Claim should be dismissed as

1   well.

2              It's true that 18 U.S.C. Section 1367 grants the

3   Court discretion as to whether to exercise supplemental

4   jurisdiction, but it is also well-established in Sixth

5   Circuit that when all of the Federal Claims have been

6   dismissed, that, quote, the balance of considerations

7   usually will point to dismissing the State Law Claims,

8   unquote.  And that is from Musson Theatrical versus Federal

9   Express, 89 F.3d 1244, pages 1254 to 55, Sixth Circuit

10  1996.

11             The Sixth Circuit has elsewhere described that as

12  a strong presumption.  That is, Pinney Dock Transport versus

13  Penn Central, 196 F.3d 617, 620 to 21, Sixth Circuit 1999.

14  And, finally, the Supreme Court has said the same.  United

15  Mine Workers of American versus Gibbs, 383 U.S. 715, 726,

16  1966.

17             And the reason for that rule is very clear.

18  Federal Courts should refrain from unnecessarily deciding

19  substantive issues of State law.  And that is, we submit,

20  what this Court would be doing if it were to rule on the

21  Preliminary Injunction first.

22             In part, because the Preliminary Injunction

23  presents a freestanding issue of State law.  It doesn't turn

24  on any Federal Constitutional questions.  It's a discrete

25  matter of State law.

1          Musson and Pinney -- the cases that I mentioned --

2     do allow for retaining jurisdiction, but that is when

3     unusual circumstances exist, which in the case law boils

4     down to judicial economy, convenience, and fairness.

5          So, for example, in Pinney, the cases had already

6     been proceeding for several years, or in some cases the

7     parties have completed discovery and fully briefed Summary

8     Judgment, or the Plaintiff is voluntarily dismissing Federal

9     Claims to engage in forum shopping.

10          None of that is the case here.  There's been no

11     discovery.  We're at a preliminary stage of this matter.  It

12     would be simple enough to re-file this case in State Court.

13          Further, we submit that no -- there is no great

14     emergency to resolve the Preliminary Injunction.  The status

15     quo at Bethel was in effect for nearly a year before the

16     Plaintiffs brought this case.

17          That delay is why they had to rest on a statutory

18     presumption of irreparable harm.  Any claim of actual harm

19     would have been undercut by the delay.  So they can hardly

20     claim a pressing emergency now.

21          Also, according to the School's calendar, Bethel's

22     last day of school is May 25, which is less than three weeks

23     away.  I certainly don't mean to speak for the Court, but it

24     does seem likely that by the time today's argument can be

25     taken under advisement, and a ruling issued, that time

1    either will have passed, or nearly so, and the students will

2    be into the summer break.

3         On top of all that, as the Court is aware, the

4    Plaintiffs' OMA Claim is duplicative of a pending State

5    Court action, which creates an elevated risk of conflicting

6    rulings.

7         So we submit that regardless of the outcome of the

8    School District's Rule 12 Motion on the OMA Claim itself,

9    this Court should rule on the Rule 12 Motions first at

10   minimum as to all Federal Claims before ruling on the

11   Preliminary Injunction, so as to serve that strong policy

12   and strong presumption of deferring to State Courts on State

13   law.

14        So turning to the Rule 12 Motion.  I'll start with

15   Count 2, which is Title IX.  The Plaintiffs are plainly

16   intent on getting this Court to weigh in on an abstract

17   question about how Title IX should be interpreted; but their

18   claim is just that, it's an abstract question.

19        Under Lujan, they have the burden to demonstrate

20   all three elements of Standing.  They fail on all of them,

21   for the reasons that we've explained, but maybe the most

22   obvious problem they have is redressability.

23        They could win on this claim, and nothing would

24   have to change.  They could lose on this claim, and nothing

25   would have to change.

1    That is the definition of an academic question and

2    that should be the end of their claim -- dismissal for lack

3    of subject matter jurisdiction.

4    Over the course of this case, the Plaintiffs have

5    jumped between several Standing theories, and I would like

6    to briefly recap why each of them fails.

7    First, they described the purpose and context of

8    their Title IX Claim at the February 7 Preliminary

9    Injunction Hearing around Pages 62 to 63 of the transcript.

10    Counsel stated that his clients disagree with the

11    School District's understanding of Title IX, and described

12    it as a contentious issue of public debate.

13    The Plaintiffs are seeking clarity and resolution

14    on that issue in what they described as clear binding

15    guidance, so that the School District can, quote, make

16    decisions off of it, unquote.

17    As we've explained, all of that fundamentally

18    misconstrues the role of courts. Courts resolve live cases

19    and controversies. They do not preemptively advise other

20    Government bodies about the meanings of laws for the

21    purposes of guidance, whether binding or otherwise.

22    In fact, that is at the heart of what Article III

23    Courts cannot and do not do -- issue advisory opinions.

24    So even if the School District had been wrong about

25    Title IX -- which it was not, and I'll be discussing that in

1    a minute -- the Plaintiffs would need a cause of action

2    brought under Title IX, not merely a question about it.

3    They've brought no such claim.

4         Second, in their Standing briefing, the Plaintiffs

5    argued that the School District is enforcing Title IX in a

6    manner that violates their Constitutional Rights.

7         And the problem with that argument is that it

8    doesn't describe a cause of action under Title IX.  The

9    Plaintiffs do have other claims that the School District has

10   allegedly violated their Constitutional Rights by its

11   actions, but they are not in a position to challenge Title

12   IX itself because it's not being enforced against them.

13        They're not an entity that is subject to Title IX.

14   They don't claim that anybody has brought or imminently will

15   bring an enforcement action against them under Title IX.

16        Contrast that with the case that they cite, Steffel

17   versus Thompson, where a Plaintiff challenged a criminal

18   statute when he was under immediate threat of prosecution.

19   There's no equivalent to that here.

20        Third, and also in their Standing briefing, the

21   Plaintiffs argue that if the School District had acted

22   differently than it did, Anne Roe might have sued the School

23   District, or they claim that if they prevail on their

24   Constitutional claims in this case, Anne may sue the School

25   District some day in the future; and they contend that the

1    Court should adjudicate that now.

2           Neither one of those scenarios gets them closer to

3    Standing.  The first one is counterfactual; and, therefore,

4    moot.  The School District provided Anne with equal restroom

5    access, so why would this Court need to rule on litigation

6    that she never brought on a situation that never happened?

7           The other scenario involves multiple layers of

8    speculation.  The prospect of future litigation that may or

9    may not happen does not constitute an imminent or certainly

10   impending injury that would confer Standing.

11          And even further, any lawsuit would be brought

12   against the School, not against the Plaintiffs.  They have

13   no basis to demand preemptive adjudication of any future

14   lawsuit, much less one that is unripe and speculative.  Even

15   less, one that wouldn't be brought either by them or against

16   them.

17          So that brings us to their opposition to Anne Roe's

18   Rule 12 Motion.  And here, again, they go back to the first

19   theory.  They concede repeatedly that they are seeking a

20   ruling about whether Title IX, quote, permits, unquote, the

21   School District to expel transgender students from communal

22   restrooms matching their gender.

23          That is the framing of the Complaint.  It matches

24   what they said at the February 7 hearing, and it is not a

25   basis for Standing.

1         Because, again, they're not saying that they're

2    entitled to relief because of Title IX.  They're saying that

3    they're entitled to relief for other reasons under other

4    laws, and that Title IX is not a defense.

5         The Supreme Court addressed that in the MedImmune

6    case -- MedImmune versus Genentech.  That litigants, quote,

7    may not use a Declaratory Judgment Action to obtain

8    piecemeal adjudication of defenses that would not finally

9    and conclusively resolve the underlying controversy,

10   unquote.  That is the precise maneuver that the Plaintiffs

11   are attempting here.

12        Now, at the last minute in this latest brief, the

13   Plaintiffs seem at times to be trying to suggest that Title

14   IX has been violated; but they never explain how their Title

15   IX rights have been violated.

16        Even assuming that is what they mean to argue, that

17   fails for a couple of reasons.  First, it's completely

18   inconsistent with the cause of action described in the

19   Complaint.

20        Part of the reason we know that is that the

21   Plaintiffs have not suggested anything of this like before.

22   Their claim in the Complaint is about whether Title IX

23   permits banning transgender students from restrooms matching

24   their gender, not whether Title IX requires such a ban.

25        Nothing that has been pled anywhere -- second --

1    suggests that Plaintiffs are being treated differently on

2    the basis of sex, nor do they ask for a Declaratory Judgment

3    saying so.

4          All they've argued is that Title IX shouldn't be

5    construed to encompass discrimination on the basis of gender

6    identity.  They don't point to any differential treatment

7    based on sex.

8          So yet, again, what they're arguing is a

9    disagreement about Title IX, not a claim that their Title IX

10   rights have been violated.  So they failed to allege any

11   injury that would give rise to Standing.

12         Now, turning briefly to the merits of their Title

13   IX Claim.  Taken in a vacuum, the Plaintiffs' abstract

14   question about the law is a relatively discrete one; and

15   it's one that was necessarily answered by the Sixth Circuit

16   in Dodds.

17         Their question is this:  Does Title IX require

18   public schools to refrain from excluding transgender

19   students from the communal restrooms matching their gender

20   identity?

21         The Sixth Circuit said, yes, it does require that.

22   And Chief Judge Marbley said the same in the Highland School

23   District case, and that tracks with settled principles of

24   law in this circuit, not to mention the Supreme Court's

25   decision in Bostock.

1        Discrimination on the basis of gender identity is

2    necessarily a form of discrimination on the basis of sex.

3    Title IX prohibits discrimination on the basis of sex.

4        We submit that this Court is not free to simply

5    ignore the Sixth Circuit's ruling in Dodds as the Plaintiffs

6    urge it to do.

7        In no small part because that ruling was correct,

8    but the larger point is that this case does not reach that

9    question.

10        The Plaintiffs have made no secret of their goal

11    with this claim.  They're not seeking resolution to a

12    discrete ripe live controversy, which a Declaratory Judgment

13    would not provide them anyway.

14        They're asking for a gratuitous preemptive opinion

15    from a Federal Court that they can use as a bargaining chip

16    against the School District in an ongoing political dispute.

17    That is exactly what they explained in the February hearing

18    in this matter.

19        Federal Courts do not -- and we submit should not

20    -- allow themselves to be used in that manner.  So we submit

21    that it would be reversible error to do so here.

22        Moving forward to Count 3, the Parenting Right.

23    This claim is very straightforwardly subject to dismissal on

24    the face of the Complaint; and I say straightforwardly

25    because there is a well-developed and robust body of

1    jurisprudence that provides us with a clear bright line, and

2    these claims fall on the wrong side of it.

3            The Sixth Circuit explained that line in Blau

4    versus Fort Thomas Public School District.  Parents have a

5    fundamental right to decide whether to send their child to a

6    public school.  They do not have a right to reach into that

7    school and dictate its operations or its policies or what it

8    teaches.

9            That principle extends to curricular content, to

10   extracurricular activities, school discipline, hiring

11   practices, dress code, and, yes, restroom accommodations.

12           Whatever other legal rights may be implicated by

13   various schools' practices and policies, whether those

14   rights are Federal or State, statutory or Constitutional,

15   the fundamental Parenting Right of the United States

16   Constitution simply does not grant a right to control public

17   schools the way that Plaintiffs are asserting here.

18           Another way to think of this is that the Parenting

19   Right grants protection from State intrusion.  The Supreme

20   Court put it that way in Troxel versus Granville.  That the

21   right does not allow the State to, quote, inject itself into

22   the private realm of the family, unquote.

23           That is the core guiding principle and core

24   distinction for this area of law, and we've cited cases to

25   that effect from the First, Second, Fourth, Fifth, Sixth,

1    Seventh, Ninth, Tenth, and Eleventh Circuit, plus the

2    Supreme Court, and that basic principle dispenses with all

3    of Count 3 here.

4         The Parenting Right gives no basis to control a

5    school's restroom arrangements.  It gives no power to manage

6    the school's curriculum, and it gives no authority to force

7    the school to respond to what are essentially

8    interrogatories and hypothetical questions.

9         The Plaintiffs attempt to draw a couple of

10   distinctions here, but they don't hold up.

11        First, they point out that in Blau the Sixth

12   Circuit wrote that the right plainly extends to the public

13   school setting.

14        That is, of course, true, and we don't maintain

15   otherwise; but the Plaintiffs' brief takes that partial

16   sentence badly out of context to suggest that it somehow

17   implies that parents do get to control the public school

18   setting in some circumstances.

19        But, in fact, the rest of that sentence, the rest

20   of that paragraph, the rest of Blau, and the rest of this

21   body of law make it clear that the right may extend to the

22   public school setting, but that doesn't mean it gives the

23   parents the right to control the school.  Blau quite

24   literally says the opposite of that in the very next

25   sentence.

1        We've repeatedly pointed in our briefing to Arnold,

2   an Eleventh Circuit decision, because it shows the clear

3   demarcation here.

4        Parents don't have the right to demand information

5   or to compel the school to act in a certain way, but in

6   Arnold, it was a violation of the Parenting Right for school

7   personnel to coerce students not to tell their parents about

8   a pregnancy.

9        No one is suggesting that school officials were

10  exempt from following the law merely because they made those

11  coercive statements on school grounds.

12       The operative question in Arnold was the same as

13  the operative question here:  Did public officials inject

14  themselves into the private realm of the family?

