UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

DOE NO. 1, *et al.*,

      Plaintiffs,                       Case No. 3:22-cv-337

vs.

BETHEL LOCAL SCHOOL DISTRICT       District Judge Michael J. Newman
BOARD OF EDUCATION, *et al.*,          Magistrate Judge Peter B. Silvain, Jr.

      Defendants.

---

**ORDER: (1) GRANTING DEFENDANTS' AND INTERVENOR-DEFENDANT'S MOTIONS TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS (Doc. Nos. 75, 79); (2) DISMISSING COUNTS II AND IV FOR LACK OF STANDING; (3) DISMISSING COUNTS III, V, AND VI FOR FAILURE TO STATE A CLAIM; (4) DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING STATE-LAW CLAIMS; AND (5) DENYING AS MOOT PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION, DEFENDANTS' MOTION *IN LIMINE*, AND INTERVENOR-DEFENDANT'S MOTION TO WITHDRAW (Doc. Nos. 5, 48, 93)**

---

        This civil case, premised on federal question jurisdiction, is before the Court on Plaintiffs'

motion for a preliminary injunction on their state-law claim under the Ohio Open Meetings Act,

Ohio Rev. Code § 121.22, over which they allege that there is supplemental jurisdiction, and

Defendants' and Intervenor-Defendant's motions to dismiss for lack of subject matter jurisdiction

and for judgment on the pleadings.  Doc. Nos. 5, 75, 79.  Defendants filed a motion *in limine*,

seeking to exclude certain evidence from being considered on Plaintiffs' motion for a preliminary

injunction.  Doc. No. 48.  Upon full review of the record, the Court likewise ordered the parties to

brief: (1) whether a stay is warranted because there are parallel proceedings in state court; and (2)

whether Plaintiffs have standing to litigate their federal claims.  Doc. Nos. 52, 64.  All parties filed

briefs in response and reply to the motions and Orders (Doc. Nos. 58, 59, 60, 62, 63, 67, 69, 70,

71), so this matter is ripe for review.

## I. BACKGROUND

### A. Underlying Facts

This case concerns the relationship between a school district, schoolchildren, their parents, and state and federal law. Plaintiffs are: (1) students who attend middle school in the Bethel Local School District in Tipp City, Ohio (listed as "Child No. 1A" through "Child 7F"); (2) parents of the students named as Plaintiffs (listed as "John Doe" and "Jane Doe"); and (3) other parents whose children are Bethel Middle School students but not named as Plaintiffs in this case. *See* Doc. No. 1 at PageID 4–5. Defendants (collectively, "the School District") are: (1) the Bethel Local School District Board of Education ("the Board"); (2) Lydda Mansfield, the Board's current president ("Mansfield"); (3) Lori Sebastian ("Sebastian"), the Board's current vice president; (4) Jacob King ("King"), the Board's past president and a sitting Board member; (5) Natalie Donahue ("Donahue"), a Board member; (6) Danny Elam ("Elam"), a Board member; and (7) Matthew Crispin ("Crispin"), Bethel Local School District's current superintendent. *Id.* at PageID 5–6. Intervenor-Defendant Anne Roe ("Anne") is the transgender student whose bathroom occupancy is at the heart of this case. She intervened on January 20, 2023. *See* Doc. No. 30.

### 1. Anne's Time at Bethel

Anne transferred to Bethel Middle School in January of 2020. *See* Doc. No. 13-1 at PageID 123. After her parents informed Tim Zeigler, then Bethel Middle School's principal—that Anne was transgender—Anne, her parents, and Zeigler agreed that she "would use the single occupancy bathroom in the Nurse's office, or the Faculty Restroom located between the middle school office and the high school office."[1] Doc. No. 13-2 at PageID 134. In the present case, Anne swore in an

---

[1] The Court adopts the Sixth Circuit's convention of referring to transgender individuals by their preferred pronouns. *See McBee v. Campbell Cnty. Detention Ctr.*, No. 17-5481/5943, 2018 WL 2046303, at *1 n.1

2

Case: 3:22-cv-00337-MJN-PBS Doc #: 94 Filed: 08/07/23 Page: 3 of 52  PAGEID #: 2000

affidavit that using the single occupancy bathroom was difficult because it was frequently occupied whenever she needed to use it, and she felt ostracized, humiliated, and targeted by other students who taunted her for using the separate bathroom.  Doc. No. 13-1 at PageID 125–26.  This caused her to hold her urine during the day "to avoid using the restroom at school[,]" which she claims "began negatively affecting [her] school performance."  *Id.* at PageID 126.

On August 23, 2021, Anne's father spoke with Matt Triplett, who had taken over as Bethel Middle School's principal.  Doc. No. 13-2 at PageID 135.  He asked "if the school would grant [Anne] an accommodation to use the girls' communal restroom in addition to the two single-use restrooms she was already allowed to use."  *Id.*  Triplett promised to discuss the issue with other school officials.  *Id.*  Then, on December 5, 2021, Anne's mother emailed Triplett about the issue.  Doc. No. 54-1.  She expressed her concern about waiting for the officials to come to a decision and advised that her daughter was being treated unfairly because she did not have access to the girls' communal bathroom.  *Id.* at PageID 1166.  Importantly, she noted, "I've recently been made aware that I can file a complaint with the . . . U.S. Department of Justice if I feel that [Anne] is being discriminated against and treated unfairly because she is transgender."  *Id.*

Two weeks later, on December 17, Anne, her parents, Triplett, and Justin Firks—Bethel Local School District's Superintendent—met.  *Id.*  At that meeting, Triplett and Firks told Anne that she "would be allowed to use the girls' communal restroom once she returned from Winter Break in January of 2022."  *Id.*  As Firks would swear later in an affidavit filed in the present case, he "appl[ied] the Board's . . . Anti-Harassment [Policy] . . . and grant[ed] Anne['s] . . . request for [an] accommodation" to use the girls' communal restroom.  Doc. No. 48-1 at PageID 1053.

---

(6th Cir. Mar. 15, 2018); *Murray v. Bureau of Prisons*, 106 F.3d 401 (Table), No. 95-5204, 1997 WL 34677, at *1 n.1 (6th Cir. Jan. 28, 1997).

### 2. Board Policy

The Board, pursuant to its bylaws, holds regular public meetings at least every two months. Doc. No. 16-1 at PageID 187.  At these meetings, the Board's members discuss "routine business items[,]" such as "hiring of personnel" or adopting a resolution that sets the Board's new policy—so long as it occurs in public.  *Id.*  However, the Board may also "enter into executive session" to discuss certain matters "that are exempted from public sessions[.]"  *Id.* at PageID 190.  These topics concern: (1) acting with respect to a public employee or official's employment; (2) investigating charges or complaints against an employee; (3) considering school property sales; (4) discussing imminent court action with the Board's legal counsel; (5) preparing for or conducting collective bargaining; (6) reviewing information that federal or state law requires to be confidential; (7) addressing security matters or emergency response protocols; and (8) addressing confidential information about the School District's economic development.  *Id.*  "No official action may be taken in executive session[,]" and "[a]n executive session will be held only at a regular or special meeting."  *Id.*  Likewise, "no member of the Board, committee[,] or subcommittee shall disclose the content of discussions that take place during such sessions."  *Id.*

The Board also follows the School District's anti-discrimination policy.  Doc. No. 16-2. Under that policy, the School District "will employ all reasonable efforts to protect the rights of" individuals subject to what the School District determines to be discriminatory conduct.  *Id.* at PageID 211.  Likewise, the School District retains all documents and information "pertaining to" discriminatory conduct and treatment, including requests by an individual that is experiencing discrimination.  *Id.* at PageID 211–12.  The policy further notes that this information may be exempted from disclosure under federal law, including the Americans with Disabilities Act ("ADA") and the Family Educational Rights and Privacy Act ("FERPA").  *Id.* at PageID 212.

### 3. Relevant Board Meetings

On September 13, 2021, the Board held a public meeting. *See* Board Education, *Bethel Schools's Personal Meeting Room*, YouTube (Sept. 13, 2021), https://www.youtube.com/watch?v=9xxrRDef_G0.[2] At that meeting, the Board opened the floor to members of the public to raise their concerns. *Id.* at 1:20:00. One person brought up "transgender rights" as a topic for the Board to consider, alleging that transgender students attended school in the district. *Id.* at 1:20:10–:29, 1:21:45–:52. According to this person, these students should be allowed to use the bathroom that corresponds with their gender identity, and not allowing this violated federal law. *Id.* at 1:20:29–1:24:55. King responded that the Board "was still conferring with [its] legal counsel in regards" to those issues. *Id.* at 1:24:56–1:25:10. He acknowledged that allowing students to use the bathroom corresponding to gender identity would be a change from the norm throughout the Bethel School District. *Id.* at 1:25:11–:47.

The Board held another meeting on December 7, 2021, and, at the end of that meeting, King moved to enter executive session. *See* Board Education, *Board Work Session* at 52:35–54:22, YouTube (Dec. 7, 2021), https://www.youtube.com/watch?v=DGFWcZRhEhI. The Board members reference moving into executive session to discuss legal advice given to them by their attorney. *See id.* at 52:35–:50. King announced in public that, based on their prior discussions, executive session would fall under the Open Meetings Act's exceptions for discussions: (1) with the board's attorney to discuss matters subject to pending or imminent court action; (2) about security arrangements; and (3) concerning employment matters or complaints against a student or employee. *Id.* at 53:20–54:00.

What happened during that executive session is genuinely disputed. The School District

---

[2] Bethel Local School District's YouTube channel is called "Board Education." *See* Board Education, YouTube, https://www.youtube.com/c/bethelboardmeetings (last visited Mar. 6, 2023).

submitted an affidavit from Superintendent Firks, claiming that the Board discussed matters under Ohio Revised Code §§ 121.22(G)(1) and (3); namely, an investigation about an employment into a school district employee and attorney-client matter between the Board and its counsel. Doc. No. 48-1 at PageID 1052.

Jessica Franz, a member of the Board from January 10, 2022 until September 2, 2022, was invited to the December 7th meeting as a recently appointed Board member. Doc. No. 37-3 at PageID 814. In an affidavit filed for Plaintiffs, Franz claimed that the Board entered executive session, the purpose of which "was to discuss the school's rules for bathrooms and locker rooms in accordance with a student's chosen identity rather than biological sex." *Id.* at PageID 815. According to Franz, both King and Firks "explained that they had spoken with the Board's attorney about the matter," who "told them Bethel had to allow restroom use in accordance with a student's gender identity." *Id.* However, that attorney was not present at the December 7 executive session. *Id.* at PageID 816. Franz further recalled, "I distinctly remember leaving the meeting with the impression that the [B]oard had reached a consensus to allow the transgender students [to] use the restroom of their preference because I knew I would have to vote in the minority on the issue at my first public Board meeting on January 10, 2022." *Id.* at PageID 817. Franz also noted that "the [B]oard discussed a cafeteria employee suspected of stealing[.]" *Id.*

Then, the Board held a meeting on January 10, 2022. *See* Board Education, *Regular BOE Meeting*, YouTube (Jan. 10, 2022), https://www.youtube.com/watch?v=36ndGc1Ge-8. Mansfield, who had become Board president by this time, stated the following during the meeting:

> The best introduction I can give to this, I guess. A change went into effect the beginning of the year, correct?
>
> So at the beginning of the year the district has adopted the stance, I guess is the best way to put it, that transgender students may use the restroom that aligns with their gender status upon advice received

from our attorney.

The statement our attorney gave to us follows: Several United States Courts of Appeals, including the Sixth Circuit Court of Appeals, in which Ohio is located, have determined that Title IX of the Educational Amendments of 1972 requires that transgender students be granted access to the restrooms and locker rooms of their sexual identification. This includes the Third Circuit, Sixth Circuit, and the Ninth Circuit. The Sixth Circuit case denied overturning a lower case ruling.

