# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  August 26, 2025

Mr. Joseph P Ashbrook
Ashbrook Byrne Kresge Flowers LLC
P.O. Box 8248
Cincinnati, OH 45249

Mr. Nicholas Barry
America First Legal Foundation
611 Pennsylvania Avenue
Suite 231
Washington, DC 20003

Ms. Julie Elizabeth Byrne
Ashbrook Byrne Kresge Flowers LLC
P.O. Box 8248
Cincinnati, OH 45249

Mr. David Joseph Carey
American Civil Liberties Union of Ohio Foundation
1108 City Park Avenue, Suite 203
Columbus, OH 43206

Mr. Benjamin Michael Flowers
Ashbrook Byrne Kresge Flowers LLC
P.O. Box 8248
Cincinnati, OH 45249

Ms. Taylor Christine Knight
Reminger Company
One SeaGate
Suite 1600
Toledo, OH 43604

Mr. Gabriel Krimm
Office of the Attorney General of Tennessee
500 Dr. Martin L. King Boulevard, Suite 3214
Nashville, TN 37219

Ms. Malita Picasso
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Mr. John A. Podgurski
Law Office of John Podgurski
9155 Chillicothe Road
Kirtland, OH 44094

Ms. Mathura Jaya Sridharan
Office of the Attorney General
of Ohio
30 E. Broad Street
17th Floor
Columbus, OH 43215

Mr. Vincent M. Wagner
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176

        Re:   Case No. 23-3740, *Doe, et al v. Bethel Local Sch. Dist. Bd. of Educ., et al*
               Originating Case No. : 3:22-cv-00337

Dear Counsel,

   The Court issued the enclosed opinion today in this case.

   Enclosed are the court's unpublished opinion and judgment, entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                      Sincerely yours,

                      s/Cathryn Lovely
                      Opinions Deputy

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name:  25a0410n.06

Case No. 23-3740

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

> **FILED**
> Aug 26, 2025
> KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| JOHN AND JANE DOE NO.1, et al., | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| BETHEL LOCAL SCHOOL DISTRICT BOARD | ) | DISTRICT OF OHIO |
| OF EDUCATION, et al., | ) | |
| Defendants-Appellees. | ) | O P I N I O N |
| | ) | |

Before:  MOORE, COLE, and LARSEN, Circuit Judges.

COLE, J., delivered the opinion of the court in which MOORE, J., concurred, and LARSEN, J., concurred in part and in the judgment.  LARSEN, J. (pp. 22–28), delivered a separate concurring opinion.

COLE, Circuit Judge.  In January 2022, the Bethel Local School District (School District) revised its bathroom policy to permit transgender students to use the communal bathroom of the gender with which they identify based on legal advice that Title IX required it to do so.  Parents and students subsequently sued the school board, its board members, and the superintendent alleging violations of state and federal law, including free exercise and parental rights claims. They also requested a declaratory judgment that Title IX did not require the School District to implement a bathroom policy based on gender identity.  The district court granted defendants' motions to dismiss and for judgment on the pleadings, dismissing all federal law claims and declining to exercise supplemental jurisdiction over the remaining state law claims.  Plaintiffs timely appealed.

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

During the pendency of the appeal, Ohio enacted a law requiring schools to restrict communal student restrooms for use based on biological sex. Ohio Rev. Code § 3319.90(B)(2). Accordingly, the School District no longer maintains the challenged bathroom policy and plaintiffs' claims for injunctive and declaratory relief are moot. We therefore consider only whether plaintiffs are entitled to damages for the time the bathroom policy was in place. Because they are not, we affirm.

## I.

The School District serves nearly 2,000 students in a one-building campus that contains communal boys' restrooms, communal girls' restrooms, and single occupancy restrooms. The communal restrooms all contain partitioned stalls for student privacy.

A transgender middle-school student, Anne Roe, transferred to the School District. Concerned for her daughter's well-being, Roe's mother emailed the principal to request an accommodation for Roe to use the communal restroom of the gender with which she identifies. She raised the possibility of filing a Title IX complaint against the School District. An attorney advising the school board informed the board that, under Title IX, the School District could not require transgender students to use restrooms corresponding to their biological sexes.

Pursuant to the advice of counsel, the School District modified its policy to allow transgender students to use the communal restrooms corresponding to the gender with which each student identifies.[1] Following the adoption of this policy, some students felt uncomfortable using the communal restrooms. Some Muslim students believe their religion requires "modesty and

---

[1] Defendants have maintained throughout this litigation that the "policy" at issue was not a general policy, but an isolated accommodation granted to Roe. Plaintiffs, however, describe the policy as having widely granted accommodations to all current and future transgender students in the School District. At this stage, "we recite the facts as they are alleged in the complaint." *Savel v. MetroHealth Sys.*, 96 F.4th 932, 937 (6th Cir. 2024).

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

separateness between the sexes." (Compl., R. 1, PageID 11.)  And some Christian students believe the intermingling of sexes in the communal bathrooms harms a "fundamental part" of human dignity stemming from "God's fashioning of a human being as a man or woman at birth[,]" and that to "impose on that dignity . . . transgress[es] the fundamental core of a Christian." (*Id.* at PageID 14.)  These students were troubled by sharing restrooms with students whose gender identity did not correspond with their biological sex, resulting in "anxiety and emotional distress" and causing them to hold their urine and avoid using the restroom at school.  (*Id.* at PageID 12, 14.)

Members of the Muslim community donated funds to construct a gender-neutral restroom near the communal restrooms.  The School District built the restroom but did not rescind its bathroom policy.  Parents requested information about how the School District's policy would apply to adults, ensure student safety, facilitate teacher supervision, and deal with boarding students on overnight trips, among other topics.  The School District did not provide the requested information.