15       The right applies in the public school context, in

16  the public school setting, which is essentially just to say

17  that the school is a Government entity subject to the

18  Constitution.  That's all the Sixth Circuit was saying with

19  that one partial sentence in Blau.

20       Second, the Plaintiffs argue because their

21  Parenting Right is intertwined with their religious beliefs,

22  and because they brought a Free Exercise Claim, the

23  Parenting Rights Claim is boosted such that strict scrutiny

24  automatically applies.

25       As we've pointed out in our briefing, they are not

1    the first litigants to make this argument.  It's the

2    so-called Hybrid Rights Theory.

3           It's drawn from some dicta in Employment Division

4    versus Smith, and in an aggressive misreading of Wisconsin

5    versus Yoder.

6           And the Sixth Circuit could not be clearer about

7    rejecting it.  They rejected it in 1993, Kissinger; 2001,

8    Watchtower; 2002, Prater; and again in 2020, Pleasant View

9    Baptist Church; and it was right to do so, because, frankly,

10   it makes no sense to suggest that alleging two different

11   kinds of Constitutional violations somehow invokes stronger

12   protections than either one on its own.

13          And as we've noted in our Reply Brief, many of the

14   cases specifically rejecting a Parental Right to control

15   school operations also involved religious objections, but

16   that didn't change the fundamental scope and nature of the

17   Parenting Right.

18          This is a well-developed area of law, and claims of

19   this general nature are not especially uncommon; but the

20   Plaintiffs have cited no precedent for any of the particular

21   parental powers that they're claiming here.

22          Instead, they're resting on an implausible reading

23   of Blau, a rejected interpretation of Yoder and Smith, and

24   then inflating their claim by comparing the Bethel Local

25   Schools to Spartan military trainings and medieval

1    thiefdoms.

2           But at the end of the day, this is a very simple

3    claim.  The Plaintiff parents simply don't agree with the

4    School's curriculum or its restroom accommodations.

5           That is not and cannot be a basis for parents to

6    commandeer school operations.  Otherwise, schools would

7    simply collapse from all of the conflicting parental

8    demands.  So Count 3 should be dismissed.

9           Moving on to Count 4, Equal Protection.  I'll start

10   with a simple point that provides a clear basis for

11   dismissal.

12          The Plaintiffs have not alleged discriminatory

13   intent, and that on its own is fatal, leaving aside

14   everything else.  That has been the law ever since

15   Washington versus Davis.

16          A showing of discriminatory purpose is required.

17   And that is purpose, not merely awareness, that disparate

18   impact may occur.

19          Here, not only did they not allege in the Complaint

20   that the School District intended to treat religious

21   students differently or was motivated to that effect,

22   they've actually alleged in the Complaint what the School's

23   motivation was, and it wasn't that.

24          They've alleged that the School District was doing

25   this in order to protect transgender students' rights.  Its

```
1    intent was specifically not to discriminate.

2           That really could be the end of the analysis, but

3    it's also worth discussing the fundamental structural flaws

4    of this claim.

5           This Equal Protection Claim is trying to put a

6    square peg in a round hole, and the first obvious indicator

7    of that is that the Plaintiffs are making an Equal

8    Protection Claim about restroom access when they have the

9    same restroom access as everyone else.

10          And that is critical.  The Plaintiffs don't

11   actually allege that they are being subjected to some kind

12   of different conditions from other students.

13          Instead, what they're claiming is, in essence, that

14   they didn't get what they wanted.  They allege that

15   transgender students got what they wanted -- namely, equal

16   access to restrooms -- and that since the Plaintiffs are

17   religious and also protected from discrimination on the

18   basis of a protected characteristic, they should also get

19   their preferred outcome; even, though, in this case, their

20   preferred outcome is nothing more than removing the equal

21   restroom access that had been given to transgender students.

22   That's simply not how Equal Protection works.

23          They haven't identified a similarly-situated

24   comparator class.  They haven't shown differential

25   treatment.
```

1          As a comparator class, they've attempted to point

2    to transgender students, but the only thing that they share

3    with that group is having some protective characteristic.

4    That doesn't make them comparable in every relevant respect.

5          And the Plaintiffs' only claim of differential

6    treatment is that Anne Roe was afforded access to a restroom

7    matching her gender, and that the Plaintiffs aren't being

8    allowed to have that access taken away.

9          That is not describing unequal treatment.  It's

10   describing the School providing equal treatment to

11   transgender students in a way the Plaintiffs don't like.

12         They're not alleging that Anne gets to use a

13   restroom while they're denied access to it, and they're not

14   arguing that the School treats religious students

15   differently than non-religious students on the basis of

16   their religion.

17         What they're doing is trying to equate, on the one

18   hand, transgender student's right to be free of unequal

19   treatment, with, on the other hand, Plaintiffs' own desire

20   to compel unequal treatment, which they've couched

21   rhetorically as an aspect of their identity.  That is a

22   false equivalence.

23         Nothing about Equal Protection means that affording

24   equal treatment to one group automatically means that

25   another group may come along and demand the removal of that

1    equality as a sort of reciprocity.

2         So, again, the Plaintiffs are not seeking equal

3    treatment.  They have equal treatment.  What they want is

4    for it to be denied to others.

5         We've pointed to Jones versus Boulder Valley School

6    District, which is a District of Colorado case, simply

7    because it's so strikingly similar to the Plaintiffs'

8    framing here.

9         In that case, a group of parents sued a public

10   school over its transgender tolerance curriculum to which

11   they had objections.

12        They argued that as religious parents, they were

13   being treated unequally from non-religious parents because

14   their preferences were not being adopted and that the

15   curriculum was a concern for their religion.

16        And the Court rejected that claim, because just

17   like here, there were no allocation of unequal treatment.

18   Everyone was having to take the same program.  No one was

19   exempt from it.

20        That is why Plaintiffs' Equal Protection Claim

21   fails under both Federal and State Law.  The Plaintiffs are

22   not being treated differently on the basis of their

23   religion.  They're subject to the same restroom arrangement

24   as everyone else, and they're treated no differently under

25   it.

1          The only difference is that they object to it; and

2     for Equal Protection purposes, that on its own is not a

3     difference.  And, again, they've alleged no discriminatory

4     purpose, so this claim should be dismissed.

5          That brings me to Count 5, Free Exercise.  Under

6     Employment Division versus Smith, the school's restroom

7     arrangements are subject to rational basis review under the

8     U.S. Constitution essentially for the same reasons that I

9     just discussed for Equal Protection.

10          The Plaintiffs are not being subjected to unequal

11     treatment on the basis of religion.  They're subject to the

12     same rules as everyone else, and those rules are not

13     specifically directed at religious practice.  They do not

14     discriminate on their face, and religious exercise is not

15     their object.

16          Under Smith, and Kennedy versus Bremerton School

17     District, this is a neutral and generally applicable policy;

18     but even if it wasn't neutral, it still doesn't impose a

19     substantial burden on the Plaintiffs' religious exercise,

20     which would be necessary for their First Amendment Claim;

21     nor does it have a coercive effect, which they would need to

22     show to state a claim under Article 1, Section 7 of the Ohio

23     Constitution.

24          Quite simply, no one is compelling them to do or

25     not do anything in particular.  So, for example, they're not

1    being compelled to adopt any beliefs or recite any creed

2    that is contrary to their faith.

3         They're not being compelled to refrain from any

4    religious practice, such as wearing a garment or saying a

5    private prayer.

6         They're not being compelled to engage in any act

7    their religion forbids, such as an enforced prayer or eating

8    food that is forbidden.

9         Instead, what is happening is that the Plaintiffs

10   are not being permitted to compel the behavior of others by

11   way of School policy.

12        They're not being permitted to control where others

13   are allowed to be.  And, here, the School has even gone so

14   far as to provide alternative accommodations.

15        The Plaintiffs concede in the Complaint that they

16   are permitted to use single-occupancy restrooms, and they do

17   not claim that those restrooms violate any religious

18   preference.

19        They argue in their briefing that those restrooms

20   wouldn't accommodate a population of 400; but this is not a

21   class action.

22        The status quo was in place for nearly a year

23   before they filed this case, but they have not alleged any

24   inability to use the restrooms themselves.  They don't even

25   allege that they tried.

1          And it is rather telling -- as noted in Anne Roe's

2     Reply Brief -- that the Plaintiffs are not actually asking

3     for a religious accommodation here.

4          They are not asking for a restroom that fits their

5     religious preferences.  They can't, because they already

6     have one.

7          They are not asking for more single-occupancy

8     restrooms or better single-occupancy restrooms.  They're not

9     asking for stall doors that afford them greater privacy.

10         What they're asking for is for someone else to be

11    excluded altogether -- not because the status quo is

12    coercive on the Plaintiffs or substantially burdens their

13    rights.  It's not, and it doesn't -- but because it is the

14    Plaintiffs' preference that their environment conform to

15    their religion.  That does not suffice for Free Exercise

16    Claim.

17         And this is a common motif across several of the

18    Plaintiffs' claims, so it's worth emphasizing here.  It is

19    not an invasion of one person's Constitutional Rights when

20    the Government does not act on their behalf to dictate the

21    actions of their classmates or their children's classmates

22    in the name of religion.

23         It is Plaintiffs' requested relief that would be

24    coercive by expelling Anne Roe and other transgender

25    students from the restroom on the basis of their classmates'

1   religious beliefs.

2        And that dispenses with the Federal and State Free

3   Exercise Claims with one addendum.  In their Opposition

4   Brief, the Plaintiffs argue for the first time that the

5   School District is motivated by animus toward religion.

6        These allegations do not appear in the Complaint.

7   And for the reasons discussed in our Reply, this case is

8   miles away from the one case that the Plaintiffs cite on

9   this point, Meriwether versus Hartop.

10       There are no allegations of overtly hostile

11  comments here as there were in Meriwether.  The School

12  District has not danced around different justifications for

13  its actions.

14       It hasn't repeatedly flip-flopped or obfuscated

15  about what its non-discrimination policy even requires.

16  Everything is quite clear.  The Plaintiffs simply disagree

17  with it.

18       The Plaintiffs also discuss in this section an

19  investigation of a supposed incident involving Anne Roe.

20  And setting aside everything else about that, nothing about

21  it has been pled, which renders it wholly irrelevant to a

22  Rule 12 Motion.

23       The bottom line, yet, again, is that the mere fact

24  that the School District made a decision that the Plaintiffs

25  find offensive does not indicate discrimination or animus.

1          For all those reasons, rational basis review

2     applies here.  The School District easily clears rational

3     basis, and the Plaintiffs don't attempt to argue that it

4     doesn't.

5          But even if strict scrutiny somehow did apply here,

6     the School's restroom arrangement survives.  It arises out

7     of two tightly inter-related compelling interests.

8          First, non-discrimination.  The Plaintiffs allege

9     that the School District was complying with its

10    understanding of Title IX.  The purpose of which is

11    non-discrimination.  Combatting discrimination, according to

12    the Supreme Court, is a compelling interest of the highest

13    order.

14         Second, and related, student health and safety.

15    That is tightly related to non-discrimination.  There is a

16    reason that non-discrimination is such a powerful compelling

17    interest, especially in the context of schools; and that's

18    in part because it serves in turn student health and safety.

19         At Paragraphs 48 and 49 of the Complaint, the

20    Plaintiffs appear to concede that part of the impetuous here

21    was protecting students from the perceived emotional harm

22    that would result from denying equal restroom access.

23         And the School's action was as narrowly tailored to

24    those interests as it was possible to be.  Anything else

25    would have failed to alleviate the discrimination that Anne

1    Roe was suffering.

2          And according to the School FAQ document, which is

3    described in the Complaint and attached to the School's

4    Answer, the School extended single-occupancy restroom access

5    to anyone who wanted additional privacy.  The Plaintiffs

6    have simply elected not to use that option.

7          In their response to Anne Roe's Rule 12 Motion, the

8    Plaintiffs argue that a more narrowly tailored solution

9    would have eliminated bullying altogether, which they

10   apparently believe is not only possible at all in high

11   school, but achievable through what they call civic

12   education.  Frankly, that's just lacking credibility.

13         Yes, it would be wonderful if students would all be

14   kinder to each other.  It would be wonderful if students

15   didn't berate my client on her way to the restroom, as she's

16   recounted in her declaration testimony.

17         It would be wonderful if people didn't ask her

18   invasive questions about her body, or declare as she passes

19   that we should kill all transgenders, or leave scissors

20   sitting upright on her school chair, or spray her with

21   disinfectant spray; but suffice it to say, that doesn't seem

22   likely to be our reality any time soon.

23         School administration could not just stick its head

24   in the sand -- as the Plaintiffs suggest it should have

25   done -- so it took the only action available to it in the

1    interest of serving all of its students.

2         It's not the fault of the School that the

3    Plaintiffs are dissatisfied with that.  I'll stop there

4    until rebuttal unless the Court has questions.

5         THE COURT:  No.  Thank you, Counselor.

6         MR. CAREY:  Thank you.

7         THE COURT:  Good morning, Ms. Dinkler.

8         MS. DINKLER:  Good morning, Your Honor.

9         THE COURT:  Just double-checking in an abundance of

10   caution, you're able to hear everything okay?  No -- no

11   accommodation issues?

12        MS. DINKLER:  Yes.  Thank you very much.

13        THE COURT:  My pleasure.  My pleasure.

14        MS. DINKLER:  Time cures all.  May it please this

15   Honorable Court, Your Honor, Opposing Counsel (Indicating),

16   Counsel for Intervenor Defendant (Indicating), my name is

17   Lynnette Dinkler, and I represent the Board of Education,

18   and the individually-named Defendants in official capacity

19   only.