The United States Supreme Court, while not yet issuing a ruling on transgender students using bathrooms of their sexual identifications, in 2020 issued a ruling determining that transgender status is protected by the federal law against sex discrimination in the workplace, or Title VII.

Title VII and Title IX have similar prohibitions against discrimination. This ruling will have a significant impact on how the Supreme Court will rule on educational bathroom issues. So again, we have made this change within our district based upon the advice of our attorney that should there be a court case come before us, pending or otherwise, we would not be successful in any battle and would simply cost the district a lot of money that we simply cannot afford to spend.

The change will be made. Our students are using bathrooms aligned with their identity at this time.

*Id.* at 1:16:00–1:17:47; Doc. No. 17-2 at PageID 593–94.

## B. Procedural History

### 1. The State Lawsuit

A plaintiff, who apparently resides in Miami County, Ohio, filed suit in the Miami County Court of Common Pleas on July 21, 2022. *See State ex rel. Croley v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 22 CV 279, at Doc. Entry for July 21, 2022 at p. 2 (Miami Cnty. C.P. Ct. July 21, 2022) (hereinafter, "*Croley*"). This plaintiff alleged that the School District, and its board members, violated the Ohio Open Meetings Act when it "entered executive session and deliberated" on December 7, 2021 about allowing transgender students to use the bathroom that corresponded with

their gender identity. *Id.* at Doc. Entry for July 21, 2022 at pp. 2–3.

The School District answered that complaint, and the case is undergoing discovery at this time. *See id.* at Doc. Entries for Sept. 22, 2022 and Oct. 18, 2022. The parties have until September 29, 2023 to finish discovery; summary judgment motions are due in October 2023; and a trial is scheduled for January 17, 2024. *See id.* at Doc. Entry for Oct. 18, 2022.

### 2. The Federal Lawsuit

Plaintiffs filed suit here on November 22, 2022 and moved for a preliminary injunction on their state-law claim—that the School District violated the Open Meetings Act ("Count I")—on December 2, 2022. Doc. Nos. 1, 5. They allege five federal claims under 42 U.S.C. § 1983: (1) a declaratory judgment that Title IX does not require the School District to implement its new bathroom policy ("Count II"); (2) a violation of the parent Plaintiffs' Fourteenth Amendment right to direct the care, custody, and control of their children ("Count III"); (3) a violation of the Fourteenth Amendment's Equal Protection Clause ("Count IV"); (4) a violation of all Plaintiffs' First Amendment Free Exercise right ("Count V"); and (5) a violation of the Protection of Pupil Rights Amendment ("PPRA"), 20 U.S.C. § 1232h ("Count VI"). Doc. No. 1 at PageID 18–23. They further raise claims under Ohio's constitution for violating the Ohio equivalent of the federal Equal Protection and Free Exercise Clauses. *Id.* at PageID 20–23. As mentioned above, Plaintiffs consist of students at Bethel Middle School and their parents, each alleging their own constitutional and statutory claims. *Id.* at PageID 4–6. For ease of reference, and because it will be relevant to addressing their standing, the Court shall divide Plaintiffs into groups based on their relevant characteristics and the nature of their claims.

One group of Plaintiffs consist of the students at Bethel Middle School who challenge the

School District's actions (hereinafter, "the Student Plaintiffs").[3]  *Id.* at PageID 1.  Also challenging the School District's actions are their parents and other parents of children who attend Bethel Middle School but are not a part of this lawsuit (hereinafter, "the Parent Plaintiffs").  *Id.* at PageID 4–5.

There are also distinct groups within these groups of Plaintiffs. One group consists of Muslim students, their parents, and Muslim parents whose children are not named in this lawsuit (hereinafter, "the Muslim Plaintiffs").  *Id.* at PageID 11.

As alleged in the Complaint, the Muslim Plaintiffs "sincerely believe that Allah makes men and women in the womb as distinct and separate genders." *Id.*  In their view, the School District "is imposing a substantial burden on the free exercise of that faith by placing the children in intimate facilities with members of the opposite biological sex." *Id.* at PageID 12.  They further allege that "[f]orcing [them] to use intimate facilities with members of the opposite biological sex is like forcing them to eat pork." *Id.*  The Muslim parents contend that it is a sincere part of their faith to raise their children in a manner that does not put them in contact with members of the opposite biological sex in school bathrooms.  *Id.* at PageID 11–12.  They claim "this directly contradicts their faith on a fundamental moral question and places their children in a situation of compromised modesty." *Id.* at PageID 12.

---

[3] As listed in the Complaint, the Student Plaintiffs are: Child No. 1A; Child No. 3B; Child No. 3C; Child No. 4D; Child No. 5E; and Child No. 7F.  *Id.* at PageID 1.  The parents are John and Jane Doe No. 1, the parents of Child No. 1A; John Doe No. 3, the father of Child Nos. 3B and 3C; Jane Doe No. 4, the mother of Child No. 4D; Jane Doe No. 5, the mother of Child No. 5E; and Jane Doe. No. 7, the mother of Child No. 7F.  *Id.* at PageID 4–5. The parents whose children attend Bethel Middle School but are not a part of this lawsuit challenge the School District's actions include John and Jane Doe. No. 2; Jane Doe No. 7; John and Jane Doe No. 8; and John Doe No. 9.  *Id.*  The Muslim students are Child Nos. 1A, 3B, 3C, and 4D; their parents, John and Jane Doe No. 1, John Doe No. 3, and Jane Doe. No. 4; and John and Jane Doe No. 2, whose children are not named in this lawsuit.  *Id.* at PageID 11.  The Christian Plaintiffs are Jane Doe No. 5 and her child, Child No. 5E; Jane Doe No. 7 and her child, Child No. 7F; and Jane Doe No. 6, and John and Jane Doe No. 8.  *Id.* at PageID 14–15.

The Muslim Children Plaintiffs allegedly "hold their urine and avoid using the restroom at school if at all possible" to avoid interacting with a transgender student. *Id.* One child avoids using the bathroom, which "causes her anxiety and emotional distress . . . ." *Id.*

The Muslim Parent Plaintiffs challenge Bethel Middle School's alleged promotion of "LGBTQ+ beliefs at the school." *Id.* at PageID 13. They claim that Bethel students had to complete a fifth grade reading assignment "testing the student's 'comprehension' of a story about a queen who wanted to be a king and her noble struggle to be accepted as a boy." *Id.* This assignment, according to them, violated their Free Exercise rights to inculcate their children in the Muslim faith. *See id.*

Further claiming that the School District violated their Free Exercise rights, the Muslim Plaintiffs also allege:

> Plaintiffs John and Jane Doe No. 2 donated their own resources to build a sex-neutral restroom next to the other restrooms in the school. They did so with the understanding that the sex-neutral restroom would allow transgender students to use a restroom in the same area as all the other students without having to use restrooms in other parts of the building. Bethel took the donors' resources and built the restroom but continued in its present course, without telling the donors.

*Id.* at PageID 10. Plaintiffs further allege that, after constructing the single-use bathroom using the Muslim Plaintiffs' donations, the School District issued "a limited 'FAQ' regarding intimate facilities." *Id.* According to the Muslim Plaintiffs, this FAQ allegedly stated, "transgender students would be permitted to use the communal intimate facilities of their gender identity and, if other students did not want to use those intimate facilities, they could use a single person private restroom—including the new sex-neutral restroom provided by the Muslim community." *Id.*

Next, two parents and their children, along with two parents without children in this lawsuit ("the Christian Plaintiffs"), "are active members of the Christian community." *Id.* In their view,

10

because God made people in His image, "a human being's dignity comes from the image of God himself.  And God's fashioning of a human being as a man or woman at birth is a fundamental part of that dignity.  One cannot impose on that dignity without transgressing the fundamental core of a Christian."  *Id.* at PageID 14.  Like the student Muslim Plaintiffs, the student Christian Plaintiffs allegedly hold their urine to avoid using the bathroom: ostensibly, to avoid contact with a transgender individual because this will violate their religious faith.  *Id.*  They allege that they are Christians and "a fundamental part of the exercise of their own faith is to raise their children in the faith . . . ."  *Id.* at PageID 15.

All Plaintiffs claim that the School District is "providing communal intimate facilities for transgender students in accordance with their believed core identity while denying the Muslim and Christian families communal intimate facilities in accordance with their believed core identity." *Id.* at PageID 15.  Specifically, they claim that the School District's anti-discrimination policy creates protected classes based on gender identity, transgender status, and religious belief.  *Id.* Thus, the School District is allegedly and improperly denying a benefit—"communal intimate facilities . . . in accordance with that student's believed core identity"—to the Muslim and Christian Plaintiffs while giving transgender students access to those facilities.  *Id.*

All Parent Plaintiffs contend that the School District's policies violate their Fourteenth Amendment right to raise their children as they see fit.  *Id.* at PageID 16–17, 19–21.  They first point to the bathroom policy itself, alleging that this policy "force[s their] children to share intimate facilities with members of the opposite sex . . . ."  *Id.* at PageID 19.  Likewise, the Parent Plaintiffs allege that they "have raised numerous common sense questions regarding Bethel and its rules related to the change" that have allegedly gone unanswered.  *Id.* at PageID 17.  This includes asking about the ramifications of the policy to allow transgender students to use the bathroom that

aligns with their gender identity: such as, for example, how the School District will address locker use; adult use of restrooms; and, *inter alia*, policies for room assignments for overnight field trips. *Id.* They point out, "[u]nder Ohio law, [they] must send their children to school[,]" so they lack a remedy at law for these alleged wrongful actions. *Id.* In their view, because the School District will not answer their questions, this denies them "their right to determine whether their children should attend public school and to remove them from the public school system . . . because they cannot obtain vital information necessary to exercise their rights with full information." *Id.*

The Court granted Anne's unopposed motion to intervene on January 20, 2023. Doc. No. 30. The Court held oral argument on the preliminary injunction motion on February 7, 2023. Because the parties had not addressed standing or the pending state court litigation, this Court ordered briefing on both issues. Doc. Nos. 52, 64. Once those issues became ripe for review, Anne filed a motion to dismiss Counts II through V for lack of subject matter jurisdiction and failure to state a claim. Doc. No. 75. The Court then set a deadline—requiring Defendants to file any remaining motions to dismiss by April 12, 2023. Defendants did so, Doc. No. 79, and in Plaintiffs' opposition memorandum, Doc. No. 85, they requested oral argument on the motions to dismiss. The Court heard such oral argument May 9, 2023.

## II. LEGAL STANDARD

"Article III's restriction of the judicial power to Cases and Controversies is properly understood to mean cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." *Uzuegbunam v. Preczewski*, --- U.S. ---, 141 S. Ct. 792, 798 (2021) (quotation marks omitted) (quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000)). Thus, "to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Dep't of Com. v. New York*, --- U.S. ---, 139 S. Ct. 2551, 2565 (2019). "To have standing, a plaintiff must allege (1) an injury in fact (2) that's traceable to the defendant's

conduct and (3) that the courts can redress." *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–61 (1992)). "Each plaintiff has the burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 457 (6th Cir. 2017) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). "[A]t the preliminary injunction stage[,] the plaintiff must show 'a substantial likelihood of standing[.]'" *Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021) (quoting *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 n.3 (6th Cir. 2018)). "Standing is a jurisdictional requirement. If no plaintiff has standing, then the court lacks subject matter jurisdiction." *Tennessee ex rel. Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019) (citations omitted).