Plaintiffs, a group of Muslim and Christian parents and students as well as one "not particularly religious" parent, sued defendants under state and federal law.  (*Id.* at PageID 18–24.) Plaintiffs asserted several claims under state and federal law, but only three of their claims are relevant on appeal.  First, plaintiffs alleged that the School District's policy violated their rights under the U.S. Constitution and the Ohio Constitution because it substantially burdened their free exercise of religion.  They sought declaratory and injunctive relief and damages under 42 U.S.C. § 1983.  Second, plaintiffs alleged that by refusing to provide parents with information regarding the school's policies, the School District violated the parents' fundamental right under the Fourteenth Amendment to make decisions regarding their children's schooling.  Again, they

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

sought declaratory and injunctive relief and damages under 42 U.S.C. § 1983.  Third, plaintiffs sought a declaratory judgment under 28 U.S.C. § 2201 "that Title IX does not require [the School District] to implement an intimate facility policy based on gender identity."  (*Id.* at PageID 18–19.)  They also sought further relief, including damages, under 28 U.S.C. § 2202.

Roe moved to intervene, and the district court granted her unopposed motion.  In March 2023, she filed a motion to dismiss and a motion for judgment on the pleadings.  She argued that the plaintiffs lacked standing for several of their claims and that the claims otherwise failed as a matter of law.  Defendants moved to dismiss and for judgment on the pleadings as to all counts on the same bases.  Plaintiffs opposed the motions and requested oral argument, which the district court held in May 2023.

The district court granted defendants' and Roe's motions for judgment on the pleadings. The district court concluded that plaintiffs' free exercise and parental rights claims failed to state a claim for relief and that plaintiffs lacked standing for their Title IX claim.  The court declined to exercise supplemental jurisdiction over the remaining state law claims.

Plaintiffs appealed.  During the pendency of this appeal, Roe left the School District, and there are no longer any students who openly identify as transgender enrolled.  Further, Ohio enacted SB 104, which requires schools to restrict communal student restrooms for use based on biological sex.  As a threshold matter, we consider our jurisdiction before turning to the merits of the remaining claims.

## II.

Because the School District no longer maintains the bathroom policy, we must first consider whether any of plaintiffs' claims are moot.  While the party raising mootness bears the burden of proving it, *Cardinal Chem. Co., v. Morton Int'l, Inc.*, 508 U.S. 83, 98 (1993), "we may

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

raise the question of mootness *sua sponte*" to "assure ourselves of our own jurisdiction to hear a case," *Fouts v. Warren City Council*, 97 F.4th 459, 464 (6th Cir.), *cert. denied*, 145 S. Ct. 376 (2024).[2]

Article III of the U.S. Constitution restricts the jurisdiction of federal courts to actual "cases" and "controversies." U.S. Const. art. III, § 2; *Hanrahan v. Mohr*, 905 F.3d 947, 960 (6th Cir. 2018) ("We do not have the power to adjudicate disputes that are moot."). The case-or-controversy requirement persists through all stages of review. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016). "If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990)).

Defendants assert that the School District has not maintained the bathroom policy since Roe left the School District. Further, during the pendency of this appeal, Ohio enacted SB 104, which requires schools to restrict communal student restrooms for use based on biological sex. In relevant part, Ohio SB 104 provides:

> No school shall permit a member of the female biological sex to use a student restroom, locker room, changing room, or shower room that has been designated by the school for the exclusive use of the male biological sex. No school shall permit a member of the male biological sex to use a student restroom, locker room, changing room, or shower room that has been designated by the school for the exclusive use of the female biological sex.

Ohio Rev. Code § 3319.90(B)(2). Because SB 104 "prohibit[s]" the School District "from maintaining any policy, including accommodations, that allow a student to use a communal

---

[2] Regardless, the parties briefed the issue. After the law took effect on February 25, 2025, we ordered supplemental briefing on whether the School District continues to maintain the bathroom policy and whether any transgender students currently attend in-person classes within the School District.

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

restroom that does not match their biological sex," defendants assert that this "legislation resolves any lingering doubt that the 'policy' still exist[s]." (Appellee's Supp. Br. 6–7.)

Plaintiffs, however, maintain that their claims are not moot and that this court retains jurisdiction. With respect to standing, plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek[.]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). A corollary of that principle applies to mootness. "The test for mootness is whether the *relief sought* would, if granted, make a difference to the legal interests of the parties." *Ford v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006) (citation omitted) (emphasis added). As relevant to this appeal, plaintiffs sought four forms of relief: (A) injunctive relief under 42 U.S.C. § 1983, (B) declaratory relief under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, (C) damages under 28 U.S.C. § 2202, and (D) damages under 42 U.S.C. § 1983. We consider each in turn.

## A.

Plaintiffs' claim for injunctive relief under 42 U.S.C. § 1983 is moot. When applying the mootness doctrine to a claim seeking injunctive relief, we consider the claim to be moot when either "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Banas v. Dempsey*, 742 F.2d 277, 281 (6th Cir.1984) (quoting *United States Parole Commission v. Geraghty*, 445 U.S. 388, 396 (1980) (citation modified)).

In *Banas*, for example, welfare recipients sought an injunction preventing the state from continuing to enforce a policy that they alleged was unconstitutional. 742 F.2d at 280. While the litigation was ongoing, Congress amended a statute, preventing the state from enforcing the policy

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

at issue. *Id.* We concluded that the change in law rendered the request for injunctive relief moot. *Id.* at 281.

Defendants do not argue that Ohio SB 104 conflicts with federal law and instead take the position that the School District is bound by the law. Consequently, like the intervening federal law in *Banas*, Ohio SB 104 renders plaintiffs' request for injunctive relief moot. We can no longer enjoin the School District from maintaining the bathroom policy because the policy no longer exists, and defendants are prevented by state law from reinstating it. And plaintiffs cannot have a legally cognizable interest in stopping a policy or practice that already ceased. Thus, plaintiffs' claim for injunctive relief is moot.