20        As in the briefing, the Board of Education

21   Defendants join in Anne Roe's briefing and Oral Argument

22   presented here this morning.  Those topics will not be

23   re-addressed, but, rather, submitted to -- enjoined in.

24        To address the additional issues that remain, and

25   to supplement a few, I start with Count 6, which is the

1    pupil -- or Protection of Pupil Rights Amendment Claim that

2    the Plaintiffs allege.

3         To date, this Court has been presented with no law

4    to state that that is a claim that can be prosecuted by the

5    Plaintiffs here.

6         The Plaintiffs have not explained why this Court

7    should not apply to dismiss this claim.  The Supreme Court's

8    decision in Lexmark International versus Static Control

9    Components, Inc., a 2014 decision.

10        Instead, the Plaintiffs have stated and stated

11   again that this Court should apply a 1997, and a 2002

12   decision from the Supreme Court, Blessing versus Freestone,

13   and Gonzaga University versus Doe, respectively.

14        There's no basis for using old law, when the

15   Supreme Court has made its position clear.  Furthermore, to

16   date, the Plaintiffs have not explained where a private

17   cause of action springs from the PPRA when the Enforcement

18   Clause in that Federal Act found in 20 U.S.C. 1232h,

19   Subsection E, makes clear that there is no private cause of

20   action.  In the absence of law, there is no Standing or

21   Merit Claim under the PPRA to be asserted here.

22        Turning to Count 1, the OMA Claim.  It is, in fact,

23   distinct and separate from all other claims brought in this

24   lawsuit; and as fully briefed by the parties, should be

25   decided by the State Court.  That proceeding is in

1    discovery, and abstention is appropriate.

2         The Plaintiffs here on the Merits with regard to

3    that claim -- should the Court choose to visit it -- do not

4    apply a Federal pleading standard.  The elements are

5    straightforward.

6         It is a statutory claim, and those independent

7    elements have not been pled in the Complaint.  Because no

8    Federal law implicates the OMA Claim -- which is

9    freestanding -- the State Court should decide it and/or this

10   Court should dismiss it.

11        With regard to the issue of Standing in general,

12   the Plaintiffs have suggested that where one Plaintiff

13   demonstrates Standing, the Court should no longer look at

14   Standing, and all Plaintiffs should be assumed to

15   demonstrate Standing under Article III case in controversy.

16        The case law pointed to by Plaintiffs on this issue

17   deal with a class action -- which is not at issue here --

18   and deal with the issue of Associational Standing -- which

19   is not at issue here.

20        There are no rights of third persons at issue in

21   the Complaint.  An issue that Warth versus Seldin took up at

22   422 U.S. 499, which is the pinpoint cite.

23        Absent any law to suggest otherwise, each claim --

24   Federal and State --  must be reviewed for Standing with

25   regard to the Plaintiffs.

1           And as pointed out in the briefing, the Plaintiffs

2    fit into three different packages:  The Muslim students and

3    then, slash, their parents, which is a subsection; the

4    Christian students, slash, the subsection, and their

5    parents; and then the parent of the non-religious background

6    asserting a general privacy claim.

7           In the Plaintiffs' Reply to Standing, Document 67,

8    PageID 1477, the Plaintiffs cite and ask the Court to apply

9    a Fourth Circuit 2020 decision by the name of Grimm versus

10   Gloucester City School Board, 972 F.3d 586, with a pinpoint

11   of 618.

12          They cite it for the proposition that emotional and

13   dignitary harm is cognizable.  The issue of harm has been

14   fully briefed, and I don't raise the case for that issue but

15   to discuss some very important points, given that Plaintiffs

16   have acknowledged the authority in its application here made

17   by Circuit Judge Floyd in that opinion.

18          In that case, Grimm, a high school male transgender

19   student, files suit against the Board of Education because

20   the Board of Education denied him access to communal

21   restroom based upon his identity.

22          And the Fourth Circuit rejected the Board's policy

23   as unconstitutional under Equal Protection and in violation

24   of Title IX.

25          The Court addressed this issue as described by

1    Judge Floyd.  At the heart of this appeal is whether Equal

2    Protection and Title IX can protect transgender students

3    from school bathroom policies that prohibit them from

4    affirming their gender.  We join a growing consensus of

5    courts in holding that the answer is resoundingly yes.

6         Acknowledging that this is not squared with the

7    allegations here, because we have objectors filing suit and

8    Anne Roe as an Intervenor Defendant, the points made in this

9    decision demonstrate as a matter of law that there is no

10   animus and can be no animus of discriminatory intent

11   associated with the Board of Education's accommodation of

12   Anne Roe's request for access to communal restrooms.

13   The Complaint allegations state that, and the law states

14   this.

15        The -- the Court in that case demonstrates that a

16   policy regarding the use of sex-separated restrooms in a

17   discriminatory manner based upon a student's sex will

18   violate the law, and it looks first at what is the intimate

19   space at page 613, 614.

20        The Court citing authority and various sources in

21   the record writes:  No one questions that students have a

22   privacy interest in their body when they go to the bathroom,

23   but the Board ignores the reality of how a transgender child

24   uses the bathroom by entering a stall and closing the door.

25        Cites Whittaker and Adams for the proposition, when

1    he goes into a restroom, the transgender student enters a

2    stall, closes the door, relieves himself, comes out of the

3    stall, washes his hands, and leaves.

4         In that case, before the filing of the suit, Grimm

5    used the boys' restroom for seven weeks without incident.

6    Here, Anne Roe used the restroom almost a year before suit

7    was filed.

8         In the hearing the Court conducted on the

9    Preliminary Injunction proceeding, an analogy was made by

10   the Board of Education Defendants that using the restrooms

11   at Bethel -- which Plaintiffs concede are separated by

12   stalls -- it's no different when someone walks out of the

13   stall that they wash their hands just like they would in a

14   chemistry lab; and that, there is no associated privacy

15   doing that, to create the basis for a Constitutional

16   violation, or a violation of Title IX.

17        At page 612 in the Grimm decision, the Court

18   writes:  Transgender people frequently experience harassment

19   in schools; and assign that, 78 percent physical assault in

20   places such as schools occurs to the tune of 35 percent.

21   The Court notes that the 2009 Congress expanded hate crimes

22   to include based upon gender identity.

23        At 613, the opinion states, transgender people

24   constitute a minority lacking in political power.

25        At 615 -- very similar to what the Complaint and

1    Answer set forth -- the Court notes there that, emails from

2    apparently concerned community members and statements made

3    in two heated board meetings, which were filled with

4    vitriolic, off-the-cuff comments referring to Grimm as a

5    freak, occurred.

6            Similar to the fact pattern here as alleged in the

7    Complaint and demonstrated by the public record -- which the

8    Court can take judicial notice of -- in Grimm, parents

9    threatened to vote off board members if they allowed Grimm

10   to continue to use the boys' restroom; and, here, three

11   Bethel Board of Education members have been sued in a

12   removal process in State Court.

13           At 620, the Court observes, students are, quote,

14   pretty savvy and comfortable, end quote.  Can, quote,

15   understand and empathize with someone who just wants to use

16   the bathroom, end quote.

17           The Court goes on to state that, it is the adults

18   who struggle with it more.

19           The judge finishes the opinion with profound

20   statement by saying, the proudest moments of the Federal

21   Judiciary have been when we affirm the burgeoning values of

22   our bright youth rather than preserve the prejudices of the

23   past.

24           The Court cites and asks and -- and compares Dred

25   Scott versus Sanford, which held that the U.S. Constitution

1    did not extend American citizenship to people of black,

2    African descent; and, thus, they could not enjoy the rights

3    and privileges of the Constitution conferred upon the

4    American citizens, decided in 1857.

5        In Bowers versus Hardwick, decided in 1986, which

6    held, the Fourteenth Amendment does not prevent a State from

7    criminalizing private sexual conduct involving same-sex

8    couples.

9        With Brown versus Board of Education, decided in

10   1955, where the justices unanimously ruled that, racial

11   segregation of children in public schools was

12   unconstitutional.

13       And further compared the Obergefell versus Hodges'

14   decision of 2015, Due Process Clause of the Fourteenth

15   Amendment guarantees the right to marry as one of the

16   fundamental liberties it protects and that analysis applies

17   to same-sex couples in the manner as it does to opposite-sex

18   couples.

19       The judge continues with -- after those citations

20   -- saying, how shallow a promise of Equal Protection that

21   would not protect Grimm from the fantastical fears and

22   unfounded prejudices of his adult community.  It is time

23   to move forward.  The District Court's judgment is

24   affirmed.

25       The Supreme Court denied a writ of cert on June 28,

1    2021, of that Fourth Circuit decision.  Roberts, Breyer,

2    Sotomayer, Kagan, Gorsuch, Kavanaugh, and Barrett all voted

3    to deny cert.

4         Judge Watson relies upon Grimm in a 2020, Ray

5    versus McCloud, 507 F. Supp. 3d. 925, pinpoint 936

6    through 939.  The plain text of Title IX should not be

7    overlooked here and is not addressed by the Plaintiffs.

8         42 U.S.C. Section 18116, Subsection A, states that,

9    Title IX of the Education Amendments of 1972, 20 U.S.C.

10   Section 1681, et seq., prohibits discrimination on the basis

11   of sex in any education program or activity receiving

12   Federal funding assistance.

13        And it continues on to state that, this section

14   shall not apply to an educational institution which is

15   controlled by a religious organization if the application of

16   this subsection would not be consistent with the religious

17   tenets of that organization.

18        Here, all the parties agree that the Defendant is a

19   public school created by Ohio State statute.  It is not a

20   private religious school that can seek abstention from Title

21   IX, which is understandable.

22        This section of Title IX demonstrates why the

23   Plaintiffs do not create a comparable class for purposes of

24   Equal Protection.

25        This section also demonstrates why a Free Exercise

1    Clause Claim cannot stand here as a matter of law, and why

2    Standing for both fail to exist.

3         The argument that Plaintiffs have raised in

4    briefing of the 400-member Muslim community, let it be

5    known -- as I think that it has from the beginning through

6    the arguments, hopefully through the briefing -- that the

7    Bethel Local Schools is a rich melting pot, and it benefits

8    from having all of these students and all of their families

9    in attendance; and it seeks -- with the financial resources

10   that it has -- to best serve and educate all of them with a

11   free and public education.

12        No action -- as the Complaint demonstrates -- taken

13   by the Board of Education was done with any intent to act

14   contrary to any protected right of any Plaintiff.

15        Enforcing Title IX in good faith to accommodate a

16   request -- which the Plaintiffs have no right to weigh in on

17   and still have not addressed the privacy concerns that limit

18   their ability to weigh in on such request -- similarly, if

19   any of the Plaintiffs made a request for accommodation,

20   neither Anne Roe (Indicating), nor any other member of the

21   student body or public would be permitted to weigh in on

22   such a request.  They have failed to address that issue

23   because they can't.

24        It is because the School Board acted with no

25   discriminatory intent -- only with an intent to follow the

1    law.

2           The new argument touched briefly upon by Anne Roe's

3    Counsel regarding the Board of Education's now supposed duty

4    to eliminate bullying -- which is not pled in the

5    Complaint -- demonstrates why there is no Standing and no

6    Merit Claim here pled in the Complaint.

7           A Lexis or Westlaw search just in Federal Courts

8    with regard to bullying, Title IX will pull up thousands of

9    cases, because, unfortunately, thousands of them are filed;

10    and, unfortunately, many of them involve fact patterns

11    involving students who have either attempted or have claimed

12    their own lives.

13           School Boards of Education and teachers are

14    immunized under Ohio Revised Code 2744 for things as simple

15    as school fights where one student loses a temper, punches

16    another.  Why?  Because we cannot control the acts of third

17    parties.  "We" meaning the Board of Education and its

18    employees and its agents.

19           On one hand, the Plaintiffs are complaining that

20    people within the School are talking about the subject of

21    transgender students, and that they should not be doing

22    that.

23           On the other hand, they're now saying that the

24    Board of Education has failed because they have not given

25    civic instruction on the topic of transgender students.

```
1        These oppositional positions demonstrate why the

2   Complaint fails to make a claim.  Thank you.

3        THE COURT:  Thank you, Ms. Dinkler.  We taking a

4   break now, or are we hearing from Mr. Ashbrook?

5        MR. ASHBROOK:  If we can, let's take a quick

6   ten-minute break, so I can use the restroom.

7        THE COURT:  We stand in recess.  Thank you so much.

8        COURTROOM DEPUTY MS. McDOWELL:  All rise.  This

9   Court is now in recess.

10       (Court was in recess at 10:50 a.m. and resumed at

11   11:09 a.m.)

12       THE COURT:  Please be seated.  Court's back in

13   session.  Okay.  Mr. Ashbrook, whenever you're ready.

14       MR. ASHBROOK:  Thank you, Judge Newman.  Your

15   Honor, Joseph Ashbrook for the Plaintiffs, and may it please

16   the Court.

17       Roe and Defendants largely argue against the case

18   they wish this was rather than the case that the Plaintiffs

19   brought.

20       Biological sex -- indifference between the

21   biological sexes is a distinction that has been recognized

22   throughout the history of the nation and maybe potentially

23   all of human history.

24       Title IX is a statute.  Relates to specifically

25   biological sex.  That's the meaning of the word that was
```

1    used when Congress put it in the statute.  And so this

2    dispute is not about Roe having equal access.  It's not even

3    about Roe at all.