Challenges to the Court's subject-matter jurisdiction under Rule 12(b)(1) come in two forms: facial and factual attacks. *See McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012). "A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading." *Gentek Bldg. Prods. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). The Court accepts the allegations in the complaint as true against a facial attack. *Id.*; *Cooper v. Rapp*, 702 F. App'x 328, 331 (6th Cir. 2017). For a factual attack, "the [C]ourt can actually weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction." *McCormick*, 693 F.3d at 658 (quoting *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012)).

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings "us[es] the same standard that applies to . . . a motion to dismiss under Rule 12(b)(6)." *Moore v.*

13

*Hiram Township*, 988 F.3d 353, 357 (6th Cir. 2021) (citing *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 389 (6th Cir. 2007)). "[A]ll well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Moderwell v. Cuyahoga County*, 997 F.3d 653, 659 (6th Cir. 2021) (quoting *Jackson v. Pro. Radiology Inc.*, 864 F.3d 463, 466 (6th Cir. 2017)). However, the Court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Jackson*, 864 F.3d at 466). In considering a Rule 12 motion, the Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to [D]efendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (brackets added) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

### III. ANALYSIS

For the reasons that follow, Plaintiffs' federal claims will be dismissed because they either fail to allege a cognizable case or controversy or, assuming the allegations are true, fail to satisfy the requisite legal standards. Count II, seeking "a declaratory judgment that Title IX does not require [Defendants] to implement an intimate facility policy based on gender identity[,]" requests an advisory opinion. It would violate this Court's limited jurisdiction to opine on whether the School District's policy accurately states what Title IX requires, so that claim must be dismissed. Count III seeks to vindicate an interpretation of the Fourteenth Amendment that exceeds the Constitution's text and the relevant precedents. Although parents have the right to make decisions about where to send their children to school, they do not have a constitutional right to revoke a school's policy on student bathroom usage. Count IV imposes an Equal Protection challenge without disparate treatment, so the Court cannot afford the relief that the Plaintiffs seek. Count V,

14

which alleges that the School District enacted its bathroom policy in contravention of the Muslim and Christian Plaintiffs' faith, fails to present plausible allegations undermining the policy's neutrality or showing animus—let alone show that the possible presence of a transgender student in the bathroom is a "substantial burden" to the Plaintiffs' Free Exercise Clause rights.   Finally, on Count VI, assuming that Plaintiffs can sue under the PPRA, they do not allege a plausible claim.

When a district court dismisses federal claims before trial that are the sole basis for original jurisdiction, generally, it may dismiss without prejudice the pendent state-law claims, thus allowing Plaintiffs to pursue those claims in the state courts if they so desire.  *Gamel v. City of Cincinnati*, 625 F.3d 949, 951–52 (6th Cir. 2010); *see also* 28 U.S.C. § 1367(c).  That is the proper course here, so Count I shall be dismissed upon declining to exercise supplemental jurisdiction.

### A.  Count II (Title IX Declaratory Judgment)

Plaintiffs contend that, because they present "an issue of substantial controversy with present immediate impact and adverse legal interests between the parties[,]" Doc. No. 59  at PageID 1298, then they meet their burden to show standing to receive a declaratory judgment on whether the School District's policy violates Title IX.  They note that several students are suffering dignity harms, emotional distress, and anxiety because they "avoid the restroom and hold their urine" to avoid possibly contacting a transgender student in the bathroom.  *Id.* at PageID 1299. Because the School District adopted its policy based on its understanding that Title IX required it to do so, then Plaintiffs' belief that Title IX does not so require this—coupled with their insistence that the policy violates their constitutional rights—enables this Court, in their view, to answer whether the School District's policy accurately describes the law under Title IX.  *Id.* at PageID 1298–99.

In response, Anne argues that Plaintiffs misconstrue the School District's justification for enacting its policy with the policy itself, which could properly be disputed as violating some

15

discrete provision of constitutional, or statutory, law.  Doc. No. 62 at PageID 1420.  Likewise, she claims that because Plaintiffs do not identify how their Title IX rights were harmed, then this Court cannot adjudicate the underlying rationale to the policy, especially where the School District has not even hinted that it would adopt sex-segregated facilities if its interpretation of Title IX turned out to be incorrect.  *Id.* at PageID 1422–24.  Moreover, Anne points out that Plaintiffs' claims rest on a speculative hypothetical: (1) that they win; (2) that Anne brings a Title IX action against the School District for rescinding the policy; and (3) that the School District defends itself by claiming it is following Title IX.  *Id.* at PageID 1423–27.  In reply, Plaintiffs raise an alternative theory of standing; they contend that Anne has threatened to file a Title IX complaint and she intervened to defend the School District's policy.  Doc. No. 67 at PageID 1461–63.

"[A] court [may] enter declaratory relief only '[i]n a case of actual controversy[.]'" *Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 961 (6th Cir. 2009) (quoting 28 U.S.C. § 2201(a)).  "The Declaratory Judgment Act 'does not alter these rules or otherwise enable federal courts to deliver "an expression of opinion" about the validity of laws.'" *Safety Specialty Ins. Co. v. Genessee Cnty. Bd. of Comm'rs*, 53 F.4th 1014, 1020 (6th Cir. 2022) (quoting *Saginaw County v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 954 (6th Cir. 2020)).  Therefore, to seek declaratory relief within Article III's limits, the party seeking relief must show "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *STAT Emergency*, 946 F.3d at 954 (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).  "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (quoting *Diamond v. Charles*, 476 U.S. 54, 62 (1986)). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim

16

that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, --- U.S. ---, 141 S. Ct. 2190, 2208 (2021).

Plaintiffs' broad assertion—that the School District's policy harmed them—does not give them standing to sue under Title IX. Consider first the injury-in-fact requirement. "[A]n injury must be 'concrete, particularized, and actual or imminent[.]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). Plaintiffs believe that they have standing to challenge the policy because they have suffered dignity and emotional harms, particularly as to the Student Plaintiffs' fear of using the bathroom. Doc. No. 1 at PageID 14. But those harms stem from their religious aversion to encountering a transgender student in the bathroom, or their parents' alleged injury to their right to raise their children; these harms do not relate to Title IX, which serves to remedy discrimination on the basis of sex in the educational context. *Id.*; *cf. Murphy v. NCAA*, --- U.S. ---, 138 S. Ct. 1461, 1486 (2018) (Thomas, J., concurring) ("Remedies operate with respect to specific parties, not on legal rules in the abstract." (internal quotation marks and citations omitted)).

Resisting this conclusion, Plaintiffs generalize their harm—arguing that since the School District is enforcing its allegedly incorrect understanding of Title IX, and since this is injuring them, they have shown enough to satisfy Article III's standing requirement. *See* Doc. No. 67 at PageID 1460, 1462–63. "But crossover standing does not exist." *Vonderhaar v. Village of Evendale*, 906 F.3d 397, 402 (6th Cir. 2018). Nor is there is "supplemental jurisdiction" for standing, as "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citations omitted). The fact that Plaintiffs can "demonstrate[] harm from one [alleged] particular inadequacy" in the policy, such as its potential to chill their religious exercise, does not satisfy their burden to show a concrete,

particularized Title IX injury. *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *cf. Blum v. Yaretsky*, 457 U.S. 991, 1001–02 (1982) (plaintiffs who had standing to challenge procedural inadequacy of their nursing homes' discharges or transfers to a lower level of care lacked standing to challenge those procedures as to discharges or transfers to higher levels of care).

Redressability is another part of the standing requirement that Plaintiffs do not plausibly allege. "To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, --- U.S. ---, 141 S. Ct. 2104, 2115 (2021) (internal quotation marks and citation omitted). "The relevant standard is likelihood—whether it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 715 (6th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC) Inc.*, 528 U.S. 167, 181 (2000)). Considering this standard, Plaintiffs' request for declaratory relief is both speculative and a mismatch for the harms they allege. If the Court found that the School District misinterpreted Title IX when it created its policy, an order stating as much would have no bearing on whether the School District keeps its policy. As Defendants have intimated here, the School District could decide to afford transgender students *more rights* than Title IX provides—making any decision on whether the policy comports with Title IX superfluous, and of no real legal effect. *See* Doc. Nos. 18-1 to 18-5 (affidavits from School Board members indicating that they would have responded to Anne's request for an accommodation to use the girls' bathroom irrespective of the policy); *see also, e.g.*, *MedImmune*, 549 U.S. at 127 n.7 ("[A] litigant may not use a declaratory-judgment action to obtain piecemeal adjudication of defenses that *would not finally and conclusively* resolve the underlying controversy." (emphasis in original)); *Arizona v. Biden*, 40 F.4th 375, 385–87 (6th Cir. 2022) (state lacked standing to sue where they could not show that rescinding the

18

government's immigration enforcement priority memorandum would necessarily reduce crimes by third parties or prevent future law enforcement expenditures). Thus, Plaintiffs lack standing to challenge the policy as an allegedly flawed interpretation of Title IX.

Relatedly, Plaintiffs' alternative theory of standing—based on the potential that Anne would sue if she were excluded from the girls' bathroom—embraces the hypothetical. To be concrete, an injury must be imminent, not speculative. *See Clapper*, 568 U.S. at 409. Plaintiffs, in the alternative, assert in their reply brief that this Court should preemptively declare the current policy an incorrect interpretation of the law just in case Anne sues under Title IX if the policy is struck down. Doc. No. 67 at PageID 1461. But that would require: (1) this Court to strike down the policy; (2) Anne to then file suit; and (3) the School District to then defend its actions by invoking Title IX. That theory requires several intervening events, some of which may never occur, to occur. This is fatal to Plaintiffs' burden to show they have standing. *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1995) (holding that plaintiff could not sue Los Angeles Police Department to prevent officers from using a certain choke-hold because, even though officers previously used the choke-hold against the plaintiff, it was too speculative that they would do it again); *ACLU v. NSA*, 493 F.3d 644, 653–57 (6th Cir. 2007) (plaintiffs lacked standing to sue the NSA for possibility that illegal surveillance would discover information that could be used against them and relied on the plaintiffs' decision to voluntarily refrain from communications that may be tracked).

To bolster that point, Plaintiffs note that Anne "threatened to file a Title IX complaint" and she "specifically intervened in this case to protect that result." Doc. No. 67 at PageID 1462. Still, they misread the filings submitted. True, a "genuine threat of enforcement" of an illegal policy can satisfy Article III. *MedImmune, Inc.*, 549 U.S. at 129 (collecting cases). However, the Court

19

disagrees with Plaintiffs' interpretation that this is threatened enforcement, given that Anne's mother couched her suggestion in very hypothetical, ambiguous language. *See* Doc. No. 54-1 at PageID 1166 ("*I've recently been made aware* that I *can* file a complaint with . . . the U.S. Department of Justice . . . ."). Instead, the record is analogous with cases in which courts have rejected theories of standing based upon hypotheticals. *See Clapper*, 568 U.S. at 411–12; *STAT Emergency Med. Servs., Inc.*, 946 F.3d at 958–60.[4]

Likewise, an adjudication on Anne's possible Title IX challenge is unripe. A claim is unripe if it turns on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, --- U.S. ---, 141 S. Ct. 530, 535 (2020) (*per curiam*) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). "Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for the court's review." *Safety Specialty Ins. Co.*, 53 F.4th at 1020 (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997)). As explained above, Plaintiffs have not shown, beyond a speculative hunch, that Anne would sue if this Court struck down the policy. *See, e.g.*, *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (parents' alleged injury—that they would be prosecuted for truancy if they removed their son from a state-approved school, and if they enrolled him in a different school—presented an unripe claim); *cf. Kiser v. Reitz*, 765 F.3d 601, 608–10 (6th Cir. 2014) (dentist's challenge to advertising regulations was ripe where he demonstrated standing to sue, alleged past threats to enforce regulations against similar actors, and presented proof that the government warned him to stop advertising).