### B.

Plaintiffs' claims for declaratory relief under both under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 are also moot. Declaratory judgments are not exempted from Article III's jurisdictional requirements. *Saginaw County v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 954 (6th Cir. 2020). When considering the potential mootness of a claim for declaratory relief, "[t]he question is 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 275 (1941)).

We have previously found requests for declaratory judgments moot where the policy or agreement that allegedly violated a plaintiff's constitutional rights was no longer in effect. In *Campbell v. PMI Food Equipment Group, Inc.*, 509 F.3d 776, 781 (6th Cir. 2007), for example, employees sought a declaratory judgment that an employer agreement violated their constitutional rights. Because the agreement had expired and was no longer in effect, we reasoned that no party

- 7 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

had a continuing obligation under the agreement. *Id.* Thus, we concluded that "[g]ranting declaratory relief would therefore have no effect on the [w]orkers' current legal interests." *Id.*; *see also Allen v. Collins*, 529 F. App'x 576, 579 (6th Cir. 2013) (finding a plaintiff's request for a judgment declaring a parole guidelines manual unconstitutional was moot when that manual was rescinded).

Like the plaintiffs in *Campbell*, plaintiffs request that we declare as unconstitutional a policy that no longer exists. A controversy cannot exist where the School District no longer maintains the bathroom policy, and where defendants take the position that state law, effective February 25, 2025, precludes the reimplementation of the policy by requiring the School District to restrict communal student restrooms for use based on biological sex.

Plaintiffs argue that "[i]f [the School District] still thinks Title IX is preemptive and entitles transgender students to use opposite-sex restrooms . . . it will continue adhering to the challenged policy." (Appellant's Supp. Br. 6.) They further argue that SB 104 "will inevitably face court challenges" that could enjoin its enforcement. (*Id.* at 4–5.) But the School District no longer maintains the policy and asserts that it is "bound by Ohio's statute[.]" (Appellee's Supp. Br. 7; *see also id.* at 8 ("There is no suggestion Appellees intend to enact a policy contrary to SB 104. Quite the opposite. Appellees instituted code of conduct rules in 2023 affirming the district's position that students are expected to [] use the bathroom corresponding to their biological sex.").) As a result, the bathroom policy cannot affect plaintiffs' legal interests, and their claims for declaratory relief as to the bathroom policy are moot.

## C.

Plaintiffs' claim for damages under 28 U.S.C. § 2202 is also moot. Section 2202 allows federal courts to grant "[f]urther necessary or proper relief based on a declaratory judgment . . .

- 8 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

against any adverse party whose rights have been determined by such judgment."  In effect, "[a] declaratory judgment can [] be used as a *predicate* to further relief[.]"  *Powell v. McCormack*, 395 U.S. 486, 499 (1969) (emphasis added).  Here, because plaintiffs' request for a declaratory judgment is moot, there is no such predicate that allows a federal court to grant further relief.

Plaintiffs argue that because they sought damages, their claims for declaratory relief cannot be moot.  But parties cannot use the Declaratory Judgment Act to resurrect claims that are defeated by mootness or other jurisdictional deficiencies.  Section 2202 merely provides an additional remedy.  Plaintiffs' claim for damages under § 2202 is therefore dependent on this Court's jurisdiction over plaintiffs' request for declaratory relief under § 2201.  Because, as discussed above, we lack jurisdiction over plaintiffs' request for declaratory relief under § 2201, we necessarily lack jurisdiction over their claim for damages under § 2202.

D.

Plaintiffs' claims for damages under 42 U.S.C. § 1983, however, are not moot.  Generally, claims for damages survive mootness challenges because they "are retrospective in nature[.]" *Ermold v. Davis*, 855 F.3d 715, 719 (6th Cir. 2017) (quoting *CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 622 (3d Cir. 2013)).  Further, a claim for damages under § 1983 is not rendered moot simply because a related claim for injunctive or declaratory relief becomes moot. *See id.*

Even though plaintiffs' claims for injunctive and declaratory relief are moot, because plaintiffs request damages for a past constitutional violation, the School District's "change in conduct will not moot the case."  *Gottfried v. Med. Planning Servs., Inc.*, 280 F.3d 684, 691 (6th Cir. 2002) (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*,

- 9 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

532 U.S. 598, 608–09 (2001)).  Therefore, plaintiffs' claims for damages under § 1983 remain, and we may proceed to their merits.

III.

Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed . . . a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  We review a district court's judgment on the pleadings under Rule 12(c) de novo, applying the same standard of review as a motion to dismiss under Rule 12(b)(6).  *Boulger v. Woods*, 917 F.3d 471, 478 (6th Cir. 2019).  We must "construe the complaint in the light most favorable to the plaintiffs, accept all of the complaint's factual allegations as true, and decide whether the plaintiffs can prove any set of facts in support of their claims that would entitle them to relief."  *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007).  The factual allegations in the complaint must sufficiently notify the defendant as to what claims are alleged, and the plaintiff must plead "sufficient factual matter" to render the legal claim plausible.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs challenge the district court's grant of judgment on the pleadings to defendants and Roe on plaintiffs' free exercise and Fourteenth Amendment claims.  We address each claim in turn.

A.

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend. I.  The Fourteenth Amendment incorporates the First Amendment's protections against the states.  *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

To implicate the Free Exercise Clause, state action must burden religious exercise.  *Fulton v. City of Philadelphia*, 593 U.S. 522, 532–33 (2021).  Even so, policies that are "neutral and

- 10 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

generally applicable" and only "incidentally burden[] religion" seldom violate the Free Exercise Clause. *Id.* at 533 (citing *Emp. Div. Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 878–82 (1990)). Such laws are subject to rational basis review, meaning the law must be rationally related to a legitimate government interest. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

The Muslim and Christian plaintiffs allege that the School District's bathroom policy burdened the exercise of their religion. Defendants concede that both groups have sincerely held religious beliefs regarding modesty and the separation of the biological sexes that prevent them from sharing bathrooms with the opposite gender. Plaintiffs allege that the School District's bathroom policy burdened their religious exercise because it caused religious students to hold their urine and avoid using the communal bathrooms and undermined religious parents' commitment to keeping their kids from sharing intimate spaces with the opposite sex.