4          We --  Roe intervened in this case; but this is

5    between the Plaintiffs and the School District.  This case

6    is about the Plaintiffs enforcing the Plaintiffs' right, and

7    we're going to get to that in a minute; but Roe is not --

8    Roe is not fundamentally by the School being treated

9    equally.  Roe is being treated special; and our clients,

10   the Plaintiffs, are being treated unequally by the School,

11   and that's the problem, and that's what this case is all

12   about.

13         The briefing on these issues is robust, and the

14   question for today is just whether the Plaintiffs have

15   stated claims upon which relief can be granted.  The

16   answer to that question is, yes, as the Plaintiffs have

17   stated claims under the straightforward application of the

18   law.

19         Before I get to the other claims, a quick word on

20   the Open Meetings Act.  We believe our analysis on this

21   issue is correct on the law.  Today is now the sixth

22   opportunity Defendants have had to argue the issue, and they

23   still didn't offer any substance to refute that analysis.

24         In the instant motion, Defendants argue that we

25   didn't plead necessary elements for the OMA Claim, but do

1    not explain what those elements are or offer any law to

2    support the argument.

3            We pointed -- we pointed that out in our Response

4    Brief; and even with the Reply and now in Oral Argument, the

5    Defendants have not provided any support for that argument

6    or any law for any elements that we are missing.

7            In the end, the private right of action in the OMA

8    only requires a violation or threatened violation of the

9    statute; and as we briefed, our Complaint demonstrated that

10   Defendants' violation of the statute was not only plausible,

11   but virtually certain, and the proceedings thus far have

12   proven that to be true.

13           In the end, Defendants violated both the letter and

14   the spirit of the law by acting on a contentious issue in

15   secret, and the Plaintiffs are empowered by the OMA to

16   restore the legal status quo, enforce invalidation of

17   Defendants' new rule -- separating communal restrooms by

18   gender identity rather than by biological sex -- and to

19   require that any further action on that issue, if

20   Defendants desire, be taken in open meeting of the public

21   body.

22           Now, a few preparatory remarks before getting into

23   the other claims.  As required by the Rules of Civil

24   Procedure, the Plaintiffs provided short -- a short and

25   plain statement of their claims showing their entitlement to

1    relief.  The Plaintiffs have civil rights too, and that is

2    what this case is about.

3            Defendants are not treating the Plaintiffs

4    evenhandedly.  They're not treating religion neutrally,

5    and they are discriminating against Plaintiffs by denying

6    them an educational benefit that they are providing to

7    others.

8            Ultimately, Your Honor, Defendants and Roe cannot

9    grapple with the benefit aspect of this dispute, and that

10   motif, as Counsel adequately said -- this is a corollary to

11   that point -- works its way through all of the claims.

12           There is no dispute that communal restrooms are

13   an educational benefit.  A point made multiple times in

14   the Complaint.  For example, Paragraphs 91, 121, 123, and

15   124.

16           I also don't believe there's any dispute that

17   biologically sex-separated intimate facilities are a

18   long-standing benefit deeply rooted in our nation's history

19   and tradition, and we specifically pled that in

20   Paragraph 113 of the Complaint.

21           And that benefit -- that benefit, biologically

22   sex-separated intimate facilities, is expressly provided for

23   in Title IX, which we explained in Paragraph 42 of the

24   Complaint and Section 1686 of Title IX.

25           Therefore, intimate facilities separated by

1    biological sex that our Plaintiffs have taken advantage of

2    and came to expect are a long-standing, well-established

3    benefit deeply rooted in our nation's history and tradition,

4    and that benefit is also long-standing, well-established

5    educational benefit at Bethel Schools, which we've

6    explained at length, and we stated in Paragraph 41 of the

7    Complaint.

8            But now Defendants have taken that benefit away

9    from the Plaintiffs, and they are now denying Plaintiffs

10   that benefit because they claim they are enforcing Title IX,

11   which they claim requires them to do so.

12           Now, Roe's Motion to Dismiss and Judgment on the

13   Pleadings on this issue -- the Title IX issue -- is divided

14   into Standing and their Merits argument.

15           I'm going to deal with the --  and the Merits going

16   to the idea that schools can provide -- that -- whether

17   schools can provide the benefit of sex-segregated intimate

18   facilities.

19           I'm going to deal with Standing first.  In their

20   Standing Section -- in Roe's Standing Section, Roe maintains

21   that the issue here is hypothetical, and then adds an

22   argument that Plaintiffs lack Standing to argue the Title IX

23   issue because they don't have a Title IX Claim, and I'll

24   address both of those parts.

25           The issue is absolutely not hypothetical.

1    Defendants have admitted they're enforcing Title IX, and in

2    enforcing Title IX, they took away Plaintiffs' long-standing

3    benefit, have given it to Roe, and then -- and then refused

4    to give the same benefit to Plaintiffs, and that

5    Defendants --  therefore, Defendants are enforced --  and

6    which is violating our Constitution --  Plaintiffs'

7    Constitutional Rights.

8            The Defendants are, therefore, enforcing Title IX

9    against the Plaintiffs to the Plaintiffs' injury, and that

10   enforcement of the law is creating Plaintiffs' actual injury

11   and real interest in dispute.

12           There's nothing hypothetical about that, nor is

13   there anything hypothetical about resolving the issue once

14   and for all between all of the parties, which is the

15   exact --  which is the reason Roe said Roe wanted to

16   intervene in the Complaint --  in the dispute to begin

17   with.

18           Now, as a way of underscoring why this issue is not

19   hypothetical, to help you understand, I want you to

20   consider -- Your Honor, I want you to consider Roe's case of

21   Kennedy versus Bremerton School District.

22           What that case is going to stand for in the law 20,

23   30, 40 years from now is that's going to be the Supreme

24   Court's citation that the Lemon test and Establishment

25   Clause Jurisprudence is officially -- is officially defunct.

1    That will be the citation, and Justice Gorsuch gave

2    significant discussion and elaboration on the Establishment

3    Clause in that opinion.

4         Establishment Clause wasn't claimed -- wasn't --

5    wasn't a claim in the case.  Let me --  let me give you some

6    of his quotes in explaining what happened with the

7    Government.

8         He basically said, the Government here has put

9    itself in its own predicament by saying, we have to

10   enforce the Establishment Clause (Indicating); and,

11   therefore, we have to violate the Free Exercise Rights.

12        This case is about the football coach where the

13   school denied the football coach's civil rights to exercise

14   private prayer.

15        And they did it because they said we can't violate

16   the Establishment Clause; and Gorsuch said, you guys created

17   a false problem, and then he reached the Establishment

18   Clause issue.

19        He says -- and I'm going to quote this -- the

20   District effectively created its own vice between the

21   Establishment Clause on the one side and the Free Speech and

22   Free Exercise Clauses on the other, placed itself in the

23   middle, and then chose its preferred way out of its

24   self-imposed trap.

25        In truth, there is no conflict between the

1    Constitutional commands before us.  There's only a mere

2    shadow of a conflict -- a false choice premised on a

3    misconstruction of the Establishment Clause.

4         No one -- when they cite -- no one is going to

5    argue that Kennedy is an advisory opinion when they cite it

6    for the proposition that Lemon is now no longer good law in

7    the United States of America.

8         That is posturally and procedurally almost

9    identical to what is going on in this case before us.  The

10   School District has a -- a direction that it desires to go

11   in.  It has -- creates a false conflict between Title IX

12   that they're misapplying, and the rights of the -- the First

13   Amendment rights of the religious Plaintiffs in this case,

14   which in Document 20 -- when they did their briefing

15   opposing the PI and for the first Oral Argument on the 7th

16   of February -- is how Counsel for the Defendants began the

17   dispute.

18        The rights of religious claimants and transgender

19   students under statutes like Title IX are still to be worked

20   out in Federal Court.  There's the problem.

21        All of the First Amendment jurisprudence -- and

22   we're going to talk about it -- just applying the

23   standard -- just applying the law is why we have a claim

24   here -- that was all well-established in the law; but they

25   put themselves in the middle of a false problem and chose

1    their way out of it.

2         To borrow Justice Gorsuch's language here, there's

3    only a mere shad--, -- but adapting it -- there's only a

4    mere shadow of a conflict.  A false choice premised on a

5    misconstruction of Title IX.

6         And in Kennedy, the school even had a Q&A like the

7    FAQs here, where the school said it's the Establishment

8    Clause that we have to abide by.  They were enforcing the

9    Establishment Clause.  Just like in their FAQs, the School

10   District here made clear that we're enforcing Title IX.  We

11   have to enforce Title IX.

12        Ultimately, Standing is about a Plaintiff having a

13   real interest in the litigation and suffering cognizable

14   harms.

15        The School is actively enforcing Title IX to

16   Plaintiffs' injury, and it admitted that it's doing so.

17        Consistent with Kennedy, there's nothing

18   hypothetical about the issue in this case, nor is the

19   Court's analysis on the issue advisory.

20        Plaintiffs -- the second aspect of what Counsel

21   raised in Defendants' briefing was that the Plaintiffs also

22   don't have a claim under Title IX.

23        And, again, this was in the -- this was in the

24   Standing subsection of Roe's briefing -- excuse me -- Roe's

25   briefing.

1           They argue that Plaintiffs don't have Standing

2    under Title IX, including because they don't have a claim

3    under Title IX; but Plaintiffs absolutely have a claim

4    under Title IX based on the Defendants' conception of the

5    law.

6           Defendants are wrong on the law; but even under

7    their own conception, they're discriminating against the

8    Plaintiffs, and that's unavoidable.  We said that in

9    Paragraph 92 of the Complaint.

10          Under their conception of the law for Title IX, in

11   addition to biological sex (Indicating) -- which is what the

12   statute specifically provides for -- Defendants are adding

13   gender identity and sexual orientation to the concept of

14   sex.

15          To make an analogy to property law where the

16   academic argument used to be, well, property law is really a

17   bundle of sticks.

18          The School District is treating sex in Title IX as

19   a bundle of sticks, and then what they're doing is that

20   they are elevating one of the sticks -- gender identity --

21   over the others, including biological sex, on the basis of

22   sex, and they can't favor one of those over the other

23   aspects of the bundle without discriminating on the basis

24   of sex.

25          And the only safe harbor that is provided in Title

1       IX for discrimination on the basis of sex -- discrimination

2       just meaning you're treating somebody worse than somebody

3       else -- discrimination -- the only safe harbor provided for

4       discrimination on the basis of sex in Title IX is

5       Section 1686, which provides for biologically sex-separated

6       intimate facilities.  Living facilities is the term, but

7       it's used to encompass intimate facilities as well.

8            So, in short, Plaintiffs have Standing for their

9       Title IX Claim because Defendants are enforcing the statute

10      against them to their injury.

11           The Court's resolution of the issue is not advisory

12      consistent with Kennedy; and contrary to Roe's argument in

13      the instant motion, Defendants are absolutely discriminating

14      against Plaintiffs on the basis of sex.

15           Okay.  So from Roe's brief, that's Standing.  Now

16      the Merits.

17           In Plaintiffs' brief we laid out the statutory

18      analysis for why Title IX expressly permits and does not

19      preclude schools from providing the benefit of communal

20      intimate facilities separated by biological sex.  Dodds

21      doesn't change that.

22           In their briefing, Plaintiffs' provided recent --

23      the recent Williamson County opinion from the Middle

24      District of Tennessee, which rejected Roe's position on

25      this issue -- not just with Dodds, but the entirety of the

1    issue.

2           Roe does not address that authority in Roe's Reply

3    Brief.  Instead, Roe provides a case from the Eastern

4    District of Tennessee; and in that case, in Footnote 3, that

5    court explicitly acknowledges that Roe is not dispositive of

6    the Title IX issue.

7           So building off of the Plaintiffs' briefing on this

8    issue, in Roe's briefing, even the parties' cases agree that

9    Dodds is not dispositive of Title IX.  Ultimately, the

10   statute is dispositive of Title IX.

11          Finally, Roe's mode of analysis argument doesn't

12   get them there.  Dodds only discussed the Title VII

13   principle that sex stereotyping based on a person's gender

14   nonconforming behavior can be impermissible discrimination.

15          But the Sixth Circuit subsequently explained in

16   Meriwether that Title IX and Title VII are different in

17   important respects, including that Title IX contains

18   Section 1687; and in Bostock, the Supreme Court admonished

19   that the same judicial humility that keeps courts from

20   adding to statutes, keeps them from diminishing them.

21          So the full analysis of the Sixth Circuit and the

22   Supreme Court -- the mode of analysis -- requires the Court

23   to give effect to the statute itself, which in this case --

24   and especially includes Section 1686 -- in which Congress

25   explicitly permits what Defendants deny.  Plaintiffs not

1    only have Standing to bring their Title IX Claim, but their

2    claim is meritorious.

3         Parental Rights.  Back to my initial point that

4    Defendants in Roe argue the case they wish it was rather

5    than the case it is.

6         The blankie they keep coming back to is that our

7    Plaintiffs cannot control the school because it's

8    comfortable to them.  No one's going to disagree with that.

9    We don't disagree with that.

10        Roe's Counsel specifically said that there's a

11   bright line.  There is not a bright line.  Blau does not

12   allow for a bright line.  Blau actually says to the

13   opposite.