To that end, Plaintiffs, in essence, seek an advisory opinion. "Article III prohibits federal

---

[4] Additionally, Plaintiffs have it backwards. The genuine threat of enforcement here would be the threat of Anne's mother *suing the School District*, not Plaintiffs, so it is hard to speculate how this theory of standing would establish a genuine threat of enforcement against them. *See* Doc. No. 54-1 at PageID 1166.

courts from issuing opinions that do not resolve 'actual controversies' or bring about change for the parties." *Flight Options, LLC v. Int'l Brotherhood of Teamsters*, 873 F.3d 540, 546 (6th Cir. 2017) (quoting *Muskrat v. United States*, 219 U.S. 346, 361 (1911)) (citing *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 113–14 (1948)). In this case, Plaintiffs seek a preemptive judgment regarding a possible defense that would only apply if they won; only if Anne is forbidden from using the girls' communal bathroom; and only if she then sued the School District. Thus, their Title IX declaratory judgment request "is but a request for an advisory opinion as to the validity of a defense to a suit" not before the Court. *Coffman v. Breeze Corp.*, 323 U.S. 316, 323–24 (1945) (patent owner sought an advisory opinion when he sued to enjoin his licensee from paying the Government accrued royalties under the Royalty Adjustment Act of 1942, and attacked the Act's constitutionality, but the licensee did not seek to recover royalties); *see also Calderon v. Ashmus*, 523 U.S. 740, 742 (1998).

In sum, Plaintiffs' declaratory judgment request is speculative, incapable of redress, and seeks an advisory opinion. Thus, Plaintiffs lack standing to raise it.[5]

## B. Count III (Fourteenth Amendment)

The complaint concerns the following claimed violations of the Parent Plaintiffs' Fourteenth Amendment right "to make decisions concerning the care, custody, and control of their children[,]" *Troxel v. Granville*, 530 U.S. 57, 66 (2000): (1) the bathroom policy abridges this right

---

[5] Plaintiffs mention, in their opposition brief, that "the Board cannot deny the Plaintiffs the same benefit of safe and private intimate facilities that others enjoy, on the basis of sex." Doc. No. 81 at PageID 1691. It is unclear if Plaintiffs are attempting to assert a challenge to the School District's bathroom policy based on sex discrimination under either Title IX (or even the state or federal Equal Protection Clauses). However, "the [C]ourt is not required to either guess the nature of or create a litigant's claim." *Russell v. Tenn. Dep't of Corr.*, 99 F. App'x 575, 577 (6th Cir. 2004) (order) (first citing Fed. R. Civ. P. 8(a); then citing *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989); and then citing *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975)). This argument appears at the end of Plaintiffs' opposition section arguing why they may seek a declaratory judgment on Title IX without alleging facts that would give them standing to sue, as stated in more detail above, so it will not salvage their lack of standing to sue. *See supra*, Part III(B).

because it transgresses the Parent Plaintiffs' desire to shield their children from encountering a same-sex individual in the bathroom; (2) the School District must answer questions about the implication of the bathroom policy because it denies the Parent Plaintiffs information they need to raise their children; and (3) alleged non-academic instruction on controversial topics further infringe this right, and not answering the Parent Plaintiffs' questions about these topics limits their ability to raise their children as they see fit. Doc. No. 1 at PageID 19–20.

As a threshold matter, the Parent Plaintiffs have standing to allege their Fourteenth Amendment claim. The harm to the Parent Plaintiffs' right "in the care, custody, and control of their children" is sufficiently tied to the School District's policy, given that allowing transgender students to use the bathroom at least indirectly burdens that interest—considering, as they allege, their religious values require them to raise their children away from transgender individuals. *Troxel*, 530 U.S. at 65–66; Doc. No. 1 at PageID 19–20. However, the same is not true on the merits of their claim as it relates to the School District's curriculum and bathroom policy.

### 1. Parents' Fundamental Right and School Bathroom Operations

Parents' "fundamental right . . . to make decisions concerning the care, custody, and control of their children[,]" *Troxel*, 530 U.S. at 66, "is 'far more precious than [any] property right[]." *Siefert v. Hamilton County*, 951 F.3d 753, 762 (6th Cir. 2020) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 38 (1981) (Blackmun, J., dissenting)); *see also Johnson v. City of Cincinnati*, 310 F.3d 484, 499 (6th Cir. 2002). Nonetheless, "while this right plainly extends to the public school setting, it is not an unqualified right." *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005) (citing *Runyon v. McCrary*, 427 U.S. 160, 177 (1976)); *see also L.W. ex rel. Williams v. Skrmetti*, --- F.4th ---, No. 23-5600, 2023 WL 4410576, at *4 (6th Cir. July 8, 2023) ("But the Supreme Court cases recognizing this right confine it to narrow fields, such as education, *Meyer v. Nebraska*, 262 U.S. 390 (1923), and visitation rights, *Troxel*, 530 U.S. at 57.").

22

This right stems from Supreme Court cases relying on the substantive protections inherent in the Due Process Clause of the Fourteenth Amendment. *See Wisconsin v. Yoder*, 406 U.S. 205 (1972) (preventing state from enforcing compulsory education laws against Amish communities under the First and Fourteenth Amendments); *Meyer v. Nebraska*, 262 U.S. 390 (1923) (declaring as unconstitutional a state statute that prohibited teaching a modern foreign language to students who had not yet passed eighth grade); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925) (rejecting compulsory education); *cf. Dobbs v. Jackson Women's Whole Health*, --- U.S. ---, 142 S. Ct. 2228, 2246–48, 2257–58 (2022); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1948). These cases made clear that the state still retains "broad power to 'limit parental[] freedom'" in many ways. *L.W.*, 2023 WL 4410576, at *4 (alteration in original) (quoting *Prince*, 321 U.S. at 167). This includes the "power to prescribe a curriculum for institutions which it supports." *Meyer*, 262 U.S. at 402; *see also Yoder*, 406 U.S. at 236; *Pierce*, 268 U.S. at 534; *Students & Parents for Privacy v. Sch. Dirs. of Twp. High Sch. Dist. 211*, 377 F. Supp. 3d 891, 903 (N.D. Ill. 2019).

The Supreme Court addressed the limited reach of parents' fundamental right to control their children's upbringing in *Runyon v. McCrary*, 427 U.S. 160 (1976), where parents sued to vindicate their parental rights in sending their children to private schools that discriminated racially against applicants, claiming that 42 U.S.C. § 1981 was unconstitutionally interfering with their substantive due process right to direct the upbringing of their children. *Id.* at 166, 176–77. The Supreme Court denied this claim, noting the "limited scope" of the parental right in school settings and remarking, "a State may post (educational) standards" without running afoul of this right. *Id.* at 177 (quoting *Yoder*, 406 U.S. at 239 (White, J., concurring)). Indeed, where applying § 1981 would not affect "the petitioner schools' right to operate or the right of parents to send their

23

children to a particular private school rather than a public school" or "involve a challenge to the subject matter which is taught at any private school[,]" then this challenge did not implicate the Fourteenth Amendment. *Id.*

Perhaps the Supreme Court's broadest pronouncements concerning parental rights arose in the context of parental visitation rights. *See Troxel*, 530 U.S. at 66; *L.W.*, 2023 WL 4410576, at *4. Still, the Supreme Court has limited this right to instances where parents "must make decisions concerning the care, custody, and control of their children"—never suggesting that parents may dictate what a public school teaches to its students or how to operate its facilities. *Troxel*, 530 U.S. at 66 (addressing an as-applied challenge to a child custody statute); *see, e.g.*, *Leebaert v. Harrington*, 332 F.3d 134, 142 (2d Cir. 2003) ("[T]here is nothing in *Troxel* that would lead us to conclude . . . that parents have a *fundamental* right to the upbringing and education of the child that includes the right to tell public schools what to teach or what not to teach him or her." (emphasis in original)).

The Sixth Circuit reiterated this understanding in *Blau v. Fort Thomas Public School District*:

> While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or, as here, a dress code, these issues of public education are generally "committed to the control of state and local authorities."

401 F.3d at 395–96 (emphasis in original) (collecting cases) (quoting *Goss v. Lopez*, 419 U.S. 565, 578 (1975)). Other circuits have followed suit, curtailing parental rights to prevent parents from dictating how schools conduct their operations. *See Parents for Privacy v. Barr*, 949 F.3d 1210,

24

1231 (9th Cir. 2020) ("[P]arents . . . lack constitutionally protected rights to direct school administration . . . generally." (citing *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1206 (9th Cir. 2005), *aff'd and amended in part on denial of reh'g en banc*, 447 F.3d 1187 (9th Cir. 2006))), *cert. denied*, 141 S. Ct. 894 (2020); *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008); *Thomas v. Evansville-Vanderburgh Sch. Corp.*, 258 F. App'x 50, 53–54 (7th Cir. 2007) (order); *Skoros v. City of New York*, 437 F.3d 1, 41 (2d Cir. 2006); *Leebaert*, 332 F.3d at 141–42. These decisions make clear that a parent has the right to control where their child goes to school. But that is where their control ends. Public school policies that direct school operations, like the Board's policy here—prescribing the use of student bathrooms—are for the school to decide. *See Yoder*, 406 U.S. at 236; *Meyer*, 262 U.S. at 402; *Pierce*, 268 U.S. at 534; *cf. Crowley v. McKinney*, 400 F.3d 965, 971 (7th Cir. 2005) (noting that the constitutional parenting right "is not a right to participate in the school's management—a right inconsistent with preserving the autonomy of educational institutions, which is itself . . . an interest of constitutional dignity").

Indeed, this caselaw undermines the primary thrust of the Parents Plaintiffs' argument. The School District's decision—to allow Anne an accommodation to use the communal bathroom that aligns with her gender identity—does not in any way implicate the right to "send . . . children to a particular private school[,]" *Runyon*, 427 U.S. at 177; the right of parents to direct the "care, custody, and control" of their children in the parental visitation context, *Troxel*, 530 U.S. at 66; their right to instruct children in certain subjects or homeschool them, *see Meyer*, 262 U.S. at 401–03; or their control over where their children receive an education, *see Yoder*, 406 U.S. at 231–33. In other words, the Parent Plaintiffs do not have a substantive due process right to dictate to the School District which bathroom a transgender student must use, anymore than the Parent Plaintiffs have the right to direct the "school curriculum" as to their children completing assignments

purportedly "promoting LGBTQ+ beliefs[.]"  Doc. No. 1 at PageID 13.  In each situation, the power to act is "committed to the control of state and local authorities."  *Blau*, 401 F.3d at 395–96 (quoting *Goss*, 419 U.S. at 578); *see, e.g.*, *Crowley*, 400 F.3d at 968–70 (denying a parental rights claim to access school records because it did not implicate a parent's right to enroll a child in private education).  Accordingly, this claim merits dismissal on this basis.

### 2. Parents' Fundamental Right, Responding to Questions About Bathroom Policies, and Teaching LGBTQ+ Topics

The Court turns next to the Parent Plaintiffs' second and third theories: (2) that the School District is refusing to answer questions about the scope of the bathroom policy, and that they "cannot exercise their fundamental right to remove their children from the public school system if they are denied the information needed to have a full picture of the Board's actions and of the non-academic instruction of their children[,]" Doc. No. 1 at PageID 19; and (3) the impermissible teaching of LGBTQ+ topics further infringes on this right.  *See id.* at PageID 19–20.  These theories also do not implicate a parent's fundamental right to control their children's upbringing.  As mentioned, the Fourteenth Amendment does not confer parents with an unfettered right to access information about what their children are learning, *see Bangura v. City of Philadelphia*, No. 07-127, 2008 WL 934438, at *4 (E.D. Pa. Apr. 1, 2008) (rejecting similar claim), or to interject in how a State school teaches children.  *See Blau*, 401 F.3d at 395–96.  Likewise, recognizing such a right would run afoul of the Sixth Circuit's pronouncement in *Blau*, along with the Supreme Court's limitation of this right as demonstrated above.  *See Runyon*, 427 U.S. at 177; *Blau*, 401 F.3d at 395–96.