Plaintiffs contend that, under *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025), we must subject the bathroom policy to strict scrutiny, irrespective of whether it was neutral and generally applicable. In *Mahmoud*, Muslim and Christian parents of public-school children challenged a school board's use of LGBTQ+-inclusive books in the kindergarten through fifth-grade elementary school curriculum. *Id.* at 2341, 2347–48. The parents alleged that the use of the books without notice or opt outs unconstitutionally burdened their religious exercise. *Id.*

The Supreme Court acknowledged that "the government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable." *Id.* at 2360. But the Court situated *Mahmoud* in line with *Wisconsin v. Yoder*, 406 U.S. 205 (1972), as an exception to the general rule because "[a] government burdens the religious exercise of parents when it requires them to submit their children to instruction that

- 11 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill." *Mahmoud*, 145 S. Ct. at 2342 (quoting *Yoder*, 406 U.S. at 218). The Court determined that the specific burdens imposed by the "educational requirements or curricular features at issue" were of a "special character" that "substantially interfered with the religious development of the parents' children." *Id.* at 2353, 2361 (citation modified).

The Court further explained that the "substantial interference" inquiry is "fact-intensive" and depends on "the specific religious beliefs and practices asserted," "the specific nature of the educational requirement or curricular feature at issue[,]" including the age of the child, and "the specific context in which the instruction or materials . . . are presented." *Id.* at 2352. Considering the "hostile" nature of the books' messages and the young age of the children at issue, the Court concluded the board's use of LGBTQ+-inclusive books in classroom instruction without any opt-outs substantially interfered with the religious development of parents' children. *Id.* at 2353–56. So, the Court subjected the policy to strict scrutiny without first considering whether the policies were neutral and generally applicable. *Id.*

This exception does not apply here. The bathroom policy does not impose a burden "of the [] same character as the burden in *Yoder*." *Id.* at 2361. Unlike the challenged state law in *Yoder*, which compelled Amish families to send their children to public or private schools, and the curricular requirement in *Mahmoud*, which required elementary school students to attend classes where certain LGBTQ+-inclusive storybooks that "unmistakably convey a particular viewpoint about same-sex marriage and gender" were taught, the bathroom policy was not an educational requirement or curricular feature, and the policy did not require students to use the communal

- 12 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

restrooms. *See id.* at 2352, 2356. In other words, the bathroom policy was neither compulsory nor instructional.[3]

Consequently, as is our usual practice with free exercise challenges, we "ask whether the law at issue is neutral or generally applicable before proceeding to strict scrutiny." *Mahmoud*, 606 U.S. at *22. Plaintiffs argue that the policy disadvantaged religious students, making the policy neither neutral nor generally applicable and thus triggering strict scrutiny. We disagree. Because the policy was neutral and generally applicable, it is subject to rational basis review, which it survives.

### 1.

We first consider if the policy was neutral and generally applicable. A policy is not neutral when it is "intolerant" of religious beliefs or restricts religious practice *because of* its religious nature. *Fulton*, 593 U.S. at 533. Even if a law is facially neutral, it may still lack neutrality if it "targets religious conduct." *Lukumi*, 508 U.S. at 534. When evaluating the neutrality of a policy, we consider factors such as the historical background of the policy, the events leading to its enactment, and any contemporaneous statements by decisionmakers. *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 639 (2018). A policy is generally applicable if

---

[3] The concurring opinion counters that the critical distinction here is the availability of an opt out. The Court, however, fashioned *Mahmoud* in line with *Yoder* as a case where the government required parents to "submit their children to *instruction*" that posed a threat to their religious beliefs. *Mahmoud*, 145 S. Ct. at 2342 (emphasis added). Because *Mahmoud*'s reasoning principally relates to curricular requirements, we are thus unpersuaded that it stands for the broad proposition that strict scrutiny is automatically triggered when a school does not allow religious students to opt out of any school policy that interferes with their religious development, including general operational policies that involve no instruction. And while we are sensitive to the concerns raised by the concurring opinion, our reading of *Mahmoud* does not foreclose relief to religious students raising Free Exercise claims outside the context of the school's curriculum. Consider the concurring opinion's mandatory school lunch hypothetical as an example. A scenario where a school compelled Jewish students to eat non-Kosher lunches would fail *Smith*'s generally applicable requirement: schools could not grant students the inevitable accommodations for dietary restrictions, for example, while denying religious students accommodations for Kosher eating. So, the mandatory lunch policy would nonetheless trigger strict scrutiny.

- 13 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

it does not differentiate between religious and secular conduct. It is not generally applicable when it provides for "individualized exemptions" or "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interest in a similar way." *Fulton*, 593 U.S. at 533–34.

The School District's policy was facially neutral. The policy permitted students to use the communal bathroom that corresponds with their gender identity—it did not refer to religion or religious conduct. As plaintiffs note, the School District adopted the policy "because a majority of its [board] members, based on the advice of legal counsel, believed Title IX required allowing transgender students to use the same restrooms as students of the opposite sex." (Appellant Br. 33.) Plaintiffs therefore acknowledge that the policy was not adopted with any aim of restricting religious practice. *See Lukumi*, 508 U.S. at 534. And by acknowledging the School District's motivation for adopting the policy, plaintiffs concede that the historical background of the policy and the events leading to its enactment also indicate neutrality. *See Masterpiece Cakeshop*, 584 U.S. at 639.