14        At the end of the day -- and those are important

15   threshold points to keep in mind --  to state a Parental

16   Rights Claim, a Plaintiff has to plead that the Government

17   is infringing on their fundamental Parental Rights.  That's

18   the claim.

19        Plaintiffs have stated a claim here if they plead

20   that the Government is interfering with the core of the

21   fundamental right.

22        Here's the right:  Plaintiffs have a fundamental

23   right to direct care, custody, and control of their children

24   and direct the upbringing and education of the children

25   under their control.

1          That's Troxel, Glucksberg, Meyers, Pierce.

2     Glucksberg makes clear that the Government violation is the

3     Government interference with that fundamental right.  And

4     that right is particularly acute with respect to directing

5     religious upbringing of their children.

6          Counsel -- Counsel --  Plaintiffs' Counsel deeply

7     respects Roe's Counsel in the jousting in the briefing that

8     we've been doing; but on this issue, the Hybrid Rights

9     Theory is a red herring of interjecting this in the issue.

10          Plaintiffs' Counsel is extremely aware of the

11     Hybrid Rights approach to arguing for heightened scrutiny,

12     but if we were going to argue that, we would have argued

13     that in Free Exercise -- not in Parental Rights.

14          Our claim is not that there's Hybrid Rights Theory

15     that -- that requires higher scrutiny in Parental Rights.

16     Our claim is that in raising and inculcating the religious

17     upbringing of your children, the interference with the

18     Government in their inability to interfere in that is

19     particularly sensitive; and that is a fair reading of Yoder.

20          Because Yoder said that Pierce stands as a charter

21     of the rights of parents in the religious upbringing of

22     their children, and so the Court has to pay special close

23     attention to that.

24          Very consistent with Chief Judge Sutton's opinion

25     in Blau where he made clear that the Plaintiffs -- where the

1    issue there was whether or not a student and a parent could

2    require their student be able to wear blue jeans.  They

3    didn't raise any claims that the practice that was

4    prohibited under the dress code was incompatible with their

5    religious faith, which is -- which is the core -- the

6    gravamen, of a large swath of our entire Complaint which

7    makes sense.

8            Our Parental Rights Claim is not unmoored, and it's

9    not untethered.  It's directly tethered to the right.  It's

10   tethered to the core of the right, including its rationale

11   in foundation -- and this is important -- concerning

12   benefits and issues deeply rooted in American history and

13   tradition.

14           Our claim presents zero issue of limitations,

15   because the interests that are specifically implicated go to

16   the core -- go to the core of the right and are deeply

17   rooted in our nation's history and tradition.

18           So, for example, I know Counsel -- Defendants'

19   Counsel spent a significant portion of argument arguing for

20   the Fourth Circuit's decision in Grimm -- which is

21   fundamentally wrong on the law -- and the most, the most --

22   the largest number of judges -- the largest panel to ever

23   consider this issue from a Federal Court in the Adams

24   Court -- which I know we've provided to the Court in our

25   briefing -- came to the exact opposite conclusion; but one

1      of their observations is really interesting, which is deeply

2      correct -- back to my point -- there's no real dispute here

3      that biologically sex-separated intimate facilities are a

4      long-standing benefit in American history.

5              The Court there says, there has been a long

6      tradition in this country of separating sexes in some, but

7      not all, circumstances, and public bathrooms are likely the

8      most frequently encountered example.

9              And then they cited Justice Thurgood Marshall's

10     pithy statement that, a sign that says "Men Only" looks very

11     different on a bathroom door than a courthouse door because

12     the differences in biological sex is a proper distinction

13     that has been recognized in this country since its founding,

14     and a parental desire for their children to have

15     restrooms -- communal restrooms separated by biological sex

16     is tethered to that history and tradition.

17             To my original point that we're tethered to the

18     core of the right, there is no more core interest in the

19     care and custody of one's children than the right to guard

20     their child in intimate spaces.

21             And that may be the least ambitious argument ever

22     advanced in the history of American advocacy.  Nor is there

23     a more core interest in directing the upbringing of one's

24     children, than shaping the child's core identity in

25     accordance with their religious and moral beliefs and

1    practices.

2              Defendants don't wrestle with the Plaintiffs' real

3    claims -- and when I say the Defendants, I mean both sets of

4    Defendants.  They argue against the case they wish it was,

5    rather than the one that is before them.

6              Plaintiffs aren't trying to control the school or

7    coerce the behavior of others.  They're just trying to raise

8    their own families, and Plaintiffs have alleged two bases

9    for the right in this case.

10             I know Counsel -- and we've argued in the

11   briefing -- Roe's Counsel -- about the first bases about

12   they're denying us information needed to choose the

13   school -- choose the best school for the children.

14             Counsel didn't mention in his particular argument

15   today, but I know that they contest that, so there's no

16   suggestion on our part --  from our part that there's a

17   waiver there.

18             But the problem is, Counsel in their -- in their

19   Reply Briefing -- in our Response Briefing we raise, this is

20   just -- our claim is tied --  when we're not --  Okay.  Let

21   me back up.

22             Nobody -- and I mean nobody -- in America disagrees

23   that the fundamental Parental Right includes the right of

24   parents to choose the best school for their children.  To

25   take themselves -- their children out of public school and

1    choose the right educational option for the children.

2    Nobody disagrees with that.

3           But the right itself, the fundamental right --  so

4    we claim there's common sense information about the School's

5    own rules that the parents need to know to properly address

6    that situation for it --  to properly use their judgment to

7    make the best decisions for their children, and the School

8    is not providing it to them.

9           They argued that we're arguing for a Constitutional

10   -- generalized Constitutional Right to information that

11   we're not arguing.

12          There's not a generalized Constitutional Right to

13   information, but -- but Constitutional law is not that

14   stilted.  It's always applied to the facts that are before

15   the Court at that particular time.

16          The foundation of the right -- which has not been

17   addressed in Reply or here yet today -- is the ability of

18   the parents and the capacity of the parents to use their

19   considered judgment on behalf of the children.

20          When the School denies that common sense

21   information about their own rules to the parents, they're

22   interfering with the parents' right to use their considered

23   judgment on behalf of the child.

24          And we explained common sense ways in the

25   complexities of real life how that actually plays out.

1    There's always cost/benefit to any decision parents make in

2    raising their kids.

3         If the public school that they're in is the

4    right decision, or if they need to move to another public

5    school because that local community has different values

6    than the local community that they're in, or -- or they're

7    deciding to homeschool their children, or they send them to

8    private school, which is an option that not everybody can

9    afford.

10        And in their Response Brief -- or in their Reply

11   Brief, Roe mentions that supposedly that's disingenuous and

12   that we're just trying to argue policy.

13        In belying that, we argue that the parents can't

14   send their kids -- that the Plaintiffs' essentially don't

15   have the option to homeschool their kids.

16        But what that misses and forgets is that we even

17   talked about moving other --  to other school districts,

18   and so the real dynamic and the real issue is when you're

19   considering what's in the best interest of your child -- and

20   every parent may be different -- they need to know to what

21   extent is the school interfering in my ability to raise my

22   child, and to what extent is the school raising security

23   concerns that I have, that's my right to guard my child

24   in intimate spaces that I need to consider to decide then

25   balancing do we move -- do we move the kids out of their

1    neighborhood?  Maybe that means they're not on their

2    baseball team anymore or their softball team anymore.

3         Do we send them to a private school and spend the

4    money for it and get that extra job?  Do we homeschool and

5    potentially forgo additional income, which has collateral

6    consequences to the family?

7         All of those real-life situations that people have

8    to face every day is what goes into considered judgment of

9    what's in the best interest of your child.

10        So the law --  the core of the right -- the right

11   itself involving the care, custody, and control of your

12   children -- that nobody disagrees -- includes the right to

13   choose the best educational option for your child.

14        When the Government withholds common sense

15   information that you need to use your considered judgment to

16   act in the best interest of your child, the Government is

17   interfering in your ability to exercise the right; and

18   just -- according to the straight application of the

19   Glucksberg interference language, the Government is

20   interfering in our fundamental right, and we stated a

21   plausible claim for relief.

22        Now, on the second issue related to the -- the

23   specific direct issues with the care and custody and

24   upbringing of the child, including the religious upbringing

25   and the improper promotion of LGBTQ beliefs and values to

1    the children, we briefed that pretty extensively and

2    accurately asserted our position on it.

3          There's a difference --  there is a difference

4    between providing students with information and proper

5    curriculum and affecting young people's hearts and minds

6    outside of proper curriculum.

7          Our --  and improperly promoting -- and, for lack

8    of a better word, proselytizing children in values and

9    beliefs that are contrary to the parents'.  There's a

10   difference between that and providing children information.

11         Our fundamental allegations fall on the

12   impermissible side of the line, not the permissible side of

13   the line.

14         And Blau stands for the proposition that parents

15   do not have the right to control schools generally, but

16   school actions are subject to Parental Rights in the rarer

17   circumstances where those fundamental rights are actually

18   implicated, and here the rights are actually implicated.

19         And I'll finish with this, with just a reminder

20   about why, again, that it's not limitless.

21         While respecting Counsels' argument that -- related

22   to other precedent from other jurisdictions that are not on

23   facts before the Court here, in a world that it continues to

24   evolve with contentious social issues that people disagree

25   very strongly about, what the Court's task is, is not to

1    apply what the Ninth Circuit says about Chief Judge Sutton's

2    opinion in Blau.

3          And the Ninth Circuit is the only circuit that has

4    aggressively stated a proposition like -- that the

5    Meyer-Pierce right ceases at the schoolhouse door.

6          The Court's -- the Court's obligation is to take

7    the right and apply the right.  When you apply the right to

8    this case, as we've claimed, the Plaintiffs have a cause of

9    action, because the interests that are implicated go to the

10   core of the right related to interests that are deeply

11   rooted in our nation's history and tradition.

12         Equal Protection.  Plaintiffs have also stated an

13   Equal Protection Claim.  As an initial matter, this is a --

14   as pled, this is a disparate treatment case.  This is not a

15   disparate impact case.  This is a disparate treatment case.

16         As the Sixth Circuit has said, to state an Equal

17   Protection Claim, a Plaintiff must adequately plead that the

18   Government treated the Plaintiff disparately as compared to

19   similarly-situated persons, and that such disparate

20   treatment either burdens a fundamental right, targets a

21   suspected class, or has no rational basis.

22         Andrews states the --  that's Andrews v. City of

23   Mentor.  It's in our briefing, but the citation is 11 F.4th

24   462.  That's at -- pin cite's at 473.

25         Andrews states the pleading standard, and we pled

1    against it.  Now, the reason that Andrews correctly --  the

2    reason that it explains the law that way, and the reason

3    that it's right is because under the law, unequal treatment

4    is presumptively invidious where the Government interferes

5    with a fundamental right.

6        Here, we're alleging that the Government is

7    interfering with two fundamental rights -- Free Exercise and

8    Parental Rights -- and Roe's Washington v. Davis argument is

9    misplaced.  Andrews accurately states the law for an Equal

10   Protection claim, and we pled against this.

11       You can see it in play in -- this dynamic in play

12   in multiple Sixth Circuit cases, including Judge White's

13   opinion in Koger v. Mohr, and Judge Cole's opinion in Maye

14   v. Klee.  Both of which we provided to the Court in our

15   briefing.

16       The Koger court specifically rejected the

17   argument that the Plaintiff had to show purposeful

18   discrimination because invidious purpose is presumptively

19   presumed where the Government makes a conscious decision to

20   treat the Plaintiff different, infringing on their religious

21   freedom.

22       And that brings up the second point I want the

23   Court to keep in --  we'd like the Court to keep in mind

24   from those two cases.  In both of those cases -- both in

25   Judge White's opinion and in Judge Cole's opinion -- the

1    Sixth Circuit found that the Government made a facially

2    discriminatory distinction when it made the conscious

3    decision to treat the Plaintiff worse.

4         Here, Defendants have made the facially

5    discriminatory -- a facially discriminatory distinction by

6    making the decision to treat Plaintiffs worse than Roe and

7    the families of other transgender students.

8         And just for reference, that's a -- that is the

9    gravamen of our -- our suit.

10        So as that is the upshot of what we're claiming, I

11   refer the Court to Paragraphs 61, 71, 87, 98, 92, 122

12   through 124, 128, and 129 in the Complaint that the

13   Government made the conscious decision to treat the

14   Plaintiffs worse than Roe and the families of other

15   transgender students.

16        The Muslim families even pled in Paragraphs 71 that

17   they didn't understand why the school valued their beliefs

18   less than the beliefs of the LGBTQ community.

19        So this case is about disparate treatment, and

20   facial -- facial distinctions by the Government to treat --

21   to treat Plaintiffs worse than Roe and other transgender

22   students.

23        So under the mode of the analysis that binds this

24   Court, Plaintiffs' claims are correctly pled, and

25   Defendants' disparate treatment has to survive strict

1    scrutiny.

2            The only way this could not have been true, is if

3    Plaintiffs and the families of transgender students weren't

4    similarly situated, and this is an area where Roe has to

5    ignore the benefit aspect of the case.

6            The Supreme Court has said -- and we provided this

7    quote from Zobel v. Williams, 457 U.S. 55, pin cite page

8    60 -- when a State distributes benefits unequally, the

9    distinctions it makes are subject to strict scrutiny --

10   excuse me -- are subject to scrutiny under the Equal

11   Protection Clause of the Fourteenth Amendment.

12           In this case, the Government is distributing

13   benefits unequally.  And as a reminder to make this

14   point, communal restrooms are an undisputed educational

15   benefit.