The caselaw mentioned, and cited, undermines the Parent Plaintiffs' desire to expansively interpret this limited right.  As an initial matter, the Court has been unable to uncover any decision that affords parents a fundamental right to have a school answer parents' questions about the scope

of a school's bathroom policy.  To the extent other cases address a comparable issue, they limit

this right in the manner identified above and rely upon the same standard.  *Supra*, Part III(A)(1).

For instance, in *Parents for Privacy v. Barr*, the Ninth Circuit addressed an identical challenge to

a school that allowed transgender students to use the bathroom that corresponded with their gender

identity.  *Parents*, 949 F.3d at 1229–32.  Rejecting a related argument that the school district's

failure to provide parents with information could subject their children to violence and harassment,

the Ninth Circuit found that parents had a panoply of state statutory provisions to vindicate this

right; and, moreover, "accommodating the different 'personal, moral, or religious concerns of

every parent' would be 'impossible' for public schools, because different parents would often

likely, as in this case, prefer opposite and contradictory outcomes" related to how schools operate

bathrooms.  *Id.* at 1233 (quoting *Fields*, 949 F.3d at 1206); *see also, e.g.*, *C.N. v. Ridgewood Bd.

of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005) ("State action that affects the parental relationship only

incidentally . . . is not sufficient to establish a violation." (quotation omitted)).

　　The First Circuit—in an opinion that the Sixth Circuit in *Blau* relied upon—further adhered

to this limited scope.  In *Brown v. Hot, Sexy and Safer Productions*, the First Circuit declined to

expand substantive due process to allow parents to sue a school for allowing their children to attend

a sexually suggestive presentation designed to educate children about safe sex practices.  *Brown

v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 530 (1st Cir. 1995), *abrogated in part on other

grounds by DePoutot v. Raffaelly*, 424 F.3d 112, 118 n.4 (1st Cir. 2005).  Again, the parental right

did not stretch so far, in that court's view.  *Id.* at 532–34.  While "the state [did] not have the power

to . . . completely foreclos[e] the opportunity of individuals and groups to choose a different path

of education[,]" this was "fundamentally different" from creating a constitutional right for parents

to veto curriculum choices or change school operations that they did not approve of.  *Id.* at 533–

34 (quoting *Meyer*, 262 U.S. at 402); *see also Swanson v. Guthrie Indep. Sch. Dist.*, 135 F.3d 694, 699 (10th Cir. 1998) (collecting cases).

The Court agrees with these cases. Parents have a right to make the initial choice about where their child attends school. *See Pierce*, 268 U.S. at 534. But inventing a constitutional right to strike down a state school's choices about curriculum and school operations would impermissibly extend that right and, in our pluralistic society, require State schools to cater to inconsistent obligations from parents who may have different moral objections about how a school operates. *See Parents*, 949 F.3d at 1233; *Crowley*, 400 F.3d at 969; *Brown*, 68 F.3d at 534. The substantive protections in the Due Process Clause do not extend so far. *See Students & Parents for Privacy*, 377 F. Supp. 3d at 903–04 (rejecting substantive due process challenge to transgender bathroom policy).

This holds true for Plaintiffs' other argument—that the school is depriving them of one or more of their constitutional rights by not giving them full information about the implications of the bathroom policy—because it still does not accord with the nature of parents' fundamental right: "a fundamental right to decide *whether* to send their child to a public school[,]" and not a right for schools to answer every demand made of them from frustrated parents (no matter how reasonable that frustration may be). *Blau*, 401 F.3d at 395 (emphasis in original). Moreover, a school's refusal to answer concerned parents' potential questions does not deprive them of this right because they still have the option to remove them from that school. *See, e.g., id.*; *Crowley*, 400 F.3d at 968–70; *Thomas*, 258 F. App'x at 53–54 (finding no constitutional right for parents to know details about academic conversations between students and teachers).

Accordingly, the Parent Plaintiffs fail to state a plausible claim under the Fourteenth Amendment. Their allegations, accepted as true and plausibly construed in their favor, do not

invoke a right to dictate a school's bathroom policy; to prevent the School District from educating children about allegedly LGBTQ+ beliefs; or to demand that the School District answer every question that the parents may possibly have about this policy.[6]

### C. Count IV (Equal Protection Clause)

Plaintiffs note that the School District has adopted an anti-discrimination policy "that specifically guarantees nondiscrimination and equal educational opportunities for certain 'protected classes,'" including religion and gender identity. Doc. No. 1 at PageID 21. To that end, Student Plaintiffs and Parents Plaintiffs complain of unequal treatment—that transgender students and their parents receive an "educational benefit" in "communal intimate facilities in accordance

---

[6] Plaintiffs cite a recent decision from the Western District of Pennsylvania that allowed a parental substantive due process claim to survive dismissal in a case challenging a school's curriculum that allegedly exposed their children to topics about transgender individuals. Doc. No. 81 at PageID 1703, 1710; *see Tatel v. Mt. Lebanon Sch. Dist.*, --- F. Supp. 3d ---, No. 22-837, 2022 WL 15523185, at *1–2 (W.D. Pa. Oct. 27, 2022). That case is neither binding nor persuasive. That court never cited or addressed *Runyon* or *Blau*—two binding cases in this Circuit that placed clear limitations on a parent's right to dictate his or her child's public-school education or the facilities therein. *See id.* at *11–13 (listing only *Dobbs*, *Meyer*, *Pierce*, *Prince*, *Yoder*, *Stanley*, and *Troxel*). Indeed, that court relied on its own interpretation of Third Circuit precedent to recognize an unenumerated constitutional right for parents to tell a school not to show their children educational videos about transgender people. *See id.* at *13–16. It is also unclear how that court's dividing line—finding that a court must apply strict scrutiny when parents plausibly allege that a school's decisions implicate "a matter of great importance that goes to the heart of parenting"—would produce a workable rule in subsequent cases. *Id.* (citation omitted). For instance, teaching children about sexual practices, *see Brown*, 68 F.3d at 533; instructing them in a manner that contravenes their parental religious values, *see Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1060–61 (6th Cir. 1987); enrolling children in classes that discuss alcohol, drugs, and sexual behavior, *see Leebaert*, 332 F.3d at 138; or eliminating schools that align with a parent's "core identity" altogether, *see Runyon*, 427 U.S. at 176–77, could violate that rule because all those instances concern "the heart of parenting" in major ways. Such a rule also ignores that state schools "have an abiding interest in 'preserving the welfare of children,'" that affords "broad power to 'limit[] parental freedom.'" *L.W.*, 2023 WL 4410576, at *4 (first quoting *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019); and then quoting *Prince*, 321 U.S. at 167) (citations omitted). It also proves unworkable because, in a pluralistic society, parents will have different opinions on what is important for their children to learn—opinions that might be so strong as to go to the "heart" of their parenting approach—so it would be impossible for schools to accommodate these contradictory values. *See, e.g.*, *Parents*, 949 F.3d at 1233; *cf. Lee v. Weisman*, 505 U.S. 577, 590 (1992) ("To endure . . . offensive content and then to counter it is part of learning how to live in a pluralistic society, a society which insists upon open discourse towards the end of a tolerant citizenry."). Thus, because this Court stands "reluctant to expand" the "treacherous field" of substantive due process, the Court declines to adopt this reasoning. *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992); *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion).

with those students' self-declared core identity" and at the behest of their parents. *Id.* In their view, the School District is giving transgender students and their parents a benefit while depriving Student Plaintiffs and Parent Plaintiffs of the same. *Id.* This leads the Student Plaintiffs to avoid the bathroom and suffer anxiety, while the Parent Plaintiffs feel "substantial distress" out of concern for their children and interference with their faith, which forbids interacting with a member of the opposite sex in a school bathroom. Doc. No. 59 at PageID 1305.

Anne and the School District frame the issue differently. While Anne does not explicitly contest the Student Plaintiffs' standing to raise their Equal Protection Clause challenge, she mentions that the Parent Plaintiffs only allege a "vicarious injury" that is not particularized. Doc. No. 62 at PageID 1428. Meanwhile, the School District agrees with Anne as to the Parent Plaintiffs regarding their "vicarious injury." Doc. No. 63 at PageID 1444. The School District adds that the Student Plaintiffs lack standing because "[b]eing in the same communal room with Anne . . . is legally insufficient" to confer an injury-in-fact. *Id.*

### 1. Standing to Assert an Equal Protection Claim

It is unclear how Plaintiffs have alleged a concrete injury. *See, e.g.*, *Clapper*, 568 U.S. at 409. "The 'injury in fact' in an equal protection case . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (citing *Turner v. Fouche*, 396 U.S. 346, 362 (1970)). That is true even when there is "no right" to the benefit at issue because "the 'State may not deny to some the privilege . . . that it extends to others on the basis of distinctions that violate federal constitutional guarantees." *Sullivan v. Benningfield*, 920 F.3d 401, 408 (6th Cir. 2019) (quoting *Turner*, 396 U.S. at 363). Yet "the threshold element of an Equal Protection claim is *disparate treatment*." *New Doe Child #1 v. Cong. of U.S.*, 891 F.3d 578, 594 (6th Cir. 2018) (emphasis added) (internal quotation marks

omitted).

Plaintiffs characterize the School District's actions as a preference favoring transgender students by permitting them to use the bathroom that aligns with their gender identity, while harming Plaintiffs by rejecting their attempt to prevent Anne from using the girls' bathroom—causing them anxiety and distress because the School District is not honoring their "self-declared core identity."  Doc. No. 1 at PageID 21.  The Parent Plaintiffs make the same allegations, contending that parents of transgender students receive disproportionate favoritism because their children's wishes are respected, while the Parent Plaintiffs children's religious beliefs requiring transgender-free bathrooms are not honored.  *Id.*  In essence, Plaintiffs claim stigmatic harm: the School District is "stigmatizing those whose religious beliefs" do not align with the School District's policy, by giving transgender individuals access to their bathroom of choice while not accommodating Plaintiffs' desire for school bathrooms segregated by biological sex.  *New Doe Child #1*, 891 F.3d at 594.  Perceived stigma, like Plaintiffs', "accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct."  *Allen v. Wright*, 468 U.S. 737, 755 (1984) (quoting *Heckler v. Matthews*, 465 U.S. 728, 740 (1984)), *abrogated in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014).  No such unequal treatment exists here.  Nothing about the School District's decision to allow Anne to use the girls' bathroom denies the Student Plaintiffs access to the school communal bathrooms, or any other public benefit afforded to every student under the School District's anti-discrimination policy.  Given this, it is unclear how Plaintiffs have been "personally subject[ed] to discriminatory *treatment*."  *Id.* at n.22 (emphasis added) (citing *Heckler*, 465 U.S. at 739–40).