Rather than contend that the School District adopted the policy with the aim of restricting religious practice, plaintiffs argue that the policy was not neutral because the School District "'proceed[ed] in a manner intolerant of religious beliefs' by treating hardships arising from those beliefs as less significant than identical hardships arising from secular beliefs[.]" (Appellant Br. 22 (quoting *Fulton*, 593 U.S. at 533).) We disagree. The policy applied neutrally, without respect to a student's religion. All hardships resulting from the implementation of the policy were treated the same, regardless of whether a student was secular or religious: any student who was uncomfortable using the communal restrooms with a transgender student, regardless of the motivation of that hardship, could use the single occupancy restroom.

- 14 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

The Ninth Circuit recently addressed a similar free exercise challenge to a school district's policy allowing transgender students to use school bathrooms, locker rooms, and showers that correspond with their gender identity. *Parents for Priv. v. Barr*, 949 F.3d 1210, 1217 (9th Cir.), *cert. denied*, 141 S. Ct. 894 (2020). The court concluded the policy was neutral because it did not reference religious conduct or a religious motivation, the policy stated that it was created to support a transgender student, and the complaint lacked any allegation that the school policy "was adopted with the object of suppressing the exercise of religion." *Id.* at 1235. Like the school policy in *Barr*, the School District's policy was neutral.

Alternatively, plaintiffs argue the policy was not generally applicable because it "accord[ed] preferential treatment to secular conduct" by "treat[ing] student choices about the sex of the individuals with whom they share restrooms more favorably when those choices rest on secular beliefs about gender rather than religious beliefs." (Appellant Br. 22–23 (citation omitted).) They largely rely on *Fulton* to support their argument. 593 U.S. at 533.

In *Fulton*, the Supreme Court considered a free exercise challenge to the City of Philadelphia's refusal to continue a foster care placement contract with Catholic Social Services, a foster care agency. 593 U.S. at 527. Catholic Social Services refused to certify same-sex couples as foster parents due to its religious beliefs regarding marriage. That refusal arguably violated the terms of Philadelphia's contracts with foster care agencies, which prohibited agencies from rejecting a child or family based on sexual orientation "unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion." *Id.* at 535 (citation omitted). The Court found that the policy was not generally applicable because it "incorporate[d] a system of individual exemptions, made available . . . at the 'sole discretion' of the Commissioner." *Id.* The Court explained that having put an exemption system in place, the City

- 15 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

could not refuse to extend exemptions "to cases of 'religious hardship' without compelling reason." *Id.* (citation omitted).  Applying strict scrutiny, the Court concluded Philadelphia violated the Free Exercise Clause by refusing to contract with Catholic Social Services.  *Id.* at 542.

Unlike the unconstitutional foster care policy in *Fulton*, the School District's policy was generally applicable—it did not contain any discretionary mechanism for individual exemptions.  It permitted all students, religious and nonreligious students alike, to use the communal restroom corresponding with their gender identity, or, if they were uncomfortable, to use the single occupancy restrooms.

2.

Because the bathroom policy was neutral and generally applicable, it is not subject to strict scrutiny.  *See Fulton*, 593 U.S. at 533.  As such, we review the policy for a rational basis.  Under that standard, we hold that, when it was in effect, the policy was constitutional so long as it was rationally related to a legitimate government purpose.  *See, e.g.*, *Kowall v. Benson*, 18 F.4th 542, 548 (6th Cir. 2021).  Plaintiffs bear the burden "to negat[e] every conceivable basis which might support" the policy.  *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) (citation omitted).

Here, plaintiffs fail to meet their burden.  Defendants proffered the legitimate purpose of complying with Title IX as then interpreted and eliminating sex discrimination, pursuant to the legal advice they had received at the time of the policy's implementation.  Plaintiffs do not dispute that, at the time the policy was in effect, it was rationally related to this purpose.  Accordingly, the policy survives rational basis review.

We, therefore, affirm the district court's grant of judgment on the pleadings to Roe and defendants on plaintiffs' free exercise claim.

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

B.

Next, the parent plaintiffs contend the policy infringed on their Fourteenth Amendment right to direct the upbringing of their children. The Fourteenth Amendment's Due Process Clause contains a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests," including parents' fundamental right to decide the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (internal quotation marks and citations omitted). The right extends to parents' ability to "bring up children" and "to control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923). But it is not without limits: "[t]he power of the State . . . to make reasonable regulations for all schools . . . is not questioned." *Id.* at 402. Generally, parents "do not have a fundamental right [] to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities at the school, or . . . a dress code, these issues of public education are generally committed to the control of state and local authorities." *Blau*, 401 F.3d at 395–96 (citation omitted).

On appeal, the parent plaintiffs specifically argue that the School District infringed on their right to direct the upbringing of their children by (1) modifying the School District's bathroom operations, (2) increasing their children's risk of physical danger, and (3) choosing not to answer questions about implementing the bathroom policy. We are unpersuaded by their arguments, and thus, we affirm the grant of judgment on the pleadings on plaintiffs' Fourteenth Amendment claim.

1.

This court and other circuits have concluded that schools may impose non-academic regulations upon the administration of education without infringing on the fundamental right of a

- 17 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

parent to direct the upbringing of their child. *See Blau*, 401 F.3d at 395–96 (holding parents do not have a substantive due process right to exempt their child from a school dress code); *Skoros v. City of New York*, 437 F.3d 1, 41 (2d Cir. 2006) (holding parents do not have a substantive due process right to prevent a school from displaying religiously diverse holiday decorations without including a creche or nativity); *Barr*, 949 F.3d at 1233 (holding parents do not have a substantive due process right to prevent a school from implementing a policy that allows students to use school facilities that match their gender identity).

In *Blau*, for example, we upheld a school dress code policy, reasoning such public education issues are generally "'committed to the control of state and local authorities.'" 401 F.3d at 395–96 (quoting *Goss v. Lopez*, 419 U.S. 565, 578 (1975)). Like the school's implementation of a dress code policy in *Blau*, the School District's implementation of the bathroom policy merely directed school operations, which is within the control of the state, not individual parents.