16           Roe has always had access to communal restrooms,

17   period.  The problem for Roe was that Roe claimed the

18   communal restrooms for biological males are not compatible

19   with Roe's asserted identity with who Roe is.

20           But Plaintiffs also want communal restrooms

21   compatible with their identity -- who they are; and once

22   Defendants stop distributing the benefit based off of

23   immutable characteristic -- biological sex -- and instead

24   began distributing the benefit based on an asserted

25   identity, they can't play favorites, and they can't deny the

1    same benefit to Plaintiffs without compelling interests

2    narrowly tailored.

3         And that's true in the larger sense -- that

4    Plaintiffs and Roe are similarly situated, and that they

5    both want communal restrooms -- a benefit that the School's

6    denying to Plaintiffs -- they both want communal restrooms

7    compatible with their asserted identity.

8         The communal restrooms provided by the School right

9    now are incompatible with Plaintiffs' asserted identity --

10    their religious identity.

11         But in this case, there's no pressure on that

12    larger point -- which I'm sure will probably be litigated in

13    American --  will be litigated in the case law in the years

14    to come -- because the School specifically has a law that

15    protects Plaintiffs in their religion and guarantees them

16    equal benefits -- PO 2260 -- just like the benefit they gave

17    to Roe.

18         Under that policy, as we pled, Defendants also

19    make gender identity and transgender status a protected

20    class.

21         So in a world where they're no longer making

22    distinctions based on immutable characteristics, the

23    School has a law that says your religious -- you religious

24    Plaintiffs, you get -- we guarantee you equal benefits;

25    and then they're denying them communal restrooms

1    compatible with their identity while giving that under

2    the auspices of remedying discrimination to Roe based on

3    Roe's identity.

4          That is quintessentially denying Plaintiffs the

5    Equal Protection of a law -- Policy 2260 -- that protects

6    them.

7          So when Roe briefs that Plaintiffs invert every

8    basic principle of Equal Protection Law in arguing that they

9    somehow have a right to compel the unequal treatment of

10   others -- besides framing it in a way to try to avoid

11   grappling with the hard issues in this case -- the reality

12   is, the only inversion in this case is the realization that

13   Plaintiffs have civil rights too; and when you apply the --

14   when you apply --  when you apply the straightforward

15   application of the law, the Government has to survive strict

16   scrutiny.

17         When it treats Plaintiffs unequally, and that

18   unequal treatment infringes on a fundamental right, if that

19   upsets people's expectations that the law can apply

20   neutrally in a generally applicable way, then maybe it does

21   upset and invert basic principles; but they're not the

22   principles of law.  They're the principles of power.

23         Free Exercise.  Plaintiffs pled Free Exercise

24   Claims under both the U.S. and Ohio Constitutions.  As

25   explained in the briefing, Ohio did not adopt Employment

1      Division v. Smith and requires the pre-Smith/Sherbert

2      analysis of burden and sincerity; and then post-Smith, the

3      Federal Claim layers on the question of whether the

4      Government action is both neutral and generally applicable.

5           But as Judge Thapar explained in Meriwether, even

6      under the Federal Constitution, Government actions that

7      burden religious exercise are presumptively

8      unconstitutional, unless they are both neutral and generally

9      applicable.

10          The Complaint explains the Plaintiffs' beliefs, and

11     no one can test their sincerity.  The disagreement centers

12     around the other elements.

13          For Ohio, Sherbert burden; and for the U.S.

14     Constitution, Sherbert burden, and whether Defendants are

15     both --  whether Defendants' actions are both neutral and

16     generally applicable.

17          In our Complaint and briefing, we explain the

18     burden under the law and why the Government's actions are

19     not neutral or generally applicable, which goes back to and

20     arises out of the analysis that begins in our Complaint in

21     the Equal Protection section, and even pre-, -- and even

22     beginning before the causes of action are set forth in the

23     Complaint, and that this case is fundamentally about

24     disparate treatment.

25          Substantial Burden.  We've alleged multiple

1    substantial --  we've alleged multiple burdens on the

2    Plaintiffs' Free Exercise, and a central failure of Roe's

3    briefing is the inability to grapple with the aspect -- the

4    benefit aspect of the law -- and we see that here too --

5    including the coercion arising from the Government's unequal

6    distribution of the benefits.

7            While the sincerity of Plaintiffs' beliefs are not

8    an issue, it's helpful to start there to understand the

9    burden.

10           It is incompatible with the exercise of Plaintiffs'

11   sincerely held religious beliefs to force their children to

12   share intimate facilities with members of the opposite

13   biological sex.

14           I'll say that again:  Based on their sincerely

15   held religious beliefs, it is incompatible with faithful

16   practice of Plaintiffs' religious beliefs to share intimate

17   facilities with members of the opposite biological sex.

18           As -- as an aside, let me stop there and mention

19   something that Defendants' Counsel has argued -- argued

20   today and has argued before.

21           The idea that intimate facilities are not really

22   intimate outside of the stall.  That is a revolutionary

23   concept that is contradictory to the expectation that has

24   existed since the founding of the nation and is long rooted

25   in the history and tradition of the nation, that people have

1    an expectation that their children -- or for themselves --

2    they have a privacy in intimate spaces.

3         So, while Counsel is -- we submit that Counsel's

4    free to continue to develop that claim as the case

5    progresses, and the arguing that, that are --  in relation

6    to the sincere religious beliefs of the Plaintiffs, what

7    this --  the Plaintiffs in the Complaint have told the

8    Court is that it is incompatible with the Plaintiffs'

9    sincere religious beliefs to force their children to share

10   communal restrooms with members of the opposite biological

11   sex; and it is not -- it is not the province of the Court

12   to question the sincerity of those beliefs.

13        And the precision of Counsel's argument that -- of

14   required to set aside the fact -- the point I just stated --

15   requires development in the record that makes it wholly

16   improper to consider at this stage of the proceedings,

17   including because it's a revolutionary concept in the

18   history of mankind that would surprise everybody, other than

19   those who assert it.

20        So the burdens that we talked about were both

21   forcing children -- the students -- to share intimate

22   facilities with members of the opposite biological sex,

23   because there's no reasonable alternatives available, in

24   the Hobson's choice mentioned by Judge Thapar in

25   Meriwether of -- the Hobson's choice for them of sharing

1    intimate communal facilities with members of the opposite

2    biological sex in violation of their religious exercise or

3    forgoing the benefit of communal restrooms.  They have a

4    choice.  Do you want -- if you want to participate in the

5    community, get on board and use -- set aside your religious

6    views and use the restroom.

7           As Counsel for the Defendants mentioned subtly from

8    the Grimm opinion, this is an issue that parents care

9    about -- not the kids care about.

10          And we disagree with that, and we'll get through --

11   we'll have time to address all of that in time throughout

12   this case; but the reality of it is, is that people don't

13   fundamentally understand and respect the reality of the

14   religious beliefs and the views.

15          But if you want --  so if you want to participate

16   in the communal benefit, and you want to be part of the

17   community, just get on board and set your religious beliefs

18   at the side; but our country wasn't founded -- and the

19   Constitution prohibits -- prohibits that.

20          So the coercion that matters under Sherbert is

21   not just direct coercion with a public penalty or

22   criminal prosecution, it's the indirect coercion of being

23   forced to give up your rights or violate cardinal

24   principles of your faith in order to attain a Government

25   benefit.

1          So -- so they're both directly -- they're both

2     directly burdening the Free Exercise, and they're indirectly

3     burdening the Free Exercise through coercion.  Sixth

4     Circuit's had multiple -- and that's Sherbert.  Sherbert

5     directly makes that point.

6          Sixth Circuit's had multiple cases saying that, and

7     we've cited them in our brief.  The Dahl case, a policy that

8     forces a person to choose between observing her religious

9     beliefs and receiving a generally available Government

10    benefit burdens her Free Exercise Rights.

11         And then the Yaacov v. Mohr case, with its citation

12    from Living Word stating that, a burden is substantial

13    where it forces an individual to choose between following

14    the tenets of his religion and retaining Government

15    benefits.  That's exactly what we're alleging is happening

16    here.

17         Before I leave Free Exercise, I want to state --

18    make one point about the parents' claims themselves.  This

19    hasn't been overly-argued and developed in the briefing, but

20    Roe claims that -- and says in this briefing that the Court

21    can't reasonably entertain the parents' own independent Free

22    Exercise interests in raising their children in the faith,

23    because it would create a vicarious Standing problem; and,

24    and because --  well, largely because they say it would

25    create a vicarious Standing problem, but the question of

1    Standing doesn't ask is it a result that -- is it a result

2    that increases the amount of claims that can be filed?

3         The question of Standing is whether they have their

4    own interest.  They have their own interest -- cognizable

5    interest, because it's their faith.  We pled the specific

6    provisions from the both -- from the sacred text of both

7    the Muslim -- for both the Muslims and the Christians

8    about how raising a child in the faith is part of your own

9    faith.

10        So while Roe claims that it cannot reasonably

11   entertain that the Court would consider the parents'

12   exercise of their own faith, we submit that it cannot be

13   reasonably entertained that it does not, because the only

14   way that the Court can determine that is questioning the

15   sincerity of the Plaintiffs' religious beliefs, which the

16   Court is not supposed to do.

17        And it's also factually inaccurate.  It is part of

18   the Plaintiffs' -- the parent Plaintiffs' religious beliefs

19   to raise their children in the faith.

20        In the Sixth Circuit Mozert case that Roe cites for

21   this proposition is a case where the parents had Standing.

22   The Court --  it's a case about evolution.  Standing for the

23   proposition that parents can't keep schools from giving

24   information to their kids, even if it's offensive

25   information to their kids.

1          We're not disagreeing with that in this case.

2     Nobody's fighting against that.  But in order to reach the

3     issue, the Court had to have Standing to reach the issue.

4     The parents had Standing to assert the claim.

5          And we do want to point out to the Court, without

6     belaboring Mozert -- because it's not that important -- the

7     Court in Mozert went to extreme pain to emphasize and

8     re-emphasize that all that they were reaching was the

9     issue of whether or not a school -- parents could keep a

10    school in their proper curriculum from exposing children

11    to ideas that the parents disagreed with.  Nobody's

12    disagreeing with that here.

13         Finally, and quickly, and I'll tick through a

14    couple other things real quickly.  Neutral and generally

15    applicable.  A Free Exercise Claim, even under the --  so

16    what we just described -- substantial burden, coercion, and

17    indirect -- both direct burden and indirect coercion, and

18    the sincere religious beliefs is an Ohio Free Exercise

19    Claim.

20         So under Ohio Jurisprudence, they have -- because

21    the Sherbert -- Sherbert is triggered, the Plaintiffs --

22    excuse me -- the Government has to justify and satisfy

23    heightened strict scrutiny for their actions; but under the

24    Federal -- under the Federal standard, the same -- the

25    result is the same, because the Government's actions were

1    not neutral and generally applicable.

2         It's important to remember that the Sixth Circuit

3    has made clear that Government actions are not neutral and

4    generally applicable unless they're -- unless there's

5    neutrality between religion and non-religion, and that's

6    Roberts v. Neace.

7         The Sixth Circuit has also made clear that the Free

8    Exercise Clause protects against even subtle departures from

9    neutrality; and that was Judge -- Judge Thapar makes that

10   point in the Meriwether case, emphasizing that even -- even

11   subtle departures from neutrality.

12        And with respect to the First Amendment Free

13   Exercise, Judge White and Judge Cole in Koger and Maye, both

14   explain that the Government -- as we mentioned before --

15   makes a facially discriminatory distinction when it treats

16   the religious Plaintiffs worse than others.

17        Now, in those two cases, it was -- they both

18   involved Islamic Plaintiffs.  One involved -- but it was --

19   they were inter-religion.  So one related to a Muslim

20   practice versus Rastafarian practice, and the other was just

21   within religion, Muslim practice versus another religion;

22   but the difference between religion versus religion and

23   religion versus non-religion is an immaterial distinction.

24        The Free Exercise Clause requires neutrality

25   between religion and non-religion.  That's -- that's Roberts

1    v. Neace.

2            So Judge White and Judge Cole's opinions in Koger

3    and Maye are directly applicable, and so is their analysis,

4    and the mode of analysis is binding on this Court.

5            Fundamentally, Defendants are giving a benefit

6    to transgender students that they're denying the Plaintiffs

7    -- access to a communal restroom compatible with their

8    identity.

9            In our case, that happens to be a religious

10   identity; and the Government --  so they're saying -- the

11   School is saying that we are choosing to favor Roe's secular

12   gender identity over the Plaintiffs' religious identity, and

13   that's a value judgment that the Constitution does not

14   allow.

15           And it's not a zero sum game.  There's no reason

16   the School could not still provide communal restrooms for --

17   for the religious families based on -- that are compatible

18   with their gender identity.

19           Nobody's saying that, further underscoring the

20   false narrative, that this is about coercing Roe and

21   excluding Roe.  This is about -- this is, in truth, is about

22   coercing the Plaintiffs.  The Plaintiffs have civil rights

23   too.

24           So the Government is making a distinction that is

25   discriminatory on its face in not distributing benefits

1    equally and evenhandedly across the board.