This is not the typical Equal Protection case where a plaintiff challenges an underinclusive

31

statute that offers a benefit that he or she is not entitled to receive. *See, e.g.*, *Heckler*, 465 U.S. 739–40; *Coakley v. Sunn*, 895 F.2d 604, 607 (9th Cir. 1990). Rather, the School District is affording a general benefit all students, transgender or not: access to the communal bathrooms, notwithstanding the Student Plaintiffs' religious aversion from using them. *See, e.g.*, *New Doe Child #1*, 891 F.3d at 594–95 (atheist plaintiffs failed to allege a concrete injury under the Equal Protection Clause where they only alleged that "In God We Trust" motto "stigmatiz[ed] those whose religious beliefs [did] not include trust in God"). As is made apparent in their complaint, Plaintiffs feel that, under the School District's new policy, their religious views are not given the same level of respect as a transgender student's gender identity. Doc. No. 1 at PageID 21. But "claims of injury that are purely abstract, even if they might be understood to lead to 'the psychological consequence presumably produced by observation of conduct with which one disagrees,' do not provide the kind of particular, direct, and concrete injury that is necessary to confer standing . . . ." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 616 (1989) (internal citation omitted) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982)). Absent some allegations that the School District's bathroom policy— giving every student access to communal bathrooms that align with their gender identity—imposes different treatment, the Student Plaintiffs lack a concrete injury in disparate treatment, as required for standing to sue under the Equal Protection Clause. *See Allen*, 468 U.S. at 754–56; *see also, e.g.*, *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017) (rejecting plaintiff's Equal Protection Clause challenge to Mississippi's state flag for failing to show "a corresponding denial of equal treatment," despite plaintiff being personally offended by it).

### 2. Equal Protection Claim's Underlying Merit

Even assuming, *arguendo*, that the Plaintiffs have standing to allege this claim, their allegations would still fail to state a claim. The basis for an Equal Protection claim is "differential

treatment" coupled with "a discriminatory intent or purpose." *Maye v. Klee*, 915 F.3d 1076, 1085 (6th Cir. 2019) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–64 (1977)). The Equal Protection Clause mandates that the state not "deny to any person . . . the *equal protection* of its laws." U.S. Const. amend. XIV, § 1 (emphasis added). As indicated above, the adoption of a policy that affords every student the same benefit does not impose disparate treatment, so it is not cognizable under the Equal Protection Clause. *See, e.g.*, *Palmer v. Thompson*, 403 U.S. 217, 226 (1971) ("Nothing in the history or the language of the Fourteenth Amendment nor in any of our prior cases persuades us that the closing of the Jackson swimming pools to all its citizens constitutes a denial of 'the equal protection of the laws.'").

The Sixth Circuit's decision in *Freedom from Religion Foundation v. City of Warren* is instructive. 707 F.3d 686 (6th Cir. 2013). The Foundation sued the City of Warren after it refused to place a sign with an anti-religious message next to the City's nativity and holiday scene in the atrium of the City's Civic Center. *Id.* at 690. That refusal did not violate the Equal Protection Clause because the City was under no obligation to treat the Foundation's "preferred message" better than its own. *Id.* at 698. "[T]hat would place [the Foundation] in a *preferred* position," which would not satisfy the Equal Protection Clause's mandate to grant all persons "*equal* protection" under the law. *Id.* (emphasis in original); *see also New Doe Child No. 1*, 891 F.3d at 594. That is the situation here—Plaintiffs seek their preferred outcome (removing transgender students' access to their allegedly preferred communal bathroom) and claim that the School District's refusal to do so denies them the Equal Protection of the laws. Doc. No. 1 at PageID 21. Agreeing with, and finding for, Plaintiffs would improperly put them in the preferred position to another's detriment, which the Court will not oblige. *Cf. Freedom from Religion*, 707 F.3d at 698. Again, the School District offers the same benefit—access to communal and individual gender-

neutral bathrooms—to everyone irrespective of their individual characteristics.  *See* Doc. No. 17-2 at PageID 593–94.  There is no Equal Protection Clause violation where there is no differential treatment.  *See, e.g.*, *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 528–29 (6th Cir. 2023) (applicant to build a medical marijuana dispensary was not subject to differential treatment in having its application rejected because "the City applied the same method of measurement to each comparable applicant"); *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005) (hospital did not have a successful equal protection claim where they only targeted the "beneficial treatment" in awarding another hospital tax levy funds).

Thus, Plaintiffs fail to plausibly allege an Equal Protection Claim.  The same holds true of their argument that they are being discriminated against based on their religion because, as stated below, they have no such claim.

### D. Count V (Free Exercise Clause)

The Muslim and Christian Plaintiffs—parents and students alike—allege that the School District's actions have burdened the exercise of their religion.[7]  Doc. No. 1 at PageID 22–23. Namely, both student groups have sincerely held religious beliefs that prevent them from sharing bathrooms with the opposite gender and receiving instruction about LGBTQ+ beliefs.  *Id.* at PageID 11–16, 22.  In exposing the Muslim and Christian Student Plaintiffs to the prospect that they will encounter a transgender individual in the bathroom, the School District has allegedly indirectly burdened the exercise of their faith because they have caused them to refrain from using the bathroom.  *See id.*  As to the Muslim and Christian Parent Plaintiffs, they allege that the School

---

[7] The Court does not doubt whatsoever that the Muslim and Christian Plaintiffs' religious beliefs are sincerely held, and this decision should not be read to cast any doubt on the sincerity of their beliefs.  *Cf. Episcopal Student Found. v. City of Ann Arbor*, 341 F. Supp. 2d 691, 700 (E.D. Mich. 2004) ("Taking the evidence in a light most favorable to the Plaintiff, the Court has no reason to doubt Plaintiff's religious beliefs are sincerely held, and will not delve further into those beliefs at this stage.").

District's actions are denying them "the ability to exercise their good-faith religious beliefs in raising their children in [their] faith."  Doc. No. 59 at PageID 1307.  Furthermore, the Muslim Plaintiffs argue that the School District demonstrated animus when it used the parents' resources to build the single-occupancy stall, but then decided to allow transgender students to use communal bathrooms, as well as by having allegedly inconsistent justifications for the policy.  Doc. No. 81 at PageID 1725–28.

"[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"  *Kennedy v. Bremerton Sch. Dist.*, --- U.S. ---, 142 S. Ct. 2407, 2421–22 (2022) (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 879–81 (1990)).  "[R]eligious beliefs need not be acceptable, logical, consistent or comprehensible to others in order to merit First Amendment protection."  *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981).  "A law is not neutral if the object of the law, whether overt or hidden, is to infringe upon or restrict practices because of their religious motivation."  *Mt. Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 405 (6th Cir. 1999) (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993)).  "A rule of general application . . . is one that restricts religious conduct the same way that 'analogous non-religious conduct' is restricted."  *Monclova Christian Academy v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 480 (6th Cir. 2020) (order) (*per curiam*) (quoting *Lukumi*, 508 U.S. at 546).  Thus, "a generally applicable law that incidentally burdens religious practices usually will be upheld[,]" *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020) (order) (*per curiam*) (citing *Smith*, 494 U.S. at 878–79), however, "courts have an obligation to meticulously scrutinize irregularities to determine whether a law is being used to suppress religious beliefs."  *Meriwether v. Hartop*, 992 F.3d 492, 514 (6th Cir. 2021) (first

citing *Lukumi*, 508 U.S. at 534–35; and then citing *Monclova*, 984 F.3d at 481–82).

Comparing the School District's policy to this standard shows that it is neutral and generally applicable.  As a reminder, the School District announced that it would allow students to use the bathroom that corresponded with their gender identity.  Doc. No. 17-2 at PageID 593–94.  This is (1) facially neutral because it makes no reference, overt or implied, to religion or religious conduct; and (2) generally applicable because it restricts religious and nonreligious conduct equally—every student gets to use the bathroom that corresponds with their gender identity.  *Id.* at PageID 594 ("Our students are using bathrooms aligned with their gender identity at this time."); *accord Seger v. Ky. High Sch. Athletic Ass'n*, 453 F. App'x 630, 634 (6th Cir. 2011) (Kentucky High School Association's scholastic program was generally applicable because its "restrictions appl[ied] in the same manner to all non-public schools, regardless of whether a school is religiously affiliated"); *Parents*, 949 F.3d at 1235–36.

Moreover, Plaintiffs' complaint does not hint of any plausible fact that suggests the School District is using this policy to suppress religious beliefs, as the School District's actions make no mention of, and do not reference, religion whatsoever.  Nor are there any "irregularities" pled that signal "whether a law is being used to suppress religious beliefs."  *Meriwether*, 992 F.3d at 514.  While the Muslim Plaintiffs allege that the School District used resources that were donated to them by members of the Muslim community affiliated with the school, Doc. No. 1 at PageID 10, it is unclear how this would demonstrate hostility because even the complaint notes that the School District adopted its policy to prevent what it believed to be discrimination on the basis of sex.  *Cf. Doe*, 891 F.3d at 591 ("[T]he incidental effect of suppression is permissible under the Free Exercise Clause absent restrictive intent: The laws must have been 'enacted because of, not merely in spite of their suppression.'" (quoting *Lukumi*, 508 U.S. at 541)).  Even assuming, *arguendo*, that

the School District knew the concerns of religious objectors, this would just show that it adopted the policy "in spite of [its] . . . suppression" on some Plaintiffs' religious beliefs. *Id.* This does not overcome an otherwise neutral and generally applicable policy.

Their comparison to the facts in *Meriwether* falls further afield. *Meriwether* involved a university disciplining a professor who refused to use a student's pronouns that conflicted with the professor's religious beliefs. 992 F.3d at 498–503. The Sixth Circuit found that the university was inconsistent when it switched from calling the case a "hostile environment" case to a "disparate treatment" case. *Id.* at 514–15. Next, the university had an inconsistent accommodations policy, which they, at times, characterized as both allowing religious accommodations and not allowing religious accommodations. *Id.* at 515. Finally, the university's Title IX investigation was alleged to be incomplete, and it only interviewed a few witnesses. *Id.* at 515. Likewise, the policy did not demonstrate why refusing "to use a student's preferred pronouns constitutes harassment"; "explain how [the plaintiff's] conduct interfered with . . . any 'educational benefits or opportunities'"; or address the plaintiff's "request for an accommodation based on his sincerely held religious beliefs." *Id.* at 515–16 (emphasis deleted).

Plaintiffs do not make similar allegations. Nor could they. The School District, throughout this litigation and throughout its members' pronouncements about its policy, has declared that it is adopting the policy to prevent what it believes to be discrimination on the basis of sex. *See* Doc. No. 17-2 at PageID 593–94; Doc. No. 18-3 at PageID 635–36; Doc. No. 37-3 at PageID 816; Doc. No. 48-1 at PageID 1053. The School District's bathroom policy applies evenly to all students, making no exception for anyone based on their religion, to allow each student's identified gender to prescribe the bathroom to use. Doc. No. 17-2 at PageID 593–94.

Even assuming, *arguendo*, that Plaintiffs could allege the policy lacks neutrality or general applicability, they have not plausibly alleged a substantial burden on their religious practice. Such a burden exists when "governmental action penalize[s] religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Living Water*

38

*Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988)).  That is not present in any allegation in the complaint.  Instead, the complaint acknowledges that both religious and non-religious students have access to the communal bathrooms and single occupancy bathrooms.  Doc. No. 1 at PageID 8 (recognizing the proposed change in 2021 as "allow[ing] students to use the intimate facilities of their preferred gender identity").  Although the complaint frames the issue as "providing communal intimate facilities for transgender students in accordance with their believed core identity while denying the Muslim and Christian families communal intimate facilities in accordance with their believed core identity[,]" this false dichotomy still admits that all students— regardless of religion, sex, race, or any other immutable characteristic—are allowed to use communal bathrooms consistent with their gender.  *Id.* at PageID 15.  That means all students possess "an equal share of the rights, benefits, and privileges enjoyed by other" students— according to the Plaintiffs' allegations—and the First Amendment's Free Exercise Clause allows the School District to give every student access to the bathrooms in this neutral manner.  *Living Water*, 258 F. App'x at 734; *see, e.g.*, *Lyng*, 485 U.S. at 449–52 (rejecting Free Exercise challenge to the government's permitting of timber harvesting on a sacred location to indigenous tribes because it did not deny those tribes an equal right that other citizens enjoyed); *Asher v. Clay Cnty. Bd. of Educ.*, 585 F. Supp. 3d 947, 965 (E.D. Ky. 2022) (dismissing Native American group's claim to prevent the government from removing graves from a sacred site where they sought "to exact a benefit from the local government" that would divest the government of its right to administer its property).