The parent plaintiffs rely on *Yoder* to contend that the policy forced students to live in a manner contrary to the moral standards and religious beliefs that they, as parents, have tried to instill in their children. 406 U.S. at 233. But they fail to meet *Yoder*'s high bar. In *Yoder*, the Supreme Court exempted Amish children from compulsory education requirements under state law because the "inculcation" of Amish values—centered on a belief in living apart from the secular world and the ability to raise their children in the Amish community during the children's formative years—would be impossible if Amish parents were forced to send their children to public school. *Id.* at 233–34. In effect, Amish families could not comply with state law while also educating their children according to their religious beliefs. *Id.*

This is not the case here. Students were not forced to use the communal bathrooms. Rather, they had the option to use the single-occupancy restrooms if they found sharing communal

- 18 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

restrooms with a transgender student incompatible with their religious upbringing.  As such, the

bathroom policy did not force students to live in a manner contrary to their moral standards and

religious beliefs.

2.

Next, the parent plaintiffs argue that the policy created risks to the physical safety of their

children, "implicat[ing] the parental 'duty to maintain and protect' one's child."  (Appellant Br.

52.)   They largely fail to develop this claim: they do not cite any incidents within the School

District that gave rise to such safety concerns.  Thus, the parent plaintiffs' claim that the policy

created risks for their students is entirely speculative.  Plaintiffs cite no precedent permitting a

parent's speculative fear of harm to their child to overcome a school district's general authority to

control "issues of public education."  *See Blau*, 401 F.3d at 396.

3.

Finally, the parent plaintiffs, relying on *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000), assert

that schools violate parents' fundamental right to control the upbringing of their children when

they withhold the information necessary for parents to make decisions regarding their child's

upbringing.  In *Gruenke*, a high school swim coach suspected that a student was pregnant.  *Id.* at

296–97.   The coach asked other school employees to speak with the student, discussed the

student's pregnancy with mothers of other students on the swim team, and repeatedly attempted to

get the swimmer to take a pregnancy test.  *Id.*  Once the swimmer took a test and learned she was

pregnant, the coach did not attempt to inform the swimmer's parents or any higher level of the

school's administration.  *Id.*  The Third Circuit held that the parents had demonstrated that the

- 19 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

coach's conduct violated the parents' Fourteenth Amendment right to "bring up their children." *Id.* at 306–07.

The parent plaintiffs analogize to *Gruenke*, contending that School District similarly "arrogat[ed] the parental role" when it did not answer parents' questions about its implementation of bathroom policy, including how the policy applies to adults, to overnight trips, and to students of different ages. Contrary to the parent plaintiffs' arguments, this case is not like *Gruenke*. In *Gruenke*, the coach withheld information from the parents regarding a "private family matter"— their child's pregnancy—while actively gossiping about it with other members of the school community. *Id.* at 306. The parents argued their child's pregnancy was a "family crisis," and the school "obstruct[ed] the parental right to choose the proper method of resolution." *Id.*

Here, by contrast, the parents argue that the School District was unresponsive regarding information about generally applicable School District policies, not that it intruded into a private matter of family concern. And schools have the power to direct their operations. *See id.* at 304 (noting that "school authorities . . . may impose standards of conduct on students that differ from those approved by some parents"). Plaintiffs point to no case holding that parents have a fundamental right to all the information they desire regarding a school's operational policies. A school district's expedient responsiveness to parental concerns about the district's general operational policies may be a matter of local concern, but such responsiveness is not required by the Due Process Clause.

IV.

Lastly, plaintiffs allege that the bathroom policy violated Article I, § 7 of the Ohio Constitution, which they claim provides greater protections for the free exercise of religion. The district court declined to exercise supplemental jurisdiction over this claim once it dismissed

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

plaintiffs' federal claims. We review that decision for abuse of discretion. *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010).

A district court "may decline to exercise supplemental jurisdiction over a claim" grounded in state law if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Here, after either dismissing or granting judgment on the pleadings on all of plaintiffs' federal claims, the district court declined to exercise supplemental jurisdiction over their state law claims. We find no compelling reason to depart from our usual practice and affirm the district court's decision to decline exercising supplemental jurisdiction over plaintiffs' claims under the Ohio Constitution. *See Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims[.]").

V.

For the foregoing reasons, we affirm.

- 21 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

LARSEN, Circuit Judge, concurring in part and concurring in the judgment. I agree with the majority opinion that plaintiffs' claims for declaratory and injunctive relief are moot and that plaintiffs' parental rights claim fails. I also agree with the conclusion that plaintiffs' free exercise claim fails because Bethel's restroom policy operated neutrally and with general applicability; and *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025), which the Supreme Court decided after the parties argued this case, does not command strict scrutiny here. But I question whether the majority has read *Mahmoud* too narrowly. So I write separately to explain my views on the case.

In *Mahmoud*, Muslim and Christian parents sued to enjoin Montgomery County Public Schools (MCPS) from enforcing a policy that introduced "'LGBTQ+-inclusive' storybooks" into the elementary-school curriculum and prohibited parents from opting their children out of instruction involving the storybooks. *Id.* at 2341, 2349. After MCPS added the books to the curriculum, some parents expressed concerns. *Id.* at 2345–46. At first, MCPS allowed objecting parents to excuse their children from "instruction involving the books." *Id.* at 2346. But MCPS soon reneged and announced that objecting parents could no longer opt their children out. *Id.* And despite a petition signed by more than 1,000 parents, MCPS held firm. *Id.* So a group of religious parents sued, alleging, among other things, "that the Board's no-opt-out policy infringed their right to the free exercise of their religion." *Id.* at 2349.