2         Their actions are, therefore, neither neutral nor

3    generally applicable.  In the interest of time, I'll just

4    refer to the briefing on our points from Judge Thapar's

5    opinion about the reasons that it's proper.

6         Both that it's proper for the Court to closely

7    scrutinize what we believe are the marks of -- that

8    Defendants' series of irregularities bear the marks of

9    religious hostility, and why it's -- at the very best for

10   the Plaintiffs on their claims on the Rule --  excuse me --

11   Defendants on the Rule 12 Motion, it's premature to consider

12   their arguments at this stage of the litigation, because the

13   Government's actions are irregular and bear the marks of

14   religious hostility.

15        So the Sixth Circuit made clear -- and this is

16   Judge Thapar -- that the Government must give neutral and

17   respectful consideration to a person's sincerely held

18   religious beliefs.

19        A specific example that's troubling in the

20   Complaint is the disrespect for the Ahiska Muslim Turkish

21   families who gave their own resource, and then were -- to

22   try to create a solution for the problem.

23        They wanted a benefit of communal restrooms.  They

24   wanted to love Roe and any other transgender students the

25   best they could and try to create in a pluralistic society a

1    world where everyone could coexist in a community; and the

2    School addressed their attempt in about as disrespectful of

3    a manner as you can, by taking the resources and not even

4    telling them they were not only not using them to help

5    provide and meet the need of the Muslim families, but they

6    were using them contrary.  To then tell the Muslim families,

7    if you need more privacy for your students, you can use the

8    single-use restroom.

9         Oh, which, by the way, are discriminatory if Roe

10   uses them; but -- but are an accommodation for the religious

11   Plaintiffs.

12        No.  The religious Plaintiffs seek the same

13   accomodation that Roe received, which is communal intimate

14   facilities compatible with their identity.

15        The irregularities we mentioned in our brief, I

16   think Roe argues against them some.  I don't think Roe does

17   an effective job addressing the reality that the moving

18   target of the Government here is that they're changing their

19   position.

20        So they said it was Title IX.  Then to try to

21   survive the PI, they argued, oh, no, we're enforcing our

22   Antiharassment Policy.

23        This is Title IX, and we have an Antidiscrimination

24   Policy consistent with Title IX.  That was in the July 10th

25   meeting -- in and around that time frame -- and in their

1    FAQs that came out subsequent.

2          Then, in trying to survive the Preliminary

3    Injunction, they said, oh, no.  Even though there's no

4    language about accommodations at all in our Antiharassment

5    Policy, and even though we've had six opportunities, we're

6    not going to explain to the Court A plus B equals C from

7    that policy how we were doing what we were doing.  It was

8    antiharassment.

9          And now -- now they're adopting wholesale Roe's

10   argument that it's about discrimination.  So the

11   Government's position has been all over the board.  That's a

12   moving target.  That's irregular conduct and a moving

13   target.

14         They also have not applied their rationale

15   consistently.  In the FAQs, they talked about the

16   importance of respecting the dignity of all the -- of all

17   the students.

18         And you'll notice in our pleading for the --

19   related to the Christian families and their beliefs, gender

20   identity --  excuse me -- biological sex, that immutable

21   characteristic created and given by God, in their beliefs is

22   -- goes to the fundamental core of their dignity as a human

23   being.

24         So what the school is saying is, we're going to

25   make sure that all students have communal restroom access in

1    accordance with their dignity, but they're not applying that

2    rationale in a consistent way.  That's irregular.

3         And then, the -- the mention about the Defendants'

4    supposed investigation into the events of January 12.  While

5    it's not in the Complaint, it didn't happen until after the

6    Complaint.

7         It is part of the record of this case, and what it

8    shows is, it's not --  it's not a witch hunt.  It shows that

9    the Government is not treating -- it's consistent with the

10   idea that the Government is not treating these -- all these

11   parties evenhandedly.

12        It's -- it's -- it has favorites, and it's playing

13   favorites.  That's an irregularity.  Not fully vetting

14   obvious inconsistencies and conflicts in testimony, and not

15   talking to all the witnesses who were there and were

16   affected by it, that's an inconsistency.  It's -- it's a red

17   flag that they're not acting evenhandedly.

18        And as we've mentioned, all of the foregoing was in

19   addition to the significant irregularity of violating State

20   law to make a major change in secret.

21        To quote Judge Thapar, courts have an obligation to

22   meticulously scrutinize irregularities to determine where

23   Government action is being used to suppress religious

24   belief; and we respectfully submit that consistent with the

25   irregularities discussed by Judge Thapar in his opinion in

1     the Meriwether case, similar hallmarks are available --  are

2     present in this case, requiring the same level of careful

3     review and developed record.

4          Okay.  Strict Scrutiny, Student Health and Safety.

5     Backing up.  The interest that matters that the Court has to

6     assess and that we have to argue against is the Government's

7     interests.

8          So as a fundamental matter -- aside from the fact

9     that I think these proceedings are proving that there's

10    really --  that Roe and the Defendants -- Roe and the

11    Board's interests are aligned, there's really no daylight

12    between them; and that their goals are the same, where the

13    Government wholesale accepts the arguments and propositions

14    of a private party.  The interests that need to be weighed

15    by the Court are the Government's interests.

16         So we need to hear the Government explain what they

17    did, why they did it, and then we can assess whether it was

18    narrowly tailored against that interest.

19         Withholding that from the party is -- while it

20    prevents the ability of the Court to effectively --  when

21    you have claims that trigger strict scrutiny -- assess the

22    Government's actual motive -- or excuse me -- the

23    Government's actual interest, but it also underscores the

24    shifting nature of this dynamic, because -- and you think

25    about the narrowly  --  the narrowly tailored analysis.

1          We put forth several opportunities --  excuse me --

2     several possibilities for least-restrictive ways of dealing

3     with the issue of making sure everybody's respected; and a

4     lot of the -- Roe's arguments against that center around the

5     idea of discrimination.

6          It doesn't solve the discrimination problem that

7     Roe doesn't get to go into the restroom -- does not have the

8     restroom consistent with Roe's identity.

9          But all of our issues directly relate to -- all of

10    our alternatives specifically address the issue of

11    harassment, and that's what the Board -- that's what the

12    School said when it tried to get around the P --  before the

13    Court with the PI.

14         So by not having the School provide its interest,

15    having Roe argue it for the School as a tag team, the School

16    essentially gets to avoid the actual vetting and analytical

17    rigor against their actions the Constitution demands in

18    protecting people's civil rights and individual liberty.

19         And then I will just, finally, direct the Court

20    back to our briefing, because it's self-explanatory, but I

21    do want to make the point.

22         Compelling -- if --  first, health and safety.  I

23    still don't understand specifically what Roe is arguing with

24    health and safety, nor what the Defendants will be adopting,

25    because they don't actually explain it.

1          But discrimination.  You cannot have a compelling

2     interest when what the Government's actions do creates the

3     problem that they say they're trying to solve.

4          So in giving Roe the benefit they say they're

5     giving Roe and other transgender students, they're just --

6     by not giving it to the religious -- the religious

7     Plaintiffs, and saying, you either set aside your

8     religious beliefs -- if you want to use the communal

9     restrooms, set aside your religious beliefs, they're

10    creating more discrimination than they're solving.

11    Under -- under Constitutional law, that is not a compelling

12    interest.

13          So -- and instead of choosing, as we mentioned,

14    more narrowly tailored options, they chose broad

15    discrimination against the religious Plaintiffs.

16          I also have -- I'll represent to the Court -- that

17    the safety issues -- same principle.  They're creating

18    safety issues that -- that -- with their goal of promoting

19    student safety.

20          And I'll represent to the Court, in the PI hearing,

21    what was provided to the Court as the public record of the

22    School's incident report is the public record from the

23    institution.  It's not signed, and I have other copies that

24    I followed up with Miami County this weekend, and on

25    Friday just to confirm -- to get the public record, and they

1    said that they're not signed by the officer, because they're

2    submitted electronically.

3           So what the Court has in the PI hearing is the

4    public record; and in that, the student -- the School

5    Resource Officer specifically recommends that the School

6    have adults in the restrooms at all times.

7           To our knowledge, tautologically, the School hasn't

8    had adults before that point in the restrooms; and to our

9    knowledge, the School has never had adults in the restrooms;

10   but the recommendation from the Student Resource Officer is

11   now that we need -- now we need adults in the restrooms.

12          Ergo, you're creating collateral safety risks and

13   issues that didn't exist before.  All the more reason you

14   need to have the Government actually explain their

15   position.

16          Finally, the PPRA.  Our briefing explains this

17   well, and the parties' briefing on this issue is like two

18   ships passing in the night.

19          We are not claiming that the PPRA creates a private

20   right of action.  Rather, 1983 is the cause of action.

21          If the Court reads Blessing v. Freestone, which is

22   the 1997 Supreme Court case, and goes through the steps in

23   that analysis regarding the PPRA, we believe that the Court

24   comes to the conclusion that the PPRA confers individual

25   Federal rights.

1          And if a Federal statute confers individual

2    Federal rights, then Gonzaga -- the case from 2002 -- says

3    the rights are presumptively enforceable through

4    Section 1983.

5          And as identified in our briefing -- in our last

6    brief, the PPRA conveys multiple individual rights, and so,

7    therefore, 1983 let's the Plaintiffs bring a claim to

8    enforce the individual rights.

9          Counsel makes a big deal about Lexmark, but that

10   was a Lanham Act case about the scope of the cause of action

11   in the Lanham Act.  Ship passing in the night.  Has nothing

12   to do with what our actual claim is.

13         Same with the Ashby case Counsel mentions in

14   Counsel's Reply Brief.  We didn't discuss Ashby, because we

15   had already briefed it, and it's only applicable here in

16   that it specifically acknowledges the independent operation

17   of 1983.

18         So when you do the Blessing analysis and then apply

19   Gonzaga, the PPRA does confer individual rights and serves

20   as a basis for 1983.

21         Finally, because the Court asked us to and my time

22   is running short, or out, I want to address the issue of the

23   sequence of the PI in the Motions to Dismiss.

24         I'll frame  -- Defendants' Counsel didn't argue

25   this, but I think that Counsel for Roe made a cogent

1    argument, but I'll call it -- it's a prudential argument.

2         The issue for what the Court does and how the Court

3    sequences its decisions is ultimately not about prudence as

4    much as it is about power; and I would say any prudential

5    considerations or practical considerations of deciding them

6    after the Motion to Dismiss are trumped by the time of the

7    Plaintiffs submitting their Preliminary Injunction way

8    before the Rule 12 Motions were filed, and the Plaintiffs'

9    attempts to try to get that issue resolved now over a period

10   of time.

11        The power concerns are just this, and this, I

12   believe, is the correct analysis for the Court.  The Court

13   --  the minute that Complaint was filed, the Court had

14   jurisdiction over every claim in the Complaint to the extent

15   that the Court had original jurisdiction over one of the

16   Federal questions.

17        The only way that the Court did not have original

18   jurisdiction over at least one of the Federal questions is

19   if the Court -- if the Plaintiffs lacked Standing on all of

20   the Federal Claims.

21        Pointing out a really -- pointing out something

22   worth observing, in their 12(b)(1) Motions here, they

23   don't even claim to dismiss the third cause of action on

24   the grounds of Standing, which is the Parental Rights

25   Claim.

1              So as a matter of basic logical, the Court already

2      has the power properly to decide any of the issues before it

3      whether or not any of the Federal Claims would be

4      subsequently dismissed.

5              The Court previously, on its own initiative, asked

6      the Court -- asked the parties to brief the Standing issue

7      for the Court to decide for itself if the parties had

8      Standing on any of their Federal Claims.

9              And our -- and we submit to the Court, that if the

10     Court -- if the Court satisfies itself that the parties have

11     Standing on any of the their Federal Claims, then it is

12     proper for the Court to resolve the Preliminary Injunction

13     issue separate from the Motion to Dismiss, because Motions

14     to Dismiss are not -- merits arguments are not

15     jurisdictional.

16             And the Plaintiffs have -- have -- the Plaintiffs

17     have patiently waited for the Preliminary Injunction

18     decision, and we have --  which we filed months and months

19     ago, and have been respectful to let Roe intervene under

20     the -- under the auspices that it wouldn't slow down the

21     Preliminary Injunction, and we're talking about more delay,

22     and giving Counsel for the Defendants all the time Counsel

23     needed to brief and argue against it.

24             So we submit on the question of power, it's proper

25     for the Court, if it satisfies itself on Standing for one

1    claim, to decide the Preliminary Injunction issue separate

2    from the Motion to Dismiss, within the Court's discretion;

3    and we respectfully submit that prudentially, as a matter of

4    practicality, we believe the equities weigh in favor of

5    resolving --  of resolving the Preliminary Injunction Motion

6    if the Court so desires.  Thank you, sir.

7         THE COURT:  Thank you, Mr. Ashbrook.  I assume

8    we're taking another ten-minute recess at this time?

9         MR. CAREY:  Well, Your Honor, that depends on the

10   Court's schedule.  By my count, Plaintiffs took

11   approximately 12 minutes longer than the Defendants

12   collectively took.  We would like to take that time for

13   rebuttal.  If the Court has time for a ten-minute break

14   before we do so, then we would appreciate that.

15        THE COURT:  When would that -- when would that make

16   us finish up, if we do?

17        MR. CAREY:  Well, if we were to proceed now, it

18   would be 12 minutes from now.  Alternatively, it would

19   22 minutes, so a little bit after --

20        THE COURT:  I'm going to take a very, very short

21   break.  Just a -- just a minute or two.