    The only circuit court to thus far directly confront this issue has concluded similarly.  The Ninth Circuit, in *Parents for Privacy v. Barr*, rejected a Free Exercise challenge to a school's

locker and bathroom policy permitting transgender students to use the bathroom or locker room that corresponded with their gender identity. 949 F.3d at 1235. Where the policy in question made "no reference to any religious practice, conduct, belief, or motivation[,]" it stood as neutral and without any inclination of hostility towards the religious objectors. *Id.* (quoting *Stormans, Inc. v. Wiseman*, 794 F.3d 1064, 1076 (9th Cir. 2015)). Moreover, it was generally applicable because it was "not underinclusive," meaning "it d[id] not place demands on exclusively religious persons or conduct[,]" such as by only requiring religious students to share bathrooms or locker rooms with transgender students. *Id.* at 1236. Thus, it was subject to rational basis review, which it easily passed.

This rationale applies here. The Board announced at the January 10, 2022 meeting that it was allowing students to use the bathroom that corresponded with their gender identity—an announcement devoid of any reference or insinuation to religion, religious behavior, or even religious individuals. Doc. No. 17-2 at PageID 593–94. The policy is not underinclusive because it does not "selectively impose[] certain conditions or restrictions only on religious conduct." *Parents*, 949 F.3d at 1236. It applies to all students regardless of their religious beliefs. Despite Plaintiffs' attempt to suggest this case is one where government action "protect[s] secular activities more than comparable religious ones[,]" *Roberts*, 958 F.3d at 415 (collecting cases), this is not accurate: the School District's decision to let Anne use the girls' communal bathroom serves, as a legal matter, to grant her access to a communal benefit, not deprive religious students of a benefit. *See, e.g.*, *Seger*, 453 F. App'x at 634.

Because the bathroom policy is generally applicable, it is subject only to rational basis review. "Right or wrong, rational-basis review epitomizes a light judicial touch." *Tiwari v. Friedlander*, 26 F.4th 355, 361 (6th Cir. 2022) (first citing *FCC v. Beach Commc'ns, Inc.*, 508

40

U.S. 307, 313–14 (1993); and then citing *Williams v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–88 (1955))). This review is satisfied if "the regulation bear[s] some rational relation to a legitimate state interest[,]" *Craigmiles v. Giles*, 312 F.3d 220, 223 (6th Cir. 2002) (citations omitted), and the Court's inquiry "does not assess the wisdom of the challenged regulation." *Thiele v. Michigan*, 891 F.3d 240, 244 (6th Cir. 2018) (quoting *Breck v. Michigan*, 203 F.3d 392, 395 (6th Cir. 2000)). "[A] plaintiff may demonstrate that the government action lacks a rational basis either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012) (cleaned up) (quoting *Scarborough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)).

A rational basis exists here. The School District, as President Mansfield stated at the January 10, 2022 meeting, adopted its policy to not run afoul of federal law, including published decisions from the Sixth Circuit and this Court, which found that a school violated Title IX and the Equal Protection Clause when it prevented a transgender student from using a bathroom that aligned with the student's gender identity. *See* Doc. No. 17-2 at PageID 593–94; *Bd. of Educ. of the Highland Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 854 (S.D. Ohio 2016), *aff'd*, *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016). Although Plaintiffs have expressed doubts that this Sixth Circuit published decision binds this Court because it was an appeal of a motion seeking a stay of a preliminary injunction, Doc. No. 81 at PageID 1691–93, the Sixth Circuit has noted, "While the decisions of motions panels are generally interlocutory in nature (and, thus, not strictly binding upon subsequent panels), they do receive some measure of deference." *Wallace v. FedEx Corp.*, 764 F.3d 571, 583 (6th Cir. 2014) (first citing *Kraus v. Taylor*, 715 F.3d 589, 594 (6th Cir. 2013); and then citing *R.E. Dailey & Co. v. John Madden Co.*,

983 F.2d 1068, No. 92-1397, 1992 WL 405282, at *1 n.1 (6th Cir. 1992)); *see also In re Nat'l Prescription Opiate Litig.*, 976 F.3d 664, 669 (6th Cir. 2020). This means that the School District can give this decision that same "measure of deference[,]" *Wallace*, 764 F.3d at 583, and decide to conform its bathroom policy to the Sixth Circuit's pronouncements. The School District's interest in following the law, and eliminating discrimination on the basis of sex, is furthered by its policy. This is the rational basis review's "light judicial touch," of which the Sixth Circuit speaks, *see Tiwari*, 26 F.4th at 361, and it allows schools to err on the side of caution and afford individuals more rights than they might be entitled to. Thus, the Plaintiffs fail to state a claim under the Free Exercise Clause.

### E. Count VI (PPRA Violation)

The Court turns, finally, to Plaintiffs' PPRA claim. They claim that the School District's "nonacademic requirements, including requiring reading books promoting transgender ideology," run afoul of the PPRA's prohibition against administering "psychiatric or psychological treatment" without parental consent. Doc. No. 1 at PageID 23. Plaintiffs contend that the PPRA prevents "the use of methods or techniques that are not directly related to academic instruction and designed to affect behavioral, emotional, or attitudinal characteristics of an individual, without prior written consent of an unemancipated minor's parent or guardian[.]" *Id.* at PageID 24. Further, according to Plaintiffs, these assignments' "primary purpose . . . is to reveal information related to gender identity, sexual behavior, and personal attitudes." *Id.* The School District argues that the PPRA does not confer a private right of action. Doc. No. 79 at PageID 1662–63.[8]

---

[8] Plaintiffs initially contended that they could sue through 42 U.S.C. § 1983, which would allow it to vindicate its rights protected under the PPRA, but they admit that § 1983 cannot serve as a source for a private right of action if the federal statutory or constitutional provision cited does not itself create a private right of action. *Cf. Gonzaga Univ. v. Doe*, 536 U.S. 273, 276 (2005) ("We hold such an action foreclosed because the relevant provisions of FERPA create no personal rights to enforce under 42 U.S.C. § 1983.").

From this Court's research, neither the Supreme Court nor any federal appellate court has determined directly whether the PPRA creates a private right of action. "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Mik v. Fed. Home Loan Mortg. Corp.*, 743 F.3d 149, 158 (6th Cir. 2014) (alteration in original) (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 688 (1979)). "Statutory provisions must *unambiguously* confer individual federal rights." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. ---, 143 S. Ct. 1444, 1455 (2023) (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002)); *see Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Am. Premier Underwriters, Inc. v. National R.R. Passenger Corp.*, 709 F.3d 584, 590 (6th Cir. 2013) (emphasis deleted) (quoting *Alexander*, 532 U.S. at 286). Thus, the Court must examine "the specific statutory provisions at issue" to determine whether that provision is federally enforceable. *Barry v. Lyon*, 834 F.3d 706, 716 (6th Cir. 2016) (citations omitted). The resulting inquiry poses three questions:

> (1) whether Congress intended that the provision in question benefit the plaintiff; (2) whether the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence; and (3) whether the statute unambiguously impose[s] a binding obligation on the States by couching its right in mandatory, rather than precatory, terms.

*Waskul*, 979 F.3d at 447 (internal quotation marks omitted) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997)). The first question requires that Congress placed in "the pertinent statute . . . 'rights-creating' language that reveals congressional intent to create an individually enforceable right." *Westside Mothers v. Olszewski*, 454 F.3d 532, 541 (6th Cir. 2006) (hereinafter, "*Westside Mothers II*") (quoting *Gonzaga*, 536 U.S. at 285); *see Alexander*, 532 U.S. at 289 ("Statutes that focus on the person regulated rather than the individuals protected create 'no

implication of an intent to confer rights on a particular class of persons.'" (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981))).  The second question considers whether "the provision sets forth general objectives" in "broad and nonspecific language . . .. not amenable to judicial remedy." *Waskul*, 979 F.3d at 448 (internal quotation marks omitted) (quoting *Westside Mothers II*, 454 F.3d at 543).  The Sixth Circuit has found the third question answered where the statute phrases an obligation that a covered entity "shall" or "must" do something.  *See id.*; *Westside Mothers v. Haveman*, 289 F.3d 852, 863 (6th Cir. 2002) (hereinafter, "*Westside Mothers I*).

"Even after" a plaintiff demonstrates "that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs[,] . . . there is only a rebuttable presumption that the right is enforceable under § 1983." *Harris v. Olszewski*, 442 F.3d 456, 461 (6th Cir. 2006) (alterations in original) (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)).  Thus, the Court "must ask whether Congress 'explicitly foreclose[d] recourse to § 1983' under the relevant statute, including by establishing a 'remedial scheme sufficiently comprehensive to supplant § 1983.'" *Waskul*, 979 F.3d at 448 (quoting *Westside Mothers I*, 289 F.3d at 863).  Likewise, there may be contrary "evidence of such congressional intent [that] may be found directly in the statute creating the right, or inferred from the statute's creation of a 'comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *City of Rancho Palos Verdes*, 544 U.S. at 120 (quoting *Blessing*, 520 U.S. at 341) (citing *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 19–20 (1981)).

The relevant portion of the PPRA is as follows:

> No student shall be required, as part of any applicable program, to submit to a survey, analysis, or evaluation that reveals information concerning-- . . .
>
> (3) sex behavior or attitudes . . .

> without the prior consent of the student (if the student is an adult or emancipated minor), or in the case of an unemancipated minor, without the prior written consent of the parent.

20 U.S.C. § 1232h(b)(3).

It is not clear that the PPRA provides the Parent Plaintiffs with a cause a private cause of action.  Its text and administering regulations—forbidding disclosure of "sex behavior or attitudes[,]" *id.* § 1232h(b)(3), through surveys or "examination, testing, or treatment . . . in which the primary purpose is to reveal" a forbidden topic, 34 C.F.R. § 98.4(a)—feature the kind of "broad and nonspecific" language that courts lack the expertise to scrutinize.  *Waskul*, 979 F.3d at 448 (quoting *Gonzaga*, 536 U.S. at 292 (Breyer, J., concurring in the judgment)).  Furthermore, even if the PPRA has "rights-creating" language (which focuses on children, not their parents), the PPRA offers "a centralized review mechanism that would be undermined by piecemeal litigation[,]" which demonstrates Congress's intent not to afford parents a private right of action. *Health & Hosp. Corp. of Marion Cnty.*, 143 S. Ct. at 1464 (Barrett, J., concurring); 20 U.S.C. §§ 1232h(e), (f); *see also, e.g.*, *Mich. Corr. Org. v. Mich. Dep't of Corrs.*, 774 F.3d 892, 904 (6th Cir. 2014) (finding that private parties could not enforce Fair Labor Standards Act's wage-and-hour provisions under § 1983 based, in part, on "its own remedial scheme" that the U.S. Department of Justice could enforce).  It is also significant that "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State[,]" so anything less than an unambiguous declaration in the PPRA that it provides an enforceable cause of action fails to suffice.  *Health & Hosp. Corp.*, 143 S. Ct. at 1457 (quoting *Gonzaga*, 536 U.S. at 280); *see also* 20 U.S.C. § 1234c; *Gonzaga*, 536 U.S. at 275–80 (finding that FERPA, the PPRA's sister statute, did not provide a private right of action enforceable through § 1983).