The Supreme Court ruled for the parents. Its decision made two things clear. First, the Court held that the parents had established a substantial burden on their free-exercise rights: "the Board's introduction of the 'LGBTQ+-inclusive' storybooks—combined with its decision to withhold notice to parents and to forbid opt outs—substantially interfere[d] with the religious development of their children." *Id.* at 2353. That interference burdened the parents' rights to raise their children in accordance with their faith—a right which the Court made clear extends "into the

- 22 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

public school classroom." *Id.* at 2351. In reaching that conclusion, the Court relied heavily on its previous decision in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and to a lesser extent on its decision in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943). Drawing on these cases, the Court explained that both "direct coercion" and "more subtle forms of interference" alike can impose substantial burdens on parents' rights to direct the religious lives of their children. *Mahmoud*, 145 S. Ct. at 2352. The Court reasoned that instruction involving the storybooks was "targeted at young children," "unmistakably normative," and "clearly designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected." *Id.* at 2353. In other words, the mandatory instruction pressured impressionable children in a manner that threatened to undermine "the religious beliefs that the parents wish to instill in their children." *Id.* at 2355.

Second, the Court held that the burden imposed on the parents triggered strict scrutiny. *Id.* at 2361. In the ordinary case, the Court has told us that we should apply rational-basis review to neutral and generally applicable laws that substantially burden free exercise rights. *See Emp. Div., Dept. of Hum. Res. v. Smith*, 494 U.S. 872, 881 (1990). But in *Mahmoud*, the Court made clear that when a free-exercise burden is "of the same character as that imposed in *Yoder*," strict scrutiny applies "regardless of whether the law is neutral or generally applicable." 145 S. Ct. at 2361. So before applying *Smith*'s framework, we must ask whether Bethel's policy is "of the same character as that in *Yoder*" and *Mahmoud*. I agree with the majority's conclusion: the answer is "no." Therefore, *Smith* governs; and I further agree with the majority's conclusion that Bethel's policy was neutral and generally applicable.

But as to *why* the burden here is not sufficiently *Yoder*-like as to trigger strict scrutiny, I am not sure I agree. The majority holds that the *Mahmoud-Yoder* exception to *Smith* applies only to

- 23 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

burdens imposed by "educational requirements or curricular features" that are "compulsory" and "instructional." Maj. Op. at 12–13. But the majority's analysis is at least contestable.

I'll start with what I see as the best case for the majority's reading of *Mahmoud*. Principally, it is that *Mahmoud* speaks of "educational requirement[s] or curricular feature[s]" throughout the opinion. *See, e.g.*, 145 S. Ct. at 2353, 2356–57, 2363. So perhaps the Court's repetitious language is meant to reflect contextual limits on when a *Yoder*-like burden may arise. Add to this that much of *Mahmoud*'s discussion of whether a law will "substantially interfere" with a parent's right appears to be curriculum-specific. For instance, the Court mentions as relevant factors the following: whether the "instruction or materials at issue" are presented neutrally or "in a manner that is hostile to religious viewpoints and designed to impose upon students a pressure to conform"; the age of the child; and the "specific nature of the educational requirement or curricular feature at issue." *Mahmoud*, 145 S. Ct. at 2353 (internal quotation marks and citation omitted). Some of those factors don't neatly map onto an analysis of whether non-curricular school rules likewise burden a parent's free exercise right. So perhaps the majority opinion has correctly read *Mahmoud*.

But there are reasons for doubt. First, *Mahmoud* itself never limits its reach to "educational requirements or curricular features" or any other category of school regulation. Instead, *Mahmoud* describes the First Amendment broadly: it prevents both "policies that *compel* children to depart from the religious practices of their parents" and "policies that impose more subtle forms of interference." *Id.* at 2352 (emphasis in original). So the Court's discussion of educational and curricular features might simply reflect the factual contexts of *Mahmoud* and *Yoder* (and *Barnette*) without intentionally limiting the universe of school rules that may impose *Yoder*-like burdens.

- 24 -

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

Moreover, the ultimate question *Mahmoud* poses is whether a school policy "substantially interfere[s] with the religious development of the child or pose[s] a very real threat of undermining the religious beliefs and practices the parent wishes to instill in the child." *Id.* at 2356 (citation modified). All sorts of non-curricular school rules—which aren't clearly "educational"—can interfere with parents' religious upbringing of their children. Imagine, for example, a school that provides free school lunch to all students, regardless of income, to remove the stigma associated with accepting free or reduced-price meals. If the school neither provided Kosher meals nor permitted parents to pack brown-bag lunches, that might well impose a *Yoder*-like burden on Jewish parents and students, even though the policy would neither be obviously "educational" nor involve the curriculum. If the school cannot require Jewish students to read books "designed to" undermine their commitment to keeping Kosher, why would the school be able to more directly compel them to eat a grilled ham and cheese?[1] *Id.* at 2353.

*Mahmoud*'s rejection of the Fourth Circuit's reasoning also suggests that a broader reading may be appropriate. The Fourth Circuit had reasoned that public school curriculum choices merely regulate the government's *internal* affairs. *See Mahmoud v. McKnight*, 102 F.4th 191, 205, 212 (4th Cir. 2024) (citing *Bowen v. Roy*, 476 U.S. 693 (1986) and *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 476 U.S. 693 (1986)). But the Court rejected that reasoning. *Mahmoud*, 145 S. Ct. at 2356–57. Public schools, the Court said, "impose[] rules and standards of conduct" which bind students, and schools may "discipline [students] for misconduct." *Id.* at 2357. The operation of public schools "implicates direct, coercive interactions between the State and its young

---

[1] The majority's contention that a school's "inevitable accommodations for dietary restrictions" would cause this policy to violate *Smith* is beside the point. Maj. Op. at 13 n.3. I doubt that every non-curricular, generally applicable school policy will have inevitable exceptions. But if I am wrong about that, then it doesn't seem to matter much whether *Mahmoud*'s straight-to-strict scrutiny approach is limited to "curricular or educational" requirements, as the majority opinion posits. Strict scrutiny would apply to both "educational" and "non-educational" school policies that substantially burden religion in any event.