22        MR. CAREY:  Sure.  Thank you, Your Honor.

23        THE COURT:  We'll recess quickly.

24        COURTROOM DEPUTY MS. McDOWELL:  This Court is now

25   in recess.

1          (Court was in recess at 12:12 p.m. and resumed at

2     12:17 p.m.)

3          THE COURT:  Please be seated.  We're back in

4     session.  We tried to make our recess as quick as we could.

5     Happy to hear from -- happy to hear from Counsel.

6          MR. CAREY:  Your Honor, once, again, David Carey of

7     the ACLU of Ohio on behalf of Intervenor Anne Roe.

8          Much of what has been said is covered in our

9     briefing, and recognizing that I am the only thing standing

10    between this Court and lunch --

11         THE COURT:  Oh, no, no, no.

12         MR. CAREY:  -- I'm going to be brief.

13         THE COURT:  No, we're all good.

14         MR. CAREY:  The Plaintiffs have already presented a

15    moving target on Standing with regard to Title IX, but at

16    times it seems from their rhetoric that they're going

17    beyond simply devising new legal theories.

18         They're going so far as to misstate or try to alter

19    the claim that they've pled and the relief that they've

20    asked for.  And here is what they asked for in the

21    Complaint:

22         I'm looking at Paragraph 108.  Quote, the

23    Plaintiffs want a Declaratory Judgment that Title IX does

24    not require Bethel to implement an intimate facility policy

25    based on gender identity.  The Board has maintained that it

1    must have intimate facilities separated by gender identity

2    and not biological sex because of Title IX.

3         The Plaintiffs seek a declaration.  The law does

4    not require this, and that it is permissible for the Board

5    to have biologically sex-segregated intimate facilities.

6         I'll give them this much, that's direct, and it's

7    unambiguous.  That is the relief they asked for.  That is

8    the nature of their claim.

9         They seek a declaration from this Court that their

10   preferred restroom arrangement would be permissible under

11   Title IX, if the School ever chose to adopt it.

12        They never asked for a finding that anyone's Title

13   IX rights have been violated -- either a subset of the

14   Plaintiffs, or all of them.

15        It's unclear whether they're actually trying to

16   move those goalposts now; but if they are, what they're

17   describing would be a new cause of action, but they've not

18   asked to amend the Complaint.

19        And we submit, in fact, that adding a novel cause

20   of action at this stage -- even if they did so by amending

21   the Complaint -- or rather, by seeking to amend the

22   Complaint after numerous briefs on Title IX Standing, after

23   argument today, would be unduly prejudicial; and here I'm

24   looking at Koukios versus Ganson, 229 F.3d 1152, Sixth

25   Circuit 2000; but it would also be futile.

1            The theory that the Plaintiffs are trying to

2     articulate -- which appears to be cannibalized from their

3     Equal Protection Claim -- still does not describe

4     discrimination on the basis of sex.

5            To the extent that they're describing a

6     disagreement about Title IX, it's about interpretation of

7     the word sex, not differential treatment on the basis of

8     sex, no matter how that term sex is interpreted.

9            Moving forward to the Parenting Claim.  The

10    Plaintiffs have argued that Blau didn't raise a religious

11    claim, but it does draw a bright line, and it cites cases

12    that do involve religious claims, as we've mentioned before

13    and in our briefing.

14           The Court in Blau cited to cases including

15    Littlefield, which is a Fifth Circuit case; Leebaert, which

16    is a Second Circuit case; and Swanson out of the Tenth

17    Circuit, all of which involved religious values as part of a

18    Parenting Rights Claim, and none of which found any parental

19    right to direct the school's action.

20           In Swanson, it also expressly rejected the Hybrid

21    Rights Theory on top of rejecting a heightened level of

22    scrutiny merely from the involvement of religious values.

23    Again, that is just simply a misstatement of what Blau

24    stands for.

25           The Plaintiffs have also argued that their Parental

1    Rights have been burdened, or elsewhere they've described it

2    rhetorically as interference by the School.

3           In particular, they've argued that by not

4    providing answers to the Plaintiffs' interrogatories,

5    essentially, the School District is burdening the

6    Plaintiffs' Parental Rights.

7           There is a clear and obvious difference between

8    impermissibly burdening a right, or penalizing it, as

9    opposed to simply not actively facilitating it.

10          As we've noted in briefing, Plaintiffs also have

11   Free Speech Rights.  The School may not violate their Free

12   Speech Rights, but the School also doesn't have to furnish

13   them with a megaphone.

14          By the same token, they have a right to send their

15   children to public school or not.  The School cannot prevent

16   them from doing so or penalize their choice to do so, but it

17   is not under a Constitutional obligation to handhold them

18   through the decision process -- including answering whatever

19   questions they may personally deem important.

20          If that were the law, there would be no limiting

21   principle to it.  Public schools would be overrun with

22   parental demands of all sorts.

23          And it's worth highlighting, again, that the

24   Plaintiffs' particular questions are a good illustration of

25   how that situation would be untenable.

1          I'm looking at Paragraph 97 of the Complaint.

2    These don't appear to be mere requests for information.

3    They ask about hypothetical situations.  They demand

4    information about policy interpretations, and how they might

5    be applied in those hypothetical scenarios.  Some of them

6    are heavily leading or argumentative.

7          What they're claiming here is not requests for

8    information.  What they're claiming is a right to

9    cross-examine school officials at will.  Parenting Rights

10   cannot be weaponized in this way.

11         The Espinoza case that has been cited in

12   briefing -- Espinoza versus Montana Department of Revenue --

13   is another case that is relevant here as a contrast, both

14   with regard to Parenting Rights and Free Exercise.

15         Supreme Court in that case wrote about how

16   religious exercise was being burdened because it was being

17   comparatively penalized.  Students who went to a religious

18   private school would have to forfeit benefits to do so as

19   compared to students who went to secular private school.

20         Nothing like that sort of penalty exists here,

21   either in absolute or comparative terms.  No benefits are

22   being withheld from religious students.  Everyone is offered

23   the exact same restroom access.

24         With regard to Equal Protection, with their

25   disparate treatment argument, the Plaintiffs are still

1    attempting to equate two groups -- themselves and

2    transgender students -- who are not similarly situated.

3         In part because equality and inequality are not

4    symmetrical.  When one group asks to be treated equally and

5    a second group asks for the first group to be denied that

6    access, those are not comparable requests or equivalent

7    benefits, no matter how Plaintiffs may couch it

8    rhetorically.

9         The Court in Jones -- again, that District of

10   Colorado case -- got this right.  Courts look at how the

11   parties are actually being treated, not whether they got

12   what they wanted or what they asked for.

13        But even if the Courts did look at Equal Protection

14   from that angle, these two groups are not similarly

15   situated.  One is not being treated preferentially.  Both

16   have access to the same restrooms.  They're both being

17   treated equally under the restroom arrangement, and what the

18   Plaintiffs are seeking from the school is fundamentally not

19   the same category of thing as what Anne Roe sought.

20        Turning to Free Exercise.  The Plaintiffs are

21   asking this Court to broaden the concept of substantial

22   burden or coercion well beyond precedent; and, frankly, well

23   beyond the reality of public schools.

24        For Plaintiffs merely to encounter an environment

25   where others do not adhere to their religious beliefs cannot

1    be coercion.

2          So contrast this with Yaacov versus Mohr, which is

3    a Sixth Circuit case they cited in their briefing and

4    mentioned again today.

5          The Plaintiff in Yaacov was incarcerated, and he

6    requested a vegetarian meal because it was Kosher.  The

7    Sixth Circuit held that he had stated a claim.  He was

8    asking only that the food that he personally ate conform

9    with his religion.

10          His claim would have failed if he had tried to

11    compel the prison kitchen to serve only Kosher food.  Even

12    if his religion had mandated strict vegetarianism, and even

13    if he had argued that eating meat was transgressing the

14    fundamental core of his faith such that to be near it, to

15    see it served, to have to smell it was abhorrent to him, he

16    still would not be able to compel all others in the

17    cafeteria to eat only vegetarian meals in the name of his

18    own religion.  That might well be his preference, but he

19    would not be coerced or burdened by not being granted that

20    authority.

21          With regard to compelling interests and strict

22    scrutiny, the Plaintiffs have mentioned --  I'm sorry -- in

23    the context of religious animus, the Plaintiffs mentioned an

24    SRO report, which they claim is in the public record.  We've

25    addressed this general subject before in the Preliminary

1    Injunction hearing, but I'd reiterate that nothing in that

2    alleged incident or report says anything at all about

3    religious discrimination.

4         If rules were being broken in this school -- which,

5    again, I reiterate that they were not -- at least not by

6    Anne Roe -- that is a separate issue from students'

7    treatment on the base of their --  basis of their religion,

8    or for that matter, on the basis of their sex.  So even if

9    that SRO report was in the public record -- which we do not

10   concede -- it would be irrelevant.

11        I stand on my briefing from there with one final

12   point:  Across all of their Constitutional claims, the

13   Plaintiffs -- no matter what terminology they're trying to

14   couch it in -- are arguing that their rights are a means to

15   compel others to conform to their preferences.

16        We've explained why that's wrong in the law no

17   matter how they frame it in terms of identity or coercion or

18   burdens, but more than that, it also can't be the law.

19        Plaintiffs are -- are fond of observing -- and I'm

20   paraphrasing here -- that we live in a diverse,

21   multicultural society, that necessitates a degree of

22   tolerance of others, and I'm not just talking about as

23   interpersonal value, but as an essential component simply

24   for public institutions to function.

25        Parents -- as I've observed before, parents have

1    the right to be free of Government intrusion into their

2    parenting; but public schools could not function if parents

3    could all impose contradictory demands on curricula or on

4    operations on the basis of their religion or for any other

5    reason.

6         Students have a right to practice their faiths, but

7    public schools also could not function -- many public

8    institutions could not function if each student had the

9    right to demand that the entire environment around them and

10   everyone in it be consistent with their religion.

11        Again, that would be just impossible to navigate in

12   light of all the contradictory demands.  That is part of why

13   that line is so clearly demarcated in the law.  Breaching it

14   here would create an unworkable state of affairs, and the

15   damage would by no means be limited to restrooms.  Thank

16   you.

17        THE COURT:  Thank you, Counselor.

18        MS. DINKLER:  If I may have --

19        THE COURT:  Ms. Dinkler, yes.

20        MS. DINKLER:  May it please the Court, the School

21   moved for dismissal on all claims on Standing.  The Board of

22   Education at the Preliminary Injunction Hearing stated that

23   the United States Supreme Court has not addressed this

24   particular issue, which remains true.  Does not state that

25   Circuit Courts and District Courts haven't addressed the

1    issue, because they have, as the briefing shows.

2         Plaintiffs argued religious hostility.  It is not

3    in the Complaint.  It is disproven by the Complaint.  Three

4    groups of Plaintiffs -- two groups religious, one not -- all

5    in the Complaint state they are treated the same.  It

6    undercuts the discrimination claim as a matter of their

7    allegations and law.

8         The Board has not changed its argument.  All

9    arguments with regard to the accommodation granted here

10   started under Title IX as the Complaint admits and as

11   attached to the -- the initial pleadings; and the Title IX

12   is enforced through the Board's Antidiscrimination Policy,

13   which notes it at the bottom, which is attached to the

14   Answer, as well as all of the protections afforded for

15   religious purposes to students and families.

16        The Board has not failed to make arguments here by

17   adopting briefing to afford -- to avoid repetition, and the

18   Plaintiffs have consented to it by adopting their briefing

19   in response to the Board.  We are not at Rule 56.  We are at

20   Rule 12.

21        The Complaint -- the Board has no obligation to

22   bring -- to bring forth a record.  The record is the

23   Plaintiffs' Complaint, which has been challenged as a matter

24   of law.

25        An SRO cannot set policy, custom, or practice for a

1    Board of Education as a matter of law.  Just like a police

2    officer out on the street here in the City of Dayton cannot

3    set practice for any private or public institution.

4          What we heard here, as expected, is that history

5    tells us.  History tells us.  Judge Floyd addressed that.

6    History changes.  We make advancements.  Science changes,

7    and it makes advancements; and there is no greater benefit

8    than people tolerating one another with neutrality, which is

9    exactly what the Board of Education did in making its

10   accommodation for Anne Roe.  Thank you.

11         THE COURT:  I thank Counsel for both sides for

12   making --  all three sides for making very detailed, very

13   zealous arguments this morning.  The Court will take them

14   under submission.  We do stand in recess.  Thank you.

15         COURTROOM DEPUTY MS. McDOWELL:  All rise.  This

16   Court is now in recess.

17         (The hearing was concluded at 12:32 p.m.)

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3            I, Julie Hohenstein, Federal Official Realtime

 4    Court Reporter, in and for the United States District Court

 5    for the Southern District of Ohio, do hereby certify that

 6    pursuant to Section 753, Title 28, United States Code that

 7    the foregoing is a true and correct transcript of the

 8    stenographically reported proceedings held in the

 9    above-entitled matter and that the transcript page format is

10    in conformance with the regulations of the Judicial

11    Conference of the United States.

12

13

14

15

16    s/Julie Hohenstein     May 16, 2023
      JULIE HOHENSTEIN, RPR, CRR, RMR
17    FEDERAL OFFICIAL REALTIME COURT REPORTER

18

19

20

21

22

23

24

25
```