But assuming, *arguendo*, that the PPRA provides a private right of action, Plaintiffs have failed to state such a claim. In their complaint, they allege, "Bethel students must complete assignments promoting LGBTQ+ beliefs." Doc. No. 1 at PageID 13. Plaintiffs emphasize that these assignments are "part of Bethel's planned and systematic use of methods or techniques, not directly related to academic instruction, to affect students' behavior, emotions, or attitudes regarding sex behavior and attitudes, specifically behavior, emotions, or attitudes related to sexual identity, gender, and transgenderism." *Id.* But these allegations fall far from the PPRA's statutory scope, as it prevents students from "submit[ting] a *survey, analysis, or evaluation* that *reveals information* concerning . . . mental or psychological problems of the student or the student's family" or "sex behavior or attitudes[.]" 20 U.S.C. §§ 1232h(b)(2), (3) (emphasis added). As Plaintiffs note, the Secretary of Education's own regulations note that this includes "psychiatric examination, testing, or treatment, or psychological examination, testing, or treatment, in which the *primary purpose* is to reveal information concerning . . . [m]ental and psychological problems potentially embarrassing to the student or his or her family" or "[s]ex behavior and attitudes[.]" 34 C.F.R. §§ 98.4(a)(2), (3) (emphasis added). It remains unclear how a reading assignment or assignments discussing "LGBTQ+ beliefs," absent an allegation that students had to submit "a survey, analysis, or evaluation" that revealed their own attitudes on sex behavior, would reveal any private information about the student, let alone have that as the assignment's primary purpose. *See, e.g.*, *Parents Protecting Our Children v. Eau Claire Area Sch. Dist.*, --- F. Supp. 3d ---, 22-cv-508, 2023 WL 2139501, at *10 (W.D. Wis. Feb. 21, 2023) (finding that failure to allege that a school district "required any child to submit any type of survey, analysis, or evaluation in conjunction with [the school district's] gender identity support Guidance" was fatal to their PPRA claim).

Plaintiffs' sole, relevant PPRA-related allegation is that the School District "is . . .
administering attitudinal surveys with students regarding their views on sexual and transgender
issues, without providing notice to parents or obtaining the consent of parents, including
Plaintiffs." Doc. No. 1 at PageID 24. The Court need not credit these conclusory allegations
because the complaint is devoid of supporting facts that, if taken as true, would provide a plausible
PPRA claim. *See Moderwell*, 997 F.3d at 659. This is such an allegation, considering the only
facts that Plaintiffs offer are that the School District is requiring students to "read[] books
promoting transgender ideology," which, as stated above, does not fall into the behavior that the
PPRA forbids. *See, e.g.*, *Parents Protecting Our Children*, 2023 WL 2139501, at *10; *Newkirk v.
E. Lansing Pub. Schs.*, No. 1:91-cv-563, 1993 U.S. Dist. LEXIS 13194, at *14–16 (W.D. Mich.
Aug. 16, 1993) (dismissing PPRA claim where plaintiffs could not allege that the primary purposes
of psychiatric treatment were to obtain information that the PPRA covered).

Alternatively, Plaintiffs have not plausibly alleged that students are being required—"as
part of any applicable program" funded by the Department of Education—to submit private
information from a survey. 20 U.S.C. § 1232h(b)(1). The PPRA itself applies to two entities: (1)
"any applicable program[,]" *id.* § 1232h(b); and (2) "a local educational agency *that receives funds
under any applicable program*[,]" *id.* § 1232h(c)(1) (emphasis added), indicating a distinction
between the two groups. Furthermore, "'applicable program' means any program for which the
Secretary or the Department has administrative responsibility as provided by law or by delegation
of authority pursuant to law[,]" and "each program for which the Secretary or the Department has
administrative responsibility under the Department of Education Organization Act or under
Federal law . . . ." 20 U.S.C. § 1221(c)(1).

Although Plaintiffs allege that the School District receives federal funds generally, Doc.

No. 1 at PageID 23, they do not allege that the School District administered surveys in connection with a specific Department of Education "program" that the School District receives federal funding for.  *See, e.g.*, *Herbert v. Reinstein*, 976 F. Supp. 331, 340 (E.D. Pa. 1997) ("The text of this statute and the regulations implementing it indicate that Section 1232h was meant to apply only to programs administered by the Secretary of Education."); *Altman v. Bedford Cent. Sch. Dist.*, 45 F. Supp. 2d 368, 390 (S.D.N.Y. 1999), *rev'd on other grounds*, 245 F.3d 49 (2d Cir. 2001); *Newkirk*, 1993 U.S. Dist. LEXIS 13194, at *12–14.  The broad reading that Plaintiffs offer would eviscerate Congress's distinction between local educational agencies—that receive funding through an applicable program—and those applicable programs.  *Cf. United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." (quoting *Mackey v. Lanier Collection Agency & Servs., Inc.*, 486 U.S. 825, 837 (1988))).  The Court declines to go that far, so Plaintiffs' allegations—which do not identify a Department of Education funded program through which the School District submitted surveys, analyses, or evaluations to students on sex behavior or attitudes—do not state a claim under the PPRA.  *See, e.g.*, *Herbert*, 976 F. Supp. at 340; *Newkirk*, 1993 U.S. Dist. LEXIS 13194, at *12–14.

### F.  Count I (Preliminary Injunction and Supplemental Jurisdiction)

When considering a preliminary injunction, the Court must balance the answers to four questions: "Has the plaintiff established 'that he is likely to succeed on the merits'? Would the plaintiff likely suffer 'irreparable harm in the absence of preliminary relief'? Does the 'balance of equities' tip in the plaintiff's favor? And does 'the public interest' favor an injunction?"  *Biden*, 40 F.4th at 381 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Plaintiffs' request for a preliminary injunction on their state-law claim falters on the answer to the first

48

question: whether they have demonstrated a substantial likelihood of success.  *See Louisiana-Pacific Corp. v. James Hardie Bldg. Prods., Inc.*, 928 F.3d 514, 517 (6th Cir. 2019); *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) ("The district judge is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue." (internal quotations marks and citations omitted)).  The sole jurisdictional basis Plaintiffs present for judicial review of their motion for a preliminary injunction—supplemental jurisdiction over Plaintiffs' state-law claims—depends upon the likelihood that their federal claims subsist long enough to support review of their state-law claims.  However, a preliminary injunction "is an extraordinary remedy[,]" *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002), and ought not be entered where the federal claims lack merit and the factors point against exercising supplemental jurisdiction.  *See, e.g.*, *Prater v. Boyd*, 263 F.2d 788, 789 (6th Cir. 1959) (*per curiam*) (noting that a district judge was within his discretion to hear a motion to dismiss before a preliminary injunction because "the questions raised by the motion to dismiss point to the desirability of hearing and determining the motions in the order stated").  Thus, the Court must first consider whether to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims and motion for a preliminary injunction when Plaintiffs' federal claims lack merit.

"In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'"  *Gamel*, 625 F.3d at 951–52 (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  "Depending on a host of factors, then—including the circumstances of the particular case, the nature of the state[-]law claims, the character of the governing state[-]law, and the relationship between the state and federal claims—district courts may decline to

49

exercise jurisdiction over supplemental state law claims." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997). A district court must balance the "interests of judicial economy and the avoidance of multiplicity of litigation" against "needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp.*, 994 F.2d 1178, 1182 (6th Cir. 1993) (affirming district court's declination of supplemental jurisdiction where it "found no overwhelming issues of judicial economy" (citing *Province v. Cleveland Press Pub. Co.*, 787 F.2d 1047 (6th Cir. 1986))).

"When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state[-]law claims, or remanding them to state court if the action was removed." *Gamel*, 625 F.3d at 952 (quoting *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996)) (citing 28 U.S.C. § 1332(c)(3)). "Once a federal court no longer has federal claims to resolve, it 'should not ordinarily reach the plaintiff's state-law claims.'" *Southard v. Newcomb Oil Co., LLC*, 7 F.4th 451, 455 (6th Cir. 2021) (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006)). The Sixth Circuit has permitted district courts to retain such claims, but most often when "(1) the plaintiff had engaged in forum manipulation[,] . . . (2) the parties had completed discovery, and (3) the defendants' summary-judgment motions were ripe for decision." *Gamel*, 625 F.3d at 952 (citing *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 211–12 (6th Cir. 2004)). That is not the situation here, where Plaintiffs' federal claims do not survive Defendants' motions to dismiss. *See, e.g., Newsom v. Golden*, 602 F. Supp. 3d 1073, 1079–80 (M.D. Tenn. 2022) (denying motion for a preliminary injunction on a state-law claim where the underlying federal claims that made the basis for subject matter jurisdiction failed to state claims for relief). Additionally, the Court finds that the interest "against needlessly deciding state[-]law issues" further counsels in favor of declining supplemental jurisdiction, especially considering that a state court presently has before it an Ohio Open Meetings Act

challenge against the School District concerning the same events. *Id.* (quoting *Landefeld*, 994 F.2d at 1182); *Croley*, at Doc. Entry for July 21, 2022 at p. 2; *see Talismanic Props., LLC v. Tipp City*, 309 F. Supp. 3d 501, 510 (S.D. Ohio 2017) ("Comity to state courts is considered a substantial interest; therefore, this Court applies a strong presumption against the exercise of supplemental jurisdiction once federal claims have been dismissed . . . ." (quoting *Packard v. Farmers Ins. Co. of Columbus, Inc.*, 423 F. App'x 580, 584 (6th Cir. 2011))), *aff'd*, 749 F. App'x 129 (6th Cir. 2018).

Therefore, because Plaintiffs' federal claims are dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims. That renders the pending motion for preliminary injunction, and motion *in limine* that would limit what is admissible evidence that the Court may consider on the injunction motion, moot.

## IV. CONCLUSION

Not every contentious debate, concerning matters of public importance, presents a cognizable federal lawsuit. Although the parties, undoubtedly, seek to vindicate what they believe is the truth, the allegations in the complaint do not pass legal muster under the applicable methods of constitutional, statutory, or precedential interpretation. Thus, for the reasons stated, the Court: (1) **GRANTS** Defendant's and Intervenor-Defendant's motions to dismiss and for judgment on the pleadings (Doc. Nos. 75, 79); (2) **DISMISSES** Counts II and IV for lack of standing; (3) **DISMISSES** Counts III, V, and VI for a failure to state a claim; (4) **DECLINES** to exercise supplemental jurisdiction over Plaintiffs' remaining state-law statutory and constitutional claims; and (5) **DENIES AS MOOT** the motion for preliminary injunction and motion *in limine* (Doc. Nos. 5, 48). The Court shall address the Rule 11 motion by separate entry.[9] For the reasons set

---

[9] "[I]t is well established that a federal court may consider collateral issues after an action is no longer pending[,]" which includes a Rule 11 motion. *Tropf v. Fid. Nat'l Title Ins. Co.*, 289 F.3d 929, 938–39 (6th

forth below, *see supra* footnote 9, Anne's motion to withdraw is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

   August 7, 2023                            s/Michael J. Newman

                                           Hon. Michael J. Newman

                                           United States District Judge

---

Cir. 2002) (quoting *Willy v. Coastal Corp.*, 503 U.S. 131, 138 (1992)); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990).  Thus, the Court retains jurisdiction to address Plaintiffs' pending Rule 11 motion.  Doc. No. 74.  Moreover, the Court notes that Anne filed, on August 2, 2023, a motion to withdraw as an Intervenor-Defendant in this case.  Doc. No. 93.  The Court has not yet addressed this motion, but the termination of the underlying litigation has rendered it moot.  Even assuming, *arguendo*, that Anne's withdrawal impacts standing as to declaratory relief, nothing would undermine Plaintiffs' allegations of standing to seek damages for past injuries they suffered due to Defendants' allegedly unconstitutional and illegal conduct.  *See* Doc. No. 1 at PageID 26; *see also, e.g.*, *Kanuszewski*, 927 F.3d 406.