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

residents." *Id.* Thus, their operation "is not a matter of 'internal affairs' akin to the administration of Social Security or the selection of 'filing cabinets.'" *Id.* (quoting *Bowen*, 476 U.S. at 700).

By placing bathroom policies categorically outside of *Mahmoud*'s reach because they are not curricular, the majority's analysis may be repeating the Fourth Circuit's mistake in all but name. Just like the mandatory instruction in *Mahmoud*, compulsory school attendance in *Yoder*, or the compelled flag salute in *Barnette*, a policy regulating which restrooms students may (or may not) use certainly regulates student conduct. And it's not immediately apparent why the fact that the regulation is not strictly confined to the *classroom* ought to make a difference. Whether a policy applies in the school classroom, lunchroom, or restroom, it may still substantially interfere with parents' rights to instill in their children the principles of their faith. *Mahmoud* says the Free Exercise Clause "would be an empty promise if it did not follow . . . children into the public school classroom." 145 S. Ct. at 2351. But it's not obvious why the same would not be true were the Clause's protections to stop once the child walks down the hallway.

Ultimately, however, there is no need to decide whether *Mahmoud* reaches beyond the classroom. The answer is not obvious; the parties did not brief it; and the answer does not change the result. Even assuming that *Mahmoud* reaches bathroom policies, the particular features of Bethel's policy distinguish the burden here from those in *Yoder* and *Mahmoud*. Critically, Bethel's restroom policy gave objecting parents the very thing the *Yoder* and *Mahmoud* parents were denied: an opt out. So I concur in the judgment.

*Mahmoud* made clear that the "LGBTQ+-inclusive" instruction "*combined with*" the lack of both parental notice and the ability to opt out burdened parents' rights. *Id.* at 2353 (emphasis added). The plaintiffs in *Yoder* and *Barnette* also lacked an "opt out." The Amish parents in *Yoder* faced criminal sanction for failure to comply with Wisconsin's compulsory-education law, *see* 406

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

U.S. at 208, and the flag salute in *Barnette* was compelled, *see* 319 U.S. at 626. So I know of no case in which the Court has held that a government policy which *allows* religious objectors to "opt out" of the instruction or activity at hand nevertheless triggers strict scrutiny, regardless of whether the policy is neutral and generally applicable.

In this case, Bethel's policy allowed religious students to "opt out" by using single-stall restrooms instead of the communal ones to which they objected. That important fact distinguishes this case from both *Yoder* and *Mahmoud*. I do not discount the possibility that some so-called opt outs might themselves create a burden comparable to those in *Mahmoud* and *Yoder*, triggering strict scrutiny. For instance, imagine that MCPS had allowed students to opt out of instruction involving the LGBTQ+-inclusive material but required opt-outers to clean the school's toilets instead. Surely, we would recognize that Hobson's Choice for what it is. Indeed, such an arrangement would likely appear motivated by a hostility "to religious viewpoints and designed to impose upon students a 'pressure to conform.'" *Mahmoud*, 145 S. Ct. at 2353 (quoting *Yoder*, 145 S. Ct. at 2353). So that government policy—despite technically containing an opt out—might well fit within the *Mahmoud-Yoder* exception.[2] But here, plaintiffs do not allege that the "less convenient" or "not truly workable" quality of the opt out was in any sense motivated by hostility towards their religious views. R. 1, Compl., PageID 11; Appellant Br. at 4. Indeed, plaintiffs admit that the Board adopted the bathroom policy based on "bad [legal] advice [regarding Title IX], and for no other reason." Appellant Br. at 3–4.

*Mahmoud* emphasized that its rule was not intended to give either courts or parents "substantive control over the curriculum." 145 S. Ct at 2363. That must also be true for

---

[2] That hypothetical policy would likely flunk *Smith*'s neutrality requirement as well. *See, e.g.*, *Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 584 U.S. 617 (2018).

No. 23-3740, *Doe et al., v. Bethel Local Sch. Dist. Bd. of Educ., et al.*

non-curricular school policies—like which students may use which restrooms.  Instead, elected legislatures and school boards decide school policy.  *Id.*  So long as they offer religious parents an "opportunity for opt outs," the Free Exercise Clause poses no barrier.  *Id.*  Because Bethel has done that here, plaintiffs have not alleged a *Yoder*-like burden.

One final note: plaintiffs' complaint alleged that Bethel students "must complete assignments promoting LGBTQ+ beliefs," including a "reading assignment testing the student's 'comprehension' of a story about a queen who wanted to be a king and her noble struggle to be accepted as a boy."  R. 1, Compl., PageID 13.  The parents alleged that they "had no idea this was occurring" because the school "did not provide them prior notice and an opportunity to opt their child out of this and other similar assignments."  *Id.*  Those allegations sound eerily familiar to *Mahmoud*.  But plaintiffs' appellate briefing made no mention of these curricular allegations. Instead, plaintiffs on appeal challenge *only* Bethel's now-defunct restroom policy rather than these curricular requirements.

* * *

For these reasons, I concur in part and concur in the judgment.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-3740

JOHN AND JANE DOE NO. 1, et al.,

    Plaintiffs - Appellants,

      v.

BETHEL LOCAL SCHOOL DISTRICT BOARD OF
EDUCATION, et al.,

    Defendants - Appellees.

```
┌─────────────────────────────────┐
│             FILED               │
│          Aug 26, 2025           │
│   KELLY L. STEPHENS, Clerk      │
└─────────────────────────────────┘
```

Before: MOORE, COLE, and LARSEN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Dayton.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____

Kelly L. Stephens, Clerk